# In The
# United States Court Of Appeals
# For The Federal Circuit

## INFO-HOLD, INC.,

*Plaintiff-Appellant,*

v.

## MUZAK LLC,

*Defendant-Appellee.*

**Appeal from the United States District Court for the Southern District of Ohio in case no. 11-cv-00283, Judge Timothy S. Black.**

———————————

## NON-CONFIDENTIAL JOINT APPENDIX

———————————

**James L. Kwak**
**STANDLEY LAW GROUP LLP**
**6300 Riverside Dr.**
**Dublin, OH 43017**
**(614) 792-5555**

*Counsel for Appellant*

**Barry E. Bretschneider**
**Michael E. Anderson**
**Bridget S. Merritt**
**BAKER & HOSTETLER LLP**
**1050 Connecticut Ave., N.W.**
**Washington Square**
**Washington, DC 20036**
**(202) 861-1500**

*Counsel for Appellee*

**Daniel J. Wood**
**INFO-HOLD, INC.**
**4120 Airport Rd.**
**Cincinnati, OH 45226**
**(513) 248-5600**

*Counsel for Appellant*

**Kevin W. Kirsch**
**BAKER & HOSTETER LLP**
**312 Walnut Street Suite 3200**
**Cincinnati, OH 45202**
**(513) 929-3499**

*Counsel for Appellee*

# TABLE OF CONTENTS
## Volume I of III

PAGE

**Protective Order of the**
**United States District Court for the**
**Southern District of Ohio,**
**With Attached Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-i**

**Order on Claim Construction of**
**The Honorable Timothy S. Black (Dkt. No. 60)**
        **filed September 10, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A1**

**Order of**
**The Honorable Timothy S. Black**
**Denying Defendants' Motion for Reconsideration and**
**Denying Plaintiff's Motion for Reconsideration (Dkt. No. 74)**
        **filed November 6, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A12**

**Order of**
**The Honorable Timothy S. Black**
**Denying Plaintiff's Motion for Leave to**
**File First Amended and Supplemental Complaint (Dkt. No. 77)**
        **filed November 14, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A17**

**Stipulation of Judgment of
Non-Infringement of '374 Patent Claims 7-11,
14-18, 20-22, 26-29, 37 and 38, (Dkt. No. 88),
With Exhibit,**
      filed November 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A23

      <u>Exhibit A</u>:

      **Plaintiff's Updated Responses to Defendants' Second Set of
      Requests for Admission**
            dated November 2, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A27

**SEALED Order of
The Honorable Timothy S. Black
Granting Defendants' Motion for Partial Summary Judgment
Limiting Damages to Those Accrued After May 3, 2011
(Dkt. No. 125)**
      filed February 6, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A32

**SEALED Order of
The Honorable Timothy S. Black
Granting Defendants' Motion for Partial Summary Judgment on
Info-Hold's Claims of Inducement of Infringement Against
Muzak Holdings LLC and Muzak LLC and Dismissing
Muzak Holdings LLC From the Case (Dkt. No. 126)**
      filed February 6, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A50

**Order of
The Honorable Timothy S. Black
Granting Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to Injunctive Relief
(Dkt. No. 139)**
      filed March 4, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A61

**Order of**

**The Honorable Timothy S. Black**

**Granting Defendant's Motion for Partial Summary Judgment that**

**Plaintiff Info-Hold is not Entitled to Lost Profits Damages**

**(Dkt. No. 141)**

> **filed March 8, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A63**

**Order of**

**The Honorable Timothy S. Black**

**Denying Plaintiff's Motions for Reconsideration (Dkt. No. 203)**

> **filed August 20, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A70**

**Order of**

**The Honorable Timothy S. Black**

**Granting Defendant's Motion to Strike the Expert Reports of**

**Robert L. White and to Preclude Mr. White's Testimony and**

**Granting Defendant's Motion for Partial Summary Judgment that**

**Plaintiff Info-Hold is not Entitled to Reasonable Royalty Damages**

**(Dkt. No. 204)**

> **filed August 20, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A78**

**Order of**

**The Honorable Timothy S. Black**

**Denying Plaintiff's Motion for Reconsideration and**

**Entering Final Judgment Against Plaintiff (Dkt. No. 210)**

> **filed November 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A91**

**Judgment in a Civil Case (Dkt. No. 211)**

> **filed November 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A100**

**U.S. Patent No. 5,991,374**

> **dated November 23, 1999** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A101**

Excerpts of U.S. Patent No. 5,991,374 Reexamination File History
     various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A361

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1020

Complaint and Jury Demand, (Dkt. No. 1),
     filed May 3, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1053

Answer and Counterclaim of Defendants
Muzak Holdings LLC and Muzak LLC to the Complaint
(Dkt. No. 5)
     filed June 17, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1062

Excerpts of S.D. Ohio Pat. R. 105.2
Joint Claim Construction Submission (Dkt. No. 31)
     filed March 22, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1086

Excerpts of Defendants' Brief in Support of
Proposed Claim Constructions, (Dkt. No. 40)
With Selected Exhibit,
     filed June 8, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1424

    Exhibit:

    Excerpts of Exhibit C
    Amendments to the Claims
       dated March 10, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1534

Excerpts of Plaintiff's Opening Claim Construction Brief
Pursuant to Local Patent Rule 105.4, (Dkt. No. 41)
     filed June 8, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1565

Excerpts of Plaintiff's Response to Defendant's Brief in Support of
Claim Construction, (Dkt. No. 46)
      filed July 6, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1636

Excerpts of Plaintiff's Response to Defendant's
Markman Hearing Brief (Dkt. No. 55)
      filed August 17, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1841

Excerpts of Motion of Defendants Muzak Holdings LLC and
Muzak LLC for Partial Summary Judgment on
Info-Hold's Claims of Inducement of Infringement
Against Muzak Holdings LLC and Muzak LLC and
Dismissing Muzak Holdings LLC from the Case (Dkt. No. 89)
      filed December 3, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2515

Excerpts of SEALED Memorandum in Support of Defendants
Muzak Holdings LLC and Muzak LLC for
Partial Summary Judgment on Info-Hold's Claims of
Inducement of Infringement Against Muzak Holdings LLC and
Muzak LLC and Dismissing Muzak Holdings LLC from the Case
(Dkt. No. 92)
      filed December 3, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2520

Selected Exhibits to SEALED Declaration of Bridget S. Merritt in
Support of Motion of Defendants Muzak Holdings LLC and
Muzak LLC for Partial Summary Judgment on
Info-Hold's Claims of Inducement of Infringement
Against Muzak Holdings LLC and Muzak LLC and
Dismissing Muzak Holdings LLC from the Case
      filed December 3, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2536

Excerpts of SEALED Statement of Undisputed Material Facts
In Support of Motion of Defendants Muzak Holdings LLC and
Muzak LLC for Partial Summary Judgment on
Info-Hold's Claims of Inducement of Infringement
Against Muzak Holdings LLC and Muzak LLC and
Dismissing Muzak Holdings LLC from the Case
filed December 3, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2754

# TABLE OF CONTENTS
## Volume II of III

PAGE

Excerpts of Plaintiff Info-Hold, Inc.'s Response in Opposition to
Muzak's Motion for Partial Summary Judgment on Damages,
(Dkt. No. 96),
With Selected Exhibits,
 filed December 13, 2012 ................................. A2797

Exhibits:

Exhibit D
Transcript of Phone Call between
Mike Zendan and Dan Wood
 undated ......................................... A2812

SEALED Exhibit E
Settlement and Patent License Agreement between
Info-Hold, Inc. and Trusonic, Inc.
 dated September 18, 2009 ......................... A2821

Exhibit G
Letter to Daniel Wood from Joseph Corrado
 dated May 9, 2011 ................................ A2878

Exhibit I
Email to Mike Zendan from Daniel Wood,
Bates No. IH008083-IH008091
 dated June 27, 2006 ............................... A2883

Excerpts of Plaintiff, Info-Hold, Inc.'s Response in Opposition to
Memorandum in Support of Defendants
Muzak Holdings LLC and Muzak LLC for
Partial Summary Judgment on Info-Hold's Claims of
Inducement of Infringement Against Muzak Holdings LLC and
Muzak LLC and Dismissing Muzak Holdings LLC from the Case,
(Dkt. No. 101),
With Selected Exhibits,
          filed December 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3184

     Exhibits:

     Exhibit G
     Muzak Client List
          dated December 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3228

     Exhibit H
     Muzak LLC Invoice to Royal Farms Corporate
          dated October 12, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3231

     Exhibit I
     Information on Muzak Encompass Solutions
          undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3233

Response by Plaintiff, Info-Hold, Inc. to Muzak's
Proposed Undisputed Facts and Statement of
Disputed Issues of Material Fact (Dkt. No. 110)
          filed January 11, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3288

Motion of Defendants Muzak Holdings LLC and
Muzak LLC for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to Lost Profits Damages
(Dkt. No. 116)
    filed January 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3328

Exhibit to SEALED Reply in Support of Motion of Defendants
Muzak Holdings LLC and Muzak LLC for
Partial Summary Judgment that Plaintiff Info-Hold is Not
Entitled to Lost Profits Damages, (Dkt. No. 140),
    filed March 5, 2013:

    Exhibit:

    SEALED Exhibit 3
    Excerpt of Rebuttal Report of Robert L. White [AEO]
        dated February 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . A3630

Excerpts of Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to Reasonable Royalty
Damages and for Dismissal (Dkt. No. 160)
    filed April 29, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3775

Excerpts of Memorandum in Support of
Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to Reasonable Royalty
Damages and for Dismissal, (Dkt. No. 160),
With Attached Proposed Order,
    filed April 29, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3778

Excerpts of Defendant's Motion to Strike the Expert Reports of
Robert L. White and to Preclude Mr. White's Testimony,
(Dkt. No. 162),
With Attached Proposed Order,
    filed April 29, 2013 ...................................... A3810

Excerpts of SEALED Memorandum in Support of
Defendant's Motion to Strike the Expert Reports of
Robert L. White and to Preclude Mr. White's Testimony
    filed April 29, 2013 ...................................... A3823

Selected SEALED Exhibits to Declaration of Barry Bretschneider in
Support of Defendant's Motion to Strike the Expert Reports of
Robert L. White and to Preclude Mr. White's Testimony,
    filed April 29, 2013 ...................................... A3861

SEALED Plaintiff Info-Hold's *Daubert* Motion to
Strike the Damages Expert Reports of David Paris,
With Selected Exhibits,
    filed April 29, 2013 ...................................... A4110

    Exhibits:

    Excerpts of SEALED Exhibit 1
    Rebuttal Expert Report of David N. Paris,
    With Exhibits,
        dated January 18, 2013 ............................. A4159

    SEALED Exhibit 3
    Transcript of Deposition of David N. Paris
        taken April 4, 2013 ................................ A4215

SEALED Plaintiff Info-Hold's *Daubert* Motion to
Strike the Damages Expert Reports of David Paris,
With Selected Exhibits,
 filed April 29, 2013, Continued:

<u>Exhibits, Continued:</u>

SEALED Exhibit 4
Settlement and Patent License Agreement between
Info-Hold, Inc. and Trusonic, Inc.
 dated September 18, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . A4355

SEALED Exhibit 5
Declaration of Joey Hazenfield
 dated April 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4402

SEALED Exhibit 6
Assignment Regarding Ownership of
U.S. Patent No. 5,991,374
 dated October 24, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . A4405

SEALED Exhibit 7
Excerpts of Deposition Transcript of Joey Hazenfield
 taken December 4, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . A4409

# TABLE OF CONTENTS
## Volume III of III

PAGE

**Selected Exhibit to SEALED Plaintiff's Motion and Supporting Memorandum for Partial Reconsideration of the Court's Order on Defendant's Motion for Partial Summary Judgment on Lost Profit Damages, (Dkt. No. 168)**
> filed May 1, 2013:

> Exhibit:

> **SEALED Exhibit K**
> **Excerpt of Plaintiff Info-Hold, Inc.'s Responses to Defendants' First Set of Interrogatories**
>> dated December 15, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4478

SEALED Plaintiff Info-Hold's Memorandum in Opposition to
Muzak's Motion for Partial Summary Judgment that
Info-Hold is Not Entitled to Reasonable Royalty Damages and
For Dismissal,
With Exhibits,
    filed May 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4539

    Exhibits :

    Excerpts of SEALED Exhibit A
    Plaintiff Info-Hold's Response to
    Muzak's Proposed Undisputed Facts in Support of
    Muzak's Motion for Partial Summary Judgment that
    Plaintiff Info-Hold is Not Entitled to Reasonable
    Royalty Damages and for Dismissal
    With Exhibits,
        dated May 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4548

    SEALED Exhibit B
    Rebuttal Expert Report of David N. Paris, With Exhibits,
        dated January 18, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4663

    SEALED Exhibit C
    Selected Muzak Financial Documents,
    Bates Nos. MUZ007074, MUZ006416,
    MUZ007017, MUZ006403
        various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4746

    SEALED Exhibit D
    Assignment Regarding Ownership of
    U.S. Patent No. 5,991,374
        dated October 24, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4788

SEALED Plaintiff Info-Hold's Memorandum in Opposition to
Muzak's Motion for Partial Summary Judgment that
Info-Hold is Not Entitled to Reasonable Royalty Damages and
For Dismissal,
With Exhibits,
     filed May 23, 2013, Continued:

     <u>Exhibits Continued</u> :

SEALED Exhibit E
     Settlement and Patent License Agreement between
     Info-Hold, Inc. and Trusonic, Inc.
          dated September 18, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . A4792

Excerpts of
SEALED Defendant's Memorandum in Opposition to
Info-Hold's *Daubert* Motion to Strike the
Damages Expert Reports of David Paris,
With Selected Exhibits,
     filed May 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4838

     <u>Exhibits:</u>

     SEALED Exhibit A
     Excerpts of Report of Robert L. White, CPA . . . . . . . . . . . . . . . A4860

     SEALED Exhibit B
     Excerpts of Deposition Transcript of Thomas M. Jacobs
          taken April 2, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4862

Excerpts of SEALED Plaintiff Info-Hold's
Memorandum in Opposition to
Muzak's Motion to Strike the Expert Reports of
Robert L. White and to Preclude Robert White's Testimony
     filed May 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4875

Excerpt of Defendant's Reply to Plaintiff's Opposition to
Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to
Reasonable Royalty Damages and for Dismissal (Dkt. No. 185)
     filed June 6, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4927

Excerpt of SEALED Defendant's Reply to Info-Hold's Opposition to
Motion of Defendant Muzak LLC to Strike the
Expert Reports of Robert L. White and to
Preclude Mr. White's Testimony
     filed June 6, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4946

Excerpt of Info-Hold, Inc.'s Motion for Reconsideration of
Order Granting Defendant's Motion to Strike the
Expert Reports of Robert L. White and to
Preclude Mr. White's Testimony and Granting
Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to
Reasonable Royalty Damages (Dkt. No. 205)
     filed September 11, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4966

Excerpt of Info-Hold, Inc.'s Memorandum Showing Cause Why
Final Judgment Should Not be Entered Against It (Dkt. No. 206)
     filed September 11, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4982

Excerpt of Defendant Muzak LLC's Reply to
Info-Hold, Inc.'s Memorandum Showing Cause Why
Final Judgment Should Not be Entered Against It (Dkt. No. 207)
    filed September 13, 2013 ................................ A4987

Excerpts of Defendant's Opposition to Info-Hold's Motion for
Reconsideration of Order Granting Defendant's Motion to
Strike the Expert Reports of Robert L. White and to
Preclude Mr. White's Testimony and Granting
Defendant's Motion for Partial Summary Judgment that
Plaintiff Info-Hold is Not Entitled to
Reasonable Royalty Damages (Dkt. No. 208)
    filed October 4, 2013 ................................... A4994

<u>Nonprecedential Opinions</u>:

*Scipio, et al. v. Sony Music Entertainment, Inc., et al.,*
    173 Fed. Appx. 385 (6th Cir. March 3, 2006) ................. A5010

*Lativafter Liquidating Trust v.*
*Clear Channel Communications, Inc.,*
    345 Fed. Appx. 46 (6th Cir. August 18, 2009) ............... A5024

*Lidochem, Inc. v. Stoller Enterprises, Inc.,*
    500 Fed. Appx. 373 (6th Cir. September 12, 2012) ............ A5031

*Smith & Nephew, Inc. v. Arthrex, Inc.,*
    502 Fed. Appx. 945 (Fed. Cir. January 16, 2013) ............. A5048

*Unicom Monitoring, LLC v. Cencom, Inc.,*
2013 WL 1704300 (D. NJ April 19, 2013) . . . . . . . . . . . . . . . . . . . A5055

*McGuire v. Michigan Department of Community Health, et al.,*
526 Fed. Appx. 494 (6th Cir. May 9, 2013) . . . . . . . . . . . . . . . . . . . A5065

## <u>STATEMENT REGARDING NATURE OF CONFIDENTIAL<br>MATERIAL OMITTED</u>

Materials have been omitted from the Non-Confidential volume of the Joint Appendix because said materials constitute confidential information of Plaintiff Info-Hold, Inc., Muzak LLC and third party entities regarding their proprietary business and financial information. The documents filed under seal with the District Court contain a confidential license agreement, confidential royalty base figures, confidential reasonable royalty calculations and confidential business documents. These materials also contain Orders filed under seal by the District Court. The materials are subject to the District Court's Local Default Protective Order.

# APPENDIX A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |  |
|---|---|---|
|  | : | CASE NO. _____ |
|  | : |  |
| PLAINTIFF, | : | [JUDGE _____] |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| DEFENDANT. | : |  |
|  | : |  |

## PROTECTIVE ORDER

The Court recognizes that disclosure and discovery activity are likely to arise that will require the disclosure of trade secrets, confidential research, development, manufacturing, financial, process, marketing, and business information, or other commercial information within the meaning of Federal Rule of Civil Procedure 26(c). Good cause exists to protect this information from public disclosure.  In the absence of a suitable protective order safeguarding the confidentiality of such information, the parties would be hampered in their ability to produce such information.

Accordingly, the Court **ORDERS** that the parties shall adhere to the following:

## 1.    DESIGNATION OF PROTECTED MATERIAL

1.1    This Order shall govern all documents and other products of discovery obtained by the parties from one another, and from third parties, all information copied or derived therefrom, as well as all copies, excerpts, summaries or compilations thereof,

including documents produced pursuant to requests authorized by the Federal Rules of

Civil Procedure, answers to interrogatories, deposition transcripts, responses to

requests for admission, affidavits, declarations, expert reports, and other such material

and information as may be produced during the course of this litigation.

      1.2     In connection with discovery proceedings in this action, any party or third

party may designate any non-public document, material, or information as

"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY"

(collectively referred to as "Protected Material").

      (a)     A party may designate as "CONFIDENTIAL" any information,

document, or thing that the party reasonably and in good faith believes to contain

confidential information within the meaning of Fed. R. Civ. P. 26(c)(7) used by it

in, or pertaining to, its business and that is not generally known, and which that

party would not normally reveal to third parties or, if disclosed, would require

such third parties to maintain in confidence.

      (b)     A party may designate as "HIGHLY CONFIDENTIAL – ATTORNEY

EYES ONLY" such materials as the party reasonably and in good faith believes

to contain particularly sensitive technical information relating to research for and

production of current products; technical, business, and research information

regarding future products; non-public and highly sensitive financial information;

marketing and sales information, such as marketing plans and forecasts,

customer lists, pricing data, cost data, customer orders, and customer

quotations; any pending or abandoned patent applications, foreign or domestic;

and such other documents, information, or materials that relate to other

**A-ii**

proprietary information that the designating party reasonably believes is of such nature and character that disclosure of such information would be harmful to the designating party.

1.3    The following information shall not be designated or protected under this Protective Order:

(a)    Information that is in the public domain at the time of disclosure, including patent file histories, publicly available prior art publications, catalogs and other advertising materials, press releases, and publicly-filed financial statements;

(b)    Information that at any time is made public through no act of a non-designating party;

(c)    Information that the designating party has not undertaken with others to maintain in confidence and that is in the possession of or becomes available to the receiving party other than through discovery in this action, but only if the receiving party can show by written documentation that the information independently came into its rightful possession; or

(d)    Information that is independently developed by the receiving party, as reflected by written documentation demonstrated to be in existence prior to production by the party claiming confidentiality.

1.4    Any documents or things produced pursuant to a discovery request or other written materials exchanged by the parties (including discovery responses, letters, and briefs) that a party desires to designate as Protected Material shall be so designated by marking each page of the document, paper or thing CONFIDENTIAL or

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY, as appropriate, and indicating the identity of the producing party (e.g., through the use of an identifying prefix to the document identification (Bates) number).

1.5     In the event a party may make available certain of its files for inspection by another party, which files may contain non-confidential material as well as material that may be subject to protection under this Protective Order, with the intent that following such inspection the inspecting party will designate certain of the inspected documents to be copied and furnished to it, such files need not be marked with either confidentiality designation in advance, but shall all be treated as HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY materials.  Only those persons identified in paragraph 2.2 below as permitted to view HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY materials may be present at any such inspection.  When the producing party copies the documents to furnish to the inspecting party, the producing party shall mark Protected Material with the appropriate confidentiality designation to the extent warranted under paragraph 1.2.

1.6     Whenever a deposition involves a disclosure of Protected Material, the following procedures shall apply:

(a)     Any party may designate any portion or all of a deposition as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY by notifying the other parties on the record during the deposition.  The Court Reporter shall be asked to make the appropriate confidentiality designation on each page of the transcript that contains CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY information.  At that time, all

persons not qualified to receive that category of information shall leave the room prior to continuation of the deposition and until the conclusion of such designated testimony;  and

(b)      Any party may also designate any portion or all of a deposition as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY by notifying the other parties separately in writing within thirty days of receipt of the transcript.  In such event, the parties shall confer as to the most convenient way to segregate the designated portions of the transcript.  All information disclosed at a deposition and all information contained in deposition transcripts shall be treated as HIGHLY CONFIDENTIAL  – ATTORNEY EYES ONLY for a period of thirty days after the receipt of the transcript to permit adequate time for review of the transcript and notice to other counsel regarding any designation as Protected Material by a designating party.

## 2.      ACCESS TO AND USE OF PROTECTED MATERIAL

2.1     Protected Material, and all summaries, compilations, and derivations thereof, whether oral or written, shall be maintained in confidence, shall be used solely in the preparation, prosecution, or trial of this action and not for any other purpose, and shall be disclosed only as provided in the following paragraphs.

2.2     Information which has been designated as HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY may be disclosed only to:

(a)      The outside attorneys of record and their employees who are engaged in assisting in this action; provided that such does not include any persons participating in the prosecution of any present or future patent

16

**A-v**

application (including the reexamination or reissue of any present or future patent) that is a counterpart to or related to the patents-in-suit ("participating" in such prosecution includes preparing or reviewing patent applications, reviewing office actions, preparing or reviewing responses to office actions, and engaging in any discussion or other communication regarding the scope or validity of any claims in such patent applications or in the patents that are the subject of such reexamination or reissue); provided that this exclusion does not apply to persons whose involvement with the prosecution of such patents or patent applications is limited to administrative oversight for billing or project assignment purposes;

(b)       [*Optional*:  The following in-house counsel of a receiving party, (1) who has no involvement in competitive decision-making or in patent prosecution involving _____ [specify subject matter areas], (2) to whom disclosure is reasonably necessary for this litigation, and (3) who has signed the "Agreement to Be Bound by Protective Order" in Exhibit A, may have access: _____; ]

(c)       Independent consultants or experts retained by the party or its attorneys in connection with this action, including technical experts, damage and industry experts, patent experts, and jury or trial consultants, together with their employees engaged in assisting in this action (including mock jurors), but only subject to the provisions of paragraph 2.5 below; provided that such does not include any persons participating in the prosecution of any present or future patent application (including the reexamination or reissue of any present or future patent) that is a counterpart to or related to the patents-in-suit ("participating" in such prosecution includes preparing or reviewing patent applications, reviewing

17

**A-vi**

office actions, preparing or reviewing responses to office actions, and engaging

in any discussion or other communication regarding the scope or validity of any

claims in such patent applications or in the patents that are the subject of such

reexamination or reissue); provided that this exclusion does not apply to persons

whose involvement with the prosecution of such patents or patent applications is

limited to administrative oversight for billing or project assignment purposes;

(d)     The Court and its personnel;

(e)     Court reporters and their personnel engaged in proceedings

incident to preparation for trial or engaged in trial;

(f)     Professional vendors and their employees, including copy services,

trial graphics services, and translation services, engaged by counsel; and

(g)     Any person who is indicated on the face of a document to have

been an author, addressee, or copy recipient of the document, or the original

source of the information.

2.3     Information that has been designated as CONFIDENTIAL may be

disclosed only to:

(a)     The persons identified in paragraph 2.2; and

(b)     Any party or employee of a party to whom disclosure is reasonably

necessary for this litigant and litigation who has signed the "Agreement to Be

Bound by Protective Order" in Exhibit A.

2.4     [*Optional – when 2.2(b) not used*:  Notwithstanding the provisions of

paragraph 2.2 above, in order to permit full evaluation of the parties' respective

positions, the following persons shall also be permitted access to all motions for

summary judgment and all supporting, opposition and reply briefs or memoranda filed in connection with any such motions; all briefs or memoranda filed in connection with claim construction; all reports of testifying experts; and all exhibits or attachments to any of the above: _____.]

     2.5    Protected Material shall be disclosed to consultants and experts only upon the following terms:

     (a)    Prior to any disclosure, the consultant or expert shall be identified in writing to the other parties' counsel by name, address, and corporate, business or other professional affiliation or employment, together with a copy of the expert's *curriculum vitae* and a list of the expert's litigation or consulting engagements for the past three years;

     (b)    Unless another party notifies the proposing party of any objection and that objection is received within five business days after notification (by fax, by email, or by overnight mail), the consultant or expert shall thereafter be allowed to have access to Protected Material pursuant to the terms and conditions of this Protective Order;

     (c)    In the event of a timely objection, which shall be made in good faith and on reasonable grounds, the proposing party shall refrain from disclosure of Protected Material to the consultant or expert until the objection has been resolved between the parties or ruled upon by the Court;

     (d)    The parties shall endeavor in good faith to resolve the dispute without calling upon the intervention of the Court.  The burden is on the objecting party to seek the intervention of the Court by appropriate motion to preclude the

proposing party from disclosing Protected Material to the consultant or expert.  If

no such motion is filed within ten business days of receipt of the objection, the

proposing party may disclose Protected Material to the consultant or expert as if

no objection had been raised; and

(e)     No party shall use its right to object to a proposed consultant or

expert to interfere with the ability of another party to prepare for trial through the

use of consultants and experts.

2.6     Prior to receiving any Protected Material, any persons described in

sections (b), (c), (e), or (f) of paragraph 2.2 shall be furnished with a copy of this

Protective Order and shall execute a copy of the "Agreement to be Bound by Protective

Order" attached as Exhibit A.  A copy of the signed Agreement shall be maintained by

counsel for the party providing such access.

2.7     Nothing in this Protective Order shall prevent any counsel of record from

utilizing Protected Material in the examination of any person who is reasonably alleged

to be the author or source of the Protected Material or who is reasonably believed to

have knowledge relating thereto.  In addition,

(a)     Parties and present employees of the parties, or employees of third

parties, may be examined as a witness at depositions and trial and may testify

concerning all Protected Material produced or designated by that party, or by the

employee's employer if a third party;

(b)     Former employees of the parties, or former employees of third

parties, may be examined and may testify concerning all Protected Material

produced or designated by the party or third party that formerly employed such

A-ix

person and which pertains to the period or periods of his/her employment and prior thereto; and

(c)     Former experts of the parties may be examined and may testify concerning all Protected Material produced or designated by the respective party that pertains to the subject matter of his/her consultation.

2.8     Nothing in this Protective Order shall preclude any party from introducing Protected Material into evidence at any evidentiary hearing or at trial.  However, if anyone intends to introduce or refer to Protected Material at any hearing or trial, the party wishing to make the disclosure shall first notify the producing party and provide that party with an opportunity to object and/or to ask the Court to take appropriate precautionary procedures (e.g., clearing the Courtroom, sealing the record, etc.).

2.9     Nothing in this Protective Order shall bar or otherwise restrict any attorney from rendering advice to his/her clients with respect to this litigation and referring to or relying generally upon his/her examination of Protected Material, provided that in rendering such advice and in otherwise communicating with his/her clients, the attorney shall not disclose the content of such information.

2.10     All persons in possession of Protected Material shall exercise reasonable and appropriate care with regard to the storage, custody, and use of such information in order to ensure that the provisions of this Protective Order are observed and the confidential nature of the information is maintained.

## 3.     CHALLENGES TO CONFIDENTIALITY DESIGNATIONS

3.1     Any party believing that particular information has been improperly marked, i.e., that it is not in fact CONFIDENTIAL or HIGHLY CONFIDENTIAL –

**A-x**

ATTORNEY EYES ONLY, may challenge such designation at any time by raising the issue, in writing to the designating party, and specifically identifying, by document identification (Bates) number, by deposition page and line, or by other appropriate specific identifier, the information whose confidentiality status is challenged.  Within ten business days of receipt of such writing, the designating party shall either remove or reduce the designation, or respond that it has reviewed the matter and continues to maintain the designation in good faith.

3.2    The parties shall endeavor in good faith to resolve any such dispute without calling upon the intervention of the Court.  If the designating party maintains its designation and the parties are unable to reach agreement, the challenging party may bring the issue to the Court.  The party asserting confidentiality shall have the burden of establishing the appropriateness of the designation, except that a party claiming that information designated by the other as confidential is in the public domain shall have the burden of proving such public knowledge.

3.3    Challenged information shall be treated as designated until the resolution of the dispute by the parties or ruling by the Court.

**4.    FILING OF PROTECTED MATERIAL**

This Protective Order does not authorize filing protected materials under seal. According to the authority of *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996), no document may be filed with the Court under seal without prior permission as to each such filing, upon motion and for good cause shown, including the legal basis for filing under seal.  Unless the Court orders otherwise, all sealed documents shall be filed according to S. D. Ohio Civ. R. 79.3.

**A-xi**

### 5. TERMINATION OF LITIGATION

5.1     The obligations of this Protective Order shall survive the termination of the action and continue to bind the parties.  Within sixty days after termination of this action by judgment, settlement, or otherwise from which no appeal can be brought, each party shall destroy all documents containing or disclosing Protected Material of any other party.  Each party's outside litigation counsel shall have the right to retain one copy of the pleadings; of motions, memoranda, documents, and papers filed with the Court; of deposition transcripts and exhibits; and of any documents constituting work product.

### 6. THIRD PARTY DISCOVERY

6.1     In the event that any third party shall be called upon, by subpoena or otherwise, to provide or produce documents or information considered CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY by such third party, such third party may elect to have its information treated in accordance with the terms of this Protective Order by so notifying counsel for all parties in writing.  Upon service of such notice, such third party may designate documents and information as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY in the manner set forth in this Protective Order, and such third party's designated information shall be protected in the same manner as that of the parties to this action.

### 7. INADVERTENT DISCLOSURE

7.1     If a party inadvertently discloses any document or thing containing information that it deems CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY without designating it pursuant to this Protective Order, the disclosing party shall promptly upon discovery of such inadvertent disclosure inform the receiving

party in writing, forwarding a replacement copy of the inadvertently disclosed material

properly marked with the appropriate confidentiality designation.  The receiving party

shall thereafter treat the information as if it had been properly marked from the outset

and shall make a reasonable effort to retrieve and destroy the unmarked version of the

inadvertently disclosed material.  Disclosure by the receiving party to unauthorized

persons before being notified of the inadvertent disclosure shall not constitute a

violation of this Protective Order.   Nothing in this Protective Order shall preclude the

receiving party from challenging the confidentiality designation of the late-marked

material pursuant to the provisions of paragraph 3.

7.2     The inadvertent or mistaken production or disclosure of documents or

other information subject to the attorney-client privilege, the work product doctrine, or

other privilege shall not be deemed a waiver of a claim of privilege, either as to the

specific information disclosed or as to any other related information.  If a producing

party inadvertently produces or otherwise discloses to a receiving party information that

is subject to such privilege or immunity, the producing party shall promptly upon

discovery of such disclosure so advise the receiving party in writing and request that the

inadvertently disclosed information be returned.   The receiving party shall return all

copies of the inadvertently produced material within five business days of receipt of the

request.  Any notes or summaries referring or relating to any inadvertently produced

privileged material shall be destroyed.  Nothing in this Protective Order shall preclude

the receiving party returning the inadvertently produced material from seeking an order

compelling the production of information previously produced inadvertently.

## 8.     MISCELLANEOUS PROVISIONS

8.1    If Protected Material in the possession of any receiving party is subpoenaed by any court, by any administrative or legislative body, or by any other person purporting to have authority to subpoena such information, or is the subject of any discovery request under Rules 30-36 of the Federal Rules of Civil Procedure or any comparable rule of court or of any adjudicative body (such subpoena or discovery request collectively referred to as a "Third Party Request"), the party to whom the Third Party Request is directed will not produce such information without first giving prompt written notice (including a copy of the Third Party Request) to the attorneys of record for the producing party, no more than three business days after receiving the Third Party Request.  The party receiving the Third Party Request must also promptly inform in writing the party who caused the Third Party Request to issue in the other litigation that some or all the material covered by the Third Party Request is subject to this Protective Order.  The party receiving the Third Party Request must deliver a copy of this Protective Order promptly to the party in the other action that caused the Third Party Request to issue.

8.2    The producing party shall bear the burden and expense of seeking protection in court of its own Protected Material, and nothing in this Protective Order should be construed as authorizing or encouraging a party receiving a Third Party Request in this action to disobey a lawful directive from another court.  Disclosure of information in response to a properly issued Third Party Request shall not constitute a violation of this Protective Order.

8.3    This Protective Order may be modified only by further Order of the Court, whether sua sponte or by agreement of the parties or their counsel and approval by the

**A-xiv**

Court, and is without prejudice to the rights of any party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

8.4     Treatment by counsel or the parties of information designated CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY as designated shall not be construed as an admission by any party that the designated information contains trade secrets or other proprietary or confidential information. Conversely, failure to so designate shall not constitute a waiver of any party's claims, either within or outside this action, that any such documents or information do contain trade secrets or other proprietary or confidential information.

8.5     No party shall be obligated to challenge the propriety of any designation, and failure to challenge a claim of confidentiality at the time of receipt shall not constitute a waiver of the right to challenge a confidentiality designation at any later time.

**IT IS SO ORDERED:**

_____
UNITED STATES DISTRICT JUDGE
(or)
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |  |
|---|---|---|
|  | : | CASE NO. _____ |
|  | : |  |
| PLAINTIFF, | : | [JUDGE _____] |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| DEFENDANT. | : |  |
|  | : |  |

**AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, _____, hereby acknowledge that I received a copy of the Protective Order in this action.  I read and understood the Protective Order and agree to be bound by its provisions.   I agree not to copy or use any CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY information that may be provided to me for any purpose other than in connection with my retention in connection with this action, and I agree not to reveal any such information to any person not authorized by the Protective Order.

I further acknowledge and understand that a violation of the Protective Order may subject me to penalties of the Court, and I hereby submit to the jurisdiction of the United States District Court for the Southern District of Ohio in connection with any proceedings concerning enforcement of the Protective Order.

Dated: _____          _____

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

INFO-HOLD, INC.,

    Plaintiff,

    v.

MUZAK HOLDINGS LLC, *et al.*,

    Defendants.

Case No. 1:11-cv-283

Judge Timothy S. Black

## ORDER ON CLAIM CONSTRUCTION

The parties have each submitted briefs in support of their proposed claim constructions. (Docs. 40, 41, 46, 47, 48, 52, 55, 57, and 59). Additionally, the Court held a *Markman* hearing on August 10, 2012.

### I. THE PATENT AT ISSUE

Plaintiff Info-Hold, Inc. is alleging infringement of United States Patent No. 5,991,374 ("the '374 patent") by Defendants Muzak Holdings LLC and Muzak LLC. The patent survived a 2011 Reexamination Procedure by the United States Patent and Trademark Office as Patent No. 5,991,374 C1 ("the '374 C1 patent").

The '374 patent - titled "*Programmable Messaging System for Controlling Playback of Messages on Remote Music-On-Hold-Compatible Telephone Systems and Other Message Output Devices*" - is generally directed to a system and methods for the remote control of on-hold, overhead, and other message playback devices located at one or more remote locations.

**A1**

The '374 patent issued with thirty-six claims covering both the system and the method for remotely controlling message playback. While the scope of the claimed invention is disputed between the parties, the claimed invention can be generally summarized as achieving the desired control over messaging by using a computer that is programmed to push control signals to linked remote playback devices. These remote playback devices have a memory on which the various message options have been previously stored, and the ability to manage message playback according to the incoming control signal, and an output through which the chosen message is played. The control signals originating from the computer and pushed out to the remote playback devices contain instructions that include the intended device and the desired message. The designated playback device then plays the desired message.

## II.     THE CLAIMS AT ISSUE

The disputed claim interpretation revolves around the details associated with the on-hold messaging claims.

The first area of dispute centers around the phrase "when a caller is placed on hold" and the parties have identified six claim terms using that language: (1) "when a caller is placed on hold;" (2) "when callers are placed on hold on the respective telephone systems;" (3) "generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message when a

-2-

**A2**

caller is placed on hold on the respective telephone system; " (4) "storing a library of
discrete and individually accessible messages at each of said remote sites for playback on
the respective message playback device when a caller is placed on hold;" (5) "for playing
selected messages through an input of said message playback device when a caller is
placed on hold; and (6) "to provide said accessed message to said output in accordance
with said controls signals when a caller is placed on hold."

The second area of dispute concerns individual terms used to describe the
functionality of the device, and includes the terms: (7) "computer;" (8) "programmable
to;" (9) "control signal;" and (10) "discrete and individually accessible messages."

## III.   STANDARD OF REVIEW

Claim construction is a matter of law to be decided exclusively by the Court.
*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*),
*aff'd*, 517 U.S. 370.  "[T]he claims of a patent define the invention to which the patentee
is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,
Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  In construing claims, the Court determines
whether or not a term requires construction.  *United States Surgical Corp. v. Ethicon,
Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  The Court is not required to accept a
construction of a term, even if the parties have stipulated to it, but instead may arrive at its
own construction of claim terms, which may differ from the constructions proposed by

-3-

**A3**

the parties. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005).

Courts must first look to intrinsic evidence (*i.e.*, the claim itself, specifications, prosecution history and prior art cited in the patent) to resolve any ambiguities. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point [...] is always with the language of the asserted claim itself." *Comark Comm, Inv. v. Harris Corp.*, 156 F.3d 1186 (Fed. Cir. 1998). Claim terms are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective date of the patent application." *Id*. at 1313. Absent an express intent to the contrary, a patentee is presumed to have intended the ordinary meaning of a claim term. *York Prods. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources. *See, e.g., McCarty v. Lehigh Valley R.R.*, 160 U.S. 110, 116 (1895) ("If we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop").

The Court must also consider the specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." "When the

-4-

A4

specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

Finally, the Court may consider "the prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582.  The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  The prosecution history "constitutes a public record of the patentee's representations concerning the scope of and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct."  *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005).

In most circumstances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583.  However, if the intrinsic evidence does not resolve ambiguities, extrinsic evidence may be considered.  Extrinsic evidence "can shed light on the relevant art,' but is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (*quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).  Dictionaries and technical treaties, which are extrinsic evidence, hold a "special place" and may sometimes be considered along with the intrinsic evidence when determining the ordinary meaning of claim terms.  *Id.* at 1267.  However, the Federal Circuit cautions

-5-

A5

against the use of nonscientific dictionaries, lest dictionary definitions be converted into technical terms of art having legal, not linguistic significance. *Id.*

## IV.   THE COURT'S CONSTRUCTION OF THE CLAIMS

### A.   Joint Claim Constructions

The Court adopts the joint claim constructions proposed by the parties in the Joint Claim Construction Chart found at Doc. 40, Ex. B at 2-3.

### B.   Disputed Terms

#### 1.   *"When a caller is placed on hold"*

The parties dispute the construction of six similar claim phrases relating to the message playback feature of the patented device: (1) "when a caller is placed on hold;" (2) "when callers are placed on hold on the respective telephone systems;" (3) "generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message when a caller is placed on hold on the respective telephone system;" (4) "storing a library of discrete and individually accessible messages at each of said remote sites for playback on the respective message playback device when a caller is placed on hold;" (5) "for playing selected messages through an input of said message playback device when a caller is placed on hold;" and (6) "to provide said accessed message to said output in accordance with said controls signals when a caller is placed on hold."  (Doc. 22 at 4-13).

Because terms in a patent must be constructed consistently, the Court will offer one construction for the phrase "when a caller is placed on hold."

The primary dispute between the parties is whether the phrase indicates that message playback takes place *during* the time the caller is placed on hold or whether the playback *starts* when a caller is placed on hold.  (Doc. 56 at 9).  Plaintiff offers the following claim construction: "to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems."  Defendants propose the simple construction "when a caller is placed on hold."  (Doc. 22 at 7).

Defendant argues that the plain language of the claims refers to a momentary act of placing a caller on hold.  Although "when" can mean either a momentary event or "while," Defendant argues that "placing" a caller on hold clearly references a momentary act.  (Doc. 56 at 10).  The Court agrees that the plain meaning of the claim terms favors a construction of "when" as meaning "at the moment."  "Placed" indicates an action that must occur at a specific moment, indicating that the message must begin playing at that moment.  Under Plaintiff's proposed construction, the term "placed" would have no meaning, and an interpretation that reads out a claim language or renders it meaningless cannot be correct.  *Bicon, Inc. v. Starumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)

The context of the claim terms confirms this construction.  Claim seven requires that messages be accessed, delivered from storage, and played when a caller is placed on hold and also provides the system operator with the option to choose how many times a message is played.  (*See* Doc. 40, Ex. A at 46).  A message cannot be played until it is accessed; and if a message is only accessed when a caller is placed on hold, then it cannot

already be playing in a continuous loop system.

Finally, the prosecution history also supports the construction of "when" as "at the moment." During reexamination, Plaintiff added the phrase "when a caller is placed on hold" to several claims. (*See* Doc. 40, Ex. A at 46-49). To survive reexamination, Plaintiff argued that the messages were played when the caller is placed on hold, significantly modifying the body of the claims to define the timing of message access and message playback.

Plaintiff disputes this interpretation, offering many rhetorical flourishes and analogies, but little evidence. Plaintiff's principal substantive argument is that the system as understood by a person skilled in the art at the time of the filing would have been a continuous loop system because no other system existed. However, as Plaintiff did not provide any evidence to support this assertion, it must necessarily fail.

Therefore, the Court finds that in each of the six disputed claim terms recited above, the phrase "when a caller is placed on hold" shall be constructed to mean "at the moment a caller is placed on hold."

### 2. *"computer"*

Plaintiff proposes that "computer" be constructed as "a programmable electronic device capable of performing data processing functions and having a memory device, an input device, and a display." (Doc. 33 at 11). Defendant argues that this definition goes beyond the core functionality mentioned in the patent and improperly imports additional limitations. (Doc. 40 at 22). Defendant argues against any construction requiring certain

components, and suggests a construction of "a programmable electronic device that receives, processes, and presents data." (*Id.*)

While Defendant admits that the specification does include the required features for some embodiments, Defendant argues that the specification fails to state that the features are required for every embodiment of the claimed invention. (Doc. 40 at 23). However, the Court notes that the specification specifically states that "each client computer comprises a central processing unit, a memory device, a display device, such as a video monitor, and at least one input device, such as a keyboard and preferably also a mouse." (Doc. 55 at 4). Where the specification details the meaning of a "computer," the Court finds that the inventor specifically referenced necessary components of the device.

Accordingly, the Court adopts Plaintiff's proposed claim construction.

### 3. *"programmable to"*

Plaintiff proposes that "programmable to" be constructed as "capable of being programmed." In support, Plaintiff argues that "it is axiomatic that a device, programmable to accomplish X, is capable of being programmed to do X." (Doc. 41 at 22). Defendant contends that Plaintiff's proposed construction is too broad, and that it would render all computers and playback devices as infringing regardless of what they are actually programmed to do. (Doc. 40 at 24). Instead, Defendant proposes a construction of "programmed," arguing that the devices must already be programmed to carry out the functionality of the message playback device. (*Id.* at 25).

The Court finds Defendant's argument unpersuasive. Not every computer would

-9-

**A9**

be infringing, because the computer must first have the basic software formatting

necessary to enable it to be programmable to perform the claimed functionality (in other

words, it must be programmed to be programmable). "Programmable" means just that:

"capable of being programmed." Accordingly, the Court adopts Plaintiff's proposed

construction.

        *4.*     *"control signal"*

      Plaintiff proposes that "control signal" be constructed as:

> A communication, generated by said computer capable of interacting with at least
> one playback device, containing a command involving the control of playback
> devices and/or messages.

(Doc. 33 at 4).

      Defendant proposes the claim term be constructed as:

> An electronic signal generated by said computer containing instructions for
> controlling the operation of one or more remote playback devices.

(*Id.*)

      Defendant's principal objection to Plaintiff's proposed construction is that

Plaintiff's wording is "unnecessarily cumbersome and confusing." (Doc. 40 at 25).

Plaintiff responds that the use of the words "communication," "command," and "control"

is an attempt to employ words illuminated elsewhere in the claims and specifications.

(Doc. 41 at 8).

      Given that the parties do not dispute that the proposed constructions have the same

meaning, the Court agrees that Defendant's construction is more straightforward, and thus

preferred. *See Control Res., Inc. v. Delta Electronics, Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass 2001) ("The claims must be translated into plain English so that a jury will understand. Thus, accurate words that convey the essence of the invention are needed.").

       **5.**    *"discrete and individually accessible messages"*

At the *Markman* hearing, Defendant submitted that it agrees to Plaintiff's proposed construction for this term. Accordingly, "discrete and individually accessible messages" shall be construed to mean "messages that are individually identifiable and separately accessible."

## VI.   CONCLUSION

Therefore, the parties shall construe the contested terminology of the '374 patent as set forth in this Order.

     **IT IS SO ORDERED.**

Date:  <u>9/10/12</u>                <u>s/ Timothy S. Black</u>
                                  Timothy S. Black
                                    United States District Judge

**A11**

UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| INFO-HOLD, INC., | : | Case No. 1:11-cv-283 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MUZAK HOLDINGS LLC, *et al.* | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION AND DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION (Docs. 61, 63)**

On September 10, 2012, thirty days after a Markman hearing, and pursuant to the parties' briefs submitted in support of their proposed claim constructions regarding disputed claims related to United States patent No. 5,991,374, this Court entered its Order on Claim Construction (Doc. 60).

On September 17, 2012, Defendants filed a motion to reconsider the claim construction order related to the term "control signal." (Doc. 61).

On September 27, 2012, Plaintiff filed a motion for clarification, rehearing, or reconsideration of the order on claim construction, specifically contesting the Court's construction of the claim phrase "when a caller is placed on hold." (Doc. 63).

Both motions have now been fully briefed. (Docs. 64, 65, 66, 69).

**A12**

## I.    STANDARD OF REVIEW

District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case.  *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959 (6th Cir. 2004).   Nevertheless, *a fortiori*, "motions for reconsideration are disfavored."  *Davie v. Mitchell*, 291 F.Supp.2d 573 (N.D. Ohio 2003).  Thus, "courts will [only] find jurisdiction for reconsidering interlocutory orders where there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009).  Here, both parties seek reconsideration "to correct clear error and prevent manifest injustice."

## II.    ANALYSIS

### A.    "Control signal"

Defendants seek reconsideration of the claim construction order as it relates to the term "control signal."

Defendants claim that the Court mistakenly relied on Defendants' own originally proposed definition of "control signal" ... "even though this definition was not ultimately espoused by either party."  (Doc. 61 at 5).   Defendants also claim that the Court's conclusion that "the parties do not dispute that the proposed constructions have the same meaning" (Doc. 60 at 10) was incorrect, insisting that Plaintiff did not agree with Defendants' proposed construction.  (Doc. 61 at 6).

-2-

**A13**

To remedy this alleged clear error and prevent manifest injustice, Defendants move the Court to adopt a new construction, as cobbled together, using Plaintiff's original proposal and information from Plaintiff's briefing. (*Id.* at 7).

However, as Plaintiff correctly states in reply: "[t]he Court is not required to accept a construction of a term, even if the parties have stipulated to it, but instead by arrive at its own construction of claim terms, which may differ from constructions proposed by the parties." *Pfizer, Inc. v. Teva Pharms., USA, Inc.* 429 F.3d 1364, 1376 (Fed. Cir. 2005). Moreover, Plaintiff disputes that it significantly disagreed with Defendants' construction of "control signal" and affirms that "[t]he Court rightly recognized the *de minimis* distinction between the parties' proposed constructions." (Doc. 64 at 4).

Upon careful review, the Court finds no evidence of clear error or manifest injustice with regard to its construction of the claim term "control signal."

**B.    "When a caller is placed on hold"**

Plaintiff seeks reconsideration of the Court's construction of the claim phrase "when a caller is placed on hold" and alleges "that the Court erred in not giving full weight to specific references and natural implications contained in the specification." (Doc. 63 at 12-13).

More specifically, Plaintiff alleges that neither the specification nor the likely interpretation of a skilled artisan for whom the patent was written were given proper weight, and, as a result, the Court's reading of the claim phrase is grammatically incorrect,

-3-

**A14**

and that an appropriate construction would indicate that the phrase means that certain functions occur while a caller is on hold, not that the act of placing a caller on hold triggers the functions.  (Doc. 69 at 8).

Plaintiff supports these arguments in part by using evidence it alleges would have been presented at a technical tutorial, had such a tutorial taken place.  (Doc. 63 at 7).

Despite Plaintiff's assertion that "it is not frivolous or inappropriate to restate and possibly reframe the arguments that the party felt did not receive proper consideration," Defendants are correct in criticizing Plaintiff's use of the same arguments it made in its Markman briefing and oral argument.  As Defendants point out, all of Plaintiff's arguments have either already been presented or could have been made earlier. Moreover, Plaintiff's attempt to introduce new arguments and evidence not of record through a hypothetical technical tutorial that has not taken place, is not required by law, and has been repeatedly argued for previously, is likewise inappropriate and unavailing.

Upon careful review, the Court finds no evidence of clear error or resulting manifest injustice with regard to its construction of the claim phrase "when a caller is placed on hold."

### III.   CONCLUSION

Accordingly, for the reasons stated here, Defendants' motion for reconsideration (Doc. 61) and Plaintiff's motion for reconsideration (Doc. 63) are both **DENIED.**

-4-

**A15**

**IT IS SO ORDERED.**

Date:  November 6, 2012                                     ___s/ Timothy S. Black_____
                                                                       Timothy S. Black
                                                                       United States District Judge

A16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| INFO-HOLD, INC., | : | Case No. 1:11-cv-283 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MUZAK HOLDINGS LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER THAT PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST
AMENDED AND SUPPLEMENTAL COMPLAINT (Doc. 62) IS DENIED**

This civil action is before the Court on Plaintiff's motion to file a first amended and

supplemental complaint (Doc. 62) and the parties' responsive memoranda (Docs. 68, 70).

**I. BACKGROUND**

Plaintiff filed its original complaint in this case on May 3, 2011, more than a year

and a half ago. (Doc. 1). Following a scheduling conference, and based on the parties'

joint suggestions, the Court issued a Calendar Order, subsequently extended, which

included a deadline of November 29, 2011 (almost a full year ago) by which to file

motions to amend the pleadings and/or add additional parties. (Doc. 23). Now, almost a

year after the deadlines for amendment of pleadings and for service of infringement

contentions have passed, and with discovery closing in less than two months, Plaintiff has

filed its motion to file a first amended and supplemental complaint.

**A17**

According to Plaintiff, the purposes of the proposed amended complaint are to accuse a new product, to state sufficient allegations about that product to form the basis for a subsequent motion for preliminary injunction, and to satisfy questions raised by the Defendants regarding allegations contained in the original complaint.

The motion to file the amended complaint is now fully briefed. (Docs. 23, 68, 70).

## II.  STANDARD OF REVIEW

Under Rule 15(a) of the Federal Rules of Civil Procedure, a plaintiff may amend its pleadings as a matter of course if the amendment is filed within 21 days after service of a 12(b)(6) motion.  Fed. R. Civ. P. 15(a)(1)(B).  If a plaintiff wishes to file an amended complaint after the 21 day grace period, he is required to seek leave of the court to do so. And Rule 15 provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

The United States Supreme Court has held that motions for leave to amend should be liberally granted unless the motions are brought in bad faith or the proposed amendments would cause undue delay, be futile, or unfairly prejudice the opposing parties.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

Separate and apart from the Rule 15 requirements, however, a party moving for leave to amend its pleadings, after the deadline for such amendments set in the case scheduling order has passed, must show "good cause."  Fed. R. Civ. Proc. 16(b)(4).  The

-2-

**A18**

"good cause" requirement specifically calls for evidencing good cause for the "failure earlier to seek leave to amend." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

In the final analysis, granting or denying a request to amend a complaint is left to the broad discretion of the district court. *Gen. Electric Co. v. Sargeant & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990).

### III. ANALYSIS

#### A.  Fed. R. Civ. Proc. 16(b)(4)

As Defendants have pointed out, nearly a year has passed since the deadlines expired for the amendment of pleadings and the service of infringement contentions, and discovery will close in less than two months.  As a result, the inquiry into whether Plaintiff can demonstrate good cause, as required by Rule 16(b)(4), for its failure to move to amend the pleadings earlier, is an important one.  However, Plaintiff's motion does not even address the "good cause" standard of Fed. R. Civ. Proc. 16(b)(4), and Plaintiff makes little attempt to meet it, even in its reply brief.  (Doc. 70).  Plaintiff makes little attempt to answer: (1) when it first learned of the new allegedly infringing products or the new facts it now seeks to add; (2) why moving almost a year past the deadline for amending the pleadings does not constitute undue delay in this case;  and (3) why this amendment will not prejudice the Defendants.  Specifically, although the new product that Plaintiff now seeks to challenge was introduced into the market in late March or early April 2012, Plaintiff offers no justification to the Court for Plaintiff having waited until now to move to add the product to its claims.

-3-

**A19**

**B. Fed. R. Civ Proc. 15(a)**

To be granted leave to amend under Rule 15(a), a plaintiff must demonstrate that

its motion is not unduly delayed, will not prejudice the opposing party, and does not

propose futile amendments.

Here, as discussed *supra*, Plaintiff has not sufficiently justified the lateness of its

motion.  Plaintiff's motion and proposed first amended complaint do not rely on new facts

obtained through discovery.  The facts Plaintiff proposes to add in its amended complaint

were known to it when it filed its original complaint.  Moreover, Plaintiff has been aware

of the product line it seeks to add in its amended complaint since before the deadline to

amend the pleadings. (Doc. 68 at 5; Doc. 70 at 1).  And, according to Plaintiff, Plaintiff

itself informed Defendants of the patent.  (Doc. 68-2).  In this context, it is difficult to

classify this unexplained attempt to amend the pleadings  - almost a year late, after the

Court's claim construction, and less than two months prior to the close of discovery -,

and to add facts that the Plaintiff should have known when it made its Local Patent Rule

103.2 disclosures, as anything other than "undue delay."

As noted, the discovery deadline is fast approaching. The *Markman* phase of the

case is complete, and the contours of the action as a whole have been established for

many months by Plaintiff's Local Patent Rule 103.2 disclosures and the parties'

subsequent narrowing of disputed terms.[1]  Moreover, Plaintiff failed to file its motion to

---

[1] Early in a case, Local Patent Rule 103.2 requires patentees to identify all acts they
contend relate to infringement.  A patentee should not be permitted to utilize belated amendment
of pleadings to introduce facts relating to its infringement theories that the patentee was required
to allege in its initial Local Patent Rule 103.2 disclosures (in this case, nearly a year ago).

amend until the day after Defendants' Rule 30(b)(6) deposition of Plaintiff, and, accordingly, the granting of the motion to amend will likely require the retaking of that deposition and may well require new and further claim construction by the Court to address new claims being asserted by Plaintiff.  All of this creates the very real likelihood of very substantial delays to the final resolution of this case.  Such delay is a significant prejudice to Defendants ... and to the Plaintiff.

Moreover, Plaintiff states its allegations of infringement with regard to the new product "on information and belief."  (Doc. 62-1).  However, as the Supreme Court has expressly provided, a plaintiff must make "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory allegations, without more, fail to meet the pleading standards.  *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007);  *Iqbal*, 556 U.S. 662 (2009).  Under the circumstances here, Plaintiff's proposed new allegations do not meet the requirements of Fed. R. Civ. Proc. 8, and likely do not rise to the level of plausibility required by *Twombley* and *Iqbal,* especially as to Counts 9 and 10 with respect to the MBOX4.  The proposed amendments, as currently drafted, are therefore likely futile.

### C.  Fed. R. Civ. Proc. 15(d)

Finally, although Plaintiff requests that its motion be granted under Rule 15(d) "to the extent necessary," as Defendants properly point out, Plaintiff does not identify nor discuss what part of its proposed amended pleading it would have the Court regard as supplemental under Rule 15(d).

-5-

**A21**

### IV.  CONCLUSION

Accordingly, for the reasons stated here, Plaintiff's motion for leave to file a first

amended and supplemental complaint (Doc. 62) is hereby **DENIED**.

**IT IS SO ORDERED.**

Date:  November 14, 2012                      *s/ Timothy S. Black*
                                               Timothy S. Black
                                               United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | District Judge Timothy S. Black |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendants. | |

### STIPULATION OF JUDGMENT OF NON-INFRINGEMENT OF '374 PATENT CLAIMS 7-11, 14-18, 20-22, 26-29, 37 AND 38

WHEREAS Plaintiff Info-Hold, LLC ("Info-Hold") has alleged in this action that Muzak Holdings LLC and Muzak LLC both infringe claims 3, 6-11, 13-22, 24, 26-29, 37 and 38 of U.S. Patent No. 5, 991,374 ("the '374 Patent");

WHEREAS in its October 10, 2012, Order on Claim Construction (Dkt. No. 60), the Court construed the term "when a caller is placed on hold" to mean "at the moment a caller is placed on hold," and subsequently denied Info-Hold's request for reconsideration of this construction on November 6, 2012 (Dkt. No. 74);

WHEREAS the term "when a caller is placed on hold" appears in independent claims 7, 17, 22, 26 and 37 of the '374 Patent;

WHEREAS, in response to requests for admissions (Exh. A hereto), Info-Hold admitted that neither Muzak LLC and nor Muzak Holdings LLC infringes independent claims 7, 17, 22, 26 and 37 of the '374 Patent, either directly or indirectly, under the Court's construction of "when a caller is placed on hold" as set forth in Dkt. No. 60;

WHEREAS the term "when a caller is placed on hold" is incorporated into claims 8-12 and 14-16, which depend from independent claim 7, claims 18, 20 and 21, which depend from independent claim 17, unasserted claim 23, which depends from independent claim 22, claims 27

**A23**

and 28 which depend from independent claim 26, and claim 38, which depends from independent claim 37;

WHEREAS Muzak LLC and Muzak Holdings LLC cannot infringe a dependent claim if they do not infringe the independent claim upon which that dependent claim depends; and

WHEREAS Info-Hold agrees to the entry of judgment of non-infringement of claims 7-11, 14-18, 20-22, 26-29, 37 and 38 of the '374 Patent, based upon the Court's construction of "when a caller is placed on hold," but reserves its right to appeal the Court's construction of "when a caller is placed upon hold."

IT IS HEREBY **STIPULATED AND AGREED** between plaintiff INFO-HOLD, INC., and Defendants MUZAK LLC and MUZAK HOLDINGS LLC, that the Court enter judgment as follows:

1. Based upon the Court's Order on Claim Construction dated October 10, 2012 (Dkt. No. 60), and Exhibit A hereto, the Court declares that Muzak Holdings LLC and Muzak LLC do not infringe claims 7-11, 14-18, 20-22, 26-29, 37 and 38 of the '374 Patent, either directly or indirectly.

2. Based upon the Court's Order on Claim Construction dated October 10, 2012 (Dkt. No. 60), Info-Hold's Complaint herein, to the extent it claims infringement by Muzak Holdings LLC and Muzak LLC of claims 7-11, 14-18, 20-22, 26-29, 37 and 38 of the '374 Patent, is dismissed **with** prejudice.

3. Based upon the Court's Order on Claim Construction dated October 10, 2012 (Dkt. No. 60), Muzak Holdings LLC and Muzak LLC's counterclaims herein, to the extent they request a declaratory judgment that claims 7-11, 14-18, 20-22, 26-29, 37 and 38 of the '374 Patent are invalid or unenforceable, are dismissed **without** prejudice.

4. Nothing in this Stipulation shall affect Info-Hold's right to appeal the Court's construction of "when a caller is placed on hold."

IT IS SO ORDERED:

*Timothy S. Black*

November 27, 2012

Hon. Timothy S. Black
United States District Judge

Dated:  November 26, 2012

**INFO-HOLD, INC.**

By: /s/ Daniel J. Wood by Barry Bretschneider per
email authorization
    Daniel Joseph Wood
    4120 Airport Road
    Cincinnati, OH 45226
    danw@info-hold.com
    *Attorney for Plaintiff Info-Hold, Inc.*

Dated:  November 26, 2012

**MUZAK HOLDINGS LLC AND MUZAK LLC**

By: /s/ Kevin W. Kirsch
    Kevin W. Kirsch (0081996)
    John F. Bennett (0074506)
    BAKER & HOSTETLER LLP
    312 Walnut Street, Suite 3200
    Cincinnati, Ohio 45202-4074
    Telephone:  (513) 929-3499
    Facsimile:  (513) 929-0303
    jkirsch@bakerlaw.com
    jbennett@bakerlaw.com

    Barry E. Bretschneider
    John P. Corrado
    Michael E. Anderson
    Charles C. Carson
    BAKER & HOSTETLER LLP
    1050 Connecticut Ave., N.W.
    Suite 1100
    Washington, DC 20036-5304
    Telephone:  (202) 861-1500
    Facsimile:  (202) 861-1783
    bbretschneider@bakerlaw.com
    jcorrado@bakerlaw.com
    meanderson@bakerlaw.com
    *Attorneys for Defendants Muzak*
    *Holdings LLC and Muzak LLC*

## CERTIFICATE OF SERVICE

I certify that on November 26, 2012, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to counsel of record, and I also served the foregoing via electronic mail to the following:

Daniel Joseph Wood, Esq.
4120 Airport Road
Cincinnati, OH 45226
danw@info-hold.com

David Wagner, Esq.
423 Reading Road
Mason, OH 45040
wagner.david87@yahoo.com

Christopher M. Alexander, Esq.
Alexander Law Co., LPA
423 Reading Road
Mason, OH 45040
Chris@ChrisAlexanderLaw.com

/s/ John Bennett
John Bennett



# EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| INFO-HOLD, INC., | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Michael R. Barrett |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendants. | |

#### PLAINTIFF'S UPDATED RESPONSES TO DEFENDANTS'
#### SECOND SET OF REQUESTS FOR ADMISSION

Plaintiff, Info-Hold, Inc. ("Info-Hold"), submits the following updated responses to

Defendants' Second Set of Requests for Admission.  As noted in Plaintiff's Responses, the

Court's construction of the claim phrase "when a caller is placed on hold" is the subject of

a pending Motion for Reconsideration.  Plaintiff reserves the right to amend its responses

subject to the Court's ruling on the pending Motion.

#### RESPONSES

**Request for Admission No. 15**:  Admit that under the Court's
construction of "when a caller is placed on hold" in the Order on Claim
Construction (Dkt. No. 60), defendants do not infringe claim 7 of the '374
patent, directly or indirectly.

**RESPONSE: Admit** Subject to the pending Motion for Reconsideration of the

Court's construction of the claim phrase, "when a caller is placed on hold."

**Request for Admission No. 16**:  Admit that under the Court's
construction of "when a caller is placed on hold" in the Order on Claim

A28

Construction (Dkt. No. 60), defendants do not infringe claim 17 of the '374 patent, directly or indirectly.

**RESPONSE**:  **Admit** Subject to the pending Motion for Reconsideration of the Court's construction of the claim phrase, "when a caller is placed on hold."

**Request for Admission No. 17**:  Admit that under the Court's construction of "when a caller is placed on hold" in the Order on Claim Construction (Dkt. No. 60), defendants do not infringe claim 22 of the '374 patent, directly or indirectly.

**RESPONSE**:  **Admit** Subject to the pending Motion for Reconsideration of the Court's construction of the claim phrase, "when a caller is placed on hold."

**Request for Admission No. 18**:  Admit that under the Court's construction of "when a caller is placed on hold" in the Order on Claim Construction (Dkt. No. 60), defendants do not infringe claim 26 of the '374 patent, directly or indirectly.

**RESPONSE**:  **Admit** Subject to the pending Motion for Reconsideration of the Court's construction of the claim phrase, "when a caller is placed on hold."

**Request for Admission No. 19**:  Admit that under the Court's construction of "when a caller is placed on hold" in the Order on Claim Construction (Dkt. No. 60), defendants do not infringe claim 28 of the '374 patent, directly or indirectly.

**RESPONSE**:  **Admit** Subject to the pending Motion for Reconsideration of the Court's construction of the claim phrase, "when a caller is placed on hold."

2

**A29**

**Request for Admission No. 20**: Admit that under the Court's construction of "when a caller is placed on hold" in the Order on Claim Construction (Dkt. No. 60), defendants do not infringe claim 37 of the '374 patent, directly or indirectly.

**RESPONSE**: **Admit** Subject to the pending Motion for Reconsideration of the Court's construction of the claim phrase, "when a caller is placed on hold."

Dated: November 2, 2012

/s/ Daniel J. Wood
Daniel J. Wood (0037632)
4120 Airport Road
Cincinnati, Ohio 45226
Telephone:    (513) 248-5600
Facsimile:    (513) 248-5609
danw@infohold.com

Counsel for Plaintiff
Info-Hold, Inc.

3

**A30**

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2012, the foregoing was served via electronic mail

to the following:

John F. Bennett
Kevin W. Kirsch
M. Scott McIntyre
Baker & Hostetler LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
jbennett@bakerlaw.com
kkirsch@bakerlaw.com
smcintyre@bakerlaw.com


Barry E. Bretschneider
John P. Corrado
Michael E. Anderson
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
bbretschneider@bakerlaw.com
jcorrado@bakerlaw.com
meanderson@bakerlaw.com

/s/ Daniel J. Wood
Daniel J. Wood

4

**A31**

**CONFIDENTIAL MATERIAL REMOVED
SUBJECT TO PROTECTIVE ORDER**

# Pages A32-A60

UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

INFO-HOLD, INC.,
    Plaintiff,

vs.

MUZAK HOLDINGS LLC, *et al.*,
    Defendants.

Case No. 1:11-cv-283

Judge Timothy S. Black

### ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO INJUNCTIVE RELIEF (Doc. 115)

This civil action is before the Court on Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold is Not Entitled to Injunctive Relief (Doc. 115) and the parties' responsive memoranda (Docs. 130 and 131).

For an injunction to issue, the party requesting injunctive relief must show that: (1) it has suffered an irreparable injury; (2) legal remedies, such as money damages, are inadequate compensation; (3) the balance of hardships warrants an injunction; and (4) the public interest would not be disserved by an injunction.   *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (emphasis added).   Here, Joey Hazenfeld, Plaintiff's CEO, admitted in his deposition that any hardship to Plaintiff caused by the alleged infringement at issue in this suit can be remedied through an award of money damages. (Doc. 117 at 2).   Plaintiff therefore has no basis upon which to seek an injunction because it cannot demonstrate prong 2 of the *eBay* test.

Furthermore, in its responsive memorandum, Plaintiff withdraws any claim for injunctive relief and asserts that it will not pursue an injunction "either by Motion or Prayer for Relief."   (Doc. 130 at 1).   Thus, summary judgment is also appropriate to reflect Plaintiff's abandonment of its prayer for injunctive relief.

For the reasons stated, Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold is Not Entitled to Injunctive Relief (Doc. 115) is **GRANTED**.

**IT IS SO ORDERED.**

Date:   March 4, 2013                                      *s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge

UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| INFO-HOLD, INC., | : | Case No. 1:11-cv-283 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MUZAK LLC, | : | |
| | : | |
| Defendant. | : | |

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO LOST
PROFITS DAMAGES (Doc. 116)**

This civil action is before the Court on Defendant's Motion for Partial Summary

Judgment that Plaintiff Info-Hold is Not Entitled to Lost Profits Damages (Doc. 116) and

the parties' responsive memoranda (Docs. 129 and 140).

## I.    BACKGROUND

Plaintiff Info-Hold, Inc. brings this patent infringement suit against Muzak LLC

accusing it of direct infringement, contributory infringement, and induced infringement of

U.S. Patent No. 5,991,374 (the '374 patent).

Defendant now moves for entry of partial summary judgment that Plaintiff is not

entitled to lost profits as a measure of damages against Defendant in this action on the

bases that Plaintiff failed to respond to discovery requests on lost profits and that Plaintiff

has provided no evidence of having a method to determine its own gross and net profit

margins on products covered by the '374 patent.   (Doc. 116).

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A moving party is entitled to point to a lack of evidence to support the facts its opponent must prove to carry its burden of proof as a basis for summary judgment.  *Celotex,* 477 U.S. at 325.

The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Id.* at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson, supra*, 477 U.S. at 248.  It is not sufficient for the nonmoving party to merely "show that there is some metaphysical doubt as to the material facts."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Matsushita, supra*, 475 U.S. at 586).  Instead, the nonmoving party must show that "the evidence presents a sufficient disagreement to require submission to a jury."

*Griffin v. Hardrick,* 604 F.3d 949, 953 (6th Cir. 2010) (citing *Anderson, supra*, 477 U.S. at 252-52).

## III.  ANALYSIS

### A.    Lost Profits: The *Panduit* Test

Plaintiff claims it is entitled to lost profits as a measure of damages in this action based on the four-factor *Panduit* test.   *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).   This test requires Plaintiff to show: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manu-facturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made.   *Id.*   In order to show the profit it would have made in the absence of the alleged infringement, Plaintiff must present enough evidence of the profits that it earned as a result of the technology covered by the '374 patent to satisfy its burden of proof on this issue.   However, Plaintiff fails to do so for two reasons.

First, Plaintiff's Rule 30(b)(6) designee, Mr. Mason, testified that Plaintiff's profit information is reflected only on its tax returns, which do not break out profit earned on the Info-Link product separately from other products and services.   (Doc. 140 at 9).   Mr. Mason also testified that Plaintiff does not keep records of what proportion of its sales is attributable to products covered by the '374 patent.   (*Id.*)   Mr. Mason was repeatedly asked to clarify and confirm his answers and did not hesitate or express any uncertainty. (*Id.*)   Now, in the throes of summary judgment proceedings, Plaintiff cannot generate an

issue of material fact by negating testimony of its Rule 30(b)(6) witness, which was given under oath in this action.  *Farrel v. Auto Club of Mich.*, 870 F.2d 1129, 1131-32 (6th Cir. 1989).

Secondly, although Plaintiff conclusorily alleges that it has evidence of lost profits, Plaintiff does not submit that evidence to the Court.  Plaintiff cites to a single-page document that it alleges demonstrates its lost profits, but Plaintiff does not make this document of record before the Court, much less explain how it demonstrates that Plaintiff's lost profits claim has merit.  Fed. R. Civ. P. 56(c)(1) requires that a party asserting that a fact cannot be or is genuinely disputed, as Plaintiff is, "*must* support the assertion by: (A) citing to particular materials *in the record* . . . ; or (B) showing that the materials cited do not establish the presence or absence of a genuine dispute . . ." (emphasis added).  Plaintiff has failed to do so.

Moreover, given that Plaintiff's own expert does not rely on the document in question to set forth Plaintiff's case for lost profits, and given that the document was not produced during fact discovery, Plaintiff is not well situated to argue that the document is sufficient to overcome Defendant's motion for summary judgment.

Plaintiff's arguments regarding lost profits are nothing more than unsupported allegations that fail to raise an issue of material fact sufficient to survive summary judgment.  Attorney argument is not evidence.  *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence.")

**A66**

Accordingly, Plaintiff has failed to provide evidence that it has any way of calculating or proving the amount of profit it would have enjoyed but for Defendant's alleged infringement, and, therefore, Plaintiff is not entitled to lost profits damages.

**B.      Failure to Respond to Requests for Admission**

Furthermore, regardless of the foregoing analysis, Plaintiff's failure to timely respond to Defendant's Third Set of Requests for Admission alone is sufficient basis on which to grant summary judgment to Defendant.

On November 1, 2012, Defendant served its Third Set of Requests for Admission (21-25).   (Doc. 140 at 3).   The requests were served by Barry Bretschneider, counsel for Defendant, via electronic mail on Daniel Wood, David Wagner and Christopher Alexander, counsel for Plaintiff.   (*Id.*)   Under Fed. R. Civ. P. 36 and 6(d), Plaintiff's responses to Defendants' Requests for Admission were due on December 6, 2012, yet Plaintiff failed to respond until February 19, 2013.   (Doc. 140 at 3).   *See* Fed. R. Civ. P. 36(a)(3) (30 days to respond); Fed. R. Civ. P. 6(d) (three additional days for service by electronic means).

Under Rule 36, Plaintiff's failure to timely serve a response to Defendants' Third Set of Requests for Admission renders admitted all requests stated therein.   *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

Plaintiff's failure to timely respond results in the admission of the following statement:

> 21.     Info-Hold is not entitled to lost profits as a measure of damages for infringement of the '374 Patent by Muzak.

(Doc. 140 at 4).

Defendants' unanswered requests for admission are binding admissions for purposes of this action.  *See, e.g., Tracy v. Heffron*, 822 F.2d 60, 60-61 (6th Cir. 1987) ("The district court correctly deemed the requests for admissions to have been admitted by plaintiff because he did not respond to them pursuant to Rule 36(a), Federal Rules of Civil Procedure.").  *See also Luick v. Graybar Electric Co., Inc.*, 473 F.2d 1360, 1362 (8th Cir. 1973).

Plaintiff's excuse regarding the possible failing of its computer systems is unavailing as Fed. R. Civ. P. 5(b)(2)(E) renders service by electronic means "not effective if the serving party learns that it did not reach the person to be served."   As Plaintiff's failure to respond to the requests in question has already been at issue in this case, and because Plaintiffs eventually did respond on February 19, 2013, Plaintiff has clearly been aware of this failure well more than a month before it finally responded, out of time.

## V.   CONCLUSION

Accordingly, for the reasons stated, Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold is Not Entitled to Lost Profits Damages (Doc. 116) is **GRANTED**.

**IT IS SO ORDERED.**

Date:   March 8, 2013                                  _____*s/ Timothy S. Black*_____
                                                       Timothy S. Black
                                                       United States District Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

INFO-HOLD, INC.,              :        Case No. 1:11-cv-283
                             :
      Plaintiff,              :        Judge Timothy S. Black
                             :
vs.                          :
                             :
MUZAK LLC,                    :
                             :
      Defendant.             :

## ORDER DENYING PLAINTIFF'S MOTIONS FOR RECONSIDERATION
### (Docs. 153 and 168)

This civil action is before the Court on Plaintiff's Second Supplemental Motion
for Partial Reconsideration of the Court's Order Granting Defendants' Motion for Partial
Summary Judgment on Info-Hold's Claims of Inducement of Infringement Against
Muzak Holdings LLC and Muzak LLC and Dismissing Muzak Holdings LLC from the
Case (Doc. 153), Plaintiff's Motion for Partial Reconsideration of the Court's Order on
Defendant's Motion for Partial Summary Judgment on Lost Profits Damages (Doc. 168),
and the parties' responsive memoranda (Docs. 159, 169, 173, and 182).

### ANALYSIS

Motions for reconsideration "may not be used to relitigate old matters, or to raise
arguments or present evidence that could have been raised prior to the entry of
judgment." *Exxon Shipping Co. v. Baker*, 544 U.S. 471, 485 n. 5 (2008) (quoting 11. C.
Wright & A. Miller, *Federal Practice and Procedure*, § 2810.1, at 127-28 (2d ed. 1995)).

**A70**

Thus, "courts will [only] find jurisdiction for reconsidering interlocutory orders where there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009).

**A. Plaintiff's Second Supplemental Motion for Partial Reconsideration of the Court's Order Granting Defendants' Motion for Partial Summary Judgment on Info-Hold's Claims of Inducement of Infringement Against Muzak Holdings LLC and Muzak LLC and Dismissing Muzak Holdings LLC from the Case**

Plaintiff argues the Court should reconsider its decision granting partial summary judgment as to the claim of inducement of infringement to correct clear error or prevent manifest injustice.  (Doc. 153 at 2).  Plaintiff alleges that "comparing the facts and circumstances, pre- and post-filing [of the Complaint], reveals it is clear error to leave the Court's ruling in tact [*sic*] and not modified to comport with present circumstances." *Id.*

However, Plaintiff points to no clear error in the Court's decision as based on the summary judgment record before the Court at the time of the decision.  Defendant's motion for summary judgment on inducement of infringement was filed 19 months after the Complaint in this action was filed.  All of the post-filing actions that Plaintiff now claims were germane to the Court's decision took place more than a year prior to the filing of Defendant's motion.  Nothing prevented Plaintiff from bringing up in its opposition to Defendant's motion for summary judgment the post-filing circumstances.

Plaintiff has not shown that the "manifest justice" it alleges is the result of anything other than its own failure to respond to Defendant's motion in a timely and complete manner.

Moreover, Plaintiff's motion fails to address this Court's stated basis for granting Defendant's motion for partial summary judgment. The basis on which the Court granted Defendant's motion for summary judgment was that Plaintiff failed to present any evidence that Defendant Muzak LLC or former Defendant Muzak Holdings LLC *actually knew* its customers or resellers were infringing Plaintiff's patent. Plaintiff's instant motion does not address the true basis for the Court's decision and does not remedy or explain Plaintiff's failure to present any evidence with its original opposition to Defendant's motion for partial summary judgment that either Defendant Muzak LLC or former Defendant Muzak Holdings LLC actually knew that Muzak customers and resellers were infringing the '374 patent as required by *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).

As a result, Plaintiff's motion for reconsideration is unavailing.

**B. Plaintiff's Motion for Partial Reconsideration of the Court's Order on Defendant's Motion for Partial Summary Judgment on Lost Profits Damages**

Plaintiff also argues that the Court should revisit its decision granting partial summary judgment of no lost profits damages to consider evidence that allegedly was not available when it filed its opposition and thereby to prevent manifest injustice. (Doc.168 at 2).

As a preliminary matter, Plaintiff's motion does not address the Court's explicit alternative holding that "regardless of the foregoing analysis, Plaintiff's failure to timely respond to Defendant's Third Set of Requests for Admission alone is sufficient basis on which to grant summary judgment to Defendant." (Doc. 141 at 5).  Without addressing this alternative ground for summary judgment, Plaintiff cannot show why the request that the Court revisit its grant of summary judgment of no lost profits damages should be considered on the merits at all.

Furthermore, however, even if Plaintiff's request for reconsideration is considered on the merits, it fails.  As with its prior motion for reconsideration, Plaintiff must show that the arguments presented were arguments it had made before that were somehow overlooked or not considered by the Court in its original decision, or that the Court should consider new evidence that, with reasonable diligence, could not have been discovered in time to oppose Defendant's motion for partial summary judgment. *See Louisville/Jefferson*, 590 F.3d at 388.

Plaintiff makes no such showing.  None of the arguments presented in Plaintiff's motion for reconsideration are based on a change in the law since the Court's original decision, nor is there anything in the motion to suggest that the Court somehow overlooked or misunderstood arguments Plaintiff actually made in its original opposition.  What Plaintiff appears to be arguing is that it should get another chance to present arguments and evidence it wishes it had presented in its opposition to Defendant's motion

**A73**

for partial summary judgment, but did not.  Plaintiff does not suggest, and has no basis

for suggesting, that somehow the Court unjustly deprived it of the right to present a full

opposition to Defendant's original motion for partial summary judgment of no lost profits

damages.

Plaintiff's position is based in part on a fundamental misconception: that "[t]his

motion for reconsideration is of a piece with the modifications made by the Court

regarding Plaintiff's experts and their access to Attorney Eyes Only ('AEO') material."

(Doc. 168 at 2).  This argument overlooks the problem identified by the Court with

Plaintiff's opposition to Defendant's original summary judgment motion, that Plaintiff

could not produce evidence of its own profits that were allegedly lost because of

Defendant's allegedly infringing sales.  (Doc. 141 at 3-5).  Plaintiff's access to

Defendant's AEO information is irrelevant to the issue of Plaintiff's own lost profits, an

issue concerned solely with information that would have been in Plaintiff's possession all

along and was not made of record under Fed. R. Civ. P. 56(c)(1) in opposition to

Defendant's motion.

Plaintiff suggests that the timing of the Court's conference with counsel that

resulted in Plaintiff's damages expert's gaining access to Defendant's AEO documents

somehow made "exhibits, calculations and conclusions" not available to be filed with

Plaintiff's opposition.  In reality, Plaintiff had 11 days between the time its expert gained

access to Defendant's AEO documents and the date on which it was required to respond

to Defendant's summary judgment motion.  Additionally, Plaintiff could easily have filed a motion for additional time to prepare responsive declarations under Fed. R. Civ. P. 56(d) if more time was needed.  Moreover, the "exhibits, calculations and conclusions" Info-Hold says it needed to show lost profits were its own documents, not Defendant's. The timing of Plaintiff's expert's access to Defendant's AEO documents has no bearing on the appropriateness of reconsideration in this instance.

Plaintiff also argues that IH007441, a document alleged to be probative of Plaintiff's lost profits, was produced during fact discovery.  As the fact discovery cut-off was December 10, 2012, Plaintiff's argument therefore represents to the Court that IH007441 was in existence at least as early as that date, more than two months before the deadline for Plaintiff's opposition to the summary judgment motion in question.  If that be true, Plaintiff had absolutely no excuse for not making it of record as part of its summary judgment opposition filed February 19, 2013.  Plaintiff has still not overcome the fact that the Court granted Defendant's motion in part because Plaintiff did not put IH07441 "in the record" as required by Fed. R. Civ. P. 56(c)(1).  (Doc. 141 at 4). Nevertheless, even if IH007441 were actually before the Court, it would still be unauthenticated and inadmissible.  If IH007441 *had* been presented to the Court as part of Plaintiff's opposition to the summary judgment motion, Defendant would have been able to successfully object to it pursuant to Fed. R. Civ. P 56(c)(2).

**A75**

Finally, Plaintiff's motion for reconsideration does not explain why or how the evidence it proffers with its motion leads to the conclusion that the Court's decision granting summary judgment of no lost profits damages was clearly in error or manifestly unjust.  Plaintiff still has not explained how or why the alleged new evidence it submits demonstrates the existence of genuine issues of material fact as to Plaintiff's entitlement to lost profits damages.  As stated in the Court's original Order, Plaintiff's own Rule 30(b)(6) designee gave testimony binding on Plaintiff that it had no documents showing the profits it would have made on sales of products embodying the asserted claims of the '374 patent but for Defendant's alleged infringement.  (Doc. 141 at 3-4).  Plaintiff's motion completely fails to address this point.

As a result, this motion for reconsideration is unavailing as well.

## CONCLUSION

For the reasons stated, Plaintiff Info-Hold's Second Supplemental Motion for Partial Reconsideration of Court's Order Granting Defendants' Motion for Partial Summary Judgment on Info-Hold's Claims of Inducement of Infringement Against Muzak Holdings LLC and Muzak LLC and Dismissing Muzak Holdings LLC from the Case (Doc. 153) and Plaintiff's Motion for Partial Reconsideration of the Court's Order on Defendant's Motion for Partial Summary Judgment on Lost Profits Damages (Doc. 168) are hereby **DENIED**.

**IT IS SO ORDERED.**

Date:  August 20, 2013                                 *s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| INFO-HOLD, INC., | : | Case No. 1:11-cv-283 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MUZAK LLC, | : | |
| | : | |
| Defendant. | : | |

## ORDER:

### GRANTING DEFENDANT'S MOTION TO STRIKE
### THE EXPERT REPORTS OF ROBERT L. WHITE AND
### TO PRECLUDE MR. WHITE'S TESTIMONY (Doc. 162)
### AND
### GRANTING DEFENDANT'S MOTION
### FOR PARTIAL SUMMARY JUDGMENT
### THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED
### TO REASONABLE ROYALTY DAMAGES (Doc. 160)

This civil action is before the Court on Defendant's Motion to Strike the Expert

Reports of Robert L. White and to Preclude Mr. White's Testimony (Doc. 162),

Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold is Not

Entitled to Reasonable Royalty Damages and for Dismissal (Doc. 160), and the parties'

responsive memoranda (Docs. 177, 180, 185, and 186).

## I. BACKGROUND

Plaintiff Info-Hold, Inc. brings this patent infringement suit against Muzak LLC

accusing it of direct infringement, contributory infringement, and induced infringement

of U.S. Patent No. 5,991,374.

A78

Defendant now moves, first, to strike the expert reports of Robert L. White, the damages expert designated by Plaintiff, and to preclude Mr. White's testimony pursuant to Fed. R. Evid. 702 and 703 (Doc. 162); and, second, for entry of partial summary judgment that Plaintiff is not entitled to reasonable royalty damages as a measure of damages against Defendant; and, therefore, third, for dismissal of this action with prejudice on the basis that Plaintiff cannot prove it is entitled to any relief.  (Doc. 160).

## II.  STANDARD OF REVIEW

### A.  Admission of Expert Testimony

In its role as gatekeeper, the Court must exclude expert testimony that does not squarely comport with the Federal Rules of Evidence, including the Rule 702 requirements of qualifications, reliability, and relevance and the Rule 703 standard governing the factual bases of an expert's testimony.  Fed. R. Evid. 702, 703; *Daubert v. Merrill Dow Pharm.*, Inc., 509 U.S. 57, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (the court's gatekeeping function under *Daubert* applies equally to nonscientific expert testimony that is based on technical or other specialized knowledge).  A district court's decision to admit expert testimony under *Daubert* in a patent case follows the law of the regional circuit.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

"The Court's gatekeeping role involves a two-prong inquiry: (1) whether the proffered testimony is reliable; and (2) whether the expert's reasoning or methodology can be properly applied to the facts at issue, i.e., whether the opinion is relevant to the facts at issue." *English Woods Civic Ass'n/Resident Cmty. Council v. Cincinnati Metro. Hous. Auth.*, No. 1:03-cv-186, 2004 WL 6043508, at *2 (S.D. Ohio Nov. 23, 2004). The party proffering an expert has the burden to show by a preponderance of evidence that the expert's testimony is reliable, relevant, and that the expert is qualified to give his opinion on each subject matter for which it is offered. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531-32 (6th Cir. 2008); *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001). *See also Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("the issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question").

**B. Summary Judgment Standard**

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As a basis for summary judgment, a moving party can point to a lack of evidence to support the facts its opponent must prove to carry its burden of proof.

*Celotex,* 477 U.S. at 325.

The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Id.* at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson, supra,* 477 U.S. at 248.

### III.  ANALYSIS

#### A.  Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony

As a threshold matter, Mr. White's testimony as presented in his expert reports is properly excluded because Plaintiff has not shown Mr. White to possess sufficient "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

Mr. White and his firm have been doing tax and audit work for Plaintiff Info-Hold over the past fifteen to eighteen years.  (*Id.* at 5).  However, Mr. White is not specifically qualified to be an expert on damages in this case.  He has never testified as a damages expert in a patent case before, and indeed has never testified as an expert in a federal

court case before. (Doc. 167-6 at 4). He has no prior experience with the *Georgia-Pacific* factors or with patent damages calculations at all, and no prior experience with patent licenses. (*Id.* at 5, 16, 38). He learned about patent damages from reviewing cases and reading the Poltorak treatise. Mr. White relied on the discredited and inadmissible 25 percent rule, unaware that it was discredited in 2011 in *Uniloc*. And Mr. White did not independently verify many of the important facts he purports to rely on in his reports.

The deficiencies in Mr. White's qualifications, his lack of knowledge of patent damages issues, and his total acceptance of a discredited rule of thumb for patent damages collectively show that his testimony is more advocacy for Plaintiff than expert testimony.

Thus, Plaintiff has failed to satisfy its burden as the party proffering Mr. White as an expert to show by a preponderance of evidence that his testimony is reliable, relevant and that he is qualified to give his opinion on each subject matter for which it is offered. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d at 531-32; *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d at 260. Plaintiff has not shown that Mr. White's "qualifications provide a foundation for a witness to answer a specific question" on patent damages.

Most egregiously, Mr. White's reasonable royalty testimony is inadmissible as irrelevant under *Daubert* because it starts from the 25 percent rule of thumb, which is an improper legal standard for calculating damages as a matter of law. See *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("This court now holds as a

matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.  Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue").

In order for Info-Hold to carry its burden of proving damages for patent infringement, it must "sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc*, 632 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 591).  Because Mr. White's testimony relies on an improper legal standard for calculating a reasonable royalty, without relying on other, legally acceptable grounds, it is not sufficiently tied to the facts of the case and will not "aid the jury in resolving a factual dispute." *Id*. at 1315-17 (explaining that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case" and that the 25 percent rule is an "abstract and largely theoretical construct [that] fails to satisfy this fundamental requirement").  Accordingly, Mr. White's testimony is irrelevant under *Daubert* and Rule 702 and must be excluded. *Id*. at 1317 (excluding testimony of patentee's damages expert when expert relied on the 25 percent rule because the expert's "starting point of a 25 percent royalty had no relation to the facts of the case, and as such, was arbitrary, unreliable, and irrelevant").  Mr. White's reliance on the 25 percent rule "fails to pass muster under *Daubert* and taints the jury's damages calculation." *Id.* at

1318.

Plaintiff claims that Mr. White's opinions do not rely on the discredited 25 percent rule, contending instead that Mr. White's report shows that the 25 percent rule is "an alternative method" for determining reasonable royalty damages.  (Doc. 177 at 11-12).  However, in the view of the Federal Circuit, the 25 percent rule is not "an alternative method" at all; it is a "fundamentally flawed," forbidden method, which the Court as gatekeeper cannot allow to taint the jury's consideration of damages.  *Uniloc*, 632 F.3d at 1315.  Even where the 25 percent rule is offered merely as a starting point to which the relevant factors for a reasonable royalty calculation found in *Georgia-Pacific* are then applied to adjust the rate, the taint of the 25 percent rule remains because "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusions."  *Uniloc*, 623 F.3d at 1317.

The same logic applies here.  Mr. White started with a 15% royalty rate based on his application of the 25 percent rule.  (Doc. 167-3 at 19-20).  Although his description of his use of the 25 percent rule claims to employ it as an "alternative method," it is the only method Mr. White ever provides for deriving the 15% royalty rate upon which he bases his *Georgia-Pacific* analysis.  Although Mr. White then purports to apply the *Georgia-Pacific* factors to arrive at the proper royalty rate, his analysis never actually deviates from the same 15% royalty rate he derived from his application of the 25 percent rule.

Mr. White also purports to base his royalty rate calculation on the Trusonic settlement agreement, the Hazenfield license, a treatise by Alexander Poltorak, two cases, *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109 (Fed. Cir. 1996) and *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551 (Fed. Cir. 1983), and a document from the Securities and Exchange Commission website purporting to disclose Defendant's franchise royalty rates of 10% of billings for music services.  (Doc. 167-3 at 19-20).  However, Mr. White himself admits that all of this evidence is either not "pertinent" or is evidence he himself did not credit.  (*Id.*; Doc. 167-6 at 44, 46, 49).[1]

Mr. White's opinions on the reasonable royalty rate all depend on his application of the 25 percent rule and rely on other evidence which Mr. White himself agrees is not "pertinent" or admittedly gave "no credit" to.  His opinions on reasonable royalty rate therefore do not meet the *Daubert* standard for reliability and relevance.

Mr. White also improperly employs an entire market value calculation, failing to recognize that the entire market value rule applies "only where the patented feature creates the basis for customer demand" or "substantially create[s] the value of the component parts."  *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336

---

[1]  As Defendant points out and Plaintiff does not contest, Mr. White admitted in his deposition that because the Trusonic Agreement was entered into in 2009, it was not relevant to any hypothetical 2008 negotiation.  (Doc. 162 at 10-11).  Mr. White also admits that he did not rely on published royalty rate standards by industry.  (Doc. 167-6 at 46)  Finally, Mr. White admitted that *Minco* did not concern the same industry as this case, was not decided at a time relevant to the hypothetical negotiation, and was not "pertinent" to the reasonable royalty analysis in this case.  (Doc. 167-6 at 44, 49).  Evidence that is admittedly not "pertinent" to the expert's opinions cannot be the basis for a properly supported opinion under *Daubert*.  *See Anchor Wall*, 340 F.3d at 1313.

(Fed. Cir. 2009; *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549-50 (Fed. Cir. 1995). Instead of carrying out this analysis, Mr. White simply stated: "In this instance, an appropriate royalty base is comprised of all the revenue generated by Muzak on related client sales. We have included revenue generated from collateral sales (i.e., service, voice services – production services, sound system sales, appropriate consideration to these items is given in estimating the royalty rate," without providing any evidentiary basis for the statement. (Doc. 167-3 at 18).

Rule 26(a)(2)(B)(ii) requires an expert report to state the facts or data considered by the expert in forming the opinions to which the expert is expected to testify, and thus Mr. White's failure to state the factual basis for his application of the entire market value rule means that his opinions based on that application are not reliable, since they are not based on the methodology described in *Lucent Techs.*, and not relevant, since they are not tied to the facts of this case.

Moreover, to satisfy Rule 702's standards for reliability, an expert's testimony must be based on independent analysis and objective proof. *See, e.g, Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007).

Here, Mr. White has performed no independent analysis: instead, he relies, without verification, on Plaintiff's employees and Plaintiff's counsel for information crucial to his opinions. Mr. White assumed that all of Defendant's accused Encompass LE2 and MV revenues were driven by demand for the patented invention because he was

told to make this assumption by Plaintiff's counsel. (Doc. 167-6 at 40). All of Mr. White's knowledge regarding convoyed sales was derived from employees of Plaintiff. (*Id.* at 32-33). In fact, Mr. White did not independently verify anything that Plaintiff's CEO or Plaintiff's counsel told him. (*Id.* at 51). His testimony is more advocacy for Plaintiff than expert testimony.

Moreover, Mr. White relies entirely on the numbers provided in the report of Defendant's damages expert, David Paris, without examining any of Defendant's underlying documentation or independently verifying Mr. Paris' numbers. However, it is improper at law for Mr. White to form his opinions by relying on the facts and data of another expert's report without conducting his own investigation or independent verification. Fed. R. Evid. 703; *See, e.g., TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). Additionally, Mr. White took the number of units of LE2 sales that Plaintiff allegedly would have made from an assumption presented by opposing counsel to Plaintiff's CEO at his deposition, and not based on Mr. White's own consideration of the evidence. (*Id.* at 24-25; Doc. 167-9 at 2).

Plaintiff has not shown Mr. White to possess sufficient "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Accordingly, the Court strikes Mr. White's reports and precludes him from testifying at trial.

### B. Motion for Partial Summary Judgment that Plaintiff Info-Hold is Not Entitled to Reasonable Royalty Damages and for Dismissal

There is no genuine dispute that, but for the now-excluded Mr. White, Info-Hold has disclosed no witness, expert or otherwise, to testify for it on the issue of reasonable royalty damages.

If Plaintiff were to present Mr. Hazenfield, Mr. Mason or Mr. Wood, the only "non-experts" identified as witnesses by Plaintiff for any purpose, as witnesses on reasonable royalty damages to testify to a hypothetical negotiation, their testimony would properly be excluded under Fed. R. Civ. P. 26(a)(2)(C) and Fed. R. Evid. 702, 703 and 705. [2]

First, lay witnesses may only give opinions limited to ones that are "rationally based on the witness's perception," Fed. R. Evid. 701(a), and testimony as to how a hypothetical negotiation might proceed is not based on the perception of the witness of events within their personal knowledge. Second, presenting testimony on the hypothetical negotiation requires that the witness "reconstruct the market, a necessarily hypothetical exercise, to project economic results that did not actually occur." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). Moreover, "to

---

[2] These witnesses have not submitted reports pursuant to Fed. R. Civ. P. 26(a)(2)(C) as witnesses not required to submit reports under Fed. R. Civ. P. 26(a)(2)(B) who are being called on to present evidence under Fed. R. Evid. 702, 703 or 705. Plaintiff's failure in this regard invokes Fed. R. Civ. P. 37(c)(1) which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." And here the failure is neither substantially justified nor harmless.

prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id*. There is no evidence that Plaintiff's lay witnesses have the knowledge or expertise to provide such evidence based on personal knowledge.

There are no potential damages witnesses for Plaintiff to call at trial whatsoever, leaving it with no admissible evidence on reasonable royalty damages. All the additional "evidence" referred to in Plaintiff's memorandum in opposition is either not in the record as required by Fed. R. Civ. P. 56(c)(1) and/or is not presented in a form that is admissible in evidence at trial. Fed. R. Civ. P. 56(c)(2). Therefore, because Plaintiff has not presented evidence to make out even a *prima facie* case of reasonable royalty damages, summary judgment is proper on the issue of reasonable royalty damages. *See, e.g., Apple, Inc. v. Motorola, Inc*., 869 F.Supp.2d 901, 906 (N.D. Ill. 2012). To avoid summary judgment, Plaintiff needed to make of record now any admissible evidence it had to show that there is a triable damages case for the fact finder to consider. Plaintiff has not pointed to evidence in the record that would allow a reasonable jury to find reasonable royalty damages.

Accordingly, the Court grants Defendant's motion for entry of partial summary judgment on the issue of reasonable royalty damages.

Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony (Doc. 162) is **GRANTED**.  Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and for Dismissal (Doc. 162) is **GRANTED IN PART** as Defendant is entitled to entry of partial summary judgment on the issue of reasonable royalty damages, but the Motion is **DENIED IN PART** as to Dismissal, because Dismissal is not yet ripe, given the Scheduling Order reflected below.

<u>Scheduling Order</u>

Plaintiff has now been found not to be entitled to any measure of damages in this action and has conceded that it is not entitled to injunctive relief.  (Docs. 130, 139). Accordingly, in a memorandum to be filed by September 11, 2013, Plaintiff shall show cause why final judgment should not be entered against it and this case closed in this Court.  Defendant may file a reply by September 18, 2013.

The trial set to commence on October 15, 2013 is hereby **VACATED**, as is the Final Pretrial Conference of October 7, 2013.

**IT IS SO ORDERED.**

Date:  August 20, 2013                                 *s/ Timothy S. Black*
                                                                   Timothy S. Black
                                                                   United States District Judge

**A90**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| INFO-HOLD, INC., | : | Case No. 1:11-cv-283 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MUZAK LLC, | : | |
| | : | |
| Defendant. | : | |

## ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION (Doc. 205) AND ENTERING FINAL JUDGMENT AGAINST PLAINTIFF

This civil action is before the Court on Plaintiff's Motion for Reconsideration of Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion for Partial Summary Judgment That Plaintiff Info-Hold Is Not Entitled to Reasonable Royalty Damages (Doc. 205), Plaintiff's Memorandum Showing Cause Why Final Judgment Should Not Be Entered Against It (Doc. 206), and the parties' responsive memoranda (Docs. 207, 208, and 209).

## I.     ANALYSIS

### A.     Motion for Reconsideration

Motions for reconsideration "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 544 U.S. 471, 485 n. 5 (2008) (quoting 11. C. Wright & A. Miller, *Federal Practice and Procedure*, § 2810.1, at 127-28 (2d ed. 1995)).

**A91**

Thus, "courts will [only] find jurisdiction for reconsidering interlocutory orders where there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009).

Plaintiff's motion purports to be responsive to these criteria, but in reality is wholly premised on inappropriate bases for granting reconsideration. The entire memorandum in support of Plaintiff's motion for reconsideration is comprised of re-argument of issues already presented to, considered, and decided by the Court, and attempts to introduce arguments and evidence that could have been presented in opposition to Defendant's original motions, but were not.

**1.     Order Striking Mr. White's Expert Reports and Precluding His Testimony**

As a preliminary matter, Plaintiff fails to address at all the fact that Mr. White's improper reliance on the entire market value rule taints his testimony on the royalty base to which any royalty rate would be applied, and thus requires its exclusion. *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 68-69 (Fed. Cir. 2012) (testimony based on the entire market value rule was properly excluded where the offeror "presented no evidence that its patented method drove the demand" for the product). This is an independent basis for the Court's exclusion of the evidence proffered by Mr. White.

**A92**

Moreover, the rest of Plaintiff's arguments regarding Mr. White's qualifications and expert testimony are attempts to re-litigate issues already considered and decided by the Court or to bring up new arguments that could have been brought in Plaintiff's response to Defendant's initial motion.

Based on the foregoing, Plaintiff has demonstrated no legitimate basis on which it can request reconsideration of the Court's Order excluding Mr. White's expert reports and precluding his testimony.

## 2.    Order Granting Defendant's Partial Motion for Summary Judgment

Plaintiff first attempts to re-litigate the question whether the Court is obligated to award damages under the Patent Act.  (Doc. 205 at 3-5).  However, there is nothing in Plaintiff's renewed argument that was not presented, or could not have been presented before, which alone is a proper basis to deny reconsideration.  Moreover, courts do not award patent damages without supporting evidence or on the basis of speculation or conjecture.  *See, e.g., Whitserve LLC v. Computer Packages, Inc*., 694 F.3d 10, 29-33 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860, 868-73 (Fed. Cir. 2010).  It is true that a district court must determine a reasonable royalty based on whatever evidence is in the record, *Dow Chem. Co. v. Mee Indus.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003), but as the Court has already found, Plaintiff did not present record evidence from which even a *prima facie* case of damages could be cobbled together.  As a result, Plaintiff failed to present evidence from which a reasonable fact finder could

determine by a preponderance of the evidence what its reasonable royalty damages might be.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Here, unlike in *Dow*, the exclusion of Mr. White's reports and testimony means that there is no sponsoring witness through whom Plaintiff can introduce the exhibits to which he referred.  Neither a jury nor this Court can be expected to invent a reasonable royalty out of thin air, particularly given that the Federal Circuit requires "sound economic proof of the nature of the market and likely outcomes" in order "to prevent the hypothetical from lapsing into pure speculation[.]"  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

Plaintiff next argues that Defendant has not met its burden of establishing the lack of a triable issue of material fact regarding Plaintiff's entitlement to a reasonable royalty. (Doc. 205 at 5-7).  Again, there is nothing in Plaintiff's renewed argument that was not presented or could not have been presented before, which truth compels the denial of reconsideration.  Moreover, Defendant clearly pointed to the absence of evidence in the record that would allow a reasonable jury to find that Plaintiff could prove the amount of reasonable royalty damages to which it was entitled.  (Doc. 160-1 at 1-2, 7-8).  Defendant did not contend that Plaintiff had to come forth with all evidence relating to reasonable royalty damages, but simply enough to demonstrate a genuine issue of material fact in order to survive Defendant's summary judgment motion.  Plaintiff did not do so, and Defendant's motion was therefore properly granted.

Plaintiff next argues that it "has several competent damages witnesses to call at trial." (Doc. 205 at 7). Again, there is nothing in Plaintiff's renewed argument that was not presented or could not have been presented before, which alone is a basis on which to deny reconsideration. Moreover, regardless of what Mr. Hazenfield and Mr. Mason could have testified to, it is undisputed that none of that testimony is "in the record" in response to Defendant's summary judgment motion as required by Fed. R. Civ. P. 56(c)(1). Furthermore, Mr. Hazenfield and Mr. Mason also cannot testify regarding the determination of a reasonable royalty because they were not properly disclosed as witnesses who would testify regarding damages.[1] And even if Mr. Hazenfield and/or Mr. Mason had properly been disclosed as damages witnesses, their lay witness testimony would not be admissible to show reasonable royalty damages because lay witness testimony is only admissible under Fed. R. Evid. 701 when "rationally based on the perception of the witness" and "not based on scientific, technical, or other specialized

---

[1] *See, e.g., Veritas Operating Corp. v. Microsoft Corp.*, No. 2:06-cv-00703-JCC, 2008 WL 657936, at *25-28, *31 (W.D. Wash. Jan. 17, 2008) (lay witness not permitted to testify to patent damages because plaintiff failed to disclose him as a witness having discoverable information on damages and failed to supplement the purview of his disclosed testimony to include damages; the court reasoned that no justification for these failures was given, failure to disclose was not harmless because it was too late for defendant to conduct further discovery with respect to witness's newly offered damages testimony, and exclusion of testimony was proper under Rule 37 which "gives teeth" to Rule 26 requirements of disclosure and supplementation).

knowledge within the scope of Rule 702[, governing expert testimony]."[2]  Plaintiff also

cannot rely on Mr. White as a lay witness, as his testimony as a non-expert is excluded

under Rule 37(c)(1) for Plaintiff's failure to disclose him as a person with knowledge

under Rule 26(a); moreover, his testimony is inadmissible under Rule 701 for the same

reasons as those applying to Mr. Hazenfield and Mr. Mason.  Plaintiff has not presented

any witnesses who can testify to reasonable royalty damages.

Finally, Plaintiff argues that Fed. R. Civ. P. 56 does not require that summary

judgment materials be admissible, but rather that the party opposing the materials show

that they cannot be submitted in admissible form, and that there is evidence in the record

to support a reasonable royalty award.  (Doc. 205 at 12-16).  Again, there is nothing in

Plaintiff's renewed argument that was not presented or could not have been presented

before, which alone is a basis on which to deny reconsideration.  As a preliminary matter,

the hypothetical lay witness testimony already addressed above also lacks any evidence

---

[2] *See also Auto Indus. Supplier v. Ford Motor Co*., 435 F. App'x 430, 458 (6th Cir. 2011) (lay witness could not establish a foundation for the plaintiff's damages case because he lacked personal knowledge of the plaintiff's specific damages calculations); *JGR, Inc. v. Thomasville Furniture Indus., Inc*., 370 F.3d 519, 525-26 (6th Cir. 2004) (vacating jury's damage award and remanding for a new damages trial because the district court improperly admitted lay opinion testimony on lost profits in a breach of contract case when the damage calculus was outside the witness's personal knowledge and the witness "had no basis upon which to offer lay opinion testimony"); *AVM Tech., LLC v. Intel Corp*, 927 F.Supp.2d 139, 146-47 (D. Del. 2013) (testimony of patent inventor not admissible to show reasonable royalty because the proffered testimony would be "improper expert opinion" that is "the province of expert analysis" and based on speculative hypotheticals); *Veritas Operating Corp*., 2008 WL 657936, at *33 (after patent damages expert was excluded, court rejected plaintiff's argument that its lay witness employee could testify regarding monetary damages because such testimony was not properly disclosed during discovery, the witness was not qualified to testify as an expert, and a lay witness may not offer an opinion on ultimate patent damages, including evidence of a reasonable royalty).

of the royalty base to which a reasonable royalty rate would be applied, because all of

Defendant's sales and financial data is designated Attorney Eyes Only. As such, it

cannot be seen by Mr. Hazenfield or Mr. Mason, and given that Mr. White has

appropriately been precluded from testifying as an expert, he is also precluded from

testifying based on it. Moreover, per this Court's Standing Order Governing Civil

Motions for Summary Judgment:

> Each statement of material fact in a statement of Proposed Undisputed
> Facts or Response to Proposed Undisputed Facts, and each denial in a
> statement of Disputed Issues of Material Fact, must be followed by a
> specific citation or citations to (1) the affidavit of a witness competent to
> testify as to the facts at a trial, (2) a sworn deposition, and/or (3) other
> evidence, including documentary evidence, that would be admissible at
> trial.

*See* http://www.ohsd.uscourts.gov/judges/fpblack.htm.[3] Although Plaintiff insists

it has admissible evidence, it does not adequately explain how any of the alleged

evidence it mentions could not be reduced to admissible form or respond to any of

the authentication, foundation, hearsay, or other admissibility issues raised by

Defendant in its summary judgment pleadings. Plaintiff failed to demonstrate any

evidence on which the Court could properly deny Defendant's summary judgment

motion and fails to demonstrate any basis for reconsideration of that finding here.

---

[3] *See also Yates-Mattingly v. Lineback*, No. 1:11-cv-753, 2013 WL 3976313, at *10 (S.D.
Ohio Aug. 1, 2013) ("Federal Rule of Civil Procedure 56 requires that all evidence relied upon in
moving for summary judgment be admissible at trial"); *Villegas v. Metro. Government of
Nashville*, 709 F.3d 563, 576 n.7 (6th Cir. 2013) (refusing to consider inadmissible hearsay when
evaluating summary judgment because "[s]uch rank hearsay cannot be relied upon by a court
when ruling on a summary judgment motion").

Case: 14-1167 Case: 14-1167 CASE PARTICIPANTS ONLY Document: 47 Document: 45 Page: 104 Filed: 06/20/2014 Filed: 06/20/2014

Case: 1:11-cv-00283-TSB-KLL Doc #: 210 Filed: 11/13/13 Page: 8 of 9  PAGEID #: 9152

Plaintiff's entire motion and memorandum is composed of improper attempts to argue against motions that have already been thoroughly considered and granted by the Court.  Plaintiff fails to satisfy even the most basic criteria for reconsideration.

**B.      Final Judgment**

As stated, courts may not enter patent damages awards without supporting evidence or on the basis of speculation or conjecture.  *See*, *e.g.*, *Whitserve LLC*, 694 F.3d at 29-33; *ResQNet.com, Inc.*, 594 F.3d at 868-73.  Even where a patentee is entitled to damages not less than a reasonable royalty upon a finding of infringement, the patentee still must prove what those damages are with admissible evidence.  *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 361 (3d Cir. 1981) (cited with approval in *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990) ("The statute requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute")).  Here, Plaintiff has not demonstrated that it is entitled to any measurable remedy and thus is not a prevailing party to whom costs or attorneys' fees can be awarded, and Plaintiff's Memorandum Showing Cause Why Final Judgment Should Not Be Entered Against It (Doc. 206) is unavailing.

Finally, the Court notes that Defendant has consented to the dismissal of its declaratory judgment counterclaim without prejudice.  (Doc. 160-1 at 9; Doc. 207 at 3).

## II.     CONCLUSION

Accordingly, based on the foregoing:

1.  Plaintiff's Motion for Reconsideration of Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion for Partial Summary Judgment That Plaintiff Info-Hold Is Not Entitled to Reasonable Royalty Damages (Doc. 205) is **DENIED**;

2.  Defendant's declaratory judgment counterclaim is **DISMISSED** without prejudice;

3.  The Clerk shall **ENTER Final Judgment against Plaintiff**; and

4.  This case shall be **CLOSED**.

**IT IS SO ORDERED.**


Date: 11/13/13                                  */s/ Timothy S. Black*
                                                Timothy S. Black
                                                United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**INFO-HOLD, INC.,**                    **Case No. 1:11-CV-283**

      Plaintiff,                    **Judge Timothy S. Black**
                                        **Magistrate Judge Karen L. Litkovitz**

**-vs-**

**MUZAK LLC,**

      Defendant.

_____

**JUDGMENT IN A CIVIL CASE**
_____


     **[  ]**   **Jury Verdict:** This action came before the Court for a trial by jury.  The issues have been tried and the Jury has rendered its verdict.

     **[X]**   **Decision by Court:**

     **IT IS ORDERED AND ADJUDGED** that the Plaintiff's Motion for Reconsideration of Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion to Partial Summary Judgment That Plaintiff Info-Hold is Not Entitled to Reason Royalty Damages (Doc. 205) is **DENIED**; the Defendant's declaratory judgment counterclaim is **DISMISSED** without prejudice; Final Judgment is **ENTERED** against the Plaintiff; and the case is **CLOSED** from the docket of the Court.

Date: November 13, 2013                    **JOHN P. HEHMAN, CLERK**


                                            By: _s/ M. Rogers_____
                                            Deputy Clerk

**A100**



US005991374A

# United States Patent [19]

**Hazenfield**

[11] **Patent Number:** 5,991,374

[45] **Date of Patent:** Nov. 23, 1999

[54] **PROGRAMMABLE MESSAGING SYSTEM FOR CONTROLLING PLAYBACK OF MESSAGES ON REMOTE MUSIC ON-HOLD-COMPATIBLE TELEPHONE SYSTEMS AND OTHER MESSAGE OUTPUT DEVICES**

[76] Inventor: **Joey C. Hazenfield**, 2677 Little Dry Run Rd., Cincinnati, Ohio 45244

[21] Appl. No.: **08/694,854**

[22] Filed: **Aug. 8, 1996**

[51] Int. Cl.⁶ ............................................ **H04M 3/42**

[52] U.S. Cl. ............................ **379/101.01**; 379/88.11; 379/88.22

[58] Field of Search ................................ 379/67, 74, 76, 379/87, 88, 89, 90.01, 93.01, 101.01, 102.03, 201, 457, 67.1, 88.11, 88.15, 88.16, 88.17, 88.18, 88.22, 88.25, 340/825.44, 825.47, 825.52; 348/6, 7; 455/500, 70, 3.1, 3.2, 6.3, 412, 418, 31.2, 39

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,446,336 | 5/1984 | Bethel et al. . |
| 4,663,777 | 5/1987 | Szeto .......................... 379/88 |
| 4,785,408 | 11/1988 | Britton et al. ................ 364/513.5 |
| 4,797,909 | 1/1989 | Mastromoro et al. ........... 379/67 |
| 4,985,913 | 1/1991 | Shalom et al. ................ 379/76 |
| 4,996,704 | 2/1991 | Brunson ...................... 379/67 |
| 5,016,273 | 5/1991 | Hoff . |
| 5,027,384 | 6/1991 | Morganstein ................. 379/67 |
| 5,029,198 | 7/1991 | Walpole et al. ............... 379/88 |
| 5,109,414 | 4/1992 | Harvey et al. ................ 380/9 |
| 5,247,549 | 9/1993 | Snowden et al. .............. 370/94.1 |
| 5,247,568 | 9/1993 | Bergsman et al. ............. 379/67 |
| 5,293,484 | 3/1994 | Dabbs, III et al. ............. 395/164 |

| | | |
|---|---|---|
| 5,337,044 | 8/1994 | Folger et al. ................ 340/825.44 |
| 5,381,138 | 1/1995 | Stair et al. ................. 340/825.44 |
| 5,418,527 | 5/1995 | Yashiro ..................... 340/825.24 |
| 5,434,906 | 2/1995 | Robinson et al. ............. 379/67 |
| 5,434,908 | 7/1995 | Klein ........................ 379/88 |
| 5,434,910 | 7/1995 | Johnson et al. .............. 379/89 |
| 5,459,458 | 10/1995 | Richardson et al. ........... 340/825.52 |
| 5,461,665 | 10/1995 | Shur et al. .................. 379/67 |
| 5,594,658 | 1/1997 | Lemaire et al. .............. 364/514 B |
| 5,635,923 | 6/1997 | Steele et al. ................ 340/905 |
| 5,664,948 | 9/1997 | Dimitriadis et al. ........... 434/307 R |

*Primary Examiner*—Scott Weaver
*Attorney, Agent, or Firm*—Roylance, Abrams, Berdo & Goodman, L.L.P.

[57] **ABSTRACT**

A remotely programmable message delivery system comprises a number of client computers which communicate with a server to send control signals to one or more remote message playback devices. The message playback devices are each provided with a library of messages, and comprise at least one music on-hold-compatible telephone system, a public address system or other audio and/or visual advertising device. Message playlists from the client computers can be sent via the server to the message playback devices by a communication link such as a radiopaging system. The client computer is programmed to generate screens for guiding an operator to select messages from the library of messages and the order and times at which they are to be played by selected message playback devices. Message playback devices can be organized into one or more regions to allow a message playlist to be sent to more than one message playback device using a single radiopaging signal. The client computer can also generate screens to display the text of selected messages.

**36 Claims, 27 Drawing Sheets**





*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*

82

| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| ESN | Long | Electronic serial number |
| MANDATE | Date | Date of manufacture |
| REGION | Text | Region |
| BMN1 | Long | Auxiliary BMN #1 |
| BMN2 | Long | Auxiliary BMN #2 |
| BMN3 | Long | Auxiliary BMN #3 |
| MODEL | Text | Model number |
| FIRMREV | Text | Firmware revision |
| FIRMNUM | Text | Firmware ID number |
| CNFGDATE | Date | Date of last configuration programming |
| STATDATE | Date | Date of last status read |
| ZERODATE | Date | Date of last statistics clear |
| PAGECNT | Long | Total page count |
| PAGEERR | Long | Total corrupted page count |
| PAGESNT | Long | Total transmitted page count |
| CNFGPEND | Byte | 'C' for configuration pending, 'R' for region change pending |

*FIG. 5*

84

| Field | Type | Description |
|---|---|---|
| PORT | Byte | Port number |
| FUNC | Byte | Port function |
| ENAB | Byte | 1=Port enabled |
| CHANGE | Date | Date of last change |

*FIG. 6*

A106

86

| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| PW1 | Text | Current access password |
| PW2 | Text | Previous access password |
| CUSTNAME | Text | Customer name |
| ADDRESS1 | Text | Address line 1 |
| ADDRESS2 | Text | Address line 2 |
| CITY | Text | City |
| STATE | Text | State |
| ZIP | Text | Zip or other mailing code |
| PHONE | Text | Telephone number |
| FAX | Text | FAX number |
| CONTACT | Text | Contact name |
| SALESREP | Text | Sales representative name |
| MAKEDATE | Date | Record creation date |
| EDITDATE | Date | Record last edit date |

*FIG. 7*

90

| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| REGION | Text | Region name |
| KEY | Long | Region key |
| SSTATE | Integer | Record status |
| BMN | Long | Broadcast method number |
| RN | Integer | Region number |
| DESCRIP | Text | Description of region |
| MAKEDATE | Date | Record creation date |
| EDITDATE | Date | Record last edit date |

*FIG. 9*

A107

88

| Field | Type | Description |
|-------|------|-------------|
| ACCOUNT | Long | Customer account number |
| SITE | Text | Site name |
| KEY | Long | Site key |
| SSTATE | Integer | Synchronization |
| ESN | Long | CDPC electronic serial number |
| MANAGER | Text | Site manager |
| REGKEY | Long | Current region (by Key) |
| NREGKEY | Long | Newly selected region (by Key) |
| ADDRESS1 | Text | Address line 1 |
| ADDRESS2 | Text | Address line 2 |
| CITY | Text | City |
| STATE | Text | State code |
| ZIP | Text | Zip code |
| PHONE | Text | Telephone number |
| FAX | Text | FAX number |
| COUNTRY | Text | Country |
| HOURS | Text | Hours of operation |
| NOTES | Text | Notes |
| MAKEDATE | Date | Record creation date |
| EDITDATE | Date | Record last edit date |

*FIG. 8*

,92

| State | Value | Description |
|-------|-------|-------------|
| ssNew | 0 | The Client record has been created, but it has not yet been forwarded to the Server. |
| ssPend | 1 | The Client record has been forwarded to the Server, but is still awaiting transmission. |
| ssSync | 2 | The Server record and the Client record are up-to-date. |
| ssMod | 3 | The Client record has been changed, but the changes have not yet been forwarded to the Server. |
| ssReady | 4 | The Server record has been processed, but the Client has not yet been notified. |
| ssDel | 5 | The record has been deleted by the Client and requires administrative attention. |

*FIG. 10*

,94

| Field | Type | Length | Description |
|-------|------|--------|-------------|
| ACCOUNT | Long | | Customer account number |
| MCODE | Long | | Message Code |
| TITLE | Text | 32 | Descriptive title of message |
| SIG | Boolean | | TRUE for a signature track |
| TRAK | Integer | | Uncorrected track assignment |
| LIBDISC | Integer | | Library CD number |
| LIBTRAK | Integer | | Library track number |
| READER | Text | 16 | Reader code, MALE, FEMALE, etc. |
| COPY | Memo | | Message copy |
| INTROTIME | Integer | | Introduction time (seconds) |
| READTIME | Integer | | Reading time (seconds) |
| TRAILTIME | Integer | | Trailer time (seconds) |
| RECDATE | Date | | Date message was recorded |
| SSTATE | Integer | | Synchronization status |

*FIG. 11*

A109

96

| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| SITEKEY | Long | Site name |
| MCODE | Long | Message code |
| TRAK | Integer | Corrected track number |

*FIG. 12*

98

| Status | Meaning |
|---|---|
| ssNew | The message record has been entered into the Server database and needs to be sent to the Client. |
| ssPend | The message record has been downloaded to the user for approval. |
| ssSync | The message has been approved by the Customer. |
| ssMod | The message record has been changed in the Server database and needs to be re-sent to the Client. |
| ssReady | The message record has been approved in the Client database, but the Server needs to be notified. |

*FIG. 13*

100

| Field | Type | Description |
|---|---|---|
| BMN | Long | Broadcast method number |
| CARKEY | Text | Carrier key |
| PIN | Text | PIN number |
| CAPCODE | Long | Capcode |
| FORMAT | Byte | Format code |
| FREQ | Long | Frequency (Hz) |
| BW | Long | Bandwidth (Hz) |
| COVERAGE | Text | Coverage region |

*FIG. 14*

‑102

| Field | Type | Description |
|-------|------|-------------|
| CARRIER | Text | Carrier name |
| KEY | Long | Carrier key |
| INPUTFMT | Byte | Input format code |
| ADDRESS | Text | Phone number or TCP/IP address |
| MODINIT | Text | Modem initialization string |
| RESPONSE | Text | ixo/TAP response |
| PKTSIZE | Integer | Maximum packet size |

*FIG. 15*

‑104

| Field | Type | Description |
|-------|------|-------------|
| ACCOUNT | Long | Customer account number |
| SEQ | Long | Playlist sequence number |
| LIST | Text | Playlist name |
| URGENT | Byte | Urgent flag |
| SENDDATE | Date | Date to send command |
| MAKEDATE | Date | Creation date |
| EDITDATE | Date | Last modified date |
| SENDDATE | Date | Scheduled transmission date |
| SSTATE | Byte | Synchronization status |

*FIG. 16*



| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| SEQ | Long | Command sequence number |
| POS | Byte | Relative position in Playlist |
| MCODE | Long | Message code |

*FIG. 17*

| Field | Type | Description |
|---|---|---|
| ACCOUNT | Long | Customer account number |
| SEQ | Long | Command sequence ID |
| SITEKEY | Long | Site key |
| SENT | Boolean | Sent flag |

*FIG. 18*



*FIG. 19*

A112



FIG.20

FIG.25



**FIG. 21**

**FIG. 22**



*FIG.23*



*FIG. 24*

*FIG. 26*

FIG.27



*FIG. 28*



*FIG.29*



| | Field | Definition |
|---|---|---|
| 0 | START | Sequence number |
| 1 | LEN | Length of packet (SEQ through SUM inclusive) |
| 3 | SEQ | Packet sequence |
| 4 | DATA | Message-specific data |
| 2+LEN | CRC | CRC-16 |

*FIG. 30*

| Field | Definition |
|---|---|
| ACCOUNT | Account number |
| PASS | Password |
| NEWPASS | New Password (optional) |

*FIG. 31*

| Field | Definition |
|---|---|
| SITEKEY | 1st Site Key |
| SITEKEY | Last Site Key |

*FIG. 32*

| Field | Definition |
|-------|------------|
| REGNKEY | 1st Region Key |

| REGNKEY | Last Region Key |
|---------|-----------------|

*FIG.33*

| Field | Definition |
|-------|------------|
| LISTKEY | 1st Playlist Key |

| LISTKEY | Last Playlist Key |
|---------|-------------------|

*FIG.34*

| Field | Definition |
|-------|------------|
| REGION | Region name |
| KEY | Region key |
| DESCRIP | Description |
| EDITDATE | ACCOUNT |

*FIG.36*

| Field | Definition |
|---|---|
| SITE | Site name |
| KEY | Site key |
| SSTATE | Synchronization |
| MANAGER | Site manager |
| NREGKEY | Newly selected region (by Key) |
| ADDRESS1 | Address line 1 |
| ADDRESS2 | Address line 2 |
| CITY | City |
| STATE | State code |
| ZIP | Zip code |
| PHONE | Telephone number |
| FAX | FAX number |
| COUNTRY | Country |
| HOURS | Hours of operation |
| EDITDATE | Date of last change by user |

*FIG. 35*

| Field | Definition |
|---|---|
| LIST | Playlist name |
| SEQ | Playlist sequence |
| URGENT | Urgent flag |
| SITEKEY | 1st Site key in Playlist |

| | |
|---|---|
| SITEKEY | Last Site key in Playlist |
| SEP1 | End of Site list |
| MCODE | 1st Message code in Playlist |

| | |
|---|---|
| MCODE | Last Message code in Playlist |

*FIG. 37*

A123

| Field | Definition |
|-------|------------|
| KEY | Site Key |
| SSTATE | Synchronization |

*FIG. 38*

| Field | Definition |
|-------|------------|
| KEY | Region Key |
| SSTATE | Synchronization state |

*FIG. 39*

| Field | Definition |
|-------|------------|
| LIST | Playlist name |
| SEQ | Playlist sequence |
| URGENT | Urgent flag |
| SENT | Transmitted flag |
| SSTATE | Synchronization state |
| SITEKEY | 1st Site key in Playlist |

⋮

| SITEKEY | Last Site key in Playlist |
|---------|---------------------------|
| SEP1 | End of Site list |
| MCODE | 1st Message code in Playlist |

⋮

| MCODE | Last Message code in Playlist |
|-------|-------------------------------|

*FIG. 40*

A124

|   | Field | Definition |
|---|-------|------------|
| 0 | SEQ | Sequence number |
| 1 | LEN | Length of packet (SEQ through SUM inclusive) |
| 2 | DATA | Encoded Command Block |
| 4+n | SUM | Checksum |

*FIG. 41*



*FIG. 42*

|   | Field | Definition |
|---|-------|------------|
| 0 | START | STX character (02) |
| 1 | SEQ | Sequence number |
| 2 | LEN | Length of packet (FLAG through SUM inclusive) |
| 3 | DATA | Command Block |
| 3+n | SUM | Checksum |

*FIG. 43*

| | Field | Definition |
|---|---|---|
| 0 | FUNC | Packet function (30h) |
| 1 | REGMASK | Region mask |
| 3 | TRACK(0) | First track number |
| 4 | TRACK(1) | Second track number |
| | n times | |
| 3+n | TRACK(n-1) | Last track number |

*FIG. 44*

| | Field | Definition |
|---|---|---|
| 0 | FUNC | Packet function (31h) |
| 1 | ESN | Electronic serial number |
| 3 | TRKCNT | Number of tracks (n) |
| 4 | TRACK(0) | First track number |
| | TRACK(1) | Second track number |
| | n times | |
| 4+n | TRACK(n-1) | Last track number |

*FIG. 45*

| | Field | Definition |
|---|---|---|
| 0 | FUNC | Packet function (50h) |
| 1 | ESN | Electronic serial number |

*FIG. 46*

| Field | Definition |
|---|---|
| | |
| FUNC | Packet function (51h) |
| CAPCODE | Capcode #1 value |

0
1

| Field | Definition |
|---|---|
| | |
| FUNC | Packet function (54h) |
| CAPCODE | Capcode #2 value |

0
1

| Field | Definition |
|---|---|
| | |
| FUNC | Packet function (53h) |
| CAPCODE | Capcode #3 value |

0
1

| Field | Definition |
|---|---|
| | |
| FUNC | Packet function (54h) |
| CAPCODE | Capcode #4 value |

0
1

*FIG. 47*

| Field | Definition |
|---|---|
| | |
| FUNC | Packet function (56h) |
| REGNUM | Region number |

0
1

*FIG. 48*

| Field | Definition |
|---|---|
| | |
| RESP | Packet response (00h) |

0

*FIG. 49*

| | Field | Definition |
|---|---|---|
| 0 | RESP | Packet response (02h) |

*FIG. 50*

| | Field | Definition |
|---|---|---|
| 0 | RESP | Packet response (02h) |

*FIG. 51*

| | Field | Definition |
|---|---|---|
| 0 | RESP | Packet function (30h) |
| 1 | ESN | Electronic serial number |
| | CAPCODE1 | Primary Capcode |
| | CAPCODE2 | Secondary Capcode |
| | CAPCODE3 | Secondary Capcode |
| | CAPCODE4 | Secondary Capcode |
| | FORMAT | Paging format |
| | GROUPNUM | Group number |
| | CDPTYPE | CD Player ID |
| | TRACKCNT | Number of tracks in track list |
| 3 | TRACK(0) | 1st Track Number |
| 4 | TRACK(1) | 2nd Track Number |

n times

| | | |
|---|---|---|
| $3+n$ | TRACK($n-1$) | Last Track Number |

*FIG. 52*

5,991,374

1

**PROGRAMMABLE MESSAGING SYSTEM FOR CONTROLLING PLAYBACK OF MESSAGES ON REMOTE MUSIC ON-HOLD-COMPATIBLE TELEPHONE SYSTEMS AND OTHER MESSAGE OUTPUT DEVICES**

FIELD OF THE INVENTION

The invention relates to a system for generating and transmitting message playlists to remotely located optical disc players for playing selected messages via a music on-hold-compatible telephone system or public address system.

BACKGROUND OF THE INVENTION

Many businesses use music on-hold-compatible (MOH) telephone systems to provide a customer with music or audio promotions of products or services while the customer is placed on-hold and waiting for assistance. A number of existing MOH telephone systems use tape players as the audio source. The promotional messages are recorded on endless loop cassette tapes. These systems are disadvantageous because the tapes are subject to wear, and the tape players are prone to mechanical malfunctioning. Messages are not modified (i.e., adding or deleting individual messages from a message playlist or modifying the sequence for playing messages on the playlist) because an individual message track cannot be accessed without first winding the tape forward or backward, respectively, past the succeeding or preceding message tracks. Thus, tapes requiring modification are usually discarded, and a new tape is purchased and recorded with messages in accordance with a new message playlist.

Another type of existing MOH telephone system eliminates the use of a tape player by downloading digitized audio messages onto an integrated circuit (IC) chip. The stored messages are played in a particular sequence that is repeated. While the number of moving parts that are subject to mechanical failure is reduced, the system is nonetheless disadvantageous because it is does not allow a user to program when an individual message is to be played or to add or delete a message from a playlist or modify the sequence with which the stored messages are played.

An improved MOH telephone messaging system is disclosed in U.S. patent application Ser. No. 07/999,592, filed Dec. 31, 1992, for ON-HOLD MESSAGING SYSTEM AND METHOD, the entire subject matter of which is hereby incorporated herein by reference for all purposes. The improved MOH telephone messaging system uses at least one optical disc player, such as a compact disc player (CDP), as the audio source. A CDP delivers improved sound quality and offers the ability to add or delete individual messages from a playlist and to change the play sequence of messages stored on an optical disc. For example, the CDP can be programmed to not play one or more of the stored messages at all. Thus, a message playlist can be altered without purchasing and recording a new message storage medium, unlike audio sources which use a cassette tape or an IC. The disclosed CDP-based telephone messaging system, however, is not remotely programmable.

SUMMARY OF THE INVENTION

In accordance with an aspect of the present invention, a remotely programmable message delivery system is provided which allows users to specify message sequences that are to be played at one or more remote sites via an MOH

2

telephone system or other advertising device such as a public address system. The message delivery system comprises a communication link and a plurality of message playback devices, each of the message playback devices comprising a storage device for storing a plurality of audio messages. A computer remotely located from the plurality of message playback devices transmits control signals via the communication link for controlling at least one of the plurality of message playback devices. Each of the plurality of message playback devices is adapted to receive the control signals via the communication link. The computer is programmable to generate screens for guiding an operator to make choices selected from the group consisting of: which of the audio messages is to be played, which of the plurality of message playback devices is to play the selected audio message(s), which of a number of subsets of the plurality of message playback devices is to play the selected audio message(s), and the order in which multiple selected audio messages are to be played, and to generate control signals to implement these choices.

In accordance with another aspect of the present invention, the computer generates a screen displaying a location directory and a message directory. A user can select messages from the message directory for play at different remote sites selected from the location directory, as well as specify the sequence in which the selected messages are to be played at each selected remote site.

In accordance with yet another aspect of the present invention, the computer generates a location directory comprising the names of regions and the names of remote sites located in each of the regions. The computer is programmable to allow a user to add and delete remote site names in the location directory, as well as to create, modify and delete regions. The computer can generate a single command for a number of message playback devices located in the same region to play the same message playlist.

In accordance with still another aspect of the present invention, the computer is programmable to generate a screen which allows a user to select a message from the message directory and to display a full text script of the message.

In accordance with still another aspect of the present invention, the computer is programmable to generate control signals and provide them to a radiopaging company for transmission to the remote sites via radiopaging signals.

In accordance with still another aspect of the present invention, the system comprises a plurality of computers configured as client computers, and a central computer with which all of the client computers communicate via a communication link. The central computer receives data from the client computers relating to user choices for message playlists at selected remote sites and transmits the data to the remote sites via the same or another communication link. The central computer can communicate with a radiopaging company to transmit the data via radiopaging signals.

In accordance with still another aspect of the present invention, the message playback devices each comprise a compact disc player and a receiver circuit for receiving radiopaging signals transmitted by via a radiopaging company. The receiver circuit recognizes radiopaging signals directed to it and commands the compact disc player to play the message tracks specified in the radiopaging signals at the time and in the sequence requested by the client computer from which the message playlist data for the radiopaging signals originated.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of the present invention will be more readily apprehended from the fol-

5,991,374

3

lowing detailed description when read in connection with the appended drawings, which form a part of this original disclosure, and wherein:

FIG. **1** is a schematic block diagram of a remotely programmable messaging system constructed in accordance with an embodiment of the present invention;

FIG. **2** is a schematic block diagram of a message playback device constructed in accordance with an embodiment of the present invention and connected to a conventional MOH telephone system;

FIG. **3** is a schematic block diagram of a client computer constructed in accordance with an embodiment of the present invention;

FIG. **4** is a schematic block diagram of a server in a remotely programmable messaging system constructed in accordance with an embodiment of the present invention;

FIGS. **5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17** and **18** are tables for storing data in a distributed database constructed in accordance with an embodiment of the present invention;

FIGS. **19, 20, 21, 22, 23, 24, 25, 26, 27** and **28** are screens generated by a client computer for guiding a client to enter message playlist data in accordance with an embodiment of the present invention;

FIG. **29** is a schematic block diagram illustrating software modules in a server constructed in accordance with an embodiment of the present invention;

FIG. **30** depicts the format of a packet transmitted between a client computer and a server in accordance with an embodiment of the present invention;

FIG. **31, 32, 33, 34, 35, 36, 37, 38, 39** and **40** illustrate fields in different packets transmitted between a server and a client computer in accordance with an embodiment of the present invention;

FIG. **41** illustrates the format of a packet transmitted between a server and a message playback device in accordance with an embodiment of the present invention;

FIG. **42** is a diagram depicting an encoding process in accordance with an embodiment of the present invention; and

FIGS. **43, 44, 45, 46, 47, 48, 49, 50, 51** and **52** illustrate fields in packets transmitted between a server and a message playback device in accordance with an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** depicts a message delivery system **10** for remotely controlling the playback of messages at a number of remote sites via message playback devices. The term "message" used herein refers to music, advertisements or other recorded audio signals which can be played for a person whose telephone call has been answered by a MOH telephone system. In addition, the system **10** can be configured to program remote, multimedia message playback devices, in which case a message can comprise video or other data, as well. The system **10** comprises at least one central administrative computer **12** hereinafter referred to as a server. The server **12** receives message playback data, including sequences of selected messages (hereinafter referred to as playlists) that originate from a number of client computers **14a** and **14b**, and uses the message playback data to command message playback devices **24** at selected remote sites to play selected messages. Thus, message playback data can comprise identification of selected remote sites at which the messages are to be played, as well as other data such as

4

effective dates for playlists (i.e., the dates on which the server **12** actually transmits the playlists to the message playback devices). Two computers **14a** and **14b** are shown for illustrative purposes, although more client computers can be used in the system **10**. The system **10** can comprise more than one server **12**, for example, if the amount of data received from the computers **14** exceeds the processing capability of a single server **12**. The server **12** and the client computers **14** are preferably IBM-compatible personal computers (PCs), although other platforms such as UNIX and Macintosh can be used. The computers **14** are adapted to communicate with the server **12** via a communication network **16** such as a public switched telephone network (PSTN). The network can also be a private network with a private branch exchange (PBX), a radiopaging network, an optical fiber network, a microwave network, a satellite network, and the like.

The computers **14** are used by clients to enter information relating to the generation of messages at one or more remote sites. As shown in FIG. **1**, three remote sites **18, 20** and **22** are each provided with one or more message playback devices **24a, 24b, 24c** and **24d**, respectively. For example, a first client can be a bank which uses the computer **14a** to send message playlists and other information to bank branches located at sites **18** and **20**, respectively. A second client can be a product distributor which uses the computer **14b** to send message playlists to a regional office at site **22**. The system **10** allows a client to define regions such as regions A and B indicated at **26** and **28**, respectively. Region A **26** is shown as a region consisting of noncontiguous geographical areas **26a** and **26b** for illustrative purposes. Thus, a message playlist can be sent to message playback devices **24a, 24c** and **24d** at sites **18** and **22** if region A **26** is specified, or to message playback devices **24a** and **24b** at sites **18** and **20** if region B **28** is specified. The ability to define regions is advantageous because multiple sites with similar programming requirements (e.g., sites in the same geographical area or sites performing the same customer service function) can be programmed by specifying a single playlist at one of the computers **14**.

As shown in FIG. **2**, each message playback device **24** is preferably provided with a compact disc (CD) or discs **35** on which messages have been recorded. Messages, however, can also be stored and distributed on other storage media such as an integrated circuit or a magnetic disk. Accordingly, the message playback devices **24** can be configured in accordance with the present invention to access different types of storage media and discrete, individual messages stored thereon. Businesses and other concerns employing the system **10** request certain messages which are recorded and then written to optical discs. The optical discs are then distributed to each remote site associated with these businesses and installed at each corresponding message playback device **24**. The frequency with which the discs are distributed can vary, depending on the needs of the businesses to update message data. The discs for a business are preferably identical at each message playback device **24**.

The discs can comprise several related messages, which differ only by reference to a different season or recurring event or interest rate, for example. Users can therefore select the appropriate message(s) when necessary and thereby reduce the frequency of updating the discs with new messages and then distributing them. For example, a manager for a chain of five retail stores can program message playback devices at each of the stores to alternately play messages **C1** and **C2**, which correspond to announcements for everyday discount prices at 10% off list price and regular

5,991,374

5

store hours and locations, respectively. During a sale, the manager can change the playlist to include messages C1 and C3, that is, a message announcing 30% savings during the sale event. At the end of a calendar year, the manager can modify the playlist to include messages C3 and C4 corresponding to announcements for extended business hours and 50% savings. Messages C1, C2, C3 and C4 can all be recorded onto the CDs 35 in advance and programmed for play as needed. When a user (e.g., the manager) creates a playlist, the client computer 14 is programmed to prompt the user to specify an effective date, that is, the date after which the server 12 can transmit a command to play the messages on the playlist to the intended remote sites. Thus, a user can modify a playlist (e.g., replace a message on a playlist with another message from a CD 35) in advance of the actual date after which the other message is intended to be played at a remote site (e.g., in advance of a sale date).

The computers 14 transmit the message playlists and other information pertaining to selected remote sites 18, 20 or 22 to the server 12. The playlists comprise, for example, the identification codes (e.g., C1, C2, and so on) of selected messages on the CDs that a business wishes to have played, the sequence with which the selected messages are to be played, and the remote sites for which a playlist is intended. The identification codes are preferably alphanumeric codes. The server 12, in turn, generates control signals for the message playback devices at the selected remote sites to play the selected messages. In accordance with the present invention, the server 12 converts message identification codes from playlists received from the computers 14 into corresponding track numbers on the CDs which are incorporated into the control signals. For example, the server 12 determines a track number corresponding to a message on a playlist by consulting a track legend stored in a memory device 74 of FIG. 4 (e.g., tables 94 and 96 described below in connection with FIGS. 11 and 12). The track legend stores the track numbers on the disc(s) 35 and the unique identification codes corresponding to respective messages. The track numbers of a particular message can vary among the CDs at the different remote sites.

The server 12 preferably transmits control signals comprising playlists to a subcarrier radiopaging company 30 for radiopaging the remote message playback devices 24 via a communication link 31. Other types of communication links 31, however, can be used such as a satellite communication link, a microwave link, a PSTN, an optical fiber network or other communications link. Further, the server 12 can communicate with the radiopaging company 30 via the communication link 16 or another communication link 17.

With reference to FIG. 2, each message playback device 24 preferably comprises an optical disc player 32 (e.g., a CDP), and a receiver circuit 34 which is adapted to process control signals transmitted via the communication link 31 into command signals for the optical disc player 32. The optical disc player preferably comprises a speaker output or other output 41 which is connected to at least one advertising device such as a MOH telephone system 44, a public address system 45, and a visual display device (e.g., an electronic sign) 47. The receiver circuit 34 can be implemented on a circuit board (not shown) mounted inside the chassis of a commercially available optical disc player. The optical disc player 32 can be, for example, a Model CDP-297 compact disc player available from Sony Corporation of America, Park Ridge, N.J. The optical disc player 32 comprises a disc carousel 36, cartridge or retractable shelf adapted to receive one or more optical discs 35, an optics system 38 for reading data from an optical disc, an audio output circuit 39 for

6

generating audio signals from signals received from the optics system 38 and providing the audio signals to a speaker output 41, and a controller 40 for controlling the CDP components 36, 38 and 39.

As stated previously, the optical disc player 32 can be connected to a conventional MOH telephone system 44 having on-hold messaging capabilities such as the Merlin System Model 1030 manufactured by AT&T, Parsippany, N.J., or the Electra Mark II Series telephone system with Model TSW-E circuit card manufactured by NEC America, Melville, N.Y. It is to be understood, however, that the telephone system 44 can also be a PBX or other type of telephone system such as an automated telephone answering system. An optional audio amplifier 42 (e.g., a Model 1701 amplifier manufactured by University Sound, Inc., Sylmar, Calif.) can be connected between the optical disc player 32 and the MOH telephone system 44, if their respective output signal levels are different, to improve the volume level and clarity of the audio signals heard by callers accessing the MOH telephone system 44 via a communications network 46 and telephones 48 or other telecommunications access devices. The network 46 of FIG. 2 and the network 16 of FIG. 1 are preferably the same PSTN.

With continued reference to FIG. 2, the receiver circuit 34 preferably comprises a microcontroller 50 programmed in accordance with the present invention, a receiver 52 and an antenna 54. The receiver 52 is adapted to demodulate signals (e.g. radiopaging signals) received from the communications link between the server 12 and the message playback devices 24 (e.g., via the radiopaging company 30). The demodulated signals are preferably stored in a non-volatile memory device 55. The microcontroller 50 decodes the stored signals and converts them into command signals for the controller 40. The controller 40, in turn, controls the optical disc player 32 to queue up tracks corresponding to selected messages in the playlist for playing. In accordance with another embodiment of the invention, the system 10 can be configured with a single computer 14 and no server 12. For example, the computer 14 can be located in an office within a building and connected directly to one or more message playback devices 32 in the building such as a public address system 45 and a number of signs 47 via a wireline communications link (e.g., a local area network) and modem 53.

While the system 10 is described for use with a MOH telephone system 44 to accommodate customers awaiting assistance via telephones 48, the system 10 can be adapted to provide remote programmability for other types of audio and multimedia message delivery equipment such as a programmable public address system 45, an automated sign 47 or a videoconferencing device 49. The optical disc player 32 can be configured as a multimedia device having a video output device 49 for processing data accessed from the CD(s) 35. For example, messages can include video commercials for a videoconferencing device 49 at a remote site having a corresponding audio message on the speaker output 41, or a still picture (e.g., a picture of a client's business premises) that is useful with different audio messages. The videoconferencing device can receive multimedia messages directly from the multimedia optical disc player 32 or from the MOH telephone system 44.

Thus, in accordance with the present invention, each message playback device 24 at the remote sites 18, 20 and 22 can be programmed by users operating at least one of the computers 14a and 14b to play messages stored on optical disc(s) 35 on a MOH telephone system 44 or other advertising device having a speaker or display device. Further, the

5,991,374

7

system 10 simplifies the process of selecting message play-lists and allows a system user to more effectively maintain a promotional program for customers placed on-hold, or in the broadcast area of a public address system, in view of a programmable display or operating a multimedia computer.

With reference to FIG. 3, each client computer 14 comprises a central processing unit (CPU) 56 (e.g., a microcontroller), a memory device 58, a display device 60 such as a video monitor, and at least one input device 62 such as a keyboard and preferably also a mouse. The computer 14 communicates with the server 12 in a manner described below via a modem 64 and a universal asynchronous receiver/transmitter 66. Similarly, as shown in FIG. 4, the server 12 comprises a CPU 68, an input device 70, a display device 72, and a memory device 74. The server 12 comprises a network interface 76 to communicate with other devices via the network 16. The server 12 is depicted in FIG. 4 as being connected via PSTN 16 to client computers 14a, 14b and 14c and to paging companies 30a and 30b for illustrative purposes.

The system 10 software will now be described with continued reference to FIG. 4. The system 10 preferably employs a distributed database to manage information relating to the system 10 configuration, the paging companies 30a and 30b, capcodes for radiopaging signals, hardwired line connections, the histories and configuration of each message playback device 24, client accounts, among other aspects of the system 10. The distributed database comprises a number of local or client databases 78 and a server database 80 maintained by the server 12. The server database 80 is synchronized with each of the client databases 78 in a manner described in further detail below. The server database 80 preferably stores records corresponding to the records maintained at each of the client computers 14. Since database changes (e.g., deletion of a message from a previously transmitted playlist) are generally initiated by clients via the client computers 14, the client databases do not overlap. Thus, record level arbitration is minimal.

In accordance with an embodiment of the present invention, the records in the distributed database are organized as a number of tables. The server database 80 preferably manages all of the tables, and each of the client databases 78 stores a subset of the tables, that is, those tables that are pertinent to that particular client. The distributed database can be created using, for example, the ACCESS 2.0 relational database architecture developed by Microsoft Corporation, Redmond, Wash.

Each client maintains its client database 78 via its client computer(s) 14. In other words, a client can use more than one computer 14 to access the server 12 if there is equipment (e.g., a client server (not shown)) to arbitrate client database modification requests generated by different client computers. The individual client databases 78 maintain records of messages, regions, remote sites and playlists pertaining to that particular client. A client database 78 can also be maintained for more than one person and/or business entity if those persons or businesses communicate with the server 12 using the same computer(s) 14 and client database 78.

The server 12 is preferably implemented as a set of applications on the CPU 68 and operates as a dedicated computer. In addition, the server 12 preferably operates as a communications hub in the network 16, establishing connections with the computers 14 to receive database changes therefrom and to synchronize the server database 80 to the client databases 78. Synchronization involves downloading database changes from each client database 78 to the server

8

database 80. The server 12 then organizes the database changes into control signals which are sent to the paging companies 30a and/or 30b for broadcast to the message playback devices 24. The server 12 also performs administrative functions such as maintaining paging accounts and client billing.

The system 10 is preferably implemented using a demand-based client-server architecture to optimize telephone connect time during the synchronization process. A user can preferably access the client application at the computer 14 at any time. The client application, however, preferably must receive a log-on request message from the server 12 after a connection is established to begin synchronization. Thus, to optimize the call connection, the client computer 14 is not connected to the server 12 while the user is making changes to the client database. Once all of the database changes have been entered at the computer 14, the user can establish a call connection and synchronize with the server 12.

The client computers 14 are each preferably programmed using an on-demand, WINDOWS™-based client application on the CPU 56 which allows users to define remote sites, regions and message playlists. Each client database 78 comprises data relating to the identification codes corresponding to each message on the optical discs, the playlist currently in use at each remote site associated with the corresponding computer 14, alternate playlists (e.g., playlists having future effective dates), and data relating to each site and region associated with the corresponding client(s), among other data. Each computer 14 is also programmed to provide a graphic user interface by generating screens on the display device 60 for guiding a client when making changes to the client database 78 (e.g., defining a new site, region or playlist or modifying existing records). A number of the screens are described below in connection with FIGS. 19–28. The screens are created in a conventional manner using, for example, the relational database software such that data entered into the fields on the screens are processed and stored to tables and are otherwise used to generate message playlists.

Database tables will now be described with reference to FIGS. 5–18. The server database 80 comprises administrative tables that are specific to the server 12. For example, at least one table 82, as shown in FIG. 5, is stored in the server database 80 for each of the message playback devices 24. The configuration tables for the message playback devices 24 comprise a number of fields such as customer account number, an electronic serial number uniquely identifying that particular message playback device, at least one field specifying the regions in which that message playback device operates, a broadcast method number (BMN), and preferably one or two other fields with auxiliary BMNs, model and firmware identification numbers corresponding to the message playback device hardware and software, respectively, dates indicating when the message playback device configuration was last programmed and when the status of the message playback device was last read. In addition, the respective tables 82 for the message playback devices 24 are programmed to store information regarding successful transmission statistics, as well as fields for indicating total number of pages received, total number of corrupted pages, as well as total number of pages transmitted. A server port table 84 is depicted in FIG. 6 for storing data relating to ports used by the server 12.

A number of administrative tables are shared between the server database 80 and each of the client databases 78, such as a customer account table 86 (FIG. 7), a site table 88 (FIG.

5,991,374

**9**

8), and a region table 90 (FIG. 9). The customer account table 86 comprises fields for storing information such as customer account number, current and previous passwords, biographic information such as customer name, address, telephone number, facsimile number and contact name. Further, the customer account table 86 can comprise information such as name of the sales representative serving the customer and the dates on which the customer account table was created and last modified.

The site table 88 preferably comprises fields for storing information such as customer account number, site name and key, a synchronization code, site address, site manager name, an electronic serial number for the message playback device 24 serving that site, hours of operation, telephone and facsimile numbers, as well as dates on which a site table was created for a particular location and when the site table was last edited.

The site table 80 preferably contains information relating to a single site. Each site preferably specifies the location of a single message playback device 24. Synchronization codes are described with reference to FIG. 10. In order to reflect the state of tables or records in a client database 78, and records on the server 12 during synchronization, shared records are provided with a SSTATE field. The SSTATE field is provided with a value, as shown in the table 92 in FIG. 10, by the CPUs 56 or 68, depending on the transaction occurring between a client computer 14 and the server 12.

A region table 90 relates a local region name to a broadcast method. A region table 90 preferably comprises fields such as customer account number, region name, key, and status, a broadcast method number, a region number, a description of the region, as well as dates on which the region table was created and last modified.

In addition to administrative tables, the server and client databases 78 and 80 share message tables. Each message in the system 10 is preferably defined using two tables, that is, a message table 94 (FIG. 11) and a track correction (TCOR) table 96 (FIG. 12). The message table 94 defines a message currently in existence for a particular customer account. The TCOR table 96 provides per-site track translation to allow for the use of nonstandard compact discs used at the various sites. Unlike the customer account, region and site tables 86, 90 and 88, changes to message tables 94 are created at the server 12 and approved by clients. The synchronization status fields in tables 94 and 96 therefore have different definitions, as indicated in the table 98 in FIG. 13. A synchronization status field in the message table can be provided with one of preferably five different status indicators (e.g., an integer number or other code) to indicate: (1) that a message has been entered into the server database 80 and needs to be sent to the client computer 14; (2) that a message has been downloaded to the client for approval; (3) that the message has been approved by the client; (4) that the message has been changed in the server database 80 and needs to be presented to the client; and (5) that the message has been approved in the client database 98 but the server needs to be notified.

In addition to the synchronization status field, a message table 94 comprises fields for storing information such as a customer account number, a message code which uniquely identifies that message, a descriptive title for the message, an indication of whether or not the message is a signature track, a library CD number and track number, a code for indicating whether or not the message was created using a mail or female voice, a field for storing the text of the message for generation if desired on a client computer screen 60, intro-

**10**

duction time in seconds, reading time in seconds and trailer time in seconds, and the date on which the message was recorded. Entries in the message tables specify actual audio tracks on compact discs located at sites, as well as on the account library compact disc set. The unique message codes in the message tables preferably consist of a single letter followed by a number. The letter "S" preceding a message code indicates that the message is a signature track which is characterized by an additional signature index. The signature index allows, for example, intuitive representation of a single track which is used differently for different sites. The message code preferably comprises 32 bits, that is, an eight bit binary code for representing one of the letters A through Z, eight bits to denote the message number, and an additional eight bits to indicate the signature index. The remaining bits are preferably zeroes. When playlists are processed, the signature index is ignored.

The track correction table 96 provides a correction for terminated or otherwise misplaced tracks on a per-site basis. If a record exists for a particular site and a particular message, the specified correction in the table 96 overrides a track field in the message record; otherwise, a track assignment field in the message table 94 indicates that the message is an uncorrected track.

The system 10 preferably uses regions to describe broadcast coverage. The physical aspects of broadcast coverage, however, are described by a paging carrier, a capcode, and a region selector. The translation between the physical coverage model and the region model is defined by a broadcast method table 100 (FIG. 14) and a carrier table 102 (FIG. 15). The broadcast method table 100 preferably comprises fields for storing broadcast method number, carrier key, a per-site identification number or PIN, a capcode, a format code, a frequency, a bandwidth and a coverage region. The broadcast method table 100 provides a relationship between a broadcast method and particular paging account for the system 10. The paging carrier or computer on-line address, modem initialization string, ixo/TAP response and maximum packet size.

A playlist transmitted from a client computer 14 to the server 12 comprises a list of messages and a list of destinations which are represented in three related tables, that is, a playlist root table 104 (FIG. 16), a playlist message table 106 (FIG. 17) and a playlist site table 108 (FIG. 18). The tables are related using a sequence field. The sequence field in the playlist message table 106 and the playlist site table 108 comprises a command sequence identification code. The sequence field in the playlist root table 104 comprises a playlist sequence number. The other fields in the playlist root table are customer account, playlist number, a flag to indicate whether or not the playlist is urgent, a date on which to send the command to play the message playlist to the message playback devices 24, a creation date, a date indicating when the playlist root table 104 was last modified, a scheduled transmission date (i.e., a date that indicates when the playlist is transmitted, as opposed to when the message playback device 24 provides the compact disc player with the command to begin use of the playlist), and a synchronization status field.

The playlist message table 106 comprises fields for storing message codes for each of the messages in the playlist, as well as data indicating the relative position of the messages in the playlist according to a position or POS field. Messages characterized by lower POS values are played before messages having higher POS values. Further, if the

5,991,374

11

message code specifies a signature track, then a message from a custom table is played; otherwise, the message code field specifies a message in the message table.

The playlist site table **108** comprises data relating to customer account, site key and site flag in addition to the comment command identification in the sequence field. The playlist site table **108** indicates progress of playlist transmission and stores a history of commands to determine which commands are sent to what sites. When a playlist is created, a client specifies which sites are to receive it. The set of sites is converted into multiple entries in this table **108** which describe the actual transmissions that are intended to reach all sites. The entries in the playlist site table **108** are provided to the server **12** during the synchronization process. When the server **12** transmits the command (i.e., message track numbers and site numbers for message playback devices **24** destined to receive the command), the server **12** scans through all of the playlist table entries. The server **12** proceeds to prepare signals for transmission to each of the sites listed in the playlist site table. Following transmission, the server **12** changes the SENT field in the playlist site table **108** to a value corresponding to the condition "true". Further, the server **12** changes the SENT field in all other records related to the transmission to a value corresponding to "true", as well.

The client application on each of the computers **14** is programmed to generate a number of screens to guide a client through the process of generating message playlists, as well as modifying existing playlists for transmission to sites and regions. The client application allows a client to describe relationships between sites, regions, messages and playlists in graphical terms which are then recorded in the client database **78**. A number of the screens are depicted in FIGS. **19–28**. As shown in FIG. **19**, a client computer is programmed to generate a log-on screen **110** which prompts the client to enter an account number and a password. Once a valid password is entered, the computer **14** is programmed to generate a main window screen **112**, as shown in FIG. **20**.

The main window screen **112** is divided into three areas **114**, **116** and **118**, entitled Sites and Regions, Message Library and Playlist Register, respectively. The Sites and Regions area **114** shows a tree list representing regions as folders. Sites are represented as small buildings, as described below in connection with FIG. **24**. Sites are displayed when their corresponding region is double-clicked open using a mouse, for example. Four buttons **120**, **122**, **124** and **126** in this area **114** allow the client to add, delete and edit regions (e.g., regions **26** and **28**) and sites (e.g., **18**, **20** and **22**). The Message Library area **116** shows a list of all of the messages available to the client, along with message titles and message codes. Double-clicking on any message in the list or clicking on the viewer button **132** opens a corresponding message viewer screen (e.g., screen **128** or **130**) which allows the client to view message parameters, to play a message on a CD-ROM at the computer **14** if the computer **14** is provided with an optional CD drive **131** (FIG. **3**) and sound card (not shown), and to accept the message for playback from CDs located at selected remote sites. Finally, the Playlist Register area **118** indicates all pending playlists, as well as a history of playlists transmitted to the remote sites. Double-clicking on a pending playlist converts this area **118** into a Playlist Editor area **134**, as shown in screen **133** of FIG. **23**.

With continued reference to FIG. **20**, if one of the region names (e.g., Cincinnati) in the area **114** is highlighted, the computer generates a screen **136**, as shown in FIG. **24**, which lists all of the sites associated with that region (e.g., Forest Park, Goshen and so on). With reference to FIG. **25**, the client can specify certain parameters relating to a region by depressing the button **122** on screen **136** to obtain the screen **138**. Because a region is preferably an abstract entity with most of its details managed by the server **12**, in accordance with an embodiment of the present invention, the client is preferably limited to changing region name and description in fields **140** and **142**, respectively. On the other hand, a client preferably has more latitude to edit data relating to a site, as indicated in FIGS. **26**, **27** and **28**. The screens **144**, **146** and **148** depicted in these Figures illustrate how a client can enter biographical data regarding a site, the sequence of messages in a current playlist at a particular site, and a list of pending playlists and their effective dates (e.g., send dates).

With reference to FIG. **21**, the message viewer screen **128** or **130** allows a client to preview the text or message copy, introduction, read and trail times of the message, whether or not the message was generated using a male or female voice, as well as the title and message code corresponding to that message. As stated previously, the message viewer screen **128** or **130** can be used to review messages currently available on CDs distributed to remote sites, and new messages received from the server **12** for release approval.

With reference to FIG. **20**, by clicking the "add" or "delete" buttons **150** and **152**, the client can add or remove a playlist from the Playlist Register area **118**. By clicking the "edit" button **154**, or double-clicking the playlist name in the area **118**, the client can obtain the screen **133** in FIG. **23**. The Playlist Editor area **134** indicates whether or not a playlist has an effective transmission date, the sites at which the playlist is to be played, as well as the messages in the playlist. Sites can be specified by dragging them on the display **60** via a mouse or other input device **62** from the Sites and Regions area **114** to the site editor area **135**. Alternatively, the "All" button **156** can be clicked to automatically list all sites in the region highlighted in the area **114**. Messages can be selected by clicking them in the Message Library area **116** or on the message viewer screen (e.g., screen **128** or **130**). "Remove" and "Clear" buttons **158**, **160**, **162** and **164** are provided to remove selected ones or all of the sites and messages in the Playlist Editor area **134**. The entries in the Playlist Editor area **134** can then be saved or canceled by clicking the "Save" button **166** or the "Cancel" button **168**, respectively. The computer **14** is programmed via the client application to initiate a telephone call via its modem to the server **12** to relay the sites and regions configuration or playlist register data thereto. The telephone call is preferably initiated at midnight on the day that the "Save" button was depressed. If the "Urgent" button is clicked, the telephone call is initiated immediately after the "Save" button is clicked.

The operation of the server **12** will now be described with reference to FIG. **29**. The server **12** is the data interchange point of the system **10**. The server **12** accepts calls from client applications at corresponding computers **14** and generates control signals for the radiopage company **30** or other communication line. The server **12** transmits the control signals to remotely located message playback devices **24** having optical disc players **32** and one or more compact discs containing messages to control which of the messages are played and when they are played. The server **12** also collects billing information and maintains customer accounts with each client. The server **12** is programmed to perform client input tasks **170a**, **170b**, **170c** and **170d** which are preferably perpetual tasks that monitor a particular port

A134

5,991,374

13                                                                                        14

on the server 12 for incoming calls from client computers 14. Four client input tasks are shown for illustrative purposes and shall be collectively referred to using reference numeral 170. The client input task 170c subsequently records these modifications in the server database 80 during the next synchronization process. Depending on the nature of the change requested by the client, the server daemon 174 preferably operates in one of two ways. Since human interaction is preferably required to create new sites and regions in a client database, the tables for the new sites and regions contain an SSTATE field which is set to the parameter corresponding to the "New" state. The client computer (e.g., computer 14b) is programmed to retrieve data entered in the fields on the screens (e.g., screen 123) and to automatically provide it to account, site or region tables as necessary. The client computer 14b is also programmed to provide the modified tables to the server 12, along with playlist root tables 104, playlist message tables 106 and playlist site tables 108, during synchronization.

The client input tasks 170 can control a serial I/O port, a TCP/IP port or other communications interface, and are operable to accept calls from client applications on computer 14. The dialog between client input tasks 170 and client applications is preferably performed using a custom data transaction protocol (DTP), which is described below. The client application running with a client computer 14, each of the client input tasks 170 at the server 12 operates as a server, and the client application for that computer 14 operates as a slave. Communication is based on transactions which are initiated by one of the client input tasks (e.g., task 170a) and responded to by, for example, the client computer 14a. When a call is detected, the client input task 170a controls the computer 14a to prompt the client to enter a password and an account number. During synchronization, the client input task 170a also requests a list of all of the sites stored in that client database 78, all of the regions stored in that client database, as well as all of the playlists created at that computer 14a. This represents a method of passing forward notification of deleted sites, regions or playlists. The client input task 170a subsequently requests modified site records from the client computer, and continues to do so until the client computer responds with a null record to indicate that no more modified records exist. Similarly, the client input task 170a requests modified region records and modified playlist records from the client computer 14a, and does so until null records are received. The client input task 170a subsequently reports modified site records, modified region records and modified playlist records to the client application at the computer 14a. The client is therefore informed of the site records and region records that have been administratively activated or changed. The reporting transactions continue as long as the modified region and site records remain in the server database 80. The client is also informed of playlist records that have been transmitted. These reporting transactions continue as long as the modified playlist records remain in the server database 80. The client input task 170a is programmed to then conclude the session with the client computer 14a and terminate the connection on the network 16.

Paging output tasks 172 are protocol processing modules, which accept command packets generated by the server daemon 174 and deliver them to a paging company 30 via a communication link 16 or 17. The server daemon 174 is preferably a perpetual software processing module which monitors changes made to the server database 80 via client input tasks 170, determines when and how to update the message playback devices 24 and generates command packets accordingly. For example, when a client creates a new site or region, or makes a change to an existing site or region, one of the client input tasks (e.g., task 170c) at the server 12 communicates with the computer 14 (e.g., computer 14b) to receive data from that client application. The data is entered,

for example, using the screens depicted in FIGS. 20 and 23. The client input task 170c subsequently records these modifications in the server database 80 during the next synchronization process. Depending on the nature of the change requested by the client, the server daemon 174 preferably operates in one of two ways. Since human interaction is preferably required to create new sites and regions in a client database, the tables for the new sites and regions contain an SSTATE field which is set to the parameter corresponding to the "New" state. The client computer (e.g., computer 14b) is programmed to retrieve data entered in the fields on the screens (e.g., screen 123) and to automatically provide it to account, site or region tables as necessary. The client computer 14b is also programmed to provide the modified tables to the server 12, along with playlist root tables 104, playlist message tables 106 and playlist site tables 108, during synchronization.

When the server daemon 174 encounters tables with the SSTATE field set to the variable "New", the daemon 174 takes no further action since an administrator at the server 12 processes the data received from the client computers 14 at a later time to set up the necessary server database records. When administrative changes are made by a client to an existing record or table, such as changing telephone numbers or points of contact, the server daemon 174 also takes no further action since such changes have no impact on the communication path to the message playback devices 24. When the region assignment of a particular site is changed, the server daemon 174 generates and sends a command packet to the message playback device 24 at that site to change the region assignment at that computer.

The primary task of the daemon 174 is preferably to send playlists to remote message playback devices 24 to control the sequence of messages played by, for example, CD players at the various sites 18, 20 and 22. Since the transmission method is preferably a one-way data broadcast, the server is programmed to conserve air time. Playlists are most efficiently sent to sites within particular regions. Each packet generated by the paging output tasks 172 comprises a header having bit flags. The bit flags are set to indicate which region numbers have been selected. All of the sites in a region are preferably provided with the same capcode. The flags, therefore, are used as a second level of discrimination. Use of regions assigned with unique identification codes allows a single playlist to be received by every message playback device 24 in a single region, or in a cross-section thereof, or in as many as 16 regions, for example.

As stated previously, the system 10 is configured to allow programming of individual sites and offers advantages such as the ability to play signature tracks at certain sites or regions. The more differences that exist between receiving sites; however, the more air time that is required by the system 10. The system 10 is therefore configured to optimize air time to manage various situations. For example, several playlists can be scheduled for the same transmission date with some of the playlists specifying sites in the same region. In some instances, playlists can specify only some of the sites in a region and leave other sites unchanged. Finally, track corrections can exist in one or two sites within a region and thereby complicate a regional playlist. These three types of situations can also be combined to determine the optimal strategy for transmitting a set of playlists. The server 12 is programmed to set up two models. First, the server 12 attempts to create one playlist that covers the largest number of sites. The server 12 calculates the total number of data required to transmit the playlist to all the sites in the affected regions and the individually addressed playlists being sent to

5,991,374

15

sites not intended to play the first playlist. Second, the server 12 calculates the total amount of data required to individually address each site affected by the playlists. The server 12 generates command packets in accordance with the method requiring the least amount of data and forwards the command packets to one of the paging output tasks 172.

As stated previously, the client application at each computer 14 is programmed to generate screens to guide the user in describing relationships between sites, regions, messages and playlists. Activities are subsequently recorded by the client computer 14 in the client database 78 maintained at that computer. The database 78 is subsequently synchronized with the server database 80 at, for example, regular intervals to record changes made by clients at the server database 80. As stated previously, the protocol used for communication between client computers 14 and the server is preferably a customized Data Transaction Protocol (DTP). The DTP is a session-based, end-to-end protocol, which is designed to provide positive acknowledgment upon completion of each transaction. Transactions are preferably initiated by the server 12 regardless of whether they require changes to the server database 80 or to a client database 78. The DTP comprises two layers, that is, an upper layer and a lower layer. The lower layer corresponds approximately to the Data, Link, Network, Transport, Session and Presentation layers specified in the Open System Interconnection (OSI) reference model. The upper layer corresponds approximately to the Application layer of the OSI reference model. The lower level shall be described herein as a custom protocol; however, it can also be implemented as a wrapper for an industry standard protocol such as TCP/IP or IPX/SPX. Client applications and server software modules preferably run in a 32-bit WINDOWS™ environment.

Transaction in DTP between client computers 14 and the server 12 preferably comprise request messages and response messages. The server 12 preferably initiates a transaction with a request message, and the client computer preferably concludes the transaction with a corresponding response message. A request message can, for example, request a client computer 14 to change its database 78 or pass information required for the server 12 to change the server database 80. A response message, for example, reports that a change is complete or returns information from the client database 78 to the server 12. These transactions will be described in further detail below.

As stated previously, the lower layer provides the functionality corresponding to OSI reference model layers 2–6. It is therefore useful for operating with a physical layer comprising a UART 66, a modem 64 and a telephone line provided in each of the client computers 14 since it is a connection-oriented protocol. The lower layer converts request messages or response messages into preferably a single packet. The lower layer, therefore, relies on the upper layer for packet acknowledgment and packetizing. The lower layer notifies the upper layer when it is ready to receive a new message, and subsequently converts new messages into packets by prepending Start Flag, Length and Sequence bits and by calculating and appending a CRC-16 value, as shown in FIG. 30. When the lower layer receives packets, it validates the CRC-16 and checksum values. Packets having an incorrect checksum are ignored, as are packets that have already been processed. Valid packets are passed to the upper layer.

The lower layer operates in one of two modes, depending on whether it is servicing a client computer 14 or the server 12. In the client computer 14, the lower layer initiates a modem 64 call and notifies the upper layer when the first

16

message is received from the server 12. In the server 12, the lower layer places the modem 76 therein in an auto-answer mode and requests the first message from the upper layer when a call from a client computer 14 is detected and a connection with the server 12 is established.

The upper layer operates as part of the client application or the server software (i.e., client input task 170). The upper layer manages communication on a transaction level, generating request messages and response messages as necessary.

A transaction is preferably encoded as an eight-bit function code value, followed by an arbitrary number of encoded, typed fields, as indicated in FIGS. 31–40. As stated previously, a transaction comprises a request message from the server 12 and a response message from a client computer. A number of transaction types can be created for use in the system 10. Exemplary transactions will now be described in connection with FIGS. 31–40.

The log-on transaction validates a session and is intended to be the first transaction after connection between a client computer 14 and the server 12 is established. The server 12 issues a log-on request message. The client computer 14 subsequently responds with a log-on response message, as indicated in FIG. 31. If the response message contains a valid account number and password, the server 12 continues to issue request messages until the session is complete, that is, after site, region and playlist rosters are sent, and site, region and playlist modification requests are sent, as described above. If the response message from the client computer 14 is incorrect, the server 12 preferably terminates the connection. As shown in FIG. 31, one of the fields corresponds to a new password field. If the new password field is not null, then the server 12 accepts the contents as the new password to be used for subsequent sessions on that particular account.

The response portion of a site roster transaction is depicted in FIG. 32. A request message for a list of sites from the server 12 preferably comprises no fields. The client computer 14 sends a complete list of sites in its client database 78 to the server 12. Sites in the server database 80 that are not found in this list are determined to have been removed by the client. Records (e.g., site tables 88) deleted in this manner are provided with flags for administrative attention by changing the SSTATE field to SSDEL which corresponds to a code indicating that a record has been deleted by the client and requires administrative attention. Sites in the client list that are not found in the server database 80 are determined to have been created by the user. The server 12 automatically adds these sites to the server database 80. The response segment of a region roster transaction is depicted in FIG. 33 and involves adding and deleting regions to and from, respectively, the server database 80 in a manner similar to the site roster transaction. A playlist roster transaction is depicted in FIG. 34. This transaction is similar to the playlist and region roster transactions, except that records are deleted from the server database 80, as opposed to being flagged for administrative attention.

With regard to the site modification transaction, the server 12 generates a request message to solicit the next site record in which changes have been made at the client computer 14 to which the server 12 is connected. The client computer 14 in return generates a response message having fields as indicated in FIG. 35. The fields in the corresponding server database record are then updated in accordance with the fields in the site modification response message generated by the client computer. If the NREGKEY field indicates that a

5,991,374

17

region assignment change is requested, the SSTATE field in the corresponding server database table **88** is changed to SSPEND. If the record is new, the SSTATE field in the corresponding database table **88** is changed to SSNEW; otherwise, the SSTATE field is changed to SSREADY. Similarly, in a region modification transaction, the server **12** generates a request message to solicit the next region record or table at the client computer **14** in which changes have been made. The fields in the corresponding server database table **90** are then updated in accordance with the response message shown in FIG. 36. If the record is a new one, the SSTATE field in the table **90** is changed to SSNEW; otherwise, the SSTATE field in the table **90** is changed to SSREADY.

In a playlist modification transaction, the server **12** generates a request message to solicit the next playlist record in which changes have been made from the client computer **14** to which it is connected. The fields in the corresponding server database tables **104, 106** and **108** are updated in accordance with the response message depicted in FIG. 37. As with the region modification request, a new record is acknowledged by changing the SSTATE field to SSNEW; otherwise, the SSTATE field is changed to SSREADY. Since a playlist is represented by three tables, as described previously, the playlist modification transaction is more complex than the site or region modification transactions. The list of site keys in the response message corresponds to the records in the playlist site table **108**. The list of message codes corresponds to the fields in the playlist message tables **106**, with the POS field being derived from the position of each message code in the transaction. Once a playlist has been transmitted to a message playback device (i.e., the SENT field Boolean value corresponding to the state "true")), the record at the message playback device becomes a read-only record that cannot be modified, but rather only replaced.

A site modification transaction involves the server generating a request message as shown in FIG. 38 to notify the client computer **14** of changes made to the site table **88**. The only field effected by this transaction is preferably the SSTATE field since this transaction type is intended to facilitate notifying the client when administrative changes to a site record are created. Similarly, the server generates a request in the region modification transaction shown in FIG. 39 to notify a client when administrative changes to a region record are complete.

During a playlist modification transaction, the server **12** generates a request message to notify a client of changes made to a playlist in the server database **80**. Client tables are updated by the client computer **14** according to the fields in the request message as shown in FIG. 40. The SSTATE field in the client table is taken from the SSTATE field in the request message. The transaction informs the client that a playlist has been transmitted. As with the playlist modification request transaction, the site keys correspond to records in the playlist site table **108**. The message codes correspond to records in the playlist message tables **106**, with the POS field being derived from the position of each code in the transaction. In the case where a client attempts to change a playlist after it has been sent to the client computer **14**, but before the client computer **14** has been notified, the server **12** ignores the modification requests and then notifies the client computer **14** of the change.

The protocol for communication between the server **12** and the message playback devices **24** will now be described in connection with FIGS. 41–52. The message playback generating devices **24** are the end points of the system **10**. As

18

stated previously, each message playback device **24** is a microcomputer-based device designed for installation into the chassis of a compact disc player **32** (CDP), for example. The message playback device is programmable to turn the CDP **32** on and off and to select tracks for repetitive play. The message playback device is preferably operational in a receive-only manner and is programmed to select command packets from the server **12** according to a number of parameters. Each message playback device has a unique identification code, a paging capcode and a region number. The region number can range, for example, from an integer from 0 to 15 in order to identify the region membership of that particular message playback device **24**. The message playback device can receive commands encoded into alpha-numeric radiopaging or other non-wireline communication signals; however, the same command structure can be used in wireline communication. The encoding, however, is different for radiopaging to account for a limited character set and the one-way nature of radiopaging. Each radiopaging signal, which is sent from the server **12** through the radiopaging company **30** to the message playback devices **24**, preferably comprises a sequence number, a packet length, an encoded command and a single bit checksum. In addition, each radiopaging signal preferably corresponds to a single packet.

Command blocks are preferably limited such that one command block fits into one packet. The packets preferably use a limited, seven-bit character set for compatibility between several different paging systems. The transmission process is preferably unidirectional with no acknowledgement or other feedback mechanism. The receiver at each message playback device **24** can receive multiple transmissions of the same packet and replace damaged characters in an original packet with superior quality.

The command block comprises a binary data block of arbitrary length. A six-bit encoding process converts the eight-bit binary data into six-bit words, as shown in FIG. **42**. For compatibility with most processors, the resulting six-bit values are stored as eight-bit values with the zeros inserted into the two most significant bits. The packetizing process then adds a six-bit sequence number, a six-bit length code and a six-bit checksum to the binary data block to create a complete packet containing six-bit words. A character mapping process is then employed which uses a one-to-one map for converting six-bit words into seven-bit characters compatible with a paging network **30**. The complete packet is then passed along with a PIN to a paging output task **172** at the server **12** to send the packet into a paging system **30** as an alphanumeric radiopaging signal. The paging output task **172** preferably uses an industry standard transport protocol such as ixo/TAP, TNPP or SNPP.

The paging company **30** subsequently receives the alpha-numeric radiopaging signal, processes it and transmits it, accordingly. Using an industry standard paging format such as POCSAG, FLEX or ERMES, the message playback devices **24** each receive the page and decode the radiopaging signals into the original seven-bit packet, and error condition codes of each character. The seven-bit packet is then unmapped into a six-bit packet. If the six-bit packet contains bit errors which cannot be corrected using the paging format, the microcontroller **50** retains the six-bit packet in a voting buffer (not shown). Subsequent packets received with the same sequence number from the paging company **30** are provided to the voting buffer to replace damaged characters with superior quality characters. Once the buffer contains only undamaged characters, the command block is con-

5,991,374

19

verted from six-bit words to the original eight-bit data block. The original command block is subsequently processed by the microcontroller **50** to obtain the command from the server **12**.

If wireline communication is employed, the server **12** and the message playback devices **24** are preferably connected using RS-232 lines and operate in an asynchronous mode at 9600 baud or higher with no parity bits and one stop bit. The packets are preferably preceded by a start flag and suffixed by an eight-bit checksum, as shown in FIG. **43**. When a message playback device **24** receives a packet, the packet is checked for errors. If the packet contains errors or is not completely received, the message playback devices ignores it; otherwise, the message playback devices act on the command contained therein and issues a response to the server **12**.

Wireline communication is preferably divided into an upper layer corresponding to an OSI Applications layer, and a lower layer corresponding to OSI reference model layers **2** through **6**. At the server **12**, the upper layer is preferably divided into an in-process OLE server and a utility application. At the message playback device, both layers are preferably integrated directly into the microcontroller firmware. The physical layer is preferably RS-232C-based asynchronous communications hardware running at 9600 bites per second.

The command blocks for the message playback devices **24** are depicted in FIGS. **44**–**52**. In FIG. **44**, a command for program track list by region is depicted. The region mask field in the command is compared with the region programmed into the receiver **52** of the message playback device **24**. If a 0 is found in this field, the command is ignored. If the command packet is accepted, the track numbers are stored in the non-volatile memory **55** of the message playback device and programmed into the controller **40** and compact disc player **32**.

A command for message playlist by electronic serial number (**ESN**) is depicted in FIG. **45**. The ESN field is compared with the electronic serial number programmed into the receiver **52** of the message playback device **24** receiving the command packet. If a match is found, track numbers are stored and programmed into the compact disc player; otherwise, the command is ignored. The commands for setting the ESN, capcodes and the region number are depicted in FIGS. **46**–**48**. These numbers are stored into the non-volatile memory **55** of the message playback device **24**.

The format of responses generated by the message playback devices following receipt of command packets are depicted in FIGS. **49**–**52**. The message playback devices **24** are programmed to send a command complete response to the server **12** to indicate when the last received command was successfully completed, a command ignored response to indicate that the last command was not match (because either the ESN or region fields did not match those programmed into the message playback device), an EEPROM write failure response to indicate that the last command could not be completed due to failure to write to the memory **55** and a status report.

The system **10** realizes a number of advantages over existing message delivery systems. The use of CD-ROM technology overcomes the aforementioned problems with endless loop cassette tapes and provides superior sound quality. The screens generated by the client computers **14** allow users to graphically select locations of message playback devices **24** at which selected messages are to be played via a MOH telephone system or other advertising device, as

20

well as subsets or regions containing several message playback devices **24**. The screens also permit users to create playlists by graphically selecting messages from a library of messages available at the message playback devices **24** and the order in which the messages are to be played. The playlists are transmitted to each of the message playback devices preferably via radiopaging or sent via a wireline communication link. Radiopaging is relatively inexpensive and minimizes installation costs (i.e., the message playback devices **24** are merely plugged into an existing power outlet and no further wiring is required). Thus, managers of private and public organizations can use the system **10** to program the information they wish to provide their customers via a MOH telephone system or other audio and/or visual advertising device from a remote location at any time during the day efficiently and cost-effectively.

While certain advantageous embodiments have been chosen to illustrate the invention, it will be understood by those skilled in the art that various changes and modifications can be made herein without departing from the scope of the invention as defined in the appended claims.

What is claimed is:

1. A programmable message delivery system for playing messages on message playback devices at one or more remote sites comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device; and

a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;

each of said plurality of message playback devices being adapted to receive said control signals via said communication link, said control signals comprising identification data for identifying selected ones of said plurality of message playback devices and list data for identifying selected ones of said messages for playback by respective ones of said selected message playback devices, each of said selected message playback devices being programmable to access said messages identified therefor in said list data from said storage device and to provide said messages to said output until different ones of said messages are selected.

2. A system as claimed in claim 1, wherein said communication link is selected from the group consisting of a microwave link, a radio frequency link, a satellite link, a public switched telephone network, a private switched telephone network, a digital communications network, the Internet, and a fiber optic network.

3. A system as claimed in claim 1, wherein said control signals are transmitted to all of said plurality of message playback devices, each of said plurality of message playback devices comprising a receiver circuit for receiving said control signals and a processing device for processing said list data to operate in accordance with said control signals if said identification data corresponds to said message playback device.

4. A system as claimed in claim 3, wherein each of said plurality of message playback devices not identified in said control signals are operable to disregard said list data.

5. A system as claimed in claim 1, wherein said message playback device comprises a processing device, a storage

5,991,374

21

device for storing said messages as respective files, and a receiver adapted to receive said control signals via said communication link, said computer being programmable to generate said control signals comprising commands for said processing device to access at least a selected one of said files to play a corresponding one of said messages through said output.

**6.** A system as claimed in claim **1**, wherein each of said message playback devices comprises at least one message output apparatus comprising said output and selected from the group consisting of a music on-hold-compatible telephone system, an automated telephone answering system, a public address system, a visual display device, an electronically-controlled sign, an audiovisual apparatus, a videoconferencing device, and a multimedia announcement device.

**7.** A programmable message delivery system for playing messages on message playback devices at one or more remote sites comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device; and

a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;

each of said plurality of message playback devices being adapted to receive said control signals via said communication link and being programmable to access at least one of said messages from said storage device and to provide said accessed message to said output in accordance with said control signals;

wherein said computer comprises a display device and is programmable to generate screens on said display device for guiding an operator to make choices selected from the group consisting of which of said messages are to be played, which of said plurality of message playback devices are to play said selected messages, a time of day when said control signals are to be transmitted to said message playback devices, a date on which said control signals are to be transmitted to said message playback devices, a sequence in which said selected messages are to be played, and how many times to repeat at least one of said selected messages in said sequence, and to generate said control signals to implement said choices via said message playback devices.

**8.** A system as claimed in claim **7**, wherein at least one of said screens displays a location directory comprising a site name for each of said remote sites and guides said operator to select at least one of said remote sites, said computer being programmable to transmit said control signals to said remote sites selected by said operator.

**9.** A system as claimed in claim **7**, wherein at least one of said screens displays names of regions corresponding to subsets of said remote sites and guides said operator to select at least one of said regions, said computer being programmable to generate control signals addressed to said remote sites in said regions selected by said operator.

**10.** A system as claimed in claim **9**, wherein said subsets of said remote sites are selected from the group consisting of said remote sites located in contiguous geographical areas,

22

said remote sites located in a plurality of noncontiguous geographical areas, said remote sites offering a similar service, and said remote sites corresponding to a particular client.

**11.** A system as claimed in claim **7**, wherein at least one of said screens displays at least one of a list of titles and reference codes corresponding to said messages from which said operator can select a plurality of said messages for play at said remote sites, said computer being programmable to generate a playlist comprising data relating to said plurality of messages and to generate said control signals to implement said playlist using said message playback devices.

**12.** A system as claimed in claim **11**, wherein at least one of said screens comprises a script corresponding to at least one of said messages identified in said at least one of said screens.

**13.** A system as claimed in claim **11**, wherein one of said screens comprises at least one of a current playlist and a pending playlist for a selected one of said remote sites, said current playlist and said pending playlist each comprising said reference codes corresponding to said selected messages, said pending playlist further comprising a date corresponding to when said pending playlist is to be transmitted to said message playback devices.

**14.** A system as claimed in claim **11**, wherein said screen also displays a list of names corresponding to said remote sites and guides said operator to select said remote sites at which said messages on said playlist are to be played.

**15.** A system as claimed in claim **14**, wherein said screen allows said operator to specify at least one of a plurality of parameters selected from the group consisting of a time of day when said control signals are to be transmitted to said message playback devices, a date on which said control signals are to be transmitted to said message playback devices, a sequence in which said selected messages are to be played, and how many times to repeat said selected messages in said sequence at said selected remote sites.

**16.** A system as claimed in claim **11**, wherein said screen guides said operator to select one of said messages from said playlist and an operation selected from the group consisting of adding at least one of said messages to said playlist, deleting at least one of said messages to said playlist, changing said sequence of said messages on said playlist, and changing at least one of the date or time for playing at least one of said messages.

**17.** A programmable message delivery system for playing messages at multiple remote sites comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device; and

a first computer for generating and transmitting control signals via said communication link for controlling at least one of said plurality of message playback devices, each of said plurality of message playback devices being adapted to receive said control signals via said communication link;

a plurality of second computers, each of said plurality of second computers being configured to communicate with said first computer and being programmable to generate screens for guiding an operator to make choices selected from the group consisting of which of said messages is to be played, which of said plurality of message playback devices is to play said selected message, which of a number of subsets of said plurality

**A139**

5,991,374

23

of message playback devices is to play said selected message, and when said selected message is to commence playing, and to transmit data signals relating to said choices to said first computer, said first computer being programmable to generate said control signals in accordance with said data signals.

18. A system as claimed in claim 17, wherein each of said plurality of second computers is operable to store data selected from the group consisting of data relating to each of said remote sites associated with said second computer, at least one of identification codes and titles for uniquely identifying each of said messages stored via aid storage device, and message playlists comprising said identification codes of selected ones of said messages for play at said associated remote sites.

19. A system as claimed in claim 18, wherein said first computer is operable to store said data and each of said plurality of second computers is programmable to send modifications to said data stored therein to said first computer, said first computer being programmable to update said data stored therein and to generate and transmit control signals in accordance with said modifications.

20. A system as claimed in claim 17, further comprising a third computer for generating and transmitting said control signals via said communication link for controlling at least one of said plurality of message playback devices, at least one of said plurality of message playback devices being adapted to receive said control signals from said third computer via said communication link, at least one of said plurality of second computers being configured to communicate with said third computer in lieu of said first computer.

21. A system as claimed in claim 17, wherein each of said message playback devices comprises at least one message output apparatus comprising said output and selected from the group consisting of a music on-hold-compatible telephone system, an automated telephone answering system, a public address system, a visual display device, an electronically-controlled sign, an audiovisual apparatus, a videoconferencing device, and a multimedia announcement device.

22. A method of programming message playback devices located at multiple remote sites comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites;

storing at least one of a title and an identification ode for uniquely identifying each said message at a computer located remotely with respect to said message playback devices;

storing site data relating to at least a selected one of said remote sites at said computer;

selecting at least one said message from said library for play at said selected remote site using said computer;

generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message; and

transmitting said control signal to at least said selected remote site.

23. A method as claimed in claim 22, further comprising the steps of:

receiving said control signal at said selected remote site;

accessing said selected message from said library stored at said selected remote site; and

24

playing said selected message on said message playback device at said selected remote site.

24. A method as claimed in claim 22, further comprising the steps of:

defining a subset of said remote sites using a unique region code, said control signal comprising said region code, said transmitting step comprising the step of transmitting said control signal at least to all of said emote sites in said subset;

receiving said control signal at each of said remote sites in said subset;

accessing said selected message from said library stored at said remote sites in said subset; and

playing said selected message on said message playback device at each of said remote sites in said subset.

25. A method as claimed in claim 22, wherein said messages are stored on at least one optical disc at each of said remote sites and each of said remote sites comprises an optical disc player, said generating step comprising the steps of:

converting said identification code of said selected message into a number for a corresponding track on said optical disc at said selected remote site; and

generating a command for said optical disc player at said selected remote site to advance to said track and play said selected message.

26. A method of programming message playback devices located at multiple remote sites comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites;

storing message data for each said message at a first computer located remotely with respect to said message playback devices;

storing site data relating to at least two selected said remote sites at said first computer;

selecting different sets of said messages from said library using said first computer for play at respective said selected remote sites;

generating control signals for commanding said message playback devices corresponding to said selected remote sites to play respective said sets of messages; and

transmitting said control signals to at least said selected remote sites.

27. A method as claimed in claim 26, further comprising the steps of:

receiving said control signals at said selected remote sites;

accessing said sets of messages from said library at respective said selected remote sites in accordance with said control signals; and

playing said sets of messages on said message playback devices at respective said selected remote sites.

28. A method of programming message playback devices located at multiple remote sites comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites, each message being uniquely identified by at least one of an identification code and a title;

storing said at least one of said identification code and said title for each said message at a computer located remotely with respect to said message playback devices;

storing site data relating to said remote sites at said computer;

A140

5,991,374

25

generating at least one computer screen using said computer to display a list of location names corresponding to said remote sites and a list of each said message;

entering playlist data using said at least one computer screen selected from the group consisting of said identification codes of selected ones of said messages, said titles of selected ones of said messages, times for commencing the play of said messages, and selected ones of said remote sites at which said messages are to be played;

generating a control signal using said playlist data; and

transmitting said control signal to said remote sites.

29. A method as claimed in claim 28, further comprising the steps of:

receiving said control signal at said remote sites;

accessing said selected messages from said library stored at respective said selected remote sites; and

playing said selected messages on said message playback devices at respective said selected remote sites.

30. A programmable message delivery system for playing messages comprising:

a storage device for storing discrete, individually accessible messages;

a processor connected to said storage device and programmable to access at least one of said messages;

an input device connected to said processor;

a display device connected to said processor; and

at least one message output apparatus selected from the group consisting of a music on-hold-compatible telephone system, a public address system, a visual display device, an electronically-controlled sign, an audiovisual apparatus, a videoconferencing device, and a multimedia announcement device, said message output apparatus comprising an input and an output, said processor being programmable to generate at least one screen on said display device to display message data relating to each of said messages, said message data selected from the group consisting of a message titles corresponding to respective ones of said messages, message identification codes corresponding to respective said messages, and text of at least one of said messages, said processor being programmable to allow an operator to select at least one of said messages using said message data and said input devices to access said selected message via said storage device and to provide said selected message to said input of said message output apparatus for play through said output of said message output apparatus.

31. A system as claimed in claim 30, wherein said operator can select a sequence of said messages, said processor being programmable to access each of said selected messages via said storage device to provide said messages to said input for play on said output in accordance with said sequence.

32. A message playback device for playing selected messages from an optical disc, the message playback device being remotely controllable via a broadcast transmission system and comprising:

an optical disc system for playing at least one optical disc and providing signals generated therefrom to an output;

a first processor being programmed to generate control signals to control operation of said optical disc system;

a receiver unit; and

26

a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto from said broadcast transmission system and to provide said command signals to said second processor, said command signals identifying selected tracks on said at least one optical disc, said second processor being programmed to convert said command signals into corresponding ones of said control signals to play said selected tracks on said optical disc system and to provide said corresponding ones of said control signals to said first processor until different said tracks on said at least one optical disc are selected.

33. A programmable message delivery system for playing messages on message playback devices at one or more remote sites comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device; and

a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;

each of said plurality of message playback devices being adapted to receive said control signals via said communication link and being programmable to access at least one of said messages from said storage device and to provide said accessed message to said output in accordance with said control signals;

wherein said message playback device comprises an optical disc player, a processing device, a disc having tracks for storing said messages, and a receiver adapted to receive said control signals via said communication link, said control signals comprising commands for said processing device to control said optical disc player access to at least a selected one of said tracks and play a corresponding one of said messages.

34. A remotely controllable message playback device for playing selected messages from an optical disc comprising:

an optical disc system for playing at least one optical disc and providing signals generated therefrom to an output;

a first processor being programmed to generate control signals to control operation of said optical disc system;

a receiver unit; and

a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto and to provide said command signals to said second processor, said second processor being programmed to convert said command signals into control signals and to provide said corresponding ones of said control signals to said first processor;

wherein said command signals are selected from the group consisting of a radio frequency signal and a wireline communication signal.

35. A remotely controllable message playback device as claimed in claim 34, wherein said command signals are radiopaging signals, said receiver unit being configured to demodulate radiopaging signals and to provide said demodulated signals to said second processor.

36. A remotely controllable message playback device as claimed in claim 34, wherein said command signals com-

**A141**

5,991,374

27

prise at least one of a plurality of datum selected from the group consisting of a track number corresponding to a track on said at least one optical disc that is desired to be played and provided to said output of said optical disc system, an identification code for uniquely identifying said message playback device, a site code for uniquely identifying a site

28

at which said message playback device is located, a region code for uniquely identifying the geographic region in which said message playback device is located, and a radiopaging capcode.

* * * * *



US005991374C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8332nd)

# United States Patent
## Hazenfield

(10) **Number:** US 5,991,374 C1
(45) **Certificate Issued:** Jun. 21, 2011

(54) **PROGRAMMABLE MESSAGING SYSTEM FOR CONTROLLING PLAYBACK OF MESSAGES ON REMOTE MUSIC ON-HOLD-COMPATIBLE TELEPHONE SYSTEMS AND OTHER MESSAGE OUTPUT DEVICES**

(75) Inventor: **Joey C. Hazenfield**, Cincinnati, OH (US)

(73) Assignee: **Info-Hold, Inc.**, Cincinnati, OH (US)

**Reexamination Request:**
No. 90/009,671, Jan. 22, 2010

**Reexamination Certificate for:**
Patent No.: **5,991,374**
Issued: **Nov. 23, 1999**
Appl. No.: **08/694,854**
Filed: **Aug. 8, 1996**

(51) **Int. Cl.**
*H04H 20/00* (2006.01)
*H04M 3/428* (2006.01)
*H04M 3/42* (2006.01)
*H04M 3/487* (2006.01)

(52) **U.S. Cl.** ............................... 379/101.01; 379/88.11;
379/88.22

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,720,873 A | 1/1988 | Goodman et al. | |
| 4,920,556 A | 4/1990 | Wong | |
| 5,133,081 A | 7/1992 | Mayo | |
| 5,168,481 A | 12/1992 | Culbertson et al. | |
| 5,276,909 A | 1/1994 | Milner et al. | |
| 5,318,450 A | 6/1994 | Carver | |
| 5,355,302 A | 10/1994 | Martin et al. | |
| 5,374,961 A | 12/1994 | Jung | |
| 5,448,290 A | 9/1995 | Van Zeeland | |
| 5,475,835 A | 12/1995 | Hickey | |
| 5,497,502 A | 3/1996 | Castille | |
| 5,504,921 A | 4/1996 | Dev et al. | |
| 5,506,821 A | 4/1996 | Burton, Jr. | |
| 5,539,635 A | 7/1996 | Larson, Jr. | |
| 5,596,750 A | 1/1997 | Li et al. | |
| 5,629,867 A | 5/1997 | Goldman | |
| 5,668,788 A | 9/1997 | Allison | |
| 5,699,526 A | 12/1997 | Siefert | |
| 5,721,878 A | 2/1998 | Ottesen et al. | |
| 5,726,909 A | 3/1998 | Krikorian | |

(Continued)

OTHER PUBLICATIONS

DAD486x Manual Ver. 4.0 (c) 1994, ENCO Systems. (Exhibit. F).
SOH Productions, Productions, date unknown (2 pgs).
Carrie Borzillo, SW Networks to Office New Formats, Programs in Early '95, Billboards Publications, Oct. 22, 1994 (3 pgs).

(Continued)

*Primary Examiner*—Roland G Foster

(57) **ABSTRACT**

A remotely programmable message delivery system comprises a number of client computers which communicate with a server to send control signals to one or more remote message playback devices. The message playback devices are each provided with a library of messages, and comprise at least one music on-hold-compatible telephone system, a public address system or other audio and/or visual advertising device. Message playlists from the client computers can be sent via the server to the message playback devices by a communication link such as a radiopaging system. The client computer is programmed to generate screens for guiding an operator to select messages from the library of messages and the order and times at which they are to be played by selected message playback devices. Message playback devices can be organized into one or more regions to allow a message playlist to be sent to more than one message playback device using a single radiopaging signal. The client computer can also generate screens to display the text of selected messages.



**US 5,991,374 C1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,731,844 | A | 3/1998 | Rauch et al. |
| 5,734,961 | A | 3/1998 | Castille |
| 5,774,063 | A | 6/1998 | Berry et al. |
| 5,796,951 | A | 8/1998 | Hamner et al. |
| 5,912,958 | A | 6/1999 | Eyraln et al. |
| 5,918,213 | A | 6/1999 | Bernard et al. |
| 5,930,493 | A | 7/1999 | Ottesen et al. |
| 5,942,986 | A | 8/1999 | Shabot et al. |
| 5,963,964 | A | 10/1999 | Nielsen |
| 6,032,177 | A | 2/2000 | O'Donnell |
| 6,047,129 | A | 4/2000 | Frye |
| 6,058,288 | A | 5/2000 | Reed et al. |
| 6,064,723 | A | 5/2000 | Cohn et al. |
| 6,101,324 | A | 8/2000 | Connell et al. |
| 6,111,539 | A | 8/2000 | Mannings et al. |
| 6,121,593 | A | 9/2000 | Mansbery et al. |
| 6,145,088 | A | 11/2000 | Stevens |
| 6,168,563 | B1 | 1/2001 | Brown |
| 6,260,067 | B1 | 7/2001 | Barnhouse |
| 6,261,103 | B1 | 7/2001 | Stephens |
| 6,267,644 | B1 | 7/2001 | Molnar |
| 6,490,346 | B2 | 12/2002 | Lee et al. |
| 6,526,041 | B1 | 2/2003 | Shaffer et al. |
| 6,741,683 | B1 | 5/2004 | Shelton et al. |
| 2001/0046392 | A1 | 11/2001 | Lee |

## OTHER PUBLICATIONS

Chris McConnell, Companies Combine to Customize Radio Addressable Network and Disk Storage Could Product Customizable Feel, Broadcasting & Cable, v124 n.40, Oct. 3, 1994 (2 pgs).

Chris McConnell, SMARTS Broadcasting is Automating Eight Radio Stations in Sweden, Broadcasting and Cable, v124 n.31, Aug. 1, 1994 (1 pg).

Jason Hobby, A System For the Sound of Music, Computer Weekly n1248, Feb. 7, 1991 (2 pgs).

Richard Majestic, Digital Video Broadcasting The Bottom Line, Broadcast Engineering, May 1996 (6 pgs).

Charlie Goode, Commercial–Insertion Systems, Broadcast Engineering, Apr. 1996 (4 pgs).

Garrett Wood, NAB 96 Review—Radio Automation Systems, BE Radio, May/Jun. 1996 (2 pgs).

Kevin McNamara, Audio Backhaul, Program Distribution, Monitoring and Accessories, BE Radio, May/Jun. 1996 (3 pgs).

Yasmin Hashmi and Stella Plumbridge, Radio Automation Systems, BE Radio, May/Jun. 1997 (3 pages).

Yasmin Hashmi and Stella Plumbridge, Computer–Based System Profiles, BE Radio, May/Jun. 1997 (12 pgs).

Chip Morgan, Consolidating Facilities, BE Radio, Nov./Dec. 1997 (7 pgs).

Julie Pitta, Choking On a Silver Spoon, Forbes, May 9, 1994 (2 pgs).

Doing The Foxtrot, Information Week, Nov. 11, 1991 (1 pg).

Paul M. Eng and John W. Verity, Let FroxSystem Enterain You, Business Week, Nov. 4, 1991 (2 pgs).

Consumer Electronics; OutFroxed, The Economist, Oct. 26, 1991 (2 pgs).

George Gilder, Now or Never, Forbes, Oct. 14, 1991 (6 pgs).

George Gilder, Into the Telecosm, Harvard Business Review, Mar./Apr. 1991 (15 pgs).

Brenton R. Schlender, Couch Potatoes! Now It's Smart TV, Fortune, Nov. 20, 1989 (5 pgs).

Marc A. Hamilton, Video Distribution Systems for Local Area Networks, IEEE, 1985 (9 pgs).

Fong–Fui Chain, Shiau–Shiang Jiang, Long–Yih Chu, A Remote Multi–Camera Visual Surveillance System, 10th Conference On Local Computer Networks, Oct. 7–9, 1985 (6 pgs).

Harry Frankel, Stephen Ritter, Andrew Bernat, An Automated Imaging System for Border Control, IEEE 1988 Int'l Carnahan Conference on Security Technology, Oct. 5–7, 1988 (7 pgs).

Kevlin C. Haire, Hopkins Feeds Health News to Far–Flung Radio Stations, Baltimore Business Journal, Jul. 28, 1995 (2 pgs).

Mark Seavy, Frox Launches It's Home Theater System, HFD, Oct. 21, 1991 (2 pgs).

Herbert H. Howard, Michael S. Kievman, Barbara A. Moore, Radio, TV and Cable Programming (2d Ed.), Iowa State University Press, 1994 (6 pgs).

Lincoln Diamant, The Broadcast Communication Dictionary (3d Ed.), Greenwood Press, 1989 (3 pgs).

Martin H. Weik, Communications Standard Dictionary (3d Ed.), Chapman & Hall, 1996 (3 pgs).

Michael C. Keith, The Radio Station (5th Ed.), Focal Press, 2000 (3 pgs).

Steven Warren, Radio The Book (4th Ed.), Focal Press, 2005 (3 pgs).

Dynamic Digital Announcers, Teleconnect, Jan. 1991 (20 pgs).

Intercom & Paging Parade—Buyer's Guide, Teleconnect, Oct. 1991 (9 pgs).

Digital Announcer Panorama, Teleconnect, Jan. 1992 (21 pgs).

Alison Ousey, Nel–Tech Labs' Telink 700 MOH Player, Teleconnect, Jul. 1996 (2 pgs).

US 5,991,374 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1**, **2** and **5** are cancelled.

Claims **7**, **13**, **17**, **19**, **22-28**, **30** and **32-35** are determined
to be patentable as amended.

Claims **8-12**, **14-16**, **18**, **20**, **21**, **29**, **31** and **36**, dependent
on an amended claim, are determined to be patentable.

New claims **37-39** are added and determined to be patent-
able.

Claims **3**, **4** and **6** were not reexamined.

**7**. A programmable message delivery system for playing
messages on message playback devices at one or more
remote sites comprising:
  a communication link;
  a plurality of message playback devices, each of said mes-
  sage playback devices *communicating with a respective
  telephone system and* comprising a storage device for
  storing messages and for playing selected ones of said
  messages through an output of said message playback
  device *when a caller is placed on hold;* and
  a computer remotely located from said plurality of mes-
  sage playback devices and operable to generate and
  transmit control signals via said communication link
  for controlling at least one of said plurality of message
  playback devices;
  each of said plurality of message playback devices being
  adapted to receive said control signals via said commu-
  nication link and being programmable to access at least
  one of said messages from said storage device and to
  provide said accessed message to said output in accor-
  dance with said control signals *when a caller is placed
  on hold;*
  wherein said computer comprises a display device and is
  programmable to generate screens on said display
  device [for] *that include user selectable menu items for
  selection by an operator to define relationships
  between said plurality of message playback devices and
  said messages, the screens* guiding an operator to make
  choices selected from the group consisting of which of
  said messages are to be played, which of said plurality
  of message playback devices are to play said selected
  messages, a time of day when said control signals are to
  be transmitted to said message playback devices, a date
  on which said control signals are to be transmitted to
  said message playback devices, a sequence in which
  said selected messages are to be played, and how many
  times to repeat at least one of said selected messages in
  said sequence, and to generate said control signals to
  implement said choices via said message playback
  devices.

**2**

**13**. [A system as claimed in claim **11**.] *A programmable
message delivery system for playing messages on message
playback devices at one or more remote sites comprising:*
  *a communication link;*
  *a plurality of message playback devices, each of said mes-
  sage playback devices comprising a storage device for
  storing messages and for playing selected ones of said
  messages through an output of said message playback
  device; and*
  *a computer remotely located from said plurality of mes-
  sage playback devices and operable to generate and
  transmit control signals via said communication link
  for controlling at least one of said plurality of message
  playback devices;*
  *each of said plurality of message playback devices being
  adapted to receive said control signals via said commu-
  nication link and being programmable to access at
  least one of said messages from said storage device and
  to provide said accessed message to said output in
  accordance with said control signals;*
  *wherein said computer comprises a display device and is
  programmable to generate screens on said display
  device for guiding an operator to make choices selected
  from the group consisting of which of said messages are
  to be played, which of said plurality of message play-
  back devices are to play said selected messages, a time
  of day when said control signals are to be transmitted
  to said message playback devices, a date on which said
  control signals are to be transmitted to said message
  playback devices, a sequence in which said selected
  messages are to be played, and how many times to
  repeat at least one of said selected messages in said
  sequence, and to generate said control signals to imple-
  ment said choices via said message playback devices;*
  *wherein at least one of said screens displays at least one
  of a list of titles and reference codes corresponding to
  said messages from which said operator can select a
  plurality of said messages for play at said remote sites,
  said computer being programmable to generate a play-
  list comprising data relating to said plurality of mes-
  sages and to generate said control signals to implement
  said playlist using said message playback devices; and*
  *wherein one of said screens comprises at least one of a
  current playlist and a pending playlist for a selected one
  of said remote sites, said current playlist and said pend-
  ing playlist each comprising said reference codes corre-
  sponding to said selected messages, said pending play-
  list further comprising a date corresponding to when
  said pending playlist is to be transmitted to said mes-
  sage playback devices.*

**17**. A programmable message delivery system for playing
messages at multiple remote sites comprising:
  a communication link;
  a plurality of message playback devices, each of said mes-
  sage playback devices *communicating with a respective
  telephone system and* comprising a storage device for
  storing messages and for playing selected ones of said
  messages through an output of said message playback
  device *when a caller is placed on hold;* [and]
  a first computer for generating and transmitting control
  signals via said communication link for controlling at
  least one of said plurality of message playback devices,
  each of said plurality of message playback devices
  being adapted to receive said control signals via said
  communication link; *and*

US 5,991,374 C1

**3**

a plurality of second computers, each of said plurality of second computers being configured to communicate with said first computer and being programmable to generate screens [for] *that include user selectable menu items for selection by an operator to define relationships between said plurality of message playback devices and said messages, the screens* guiding an operator to make choices selected from the group consisting of which of said messages is to be played, which of said plurality of message playback devices is to play said selected message, which of a number of subsets of said plurality of message playback devices is to play said selected message, and when said selected message is to commence playing, and to transmit data signals relating to said choices to said first computer, said first computer being programmable to generate said control signals in accordance with said data signals.

19. [A system as claimed in claim 18.] *A programmable message delivery system for playing messages at multiple remote sites comprising:*

*a communication link;*

*a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device;*

*a first computer for generating said transmitting control signals via said communication link for controlling at least one of said plurality of message playback devices, each of said plurality of message playback devices being adapted to receive said control signals via said communication link; and*

*a plurality of second computers, each of said plurality of second computers being configured to communicate with said first computer and being programmable to generate screens for guiding an operator to make choices selected from the group consisting of which of said messages is to be played, which of said plurality of message playback devices is to play said selected message, which of a number of subsets of said plurality of message playback devices is to play said selected message, and when said selected message is to commence playing, and to transmit data signals relating to said choices to said first computer, said first computer being programmable to generate said control signals in accordance with said data signals;*

*wherein each of said plurality of second computers is operable to store data selected from the group consisting of data relating to each of said remote sites associated with said second computer, at least one of identification codes and titles for uniquely identifying each of said messages stored via said storage device, and message playlists comprising said identification codes of selected ones of said messages for play at said associated remote sites; and*

*wherein said first computer is operable to store said data and each of said plurality of second computers is programmable to send modifications to said data stored therein to said first computer, said first computer being programmable to update said data stored therein and to generate and transmit control signals in accordance with said modifications.*

22. A method of programming message playback devices located at multiple remote sites *and communicating with respective telephone systems, the method* comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites;

storing at least one of a title and an identification [code] *code* for uniquely identifying each said message at a computer located remotely with respect to said message playback devices;

storing site data relating to at least a selected one of said remote sites at said computer;

selecting at least one said message from said library for play at said selected remote site using said computer;

generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message *when a caller is placed on hold on the respective telephone system;* and

transmitting said control signal to at least said selected remote site.

23. A method as claimed in claim 22, further comprising the steps of:

receiving said control signal at said selected remote site;

accessing said selected message from said library stored at said selected remote site; and

playing said selected message on said message playback device at said selected remote site *when a caller is placed on hold.*

24. [A method as claimed in claim 22, further comprising the steps of:] *A method of programming message playback devices located at multiple remote sites, comprising the steps of:*

*storing a library of discrete and individually accessible messages at each of said remote sites;*

*storing at least one of a title and an identification code for uniquely identifying each said message at a computer located remotely with respect to said message playback devices;*

*storing site data relating to at least a selected one of said remote sites at said computer;*

*selecting at least one said message from said library for play at said selected remote site using said computer;*

*generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message; and transmitting said control signal to at least said selected remote site;*

*defining a subset of said remote sites using a unique region code, said control signal comprising said region code, said transmitting step comprising the step of transmitting said control signal at least to all of said* [emote] *remote sites in said subset;*

receiving said control signal at each of said remote sites in said subset;

accessing said selected message from said library stored at said remote sites in said subset; and

playing said selected message on said message playback device at each of said remote sites in said subset.

25. [A method as claimed in claim 22.] *A method of programming message playback devices located at multiple remote sites, comprising the steps of:*

*storing a library of discrete and individually accessible messages at each of said remote sites;*

*storing at least one of a title and an identification code for uniquely identifying each said message at a computer located remotely with respect to said message playback devices;*

**5**

*storing site data relating to at least a selected one of said remote sites at said computer;*

*selecting at least one said message from said library for play at said selected remote site using said computer; and*

*generating a control signal using said computer for said selected remote site to play said selected message; and transmitting said control signal to at least said selected remote site;*

wherein said messages are stored on at least one optical disc at each of said remote sites and each of said remote sites comprises an optical disc player, said generating step comprising the steps of:

converting said identification code of said selected message into a number for a corresponding track on said optical disc at said selected remote site; and

generating a command for said optical disc player at said selected remote site to advance to said track and play said selected message.

**26.** A method of programming message playback devices located at multiple remote sites *and communicating with respective telephone systems, the method* comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites;

storing message data for each said message at a first computer located remotely with respect to said message playback devices;

storing site data relating to at least two selected said remote sites at said first computer;

selecting different sets of said messages from said library using said first computer for play at respective said selected remote sites;

generating control signals for commanding said message playback devices corresponding to said selected remote sites to play respective said sets of messages *when callers are placed on hold on the respective telephone systems;* and

transmitting said control signals to at least said selected remote sites.

**27.** A method as claimed in claim **26**, further comprising the steps of:

receiving said control signals at said selected remote sites;

accessing said sets of messages from said library at respective said selected remote sites in accordance with said control signals; and

playing said sets of messages on said message playback devices at respective said selected remote sites *when callers are placed on hold.*

**28.** A method of programming message playback devices located at multiple remote sites *and communicating with respective telephone systems, the method* comprising the steps of:

storing a library of discrete and individually accessible messages at each of said remote sites *for playback on the respective message playback device when a caller is placed on hold,* each message being uniquely identified by at least one of an identification code and a title;

storing said at least one of said identification code and said title for each said message at a computer located remotely with respect to said message playback devices;

storing site data relating to said remote sites at said computer;

**6**

generating at least one computer screen using said computer to display a list of location names corresponding to said remote sites and a list of each said message;

entering playlist data using said at least one computer screen selected from the group consisting of said identification codes of selected ones of said messages, said titles of selected ones of said messages, times for commencing the play of said messages, and selected ones of said remote sites at which said messages are to be played;

generating a control signal using said playlist data; and transmitting said control signal to said remote sites.

**30.** A programmable message delivery system for playing messages comprising:

a storage device for storing discrete, individually accessible messages;

a processor connected to said storage device and programmable to access at least one of said messages;

an input device connected to said processor;

a display device connected to said processor; and

at least one message output apparatus selected from the group consisting of a music on-hold-compatible telephone system, a public address system, a visual display device, an electronically-controlled sign, an audiovisual apparatus, a videoconferencing device, and a multimedia announcement device, and message output apparatus comprising an input and an output, said processor being programmable to generate at least one screen on said display device to display message data relating to each of said messages, said message data selected from the group consisting of a message titles corresponding to respective ones of said messages, message identification codes corresponding to respective said messages, and text of at least one of said messages, said processor being programmable to allow an operator to select at least one of said messages using said message data and said input devices to access said selected message via said storage device and to provide said selected message to said input of said message output apparatus for play through said output of said message output apparatus *when a caller is placed on hold.*

**32.** A message playback device for playing selected messages from an optical disc, the message playback device being remotely controllable via a broadcast transmission system and comprising:

an optical disc system for playing at least one optical disc and providing signals generated therefrom to an output *in communication with a telephone system;*

a first processor being programmed to generate control signals to control operation of said optical disc system;

a receiver unit; and

a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto from said broadcast transmission system and to provide said command signals to said second processor, said command signals identifying selected tracks on said at least one optical disc, said second processor being programmed to convert said command signals into corresponding ones of said control signals to play said selected tracks on said optical disc system *when a caller is placed on hold on the telephone system* and to provide said corresponding ones of said control signals to said first processor until different said tracks on said at least one optical disc are selected.

US 5,991,374 C1

7

**33.** A programmable message delivery system for playing messages on message playback devices at one or more remote sites *and communicating with one or more respective telephone systems, the message delivery system* comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device *when callers are placed on hold on the respective telephone systems*; and

a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;

each of said plurality of message playback devices being adapted to receive said control signals via said communication link and being programmable to access at least one of said messages from said storage device and to provide said accessed message to said output in accordance with said control signals;

wherein said message playback device comprises an optical disc player, a processing device, a disc having tracks for storing said messages, and a receiver adapted to receive said control signals via said communication link, said control signals comprising commands for said processing device to control optical disc play access to at least a selected one of said tracks and play a corresponding one of said messages *when the caller is placed on hold.*

**34.** A remotely controllable message playback device for playing selected messages from an optical disc *when callers are placed on hold, the device* comprising:

an optical disc system *communicating with a telephone system* for playing at least one optical disc and providing signals generated therefrom to an output *when a caller is placed on hold;*

a first processor being programmed to generate control signals to control operation of said optical disc system;

a receiver unit; and

a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto and to provide said command signals to said second processor, said second processor being programmed to convert said command signals into corresponding ones of said control signals and to provide said corresponding ones of said control signals to said first processor;

wherein said command signals are selected from the group consisting of a radio frequency signal and a wireline communication signal.

**35.** A remotely controllable message playback device [as claimed in claim 34,] *for playing selected messages from an optical disc* comprising:

*an optical disc system for playing at least one optical disc and providing signals generated therefrom to an output;*

*a first processor being programmed to generate control signals to control operation of said optical disc system;*

8

*a receiver unit; and*

*a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto and to provide said command signals to said second processor, said second processor being programmed to convert said command signals into corresponding ones of said control signals and to provide said corresponding ones of said control signals to said first processor;*

wherein said command signals are radiopaging signals, said receiver unit being configured to demodulate radiopaging signals and to provide said demodulated signals to said processor.

*37. A programmable message delivery system for playing messages on message playback devices at one or more remote sites comprising:*

*a communication link;*

*a plurality of message playback devices communicating with respective telephone systems, each of said message playback devices comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device; and*

*a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;*

*each of said plurality of message playback devices being adapted to receive said control signals via said communication link, said control signals comprising identification data for identifying selected ones of said plurality of message playback devices and list data for identifying selected ones of said messages for playback by respective ones of said selected message playback devices when a caller is placed on hold on the respective telephone system, each of said selected message playback devices being programmable to access said messages identified therefor in said list data from said storage device and to provide said messages to said output until different ones of said messages are selected.*

*38. A system as claimed in claim 37, wherein said communication link is selected from the group consisting of a microwave link, a radio frequency link, a satellite link, a public switched telephone network, a private switched telephone network, a digital communications network, the Internet, and a fiber optic network.*

*39. A system as claimed in claim 37, wherein said message playback device comprises a processing device, a storage device for storing said messages as respective files, and a receiver adapted to receive said control signals via said communication link, said computer being programmable to generate said control signals comprising commands for said processing device to access at least a selected one of said files to play a corresponding one of said messages through said output.*

\* \* \* \* \*

Application/Control Number: 90/009,671                                    Page 3
Art Unit: 3992

### *Examiner's reasons for Patentability*

During a reexamination proceeding, rejections will normally be based upon the

prior art of record.  That is, a full search will not routinely be made by the examiner.

MPEP § 2254.


The March 24 amendment substantially narrow all independent claims.

Regarding claims 13, 19, 24, 25 and 35, see the final Office action regarding the

examiner's reasons for patentability.  Regarding the remaining claims, the patent owner's

arguments (in view of the claim amendments) clearly respond to the examiner's

arguments set forth in the final Office action and in the telephone interview (see the

attached summary).  Thus, the record of the prosecution as a whole makes clear the

examiner's reasons for finding the claims patentable.  Thus, see the arguments for

patentability set forth in the amendments (pages 27-32 of the March 10 amendment and

pages 27 and 28 of the March 11 amendment).  New claims 37-39 correspond to the

amended claims 1, 2 and 5 discussed in the March 10 and 11 amendments, but introduced

as new claims so that unexamined, original claims 3, 4 and 6 would not be disturbed.  See

page 26 of the March 24 Amendment for further details.

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

6.    (TWICE AMENDED)  A system as claimed in claim 1, wherein each of said

message playback devices comprises at least one message output apparatus

comprising said output and selected from the group consisting of a music on-hold-

compatible telephone system, an automated telephone answering system, a public

address system, a visual display device, an electronically-controlled sign, an audiovisual

apparatus, a videoconferencing device, and a multimedia announcement device.


7.    (AMENDED)  A programmable message delivery system for playing messages

on message playback devices at one or more remote sites comprising:

        a communication link;

        a plurality of message playback devices, each of said message playback devices

communicating with a respective telephone system and comprising a storage device for

storing messages and for playing selected ones of said messages through an output of

said message playback device when a caller is placed on hold; and

        a computer remotely located from said plurality of message playback devices

and operable to generate and transmit control signals via said communication link for

controlling at least one of said plurality of message playback devices;

        each of said plurality of message playback devices being adapted to receive said

control signals via said communication link and being programmable to access at least

one of said messages from said storage device and to provide said accessed message

to said output in accordance with said control signals when a caller is placed on hold;

        wherein said computer comprises a display device and is programmable to

-3-

A372

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

generate screens on said display device <u>that include user selectable menu items for</u> <u>selection by an operator to define relationships between said plurality of message</u> <u>playback devices and said messages, the screens</u> [for] guiding an operator to make choices selected from the group consisting of which of said messages are to be played, which of said plurality of message playback devices are to play said selected messages, a time of day when said control signals are to be transmitted to said message playback devices, a date on which said control signals are to be transmitted to said message playback devices, a sequence in which said selected messages are to be played, and how many times to repeat at least one of said selected messages in said sequence, and to generate said control signals to implement said choices via said message playback devices.

8.    (ORIGINAL)  A system as claimed in claim 7, wherein at least one of said screens displays a location directory comprising a site name for each of said remote sites and guides said operator to select at least one of said remote sites, said computer being programmable to transmit said control signals to said remote sites selected by said operator.

9.    (ORIGINAL)  A system as claimed in claim 7, wherein at least one of said screens displays names of regions corresponding to subsets of said remote sites and guides said operator to select at least one of said regions, said computer being programmable to generate control signals addressed to said remote sites in said regions selected by said operator.

-4-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

10.     (ORIGINAL)  A system as claimed in claim 9, wherein said subsets of said

remote sites are selected from the group consisting of said remote sites located in

contiguous geographical areas, said remote sites located in a plurality of noncontiguous

geographical areas, said remote sites offering a similar service, and said remote sites

corresponding to a particular client.


11.     (ORIGINAL)  A system as claimed in claim 7, wherein at least one of said

screens displays at least one of a list of titles and reference codes corresponding to said

messages from which said operator can select a plurality of said messages for play at

said remote sites, said computer being programmable to generate a playlist comprising

data relating to said plurality of messages and to generate said control signals to

implement said playlist using said message playback devices.


12.     (ORIGINAL)  A system as claimed in claim 11, wherein at least one of said

screens comprises a script corresponding to at least one of said messages identified in

said at least one of said screens.


13.     (AMENDED)  [A system as claimed in claim 11,] A programmable message

delivery system for playing messages on message playback devices at one or more

remote sites comprising:

        a communication link;

        a plurality of message playback devices, each of said message playback devices

comprising a storage device for storing messages and for playing selected ones of said

-5-

**A374**

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

messages through an output of said message playback device; and

a computer remotely located from said plurality of message playback devices and operable to generate and transmit control signals via said communication link for controlling at least one of said plurality of message playback devices;

each of said plurality of message playback devices being adapted to receive said control signals via said communication link and being programmable to access at least one of said messages from said storage device and to provide said accessed message to said output in accordance with said control signals;

wherein said computer comprises a display device and is programmable to generate screens on said display device for guiding an operator to make choices selected from the group consisting of which of said messages are to be played, which of said plurality of message playback devices are to play said selected messages, a time of day when said control signals are to be transmitted to said message playback devices, a date on which said control signals are to be transmitted to said message playback devices, a sequence in which said selected messages are to be played, and how many times to repeat at least one of said selected messages in said sequence, and to generate said control signals to implement said choices via said message playback devices;

wherein at least one of said screens displays at least one of a list of titles and reference codes corresponding to said messages from which said operator can select a plurality of said messages for play at said remote sites, said computer being programmable to generate a playlist comprising data relating to said plurality of

-6-

A375

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

messages and to generate said control signals to implement said playlist using said

message playback devices; and

wherein one of said screens comprises at least one of a current playlist and a

pending playlist for a selected one of said remote sites, said current playlist and said

pending playlist each comprising said reference codes corresponding to said selected

messages, said pending playlist further comprising a date corresponding to when said

pending playlist is to be transmitted to said message playback devices.


14.     (ORIGINAL)  A system as claimed in claim 11, wherein said screen also displays

a list of names corresponding to said remote sites and guides said operator to select

said remote sites at which said messages on said playlist are to be played.


15.     (ORIGINAL)  A system as claimed in claim 14, wherein said screen allows said

operator to specify at least one of a plurality of parameters selected from the group

consisting of a time of day when said control signals are to be transmitted to said

message playback devices, a date on which said control signals are to be transmitted to

said message playback devices, a sequence in which said selected messages are to be

played, and how many times to repeat said selected messages in said sequence at said

selected remote sites.


-7-


**A376**

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

16.    (ORIGINAL)  A system as claimed in claim 11, wherein said screen guides said operator to select one of said messages from said playlist and an operation selected from the group consisting of adding at least one of said messages to said playlist, deleting at least one of said messages to said playlist, changing said sequence of said messages on said playlist, and changing at least one of the date or time for playing at least one of said messages.

17.    (AMENDED)  A programmable message delivery system for playing messages at multiple remote sites comprising:

a communication link;

a plurality of message playback devices, each of said message playback devices communicating with a respective telephone system and comprising a storage device for storing messages and for playing selected ones of said messages through an output of said message playback device when a caller is placed on hold; [and]

a first computer for generating and transmitting control signals via said communication link for controlling at least one of said plurality of message playback devices, each of said plurality of message playback devices being adapted to receive said control signals via said communication link; and

a plurality of second computers, each of said plurality of second computers being configured to communicate with said first computer and being programmable to generate screens that include user selectable menu items for selection by an operator to define relationships between said plurality of message playback devices and said

-8-

A377

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

messages, the screens [for] guiding an operator to make choices selected from the

group consisting of which of said messages is to be played, which of said plurality of

message playback devices is to play said selected message, which of a number of

subsets of said plurality of message playback devices is to play said selected message,

and when said selected message is to commence playing, and to transmit data signals

relating to said choices to said first computer, said first computer being programmable

to generate said control signals in accordance with said data signals.


18.    (ORIGINAL)  A system as claimed in claim 17, wherein each of said plurality of

second computers is operable to store data selected from the group consisting of data

relating to each of said remote sites associated with said second computer, at least one

of identification codes and titles for uniquely identifying each of said messages stored

via aid storage device, and message playlists comprising said identification codes of

selected ones of said messages for play at said associated remote sites.


19.    (AMENDED)  [A system as claimed in claim 18,] A programmable message

delivery system for playing messages at multiple remote sites comprising:

        a communication link;

        a plurality of message playback devices, each of said message playback devices

comprising a storage device for storing messages and for playing selected ones of said

messages through an output of said message playback device;

        a first computer for generating and transmitting control signals via said

communication link for controlling at least one of said plurality of message playback

-9-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

devices, each of said plurality of message playback devices being adapted to receive

said control signals via said communication link; and

a plurality of second computers, each of said plurality of second computers being

configured to communicate with said first computer and being programmable to

generate screens for guiding an operator to make choices selected from the group

consisting of which of said messages is to be played, which of said plurality of message

playback devices is to play said selected message, which of a number of subsets of

said plurality of message playback devices is to play said selected message, and when

said selected message is to commence playing, and to transmit data signals relating to

said choices to said first computer, said first computer being programmable to generate

said control signals in accordance with said data signals;

wherein each of said plurality of second computers is operable to store data

selected from the group consisting of data relating to each of said remote sites

associated with said second computer, at least one of identification codes and titles for

uniquely identifying each of said messages stored via aid storage device, and message

playlists comprising said identification codes of selected ones of said messages for play

at said associated remote sites; and

wherein said first computer is operable to store said data and each of said

plurality of second computers is programmable to send modifications to said data stored

therein to said first computer, said first computer being programmable to update said

data stored therein and to generate and transmit control signals in accordance with said

modifications.

-10-

A379

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

20.    (ORIGINAL)  A system as claimed in claim 17, further comprising a third

computer for generating and transmitting said control signals via said communication

link for controlling at least one of said plurality of message playback devices, at least

one of said plurality of message playback devices being adapted to receive said control

signals from said third computer via said communication link, at least one of said

plurality of second computers being configured to communicate with said third computer

in lieu of said first computer.


21.    (ORIGINAL)  A system as claimed in claim 17, wherein each of said message

playback devices comprises at least one message output apparatus comprising said

output and selected from the group consisting of a music on-hold-compatible telephone

system, an automated telephone answering system, a public address system, a visual

display device, an electronically-controlled sign, an audiovisual apparatus, a

videoconferencing device, and a multimedia announcement device.

22.    (AMENDED)  A method of programming message playback devices located at

multiple remote sites and communicating with respective telephone systems, the

method comprising the steps of:

storing a library of discrete and individually accessible messages at each of said

remote sites;

storing at least one of a title and an identification [ode] code for uniquely

identifying each said message at a computer located remotely with respect to said

message playback devices;

-11-

**A380**

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

storing site data relating to at least a selected one of said remote sites at said

computer;

selecting at least one said message from said library for play at said selected

remote site using said computer;

generating a control signal using said computer for said message playback

device corresponding to said selected remote site to play said selected message <u>when</u>

<u>a caller is placed on hold on the respective telephone system</u>; and

transmitting said control signal to at least said selected remote site.


23.　　(AMENDED)　A method as claimed in claim 22, further comprising the steps of:

receiving said control signal at said selected remote site;

accessing said selected message from said library stored at said selected remote

site; and

playing said selected message on said message playback device at said

selected remote site <u>when a caller is placed on hold</u>.


24.　　(AMENDED)　[A method as claimed in claim 22, further comprising the steps of:]

<u>A method of programming message playback devices located at multiple remote sites,</u>

<u>comprising the steps of:</u>

<u>storing a library of discrete and individually accessible messages at each of said</u>

<u>remote sites;</u>

<u>storing at least one of a title and an identification code for uniquely identifying</u>


-12-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

each said message at a computer located remotely with respect to said message

playback devices;

storing site data relating to at least a selected one of said remote sites at said

computer;

selecting at least one said message from said library for play at said selected

remote site using said computer;

generating a control signal using said computer for said message playback

device corresponding to said selected remote site to play said selected message; and

transmitting said control signal to at least said selected remote site;

defining a subset of said remote sites using a unique region code, said control

signal comprising said region code, said transmitting step comprising the step of

transmitting said control signal at least to all of said [emote] remote sites in said subset;

receiving said control signal at each of said remote sites in said subset;

accessing said selected message from said library stored at said remote sites in

said subset; and

playing said selected message on said message playback device at each of said

remote sites in said subset.

-13-

A382

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

25.　　(AMENDED)  [A method as claimed in claim 22,] <u>A method of programming</u>

<u>message playback devices located at multiple remote sites, comprising the steps of:</u>

　　　<u>storing a library of discrete and individually accessible messages at each of said</u>

<u>remote sites;</u>

　　　<u>storing at least one of a title and an identification code for uniquely identifying</u>

<u>each said message at a computer located remotely with respect to said message</u>

<u>playback devices;</u>

　　　<u>storing site data relating to at least a selected one of said remote sites at said</u>

<u>computer;</u>

　　　<u>selecting at least one said message from said library for play at said selected</u>

<u>remote site using said computer; and</u>

　　　<u>generating a control signal using said computer for said message playback</u>

<u>device corresponding to said selected remote site to play said selected message; and</u>

<u>transmitting said control signal to at least said selected remote site;</u>

　　　wherein said messages are stored on at least one optical disc at each of said

remote sites and each of said remote sites comprises an optical disc player, said

generating step comprising the steps of:

　　　　　converting said identification code of said selected message into a number

for a corresponding track on said optical disc at said selected remote site; and

　　　　　generating a command for said optical disc player at said selected remote

site to advance to said track and play said selected message.

-14-

**A383**

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

26.     (AMENDED)  A method of programming message playback devices located at

multiple remote sites and communicating with respective telephone systems, the

method comprising the steps of:

        storing a library of discrete and individually accessible messages at each of said

remote sites;

        storing message data for each said message at a first computer located remotely

with respect to said message playback devices;

        storing site data relating to at least two selected said remote sites at said first

computer;

        selecting different sets of said messages from said library using said first

computer for play at respective said selected remote sites;

        generating control signals for commanding said message playback devices

corresponding to said selected remote sites to play respective said sets of messages

when callers are placed on hold on the respective telephone systems; and

        transmitting said control signals to at least said selected remote sites.

27.     (AMENDED)  A method as claimed in claim 26, further comprising the steps of:

        receiving said control signals at said selected remote sites;

        accessing said sets of messages from said library at respective said selected

remote sites in accordance with said control signals; and

        playing said sets of messages on said message playback devices at respective

said selected remote sites when callers are placed on hold.

-15-

A384

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

28.    (AMENDED)  A method of programming message playback devices located at
multiple remote sites and communicating with respective telephone systems, the
method comprising the steps of:

    storing a library of discrete and individually accessible messages at each of said
remote sites for playback on the respective message playback device when a caller is
placed on hold, each message being uniquely identified by at least one of an
identification code and a title;

    storing said at least one of said identification code and said title for each said
message at a computer located remotely with respect to said message playback
devices;

    storing site data relating to said remote sites at said computer;

    generating at least one computer screen using said computer to display a list of
location names corresponding to said remote sites and a list of each said message;

    entering playlist data using said at least one computer screen selected from the
group consisting of said identification codes of selected ones of said messages, said
titles of selected ones of said messages, times for commencing the play of said
messages, and selected ones of said remote sites at which said messages are to be
played;

    generating a control signal using said playlist data; and

    transmitting said control signal to said remote sites.

-16-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

29.     (ORIGINAL)  A method as claimed in claim 28, further comprising the steps of:

receiving said control signal at said remote sites;

accessing said selected messages from said library stored at respective said

selected remote sites; and

playing said selected messages on said message playback devices at respective

said selected remote sites.


30.     (TWICE AMENDED)  A programmable message delivery system for playing

messages comprising:

a storage device for storing discrete, individually accessible messages;

a processor connected to said storage device and programmable to access at

least one of said messages;

an input device connected to said processor;

a display device connected to said processor; and

at least one message output apparatus selected from the group consisting of a

music on-hold-compatible telephone system, a public address system, a visual display

device, an electronically-controlled sign, an audiovisual apparatus, a videoconferencing

device, and a multimedia announcement device, said message output apparatus

comprising an input and an output, said processor being programmable to generate at

least one screen on said display device to display message data relating to each of said

messages, said message data selected from the group consisting of a message titles

corresponding to respective ones of said messages, message identification codes

-17-

**A386**

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

corresponding to respective said messages, and text of at least one of said messages, said processor being programmable to allow an operator to select at least one of said messages using said message data and said input devices to access said selected message via said storage device and to provide said selected message to said input of said message output apparatus for play through said output of said message output apparatus when a caller is placed on hold.

31.     (ORIGINAL)  A system as claimed in claim 30, wherein said operator can select a sequence of said messages, said processor being programmable to access each of said selected messages via said storage device to provide said messages to said input for play on said output in accordance with said sequence.

32.     (AMENDED)  A message playback device for playing selected messages from an optical disc, the message playback device being remotely controllable via a broadcast transmission system and comprising:

        an optical disc system for playing at least one optical disc and providing signals generated therefrom to an output in communication with a telephone system;

        a first processor being programmed to generate control signals to control operation of said optical disc system;

        a receiver unit; and

        a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto from

-18-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

said broadcast transmission system and to provide said command signals to said

second processor, said command signals identifying selected tracks on said at least

one optical disc, said second processor being programmed to convert said command

signals into corresponding ones of said control signals to play said selected tracks on

said optical disc system when a caller is placed on hold on the telephone system and to

provide said corresponding ones of said control signals to said first processor until

different said tracks on said at least one optical disc are selected.


33.    (AMENDED)  A programmable message delivery system for playing messages

on message playback devices at one or more remote sites and communicating with one

or more respective telephone systems, the message delivery system comprising:

        a communication link;

        a plurality of message playback devices, each of said message playback devices

comprising a storage device for storing messages and for playing selected ones of said

messages through an output of said message playback device when callers are placed

on hold on the respective telephone systems; and

        a computer remotely located from said plurality of message playback devices

and operable to generate and transmit control signals via said communication link for

controlling at least one of said plurality of message playback devices;

        each of said plurality of message playback devices being adapted to receive said

control signals via said communication link and being programmable to access at least

one of said messages from said storage device and to provide said accessed message

-19-

A388

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 24, 2011

to said output in accordance with said control signals;

     wherein said message playback device comprises an optical disc player, a processing device, a disc having tracks for storing said messages, and a receiver adapted to receive said control signals via said communication link, said control signals comprising commands for said processing device to control said optical disc player access to at least a selected one of said tracks and play a corresponding one of said messages <u>when the caller is placed on hold</u>.

34.    (AMENDED)  A remotely controllable message playback device for playing selected messages from an optical disc <u>when callers are placed on hold, the device</u> comprising:

     an optical disc system <u>communicating with a telephone system</u> for playing at least one optical disc and providing signals generated therefrom to an output <u>when a caller is placed on hold</u>;

     a first processor being programmed to generate control signals to control operation of said optical disc system;

     a receiver unit; and

     a second processor connected to said first processor and to said receiver unit, said receiver unit being operable to receive command signals transmitted thereto and to provide said command signals to said second processor, said second processor being programmed to convert said command signals into corresponding ones of said control signals and to provide said corresponding ones of said control signals to said first

-20-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

## REMARKS

This Amendment is submitted in response to the final Office Action mailed February 11, 2011. Claims 1-36 are pending in the application after this amendment and claims 1, 2, 5, and 7-36 are subject to this reexamination. Claims 1, 3, 6, 7, 13, 17, 19, 22-28, 30, and 32-35 have been amended herein. Patent Owner respectfully requests reconsideration in view of the amendments and the following remarks.

Patent Owner's representative, David W. Dorton, spoke with Examiner Roland G. Foster and requested a personal interview. Because the interview could not be conducted before the date for responding to this Office Action, the Examiner agreed to postpone taking action on this amendment until after the interview.

## Allowable Subject Matter

Claims 13, 19, 24, 25, and 35 were indicated to contain allowable subject matter. Patent Owner thanks the Examiner for recognizing the patentable subject matter of these claims. Claims 13, 19, 24, 25, and 35 have been rewritten in independent form, along with claims 3 and 6 that were not subject to this reexamination, and are now in complete condition for allowance.

## Claims Rejected Under 35 U.S.C. §102

Claims 7, 11, 16, 22, 23, 26, 27, 30-34, and 36 stand rejected under 35 U.S.C. §102(b) as being anticipated by the U.S. Patent No. 5,133,081 to Mayo. Claims 7, 22, 26, 30, and 32-34 are the only independent claims of this rejected group. Claim 7 has

-27-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

been amended to recite that the computer generates screens that include user

selectable menu items for selection by an operator to define relationships between the

plurality of message playback devices and the messages.  Claim 7 has also been

amended to recite that the message playback devices are in communication with

respective telephone systems and play selected messages when a caller is placed on

hold on the telephone system.  Support for these amendments can be found with

reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line

2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2; and with

reference to col. 11, line 26 – col. 12, line 53; and FIGS. 19-28.  Accordingly, no new

matter is added.

Mayo '081 is directed to a message broadcast system for transmitting radio

frequency messages and does not teach, or even suggest, playing messages to a caller

placed on hold.  Mayo '081 also does not teach, or even suggest a computer that

generates user selectable menu items for selection by an operator to define

relationships between messages and playback devices at remote sites.  Rather, the

liquid crystal display (LCD) 506 is only configured to display a message title and ID

code. (See Mayo '081 at col.9, lines 24-33.)  For at least these reasons, Patent Owner

respectfully requests that the rejection of claim 7 over Mayo '081 be withdrawn.

Independent claims 22, 26, and 33 have been amended to recite that the

message playback devices are in communication with respective telephone systems

and that the message playback devices play selected messages when a caller is placed

on hold.  Claims 32 and 34 have been amended to recite that the optical disk systems

-28-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

are in communication with respective telephone systems, and that signals are generated, or selected tracks are played, when a caller is placed on hold. Claim 30 has been amended to recite that the message output apparatus comprises a music on-hold-compatible telephone system and that the processor provides a selected message for play when a caller is placed on hold. Support for these amendments can be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2. Accordingly, no new matter is added.

Patent owner submits that independent claims 22, 26, 30, 32, 33, and 34 are in condition for allowance because Mayo '081 fails to teach, or even suggest, a music-on-hold-compatible telephone system or playing messages or generating signals when callers are placed on hold, as discussed above with respect to claim 7. For at least these reasons, Patent Owner respectfully requests that the rejections of claims 22, 26, 30, 32, 33, and 34 over Mayo '081 be withdrawn.

Claims 11 and 16 each depend from independent claim 7; claim 23 depends from independent claim 22; claim 27 depends from independent claim 26; claim 31 depends from independent claim 30; and claim 36 depends from independent claim 34. Accordingly, claims 11, 16, 23, 27, 31, and 36 are in condition for allowance for at least the same reasons discussed above with respect to independent claims 7, 22, 26, 30, and 34, and Patent Owner respectfully requests that the rejections of these claims over Mayo '081 also be withdrawn.

-29-

A473

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

Claims 1, 2, 5, and 7 stand rejected under 35 U.S.C. §102(b) as being

anticipated by the DAD486x reference. Claims 1 and 7 are the only independent claims

of this rejected group. Claim 7 has been amended as discussed above. Claim 1 has

been amended to recite that the message playback devices communicate with

respective telephone systems and play selected messages when a caller is placed on

hold. Support for these amendments can be found with reference to the original issued

U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines

5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2. Accordingly, no new matter is added.

Patent Owner asserts that amended claims 1 and 7 are in condition for allowance

because DAD486x fails to teach, or even suggest, message playback devices

communicating with telephone systems or playing messages when callers are placed

on hold. For at least these reasons, Patent Owner respectfully requests that the

rejections of claims 1 and 7 over DAD486x be withdrawn.

Claims 2 and 5 each depend from independent claim 1 and are in condition for

allowance for at least the same reasons discussed above for claim 1. Accordingly,

Patent Owner respectfully requests that the rejections of claims 2 and 5 also be

withdrawn.

**Claims Rejected Under 35 U.S.C. §103**

Claims 17-19 and 21 stand rejected under 35 U.S.C. §103(a) as being

unpatentable over Mayo '081 in view of U.S. Patent No. 5,726,909 to Krikorian. Claims

8-10, 14, 15, 28, and 29 stand rejected under 35 U.S.C. §103(a) as being unpatentable

-30-

A474

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

over Mayo '081 in view of U.S. Patent No. 5,796,951 to Hamner et al. Claim 20 stands

rejected under 35 U.S.C. §103(a) as being unpatentable over the combination of Mayo

'081 and Krikorian '909, in further view of Hamner '951. Claim 12 stands rejected under

35 U.S.C. §103(a) as being unpatentable over Mayo '081 in view of the DAD486x

reference. Claims 8-10, 14, 15, 28, and 29 stand further rejected under 35 U.S.C.

§103(a) as being unpatentable over Mayo '081 in view of U.S. Patent No. 5,504,921 to

Dev et al.

Claims 17 and 28 are the only independent claims of this rejected group. Claim

17 has been amended to recite that the computer generates screens that include user

selectable menu items for selection by an operator to define relationships between the

plurality of message playback devices and the messages. Claim 17 has also been

amended to recite that the message playback devices are in communication with

respective telephone systems and play selected messages when a caller is placed on

hold on the telephone system. Claim 28 has been amended in a similar manner and is

now directed to a method of programming message playback devices located at

multiple remote sites and communicating with respective telephone systems. Amended

claim 28 further recites that messages are played back on the respective message

playback devices when a caller is placed on hold. Support for these amendments can

be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line

64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS.

1-2; and with reference to col. 11, line 26 – col. 12, line 53; and FIGS. 19-28.

Accordingly, no new matter is added.

-31-

A475

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

Patent Owner asserts that independent claims 17 and 28 are in condition for allowance because Mayo '081 fails to teach or suggest playback devices communicating with telephone systems or playing messages when a caller is placed on hold, as discussed above, and because Krikorian '909, Hamner '951, DAD486x, and Dev '921 fail to cure these deficiencies. Accordingly, Patent Owner respectfully requests that the rejections of claims 17 and 28 be withdrawn.

Claims 18-21 each depend from independent claim 17, and claim 29 depends from independent claim 28. Accordingly, claims 18-21 and 29 are in condition for allowance for at least the same reasons discussed above with respect to independent claims 17 and 28, and Patent Owner respectfully requests that the rejections of these claims also be withdrawn.

Claims 8-10, 12, 14, 15 each depend from independent claim 7. Patent Owner asserts that these claims are in condition for allowance because Mayo '081 fails to teach or suggest playback devices communicating with telephone systems or playing messages when a caller is placed on hold, as discussed above with respect to claim 7, and because Krikorian '909, Hamner '951, DAD486x, and Dev '921 fail to cure these deficiencies. Accordingly, Patent Owner respectfully requests that the rejections of claims 8-10, 12, 14, and 15 also be withdrawn.

-32-

A476

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

**CONCLUSION**

In view of the amendments and remarks set forth herein, Patent Owner respectfully requests early and favorable indication of allowance. If there are any questions regarding the foregoing, the Examiner is respectfully asked to contact the undersigned attorney.

Patent Owner does not believe that any fees are due as a result of this communication. However, if any fees are deemed necessary to complete this communication, the Commissioner may consider this to be a request for such and charge any necessary fees to Deposit Account No. 23-3000.

Respectfully submitted,

WOOD, HERRON & EVANS, L.L.P.

By: _/David W. Dorton/_____
        David W. Dorton, Reg. No. 51,625

2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
(513) 241-2324 (voice)
(513) 241-6234 (facsimile)

-33-

APPEAL,DISC-ONLY,JURY,LC3

# U.S. District Court
## Southern District of Ohio (Cincinnati)
### CIVIL DOCKET FOR CASE #: 1:11-cv-00283-TSB-KLL

| | |
|---|---|
| Info-Hold, Inc. v. Muzak Holdings LLC. et al | Date Filed: 05/03/2011 |
| Assigned to: Judge Timothy S. Black | Date Terminated: 11/13/2013 |
| Referred to: Magistrate Judge Karen L. Litkovitz | Jury Demand: Both |
| related Case: 1:08-cv-00802-TSB | Nature of Suit: 830 Patent |
| Case in other court: United States Court of Appeals, Federal Circuit, 14-01167 | Jurisdiction: Federal Question |
| Cause: 35:271 Patent Infringement | |

**Plaintiff**

| | | |
|---|---|---|
| **Info-Hold, Inc.** | represented by | **Daniel Joseph Wood** |
| | | 4120 Airport Road |
| | | Cincinnati, OH 45226 |
| | | 513-248-5600 |
| | | Fax: 513-248-5609 |
| | | Email: danw@infohold.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **James Kwak** |
| | | Standley Law Group LLP |
| | | 6300 Riverside Drive |
| | | Dublin, OH 43017 |
| | | 614-792-5555 |
| | | Fax: 614-792-5536 |
| | | Email: jkwak@standleyllp.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Christopher M Alexander** |
| | | 423 Reading Road |
| | | Mason, OH 45040 |
| | | 513-228-1100 |
| | | Email: chris@chrisalexanderlaw.com |
| | | *TERMINATED: 02/26/2013* |
| | | |
| | | **David C Wagner** |
| | | 2405 Carol Drive |
| | | Cincinnati, OH 45215 |
| | | 513-733-4689 |
| | | *TERMINATED: 02/25/2013* |

**Melancthon W Chatfield**
Chatfield Law Office
30 Garfield Place
Suite 650
Cincinnati, OH 45202
513-621-6265
Fax: 513-621-6264
*TERMINATED: 04/15/2013*

**Melissa Anne Rogers**
Standley Law Group
6300 Riverside Dr.
Dublin, OH 43017
614-792-5555
Email: mmccurdy@standleyllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Muzak Holdings LLC**                    represented by  **John Francis Bennett**
*TERMINATED: 02/06/2013*                                Baker & Hostetler LLP
                                                        312 Walnut Street
                                                        Suite 3200
                                                        Cincinnati, OH 45202-4074
                                                        513-929-3485
                                                        Fax: 513-929-0303
                                                        Email: jbennett@bakerlaw.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Barry E. Bretschneider**
                                                        Baker & Hostetler LLP
                                                        1050 Connecticut Avenue N.W.
                                                        Washington Square, Suite 1100
                                                        Washington, DC 20036
                                                        202-861-1500
                                                        Fax: 200-861-1783
                                                        Email: bbretschneider@bakerlaw.com
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Bridget Springer Merritt**
                                                        BAKER & HOSTETLER LLP
                                                        1050 Connecticut Ave NW, Suite 1100
                                                        Washington, DC 20036-5304
                                                        202-861-1574
                                                        Fax: 202-861-1783
                                                        Email: bmerritt@bakerlaw.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John P. Corrado**
Baker Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
202-861-1500
Fax: 202-861-1783
Email: jcorrado@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**M Scott McIntyre**
Baker & Hostetler LLP
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
513-852-2622
Fax: 513-929-0303
Email: mmcintyre@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Michael E. Anderson**
Baker Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
202-861-1500
Fax: 202-861-1783
Email: meanderson@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin W Kirsch**
Baker & Hostetler, LLP
312 Walnut Street
Suite 3200
Cincinnati, OH 45202-3957
513-929-3400
Fax: 513-929-0303
Email: kkirsch@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**Muzak LLC**                          represented by **John Francis Bennett**
                                       (See above for address)
                                       *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Barry E. Bretschneider**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bridget Springer Merritt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John P. Corrado**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**M Scott McIntyre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Anderson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin W Kirsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Claimant</u>**

**Muzak LLC**                    represented by **John Francis Bennett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry E. Bretschneider**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bridget Springer Merritt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John P. Corrado**
(See above for address)
*PRO HAC VICE*

**A1023**

*ATTORNEY TO BE NOTICED*

**Michael E. Anderson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin W Kirsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Muzak Holdings LLC**          represented by   **John Francis Bennett**
*TERMINATED: 02/06/2013*                        (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Barry E. Bretschneider**
                                                (See above for address)
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Bridget Springer Merritt**
                                                (See above for address)
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **John P. Corrado**
                                                (See above for address)
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Michael E. Anderson**
                                                (See above for address)
                                                *PRO HAC VICE*
                                                *ATTORNEY TO BE NOTICED*

                                                **Kevin W Kirsch**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Info-Hold, Inc.**             represented by   **Daniel Joseph Wood**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

A1024

**James Kwak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C Wagner**
(See above for address)
*TERMINATED: 02/25/2013*

**Melancthon W Chatfield**
(See above for address)
*TERMINATED: 04/15/2013*

**Melissa Anne Rogers**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2011 | | Filing fee: $350.00, receipt number 100CIN011593. (mr) (Entered: 05/03/2011) |
| 05/03/2011 | | Pursuant to Order of General Reference filed on February 23, 2011, Magistrate Judge Judge Karen L. Litkovitz added for purposes of discovery. (mr) (Entered: 05/03/2011) |
| 05/03/2011 | 1 | COMPLAINT with JURY DEMAND against All Defendants filed by Info-Hold, Inc. (Attachments: # 1 Civil Cover Sheet, # 2 Filing Fee Receipt) (mr) (Entered: 05/03/2011) |
| 05/03/2011 | 2 | REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK re 1 Complaint. (mr) (Entered: 05/03/2011) |
| 05/04/2011 | 3 | ORDER REASSIGNING CASE. Case transferred to the Clerk of the U.S. District Court for reassignment. Judge S Arthur Spiegel no longer assigned to case (reassigned to Chief Judge Susan J Dlott). Signed by Judge S Arthur Spiegel on 5/4/2011. (km1) (Entered: 05/04/2011) |
| 05/05/2011 | | ***If this case is referred, it will be to Magistrate Judge Karen L. Litkovitz. (sct1) (Entered: 05/05/2011) |
| 05/06/2011 | 4 | ORDER TRANSFERRING CASE from the docket of TheHonorable Susan J. Dlott to the docket of The Honorable Michael R. Barrett. Signed by Chief Judge Susan J. Dlott and Judge Michael R. Barrett. (sct1) (Entered: 05/06/2011) |
| 06/17/2011 | 5 | ANSWER to 1 Complaint with Jury Demand , COUNTERCLAIM against Info-Hold, Inc. filed by Muzak LLC., and Muzak Holdings LLC.. (Kirsch, |

A1025

| | | Kevin) Modified on 7/4/2011 - To correct party names (tt). (Entered: 06/17/2011) |
|---|---|---|
| 06/17/2011 | 6 | Corporate Disclosure Statement by Defendants Muzak, LLC., Mood Media Corporation, Counter Claimants Muzak, LLC., Mood Media Corporation identifying Corporate Parent Mood Media Corporation for Muzak, LLC., Muzak, LLC... (Bennett, John) (Entered: 06/17/2011) |
| 06/22/2011 | 7 | Joint MOTION Correction of Names for Defendants Muzak Holdings LLC and Muzak LLC by Defendants Muzak Holdings, LLC., Muzak, LLC.. (Attachments: # 1 Text of Proposed Order) (Bennett, John) (Entered: 06/22/2011) |
| 06/30/2011 | 8 | MOTION for Leave to Appear Pro Hac Vice of Barry Bretschneider (Filing fee $ 200, receipt number 100CIN012179) by Defendants Muzak Holdings LLC., and Muzak LLC.. (Attachments: # 1 Certificate of Good Standing) (Kirsch, Kevin) Modified on 7/4/2011 - To correct party names (tt). (Entered: 06/30/2011) |
| 06/30/2011 | 9 | MOTION for Leave to Appear Pro Hac Vice of Michael Anderson (Filing fee $ 200, receipt number 100CIN012178) by Defendants Muzak Holdings LLC., and Muzak LLC.. (Attachments: # 1 Certificate of Good Standing) (Kirsch, Kevin) Modified on 7/4/2011 - To correct party names (tt). (Entered: 06/30/2011) |
| 06/30/2011 | 10 | MOTION for Leave to Appear Pro Hac Vice of John Corrado (Filing fee $ 200, receipt number 100CIN012178) by Defendants Muzak Holdings LLC., and Muzak LLC.. (Attachments: # 1 Certificate of Good Standing) (Kirsch, Kevin) Modified on 7/4/2011 - To correct party names (tt). (Entered: 06/30/2011) |
| 06/30/2011 | | Filing fee for 9 and 10 Motions PHV: $ 400.00, receipt number 100CIN012178 (sct1) (Entered: 07/05/2011) |
| 06/30/2011 | | Filing fee for 8 Motion PHV: $ 200.00, receipt number 100CIN012179 (sct1) (Entered: 07/05/2011) |
| 07/01/2011 | 11 | ANSWER to 5 Answer to Complaint, Counterclaim filed by Info-Hold, Inc.. (Wood, Daniel) (Entered: 07/01/2011) |
| 07/01/2011 | 12 | ORDER granting 7 Motion for Correction of Names for Defendants Muzak Holdings LLC and Muzak LLC. Signed by Judge Michael R. Barrett on 7/1/2011. The Clerk is directed to modify the official docket and associated entries in the CM/ECF system so that the names of Defendants are corrected and changed. (jlw) (Entered: 07/01/2011) |
| 07/03/2011 | | NOTICE OF HEARING: Rule 26(f) Report due by 9/9/2011; Scheduling Conference set for 9/15/2011 at 10:00 AM by eleconference before Judge Michael R. Barrett; Parties shall initiate contact with the Court by calling 513-564-7660 five minutes prior to 10:00 am. Parties may obtain all the pretrial forms such as the Rule 26(f) report and trial procedures used by the trial and Magistrate Judge by visiting our website at: www.ohsd.uscourts.gov (ba1) (Entered: 07/03/2011) |

| 07/07/2011 | 13 | NOTICE by Counter Defendant Info-Hold, Inc. re 11 Answer to Counterclaim (Attachments: # 1 Supplement Signature page to ECF#11) (Wood, Daniel) (Entered: 07/07/2011) |
| 07/14/2011 | 14 | MOTION to Strike 11 Answer to Counterclaim *Affirmative Defenses* by Defendants Muzak Holdings LLC, Muzak LLC. (Kirsch, Kevin) (Entered: 07/14/2011) |
| 07/15/2011 | 15 | ORDER granting 9 Motion for Leave to Appear Pro Hac Vice of Michael Edward Anderson. Signed by Judge Michael R. Barrett on 7/15/2011. (jlw) (Entered: 07/15/2011) |
| 07/15/2011 | 16 | ORDER granting 8 Motion for Leave to Appear Pro Hac Vice of Barry Eastburn Bretschneider. Signed by Judge Michael R. Barrett on 7/15/2011. (jlw) (Entered: 07/15/2011) |
| 07/15/2011 | 17 | ORDER granting 10 Motion for Leave to Appear Pro Hac Vice of John Paul Corrado.Signed by Judge Michael R. Barrett on 7/15/2011. (jlw) (Entered: 07/15/2011) |
| 07/20/2011 | 18 | RESPONSE in Opposition re 14 MOTION to Strike 11 Answer to Counterclaim *Affirmative Defenses* filed by Counter Defendant Info-Hold, Inc.. (Wood, Daniel) (Entered: 07/20/2011) |
| 08/02/2011 | 19 | REPLY to Response to Motion re 14 MOTION to Strike 11 Answer to Counterclaim *Affirmative Defenses* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Kirsch, Kevin) (Entered: 08/02/2011) |
| 09/09/2011 | 20 | RULE 26(f) REPORT *by Plaintiff Info-Hold, Inc. and* by Defendants Muzak Holdings LLC, Muzak LLC. (Kirsch, Kevin) (Entered: 09/09/2011) |
| 09/09/2011 | | NOTICE of Hearing: Scheduling Conference set for 10/5/2011 02:00 PM in Teleconference before Judge Michael R. Barrett. (jlw) (Entered: 09/09/2011) |
| 10/04/2011 | | NOTICE of Hearing: Please be aware that the Scheduling Conference set for 10/5/2011 at 02:00 PM is being conducted by teleconference before Judge Michael R. Barrett; parties shall initiate contact with the Court by calling 513-564-7660 five minutes prior to 2:00 pm. (ba1) (Entered: 10/04/2011) |
| 10/05/2011 | | Minute Entry for proceedings held before Judge Michael R. Barrett: Scheduling Conference held on 10/5/2011; Daniel Wood appeared for Plaintiff; John Bennett, Michael Anderson, Kevin Kirsch and John Corrado appeared for Defendant; calendar order to follow. (ba1) (Entered: 10/05/2011) |
| 10/06/2011 | 21 | ORDER denying 14 Motion to Strike Affirmative Defenses re 11 Answer to Counterclaim. Signed by Judge Michael R. Barrett on 10/6/11. (ba1) (Entered: 10/06/2011) |
| 10/11/2011 | 22 | CALENDAR ORDER: Motions directed to pleadings due by 11/29/2011. Status Conference set for 8/8/2012 at 09:30 AM by teleconference before Judge Michael R. Barrett. Fact Discovery due by 12/10/2012. Motions pleadings due by 3/7/2013. Settlement Conference set for 4/24/2013 at 09:30 AM in Chambers before Judge Michael R. Barrett. Markman Hearing set for 8/9/2011 at 09:30 AM in Courtroom 109 - Cincinnati before Judge Michael R. |

A1027

| | | |
|---|---|---|
| | | Barrett. Proposed Final Pretrial Order/Jury Instructions due by 7/22/2013. Final Pretrial Conference set for 7/29/2013 at 09:30 AM in Chambers before Judge Michael R. Barrett. Jury Trial set for 8/26/2013 at 09:30 AM in Courtroom 109 - Cincinnati before Judge Michael R. Barrett. Signed by Judge Michael R. Barrett on 10/11/11. (ba1) (Entered: 10/11/2011) |
| 11/16/2011 | 23 | AMENDED CALENDAR ORDER: Amended Pleadings due by 11/29/2011. Status Conference set for 8/2/2012 at 09:30 AM by teleconference before Judge Michael R. Barrett. Fact Discovery due by 12/10/2012. Motions due by 4/29/2013. Settlement Conference set for 6/19/2013 at 09:30 AM in Chambers before Judge Michael R. Barrett. Markman Hearing set for 8/9/2012 at 09:30 AM in Courtroom 109 - Cincinnati before Judge Michael R. Barrett. Proposed Final Pretrial Order/Jury Instructions due by 9/10/2013. Final Pretrial Conference set for 9/17/2013 at 09:30 AM in Chambers before Judge Michael R. Barrett. Jury Trial set for 10/14/2013 at 09:30 AM in Courtroom 109 - Cincinnati before Judge Michael R. Barrett. Signed by Judge Michael R. Barrett on 11/3/11. (ba1) (Entered: 11/16/2011) |
| 11/17/2011 | 24 | MOTION to Amend/Correct *Preliminary Infringement Contentions* by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 11/17/2011) |
| 11/23/2011 | 25 | ORDER granting 24 Motion for Leave to Serve Revised preliminary infringement Contentions; plaintiff may serve defendants pursuant to S.D. Ohio Pat. R. 103.7. Signed by Judge Michael R. Barrett on 11/23/11. (ba1) (Entered: 11/23/2011) |
| 01/18/2012 | 26 | NOTICE by Defendants Muzak Holdings LLC, Muzak LLC *of Change of Law Firm Affiliation* (Kirsch, Kevin) (Entered: 01/18/2012) |
| 01/20/2012 | | NOTICE of Hearing: Please be aware that a Status Conference is set for 1/23/2012 at 09:00 AM by teleconference before Judge Michael R. Barrett; parties shall initiate contact with the Court by calling 513-564-7660 five minutes prior to 9:00 am. (ba1) (Entered: 01/20/2012) |
| 01/23/2012 | | Minute Entry for proceedings held before Judge Michael R. Barrett: Status Conference held on 1/23/2012; Daniel Wood appeared for Plaintiff; John Bennett, Kevin Kirsch and Barry Bretschneider appeared for Defendant; parties to confer re: mediation question, attorney eyes only issue and possible tutorial prior to markman hrg and apprise the law clerk by the end of the week and a follow up conference will be set. (ba1) (Entered: 01/23/2012) |
| 01/24/2012 | 27 | NOTICE by Defendants Muzak Holdings LLC, Muzak LLC *of Change of Law Firm Affiliation* (Kirsch, Kevin) (Entered: 01/24/2012) |
| 01/31/2012 | 28 | ORDER REFERRING CASE to Magistrate Judge Magistrate Judge Karen L. Litkovitz for the purpose of conducting a settlement conference. Signed by Judge Michael R. Barrett on 1/31/12. (ba1) (Entered: 01/31/2012) |
| 02/10/2012 | 29 | NOTICE of Settlement Conference set for Monday, 4/17/2012 at 09:00 AM in Chambers Room 716 before Magistrate Judge Karen L. Litkovitz. (COUNSEL SHOULD SUBMIT EX-PARTE SETTLEMENT LETTERS TO THE COURT (5) BUSINESS DAYS PRIOR TO THE CONFERENCE). (art) (Entered: 02/10/2012) |

| 02/10/2012 | 30 | CORRECTED NOTICE of Hearing: Settlement Conference set for Monday, 4/16/2012 at 09:00 AM in Chambers Room 716 before Magistrate Judge Karen L. Litkovitz. (COUNSEL SHOULD SUMBIT EX-PARTE SETTLEMENT LETTER TO THE COURT (5) BUSINESS DAYS PRIOR TO THE CONFERENCE). (art) (Entered: 02/10/2012) |
|---|---|---|
| 03/22/2012 | 31 | BRIEF by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 03/22/2012) |
| 03/22/2012 | 32 | BRIEF re 31 Brief by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 APPENDIX B DEFENDANTS INTRINSIC AND EXTRINSIC EVIDENCE [parts 1, 2 & 3], # 2 APPENDIX B DEFENDANTS INTRINSIC AND EXTRINSIC EVIDENCE [parts 1, 2 & 3]) (Bennett, John) (Entered: 03/22/2012) |
| 03/23/2012 | 33 | BRIEF re 31 Brief by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Appendix A Plaintiff's Intrinsic and Extrinsic Evidence) (Wood, Daniel) (Entered: 03/23/2012) |
| 03/23/2012 | 34 | NOTICE by Plaintiff Info-Hold, Inc. re 31 Brief (Wood, Daniel) (Entered: 03/23/2012) |
| 04/02/2012 | 35 | ORDER REASSIGNING CASE. Case reassigned to Judge Timothy S. Black for all further proceedings. Judge Michael R. Barrett no longer assigned to case. Signed by Chief Judge Susan J. Dlott on 4/2/12. (ba1) (Entered: 04/02/2012) |
| 04/03/2012 | | NOTICE of Hearing: The Status Conference by telephone set for 8/2/2012 at 9:30 a.m. is VACATED and RESCHEDULED for 8/2/2012 at 10:00 a.m. before Judge Timothy S. Black. Counsel shall call 1-888-684-8852; Access code: 8411435; Security code: 123456, and wait for the Court to join the conference. The Markman Hearing set for 8/9/12 is VACATED and RESCHEDULED for 8/10/2012 at 10:00 a.m. in Courtroom 3 - Cincinnati before Judge Timothy S. Black. The Final Pretrial Conference set 9/17/2013 is VACATED and RESCHEDULED for 10/7/2013 at 10:00 a.m. in Chambers, Room 815 before Judge Timothy S. Black. The Jury Trial set for 10/14/2013 is VACATED and RESCHEDULED for 10/15/2013 at 9:30 a.m. in Courtroom 3 - Cincinnati before Judge Timothy S. Black. (mr1) (Entered: 04/03/2012) |
| 04/16/2012 | 36 | Minute Entry: Case called this date before Magistrate Judge Karen L. Litkovitz for a Settlement Conference held on 4/16/2012. Counsel for plaintiff and defendant present. Matter was not settled this date. Parties will continue talks and will contact the Court if another settlement conference is needed. (Court Reporter none present.) (art) (Entered: 04/16/2012) |
| 04/20/2012 | | NOTICE of Hearing: The Status Conference by telephone set 8/2/2012 is VACATED and RESCHEDULED for 8/1/2012 at 10:45 a.m. before Judge Timothy S. Black. Counsel shall call 1-888-684-8852; Access code: 8411435; Security code: 123456, and wait for the Court to join the conference. (mr1) (Entered: 04/20/2012) |
| 05/18/2012 | 37 | MOTION to Incorporate Section 2.2(b) Into the Court's Protective Order and to Compel Defendants to Produce AEO Material by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Affidavit Daniel J. Wood, # 2 Affidavit Joey C. Hazenfield, |

| | | |
|---|---|---|
| | | # 3 Appendix Protective Order) (Wood, Daniel) Modified to edit text for document title on 5/21/2012 (mr1). (Entered: 05/18/2012) |
| 05/23/2012 | 38 | ORDER OF REFERRAL TO MAGISTRATE JUDGE LITKOVITZ. Signed by Judge Timothy S. Black on 5/22/12. (mr1) (Entered: 05/23/2012) |
| 06/01/2012 | 39 | Joint MOTION for Extension of Time New date requested 6/8/2012. by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 06/01/2012) |
| 06/08/2012 | 40 | BRIEF by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Kirsch, Kevin) (Entered: 06/08/2012) |
| 06/08/2012 | 41 | Petitioner's BRIEF by Info-Hold, Inc. *Claim Construction*. (Attachments: # 1 Appendix) (Wood, Daniel) (Entered: 06/08/2012) |
| 06/08/2012 | 42 | NOTICE by Plaintiff Info-Hold, Inc. re 41 Brief - Petitioner *Notice of Service Correction* (Wood, Daniel) (Entered: 06/08/2012) |
| 06/11/2012 | 43 | RESPONSE in Opposition re 37 MOTION for Discovery filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit Cheng email to Wood, # 2 Exhibit Wood email to Bennett, # 3 Exhibit Bennett letter to Wood, # 4 Exhibit Wood letter to Bennett, # 5 Exhibit Minute Entry, # 6 Exhibit Excerpts, # 7 Exhibit Overview, # 8 Exhibit Website printout, # 9 Exhibit Bretschneider email to Wood, # 10 Exhibit Anderson email to Wood, # 11 Exhibit Wood email to Bretschneider, # 12 Exhibit Bretschneider to Wood, # 13 Exhibit Excerpt, # 14 Exhibit Excerpt, # 15 Exhibit Excerpt, # 16 Exhibit Excerpt, # 17 Exhibit Wood letter to Rayburn, # 18 Exhibit Wood letter to Zendan, # 19 Exhibit Attorney Discipline & Sanction History, # 20 Exhibit Excerpt, # 21 Exhibit US Patent Application) (Kirsch, Kevin) (Entered: 06/11/2012) |
| 06/14/2012 | | Notation Order: This case is before the Court on an unopposed Joint Motion for Extension of Time and is hereby GRANTED. The Petitioner's Brief (Doc 41 ) is deemed timely filed. IT IS SO ORDERED by Judge Timothy S. Black on 6/14/12. (mr1) (Entered: 06/14/2012) |
| 06/25/2012 | 44 | REPLY to Response to Motion re 37 MOTION for Discovery filed by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit Agreement to Be Bound, # 2 Exhibit Email from Stephen Shilling, Law Clerk) (Wood, Daniel) (Entered: 06/25/2012) |
| 06/27/2012 | 45 | Joint MOTION for Extension of Time to File Response/Reply New date requested 7/6/2012. *Joint Motion for Extension of Time to File Responses to Opening Claim Construction Briefs* by Plaintiff Info-Hold, Inc., Defendants Muzak Holdings LLC, Muzak LLC. (Bennett, John) (Entered: 06/27/2012) |
| 06/29/2012 | | Notation Order: This case is before the Court on the parties' Joint Motion for Extension of Time to File Responses to Opening Claim Construction Briefs (Doc. 45). For good cause shown, the motion is GRANTED. Responses due by 7/6/2012. IT IS SO ORDERED by Judge Timothy S. Black on 6/29/12. (mr1) (Entered: 06/29/2012) |
| 07/06/2012 | 46 | |

A1030

| | | |
|---|---|---|
| | | RESPONSE to Motion re 45 Joint MOTION for Extension of Time to File Response/Reply New date requested 7/6/2012. *Joint Motion for Extension of Time to File Responses to Opening Claim Construction Briefs Response Brief* filed by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit A) (Wood, Daniel) (Entered: 07/06/2012) |
| 07/06/2012 | 47 | Response re 41 Brief - Petitioner *Defendants' Response Brief in Support of Proposed Claim Constructions* by Defendant Muzak LLC. (Attachments: # 1 Exhibit) (Anderson, Michael) (Entered: 07/06/2012) |
| 07/06/2012 | 48 | Objection re 41 Brief - Petitioner, 33 Brief *Defendants' Objections to Extrinsic Evidence Cited by Info-Hold in Support of Proposed Claim Constructions* by Defendant Muzak LLC. (Anderson, Michael) (Entered: 07/06/2012) |
| 07/17/2012 | 49 | ORDER/NOTICE of Hearing on 37 Motion This matter is before the Court on plaintiff Info-Hold, Inc.s Motion to IncorporateSection 2.2(b) Into the Courts Protective Order and To Compel Defendants to Produce AEO [Attorneys Eyes Only] Material (Doc. 37). An evidentiary hearing on the motion will be held on Monday, July 23, 2012 at 10:00 a.m., before U.S. Magistrate Judge Karen L. Litkovitz in Courtroom 708, U.S. Courthouse Building, 100 E. Fifth Street, Cincinnati, Ohio 45202. (jlw) (Entered: 07/17/2012) |
| 07/23/2012 | 50 | NOTICE of Appearance by M Scott McIntyre for Defendants Muzak Holdings LLC, Muzak LLC (McIntyre, M) (Entered: 07/23/2012) |
| 07/23/2012 | 51 | Minute Entry: Case called this date before Magistrate Judge Karen L. Litkovitz for an Evidentiary Hearing regarding plaintiff's 37 MOTION regarding Protective Order and to Compel held on 7/23/2012. Counsel for plaintiff and defendant present. All parties including counsel were sworn-in by the Court. Daniel Wood, Esq. testified. Joey Hazenfield, Company representative testified. Defendant's exhibit 22 was marked and admitted. Arguments heard. Matter taken under submission. Order of the Court to follow. (Court Reporter Jodie Perkins, Official Reporter.) (art) (Entered: 07/23/2012) |
| 07/23/2012 | 52 | EXHIBIT 22 tendered by defendant and admitted by the Court at 7/23/12 Evidentiary Hearing. (art) Modified on 7/26/2012 (art). (Entered: 07/26/2012) |
| 07/26/2012 | 53 | ORDER denying plaintiff's 37 Motion to Modify the Default Protective Order and to compel defendants to produce Attorneys Eyes Only information for plaintiff's counsel of record, Mr. Wood. Signed by Magistrate Judge Karen L. Litkovitz on 7/26/2012. (art) (Entered: 07/26/2012) |
| 08/01/2012 | | Minute Entry: This case came before the Court for a status conference by telephone on 8/1/12 at 10:45 a.m. Attorneys Daniel Wood, John Bennett, Kevin Kirsch, and Barry E. Bretschneider participated. The Markman hearing will proceed as scheduled on 8/10/12 at 10:00 a.m. in Cincinnati Courtroom #3. The parties will not present a tutorial to the Court prior to the Markman hearing. (mr1) (Entered: 08/01/2012) |
| 08/03/2012 | | NOTICE of Hearing: The Markman Hearing set for 8/10/2012 10:00 a.m. will proceed in Cincinnati Courtroom 7, Room 117 before Judge Timothy S. Black. (mr1) (Entered: 08/03/2012) |
| | | |

A1031

| 08/10/2012 | | Minute Entry and Notation Order: This case came before the Court for a Claim Construction Hearing on 8/10/12 at 10:00 a.m. Attorney Daniel Wood appeared on behalf of the Plaintiff; Info-Hold President Joey Hazenfield and Info-Hold CEO Mark Mason also attended on behalf of Plaintiff. Attorneys John Bennett, Barry Bretschneider, and Michael Anderson attended on behalf of the Defendant. Don Mihokovich attended by telephone. Arguments were presented to the Court. Defendant is granted leave to submit its Power-Point presentation as a hearing brief. Plaintiff may file a Response in Opposition on or before 8/17/12 and Defendant may file a Reply on or before 8/24/12. IT IS SO ORDERED by Judge Timothy S. Black. (Court Reporter Luke Lavin (Official).) (mr1) Modified on 8/10/2012 (mr1). (Entered: 08/10/2012) |
| --- | --- | --- |
| 08/17/2012 | 54 | Transcript of Proceedings (Markman Hearing) held on 8/10/2012, before Judge Timothy S. Black. Court Reporter/Transcriber Luke Lavin (official). Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms - Electronic Availability of Transcripts). Please read this policy carefully. For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office. Redaction Request due 9/7/2012. Redacted Transcript Deadline set for 9/17/2012. Release of Transcript Restriction set for 11/15/2012. (jlw) (Entered: 08/17/2012) |
| 08/17/2012 | 55 | Response re 47 Response (non motion) *Response to Muzak Markman Hearing Brief* by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 08/17/2012) |
| 08/23/2012 | 56 | NOTICE by Defendants Muzak Holdings LLC, Muzak LLC *Defendant PowerPoint Presentation from August 10, 2012 hearing* (Anderson, Michael) (Entered: 08/23/2012) |
| 08/23/2012 | 57 | Reply re 55 Response (non motion) *Defendants' Response to Info-Hold's Post-Hearing Response to Defendants' Markman Hearing Brief* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Anderson, Michael) (Entered: 08/23/2012) |
| 08/27/2012 | 58 | MOTION for Leave to File *Sur-Reply to Defendants' Reply* by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 08/27/2012) |
| 08/28/2012 | | Notation Order: This civil case is before the Court on Plaintiff Info-hold's Motion for Leave to File a Sur-reply (Doc. 58 ). For good cause shown, Plaintiff's motion is GRANTED. Plaintiff shall file its sur-reply on or before 8/28/12. IT IS SO ORDERED by Judge Timothy S. Black on 8/28/12. (mr1) (Entered: 08/28/2012) |
| 08/28/2012 | 59 | |

| | | Sur-reply to Defendants' response (Reply) to Plaintiff's Response in Opposition to Defendant's Markman Hearing Brief filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) Modified to clarify docket tex on 8/29/2012 (jlw). (Entered: 08/28/2012) |
|---|---|---|
| 09/10/2012 | | NOTATION ORDER: The civil cover sheet in Info-Hold, Inc. v. Muzak Holdings, LLC, et al., 1:11cv283 (Doc. 1-1), states that it is RELATED to Info-Hold, Inc. v. Applied Media Technologies Corporation, 1:08cv802. Upon review of the cases, the Court determines that cases are indeed related and it is ORDERED that the dockets be updated to reflect the related association. IT IS SO ORDERED by Judge Timothy S. Black on 9/10/12. (mr1) (Entered: 09/10/2012) |
| 09/10/2012 | 60 | ORDER ON CLAIM CONSTRUCTION. Signed by Judge Timothy S. Black on 9/10/2012. (mr1) (Entered: 09/10/2012) |
| 09/17/2012 | 61 | MOTION for Reconsideration *Defendants' Motion to Reconsider Claim Construction Order Related to Term "Control Signal"* by Defendant Muzak LLC. (Anderson, Michael) (Entered: 09/17/2012) |
| 09/26/2012 | 62 | MOTION for Leave to File *First Amended Complaint* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit Amended Complaint) (Wood, Daniel) (Entered: 09/26/2012) |
| 09/27/2012 | 63 | MOTION for Reconsideration re 60 Order *On Claim Construction* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit) (Wood, Daniel) (Entered: 09/27/2012) |
| 10/08/2012 | 64 | RESPONSE in Opposition re 61 MOTION for Reconsideration *Defendants' Motion to Reconsider Claim Construction Order Related to Term "Control Signal"* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 10/08/2012) |
| 10/11/2012 | 65 | RESPONSE in Opposition re 63 MOTION for Reconsideration re 60 Order *On Claim Construction* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Anderson, Michael) (Entered: 10/11/2012) |
| 10/16/2012 | 66 | REPLY to Response to Motion re 61 MOTION for Reconsideration *Defendants' Motion to Reconsider Claim Construction Order Related to Term "Control Signal"* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Anderson, Michael) (Entered: 10/16/2012) |
| 10/18/2012 | 67 | NOTICE of Appearance by David Wagner for Plaintiff Info-Hold, Inc. (Wood, Daniel) Modified on 10/25/2012 (lk). (Entered: 10/18/2012) |
| 10/22/2012 | 68 | RESPONSE in Opposition re 62 MOTION for Leave to File *First Amended Complaint* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Anderson, Michael) (Entered: 10/22/2012) |
| 10/23/2012 | 69 | REPLY to Response to Motion re 63 MOTION for Reconsideration re 60 Order *On Claim Construction* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 10/23/2012) |
| | | |

A1033

| 10/30/2012 | 70 | REPLY to Response to Motion re 62 MOTION for Leave to File *First Amended Complaint* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 10/30/2012) |
| 11/01/2012 | 71 | NOTICE of Appearance by Christopher M Alexander for Plaintiff Info-Hold, Inc. (Alexander, Christopher) (Entered: 11/01/2012) |
| 11/01/2012 | 72 | NOTICE by Plaintiff Info-Hold, Inc. *Agreement to be Bound by Protective Order* (Alexander, Christopher) (Entered: 11/01/2012) |
| 11/02/2012 | 73 | NOTICE by Plaintiff Info-Hold, Inc. *Certificate of Service for Agreement to Be Bound By Protective Order* (Attachments: # 1 Supplement Document Previously Filed) (Alexander, Christopher) (Entered: 11/02/2012) |
| 11/06/2012 | 74 | ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION AND DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION (Docs. 61 , 63 ). Signed by Judge Timothy S. Black on 11/6/2012. (mr1) (Entered: 11/06/2012) |
| 11/07/2012 | 75 | Minute Entry: Case called this date before Magistrate Judge Karen L. Litkovitz for an Informal Discovery Conference held via telephone on 11/7/2012. Counsel for plaintiff and defendant present. Order of the Court to follow. (Court Reporter none present.) (art) (Entered: 11/08/2012) |
| 11/08/2012 | 76 | ORDER re: 11/7/12 Informal Discovery Conference. Signed by Magistrate Judge Karen L. Litkovitz on 11/8/12. (sct1) (Entered: 11/08/2012) |
| 11/14/2012 | 77 | ORDER THAT PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT (Doc. 62 ) IS DENIED. Signed by Judge Timothy S. Black on 11/14/2012. (mr1) (Entered: 11/14/2012) |
| 11/15/2012 | 78 | MOTION for Leave to File *Under Seal* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bennett, John) (Entered: 11/15/2012) |
| 11/15/2012 | 79 | MOTION for Leave to Appear Pro Hac Vice of Bridget Springer Merritt (Filing fee $ 200) by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Certificate of Good Standing) (Bennett, John) (Entered: 11/15/2012) |
| 11/15/2012 | | PRO HAC VICE Filing fee: $ 200.00, receipt number 100CIN016936 for Bridget Springer Merritt. (jlw) (Entered: 11/15/2012) |
| 11/19/2012 | | NOTATION ORDER: This case is before the Court on Defendants' Motion for Leave to file under seal (Doc. 78 ). The motion is well taken and GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 11/19/2012. (mr1) (Entered: 11/19/2012) |
| 11/19/2012 | 80 | MOTION for Partial Summary Judgment by Defendants Muzak Holdings LLC, Muzak LLC. Responses due by 12/13/2012 (Attachments: # 1 Memorandum In Support, # 2 Statement of Undisputed Material Facts) (Bennett, John) (Entered: 11/19/2012) |
| 11/19/2012 | 81 | NOTICE *of Filing Under Seal 83* (Bennett, John) Modified on 11/21/2012 - To create hyper-link (tt). (Entered: 11/19/2012) |

A1034

| | | |
|---|---|---|
| 11/19/2012 | 82 | ORDER granting 79 Motion for Leave to Appear Pro Hac Vice of Bridget Springer Merritt. Signed by Judge Timothy S. Black on 11/19/2012. (mr1) (Entered: 11/19/2012) |
| 11/21/2012 | | NOTATION ORDER: This case is before the Court on Defendant's pending Motion for Partial Summary Judgment. (Doc. 80). Doc. 80 is hereby VACATED, as the Court has docketed the motion together with the attached items under seal at entry 83 . As such, any and all responses/replies should be linked to sealed entry Doc. 83 . The due date for responses remains unchanged. If the parties wish to file their responses/replies under seal, they need not move for leave and shall file their respective pleadings under seal, as desired. The Court suggests that Counsel consider presenting to the Court a joint protective order, which provides, in part, that: "In accordance with S.D. Ohio Civ. R. 79.3, any documents which contain Protected Information, if filed with this Court, shall be filed under seal and shall be made available only to the Court and to persons authorized under the terms of this Order. Pursuant to Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219, 227 (6th Cir. 1996), this Court will review each filing made under seal to determine whether there is good cause for shielding the information from public view. If the Court finds that good cause is lacking, it shall notify the parties and hold a hearing, if necessary, prior to unsealing the document." IT IS SO ORDERED by Judge Timothy S. Black on 11/21/2012. (mr1) (Entered: 11/21/2012) |
| 11/21/2012 | 84 | Minute Entry: Case called this date before Magistrate Judge Karen L. Litkovitz for an Informal Discovery Conference held via telephone on 11/21/2012. Counsel for plaintiff and defendant present. Order of the Court to follow. (Court Reporter none present.) (art) (Entered: 11/21/2012) |
| 11/21/2012 | 85 | ORDER following Informal 84 Discovery Conference. By agreement of the parties, the depositions scheduled for Monday, 11/26/2012 are postponed until a future date that is mutually agreeable to the parties. Signed by Magistrate Judge Karen L. Litkovitz on 11/21/2012. (art) (Entered: 11/21/2012) |
| 11/26/2012 | 86 | *Proposed* STIPULATION *OF JUDGMENT* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit A) (Kirsch, Kevin) Modified to edit text on 11/27/2012 (mr1). (Entered: 11/26/2012) |
| 11/26/2012 | 87 | MOTION for Leave to File *Under Seal* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Merritt, Bridget) (Entered: 11/26/2012) |
| 11/27/2012 | 88 | STIPULATION OF JUDGMENT OF NON-INFRINGEMENT OF '374 PATENT CLAIMS 7-11, 14-18, 20-22, 26-29, 37 AND 38. Signed by Judge Timothy S. Black on 11/27/12. (Attachments: # 1 Exhibit A) (mr1) (Entered: 11/27/2012) |
| 11/27/2012 | | NOTATION ORDER: This case is before the Court on Defendants' Motion for Leave to File Under Seal (Doc. 87 ). This motion is well-taken and GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 11/27/2012. (mr1) (Entered: 11/27/2012) |
| 12/03/2012 | 89 | |

| | | |
|---|---|---|
| | | MOTION for Partial Summary Judgment by Defendants Muzak Holdings LLC, Muzak LLC. Responses due by 12/27/2012 (Bennett, John) (Entered: 12/03/2012) |
| 12/03/2012 | 90 | MOTION Motion to Preclude Thomas M. Jacobs from Accessing Muzak's Protected Information by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Memorandum, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11) (Anderson, Michael) (Entered: 12/03/2012) |
| 12/03/2012 | 91 | NOTICE by Defendants Muzak Holdings LLC, Muzak LLC *of Filing Under Seal* Memorandum in Support et al. 92 89 MOTION for Partial Summary Judgment (Bennett, John) Modified to clarify docket text on 12/4/2012 (mee). Modified on 12/4/2012 - To create hyper-link (tt). (Entered: 12/03/2012) |
| 12/05/2012 | | Motions No Longer Referred: 90 MOTION to Preclude Thomas M. Jacobs from Accessing Muzak's Protected Information. (mr1) (Entered: 12/05/2012) |
| 12/06/2012 | 93 | MOTION to Remove Attorney Eyes Only Designations of the September 25, 2012, Rule 30(B)(6) Deposition Transcript of Info-Hold by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Anderson, Michael) Modified on 12/7/2012 (mr1). (Entered: 12/06/2012) |
| 12/07/2012 | | Motions No Longer Referred: 93 MOTION to Remove Attorney Eyes Only Designations of the September 25, 2012, Rule 30(B)(6) Deposition Transcript of Info-Hold. (mr1) (Entered: 12/07/2012) |
| 12/10/2012 | 94 | First MOTION for Extension of Time to Complete Discovery New date requested 2/11/2013. by Plaintiff Info-Hold, Inc.. (Alexander, Christopher) (Entered: 12/10/2012) |
| 12/10/2012 | 95 | Second MOTION for Extension of Time to Complete Discovery New date requested 2/8/2013. by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit) (Wood, Daniel) (Entered: 12/10/2012) |
| 12/13/2012 | 96 | RESPONSE in Opposition re 83 MOTION for Partial Summary Judgment *on Damages* filed by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit (Sealed per 11/21/12 Notation Order), # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit) (Wood, Daniel) Modified to correct hyper-link and edit text for detail on 12/18/2012 (mr1). (Entered: 12/13/2012) |
| 12/17/2012 | 97 | Minute Entry: Case called this date before Magistrate Judge Karen L. Litkovitz for an Informal Discovery Conference held via telephone on 12/17/2012. Counsel for plaintiff and defendant present. (Court Reporter none present.) (art) (Entered: 12/17/2012) |
| 12/20/2012 | 98 | RESPONSE in Opposition re 94 First MOTION for Extension of Time to Complete Discovery New date requested 2/11/2013. filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 |

A1036

| | | Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18) (Anderson, Michael) (Entered: 12/20/2012) |
|---|---|---|
| 12/20/2012 | 99 | RESPONSE in Opposition re 95 Second MOTION for Extension of Time to Complete Discovery New date requested 2/8/2013. filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12) (Anderson, Michael) (Entered: 12/20/2012) |
| 12/21/2012 | | Motions No Longer Referred: 95 Second MOTION for Extension of Time to Complete Discovery New date requested 2/8/2013. , 94 First MOTION for Extension of Time to Complete Discovery New date requested 2/11/2013. (mr1) (Entered: 12/21/2012) |
| 12/21/2012 | 100 | MOTION Motion to Preclude James E. Dabbs, III, and Robert L. White from Accessing Muzak's Protected Information by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Memorandum in Support of Motion, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15) (Anderson, Michael) (Entered: 12/21/2012) |
| 12/27/2012 | 101 | Response in Opposition re 89 MOTION for Partial Summary Judgment *Filed Under Seal* by Plaintiff Info-Hold, Inc. and 92 Memorandum in support (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Wood, Daniel) Modified to update entry text and create additional hyper-link on 1/7/2013 (mr1). (Entered: 12/27/2012) |
| 12/28/2012 | 102 | REPLY to Response to Motion re 83 MOTION for Partial Summary Judgment *Limiting Damages to Those Accrued After May 3, 2011* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Declaration of Barry E. Bretschneider, # 2 Exhibit A to Declaration of Barry E. Bretschneider, # 3 Exhibit B to Declaration of Barry E. Bretschneider) (Merritt, Bridget) Modified to correct the link to the motion on 1/7/2013 (mr1). (Entered: 12/28/2012) |
| 01/04/2013 | 103 | MOTION for Leave to File *Under Seal* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Merritt, Bridget) (Entered: 01/04/2013) |
| 01/07/2013 | 104 | Joint MOTION for Extension of Time New date requested 1/11/2013. *New dates requested: 1/11/13; 1/18/13 and 1/31/13* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Anderson, Michael) (Entered: 01/07/2013) |
| 01/08/2013 | 105 | ORDER GRANTING JOINT MOTION FOR EXTENSION OF TIME TO SUBMIT REBUTTAL EXPERT REPORTS (Doc 104 ). The responsive and rebuttal expert reports of the parties shall be served within the following deadlines: January 11, 2013 - Info-Hold to serve its responsive expert report on validity; January 18, 2013 - Muzak to serve its responsive expert reports on |

| | | infringement and damages; and January 31, 2013 - for the parties to serve their rebuttal expert reports. Signed by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
|---|---|---|
| 01/08/2013 | 106 | ORDER DENYING PLAINTIFF'S MOTIONS TO EXTEND THE DISCOVERY DEADLINES AND FOR LEAVE TO FILE A SUPPLEMENTAL EXPERT DISCLOSURE (Docs. 94 , 95 ). Signed by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
| 01/08/2013 | 107 | ORDER GRANTING DEFENDANTS' MOTION TO REMOVE ATTORNEY EYES ONLY DESIGNATIONS OF THE SEPTEMBER 25, 2012 RULE 30 (b)(6) DEPOSITION TRANSCRIPT OF INFO-HOLD (Doc. 93 ). Signed by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
| 01/08/2013 | 108 | ORDER GRANTING DEFENDANTS' MOTION TO PRECLUDE THOMAS M. JACOBS FROM ACCESSINGMUZAKS PROTECTED INFORMATION (Doc. 90 ). Signed by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
| 01/08/2013 | | NOTATION ORDER: This civil case is before the Court on Defendants' DN 83 sealed motion for partial summary judgment. Pursuant to this Court's standing order governing civil motions for summary judgment, Defendants filed a document entitled "Proposed Undisputed Facts" (Doc. 83-2), which sets forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. Plaintiff failed to respond as required. Therefore, Plaintiff shall file its "Response to Proposed Undisputed Facts and Statement of Disputed Issues of Material Fact" on or before January 11, 2013. See http://www.ohsd.uscourts.gov/judges/fpblack.htm. IT IS SO ORDERED by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
| 01/08/2013 | | NOTATION ORDER: This case is before the Court on Defendants' Motion for Leave to File Under Seal (Doc. 103 ). This motion is well-taken and GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 1/8/2013. (mr1) (Entered: 01/08/2013) |
| 01/09/2013 | | Motions No Longer Referred: 100 MOTION Motion to Preclude James E. Dabbs, III, and Robert L. White from Accessing Muzak's Protected Information. (mr1) (Entered: 01/09/2013) |
| 01/11/2013 | 109 | REPLY to Response to Motion re 89 MOTION for Partial Summary Judgment *On Info-Hold's Claims of Inducement of Infringement Against Muzak Holdings LLC and Muzak LLC and Dismissing Muzak Holdings From the Case* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Merritt, Bridget) (Entered: 01/11/2013) |
| 01/11/2013 | 110 | RESPONSE in Opposition re 80 MOTION for Partial Summary Judgment *Proposed Undisputed Facts and Statement of Disputed Issues of Material Facts* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 01/11/2013) |
| 01/12/2013 | 111 | RESPONSE in Opposition re 100 MOTION Motion to Preclude James E. Dabbs, III, and Robert L. White from Accessing Muzak's Protected |

A1038

| | | |
|---|---|---|
| | | Information filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 01/12/2013) |
| 01/16/2013 | [112](#) | NOTICE by Plaintiff Info-Hold, Inc. *Corrected Certificate of Service Re. [111](#) Response* (Wood, Daniel) Modified on 1/17/2013 (lk). (Entered: 01/16/2013) |
| 01/17/2013 | [113](#) | Joint MOTION for Extension of Time New date requested 2/4/2013. *Joint Motion for Extension of Time to Submit Rebuttal Expert Reports by Defendants Muzak Holdings LLC and Muzak LLC* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # [1](#) Text of Proposed Order) (Anderson, Michael) (Entered: 01/17/2013) |
| 01/18/2013 | [114](#) | First MOTION for Reconsideration re [108](#) Order on Motion for Miscellaneous Relief by Plaintiff Info-Hold, Inc.. (Attachments: # [1](#) Exhibit, # [2](#) Exhibit, # [3](#) Exhibit, # [4](#) Exhibit, # [5](#) Exhibit, # [6](#) Exhibit) (Wood, Daniel) (Entered: 01/18/2013) |
| 01/18/2013 | | This civil action is before the Court on the parties' joint motion for extension of time to submit rebuttal expert reports by Defendants Muzak Holdings LLC and Muzak LLC (Doc. [113](#) ). For good cause shown, the motion is hereby GRANTED. Defendants shall file their reply expert report on invalidity on or before 2/4/13. IT IS SO ORDERED by Judge Timothy S. Black on 1/18/2013. (mr1) (Entered: 01/18/2013) |
| 01/23/2013 | | NOTATION ORDER: This civil case is before the Court on Defendants' DN [89](#) sealed motion for partial summary judgment. Pursuant to this Court's standing order governing civil motions for summary judgment, Defendants filed a document entitled "Proposed Undisputed Facts" (Doc. 92 -2), which sets forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. Plaintiff failed to respond as required. Therefore, Plaintiff shall file its "Response to Proposed Undisputed Facts and Statement of Disputed Issues of Material Fact" on or before January 25, 2013. See http://www.ohsd.uscourts.gov/judges/fpblack.htm. IT IS SO ORDERED by Judge Timothy S. Black on 1/23/2013. (mr1) (Entered: 01/23/2013) |
| 01/23/2013 | [115](#) | MOTION for Partial Summary Judgment *THAT PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF* by Defendants Muzak Holdings LLC, Muzak LLC. Responses due by 2/19/2013 (Bennett, John) (Entered: 01/23/2013) |
| 01/23/2013 | [116](#) | MOTION for Partial Summary Judgment *That Plaintiff Info-Hold Is Not Entitled to Lost Profits Damages* by Defendants Muzak Holdings LLC, Muzak LLC. Responses due by 2/19/2013 (Attachments: # [1](#) Memorandum in Support of Motion of Defendants for Partial Summary Judgment, # [2](#) Statement of Undisputed Material Facts in Support of Motion of Defendants for Partial Summary Judgment, # [3](#) Exhibit 1 - Declaration of Barry E. Bretschneider, # [4](#) Exhibit A to Declaration of Barry E. Bretschneider, # [5](#) Exhibit B to Declaration of Barry E. Bretschneider, # [6](#) Exhibit C to Declaration of Barry E. Bretschneider, # [7](#) Exhibit 2) (Merritt, Bridget) (Entered: 01/23/2013) |
| 01/28/2013 | [118](#) | |

| | | |
|---|---|---|
| | | RESPONSE TO PROPOSED UNDISPUTED FACTS AND STATEMENT OF DISPUTED ISSUES OF MATERIAL FACT re 89 MOTION for Partial Summary Judgment *on Inducement* filed by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Wood, Daniel) Modified on 1/29/2013 (lk). (Entered: 01/28/2013) |
| 01/29/2013 | 119 | REPLY to Response to Motion re 100 MOTION Motion to Preclude James E. Dabbs, III, and Robert L. White from Accessing Muzak's Protected Information filed by Defendants Muzak Holdings LLC, Muzak LLC. (Anderson, Michael) (Entered: 01/29/2013) |
| 01/29/2013 | 120 | *** Withdrawn per Notice 123 *** MOTION for Protective Order *PREVENTING DR. DAVID LUCANTONI FROM PROVIDING A REPLY EXPERT REPORT ADDRESSING INFORMATION THAT SHOULD HAVE BEEN INCLUDED IN INFO-HOLD'S OPENING EXPERT REPORT, OR IN THE ALTERNATIVE, SEEKING TO STRIKE ANY REPLY EXPERT REPORT SERVED BY DR. LUCANTONI* by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Memorandum In Support, # 2 Exhibit 1, # 3 Text of Proposed Order) (Anderson, Michael) Modified to edit text and term the pleading as a pending motion on 2/4/2013 (mr1). (Entered: 01/29/2013) |
| 01/30/2013 | 121 | MOTION to Strike 118 RESPONSE TO PROPOSED UNDISPUTED FACTS AND STATEMENT OF DISPUTED ISSUES OF MATERIAL FACT re 89 MOTION for Partial Summary Judgment on Inducement filed by Plaintiff Info-Hold, Inc. by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Memorandum In Support, # 2 Text of Proposed Order) (Bretschneider, Barry) Modified to clarify docket text on 1/31/2013 (jlw). (Entered: 01/30/2013) |
| 02/01/2013 | 122 | MOTION for Extension of Time and AND REQUEST FOR AN URGENT ORAL HEARING - New date requested 3/1/2013 by Plaintiff Info-Hold, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Wood, Daniel) Modified to edit text for detail on 2/4/2013 (mr1). (Entered: 02/01/2013) |
| 02/04/2013 | | NOTICE of Hearing: The Court will hold a one hour in-person conference with counsel on all motions pending in this case on 2/8/13 at 11:00 a.m. in Cincinnati Chambers, Room 815. (mr1) (Entered: 02/04/2013) |
| 02/04/2013 | 123 | NOTICE OF WITHDRAWAL OF DOCUMENT by Defendants Muzak Holdings LLC, Muzak LLC re 120 MOTION for Protective Order *PREVENTING DR. DAVID LUCANTONI FROM PROVIDING A REPLY EXPERT REPORT ADDRESSING INFORMATION THAT SHOULD HAVE BEEN INCLUDED IN INFO-HOLD'S OPENING EXPERT REPORT, OR IN THE ALTERNATIVE, SEEKING TO STRIKE ANY REPLY EXPE (Bretschneider, Barry) (Entered: 02/04/2013)* |
| 02/05/2013 | 124 | RESPONSE in Opposition re 114 First MOTION for Reconsideration re 108 Order on Motion for Miscellaneous Relief filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Anderson, Michael) (Entered: 02/05/2013) |
| 02/06/2013 | 127 | |

| | | |
|---|---|---|
| | | RESPONSE in Opposition re 122 MOTION for Extension of Time New date requested 3/1/2013. filed by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Exhibit 1) (Anderson, Michael) (Entered: 02/06/2013) |
| 02/08/2013 | | Motions No Longer Referred: 122 MOTION for Extension of Time New date requested 3/1/2013. (mr1) (Entered: 02/08/2013) |
| 02/08/2013 | | Minute Entry and NOTATION ORDER: This civil action came before the Court for an in-person conference with the parties' attorneys in Chambers on all pending motions, including Doc. 100, Doc. 114, Doc. 122, and related memoranda. Attorneys Daniel Wood, David Wagner, Christopher Alexander, and David Wagner appeared for Plaintiff, and attorneys Barry Bretschneider and Kevin Kirsch appeared for Defendant. The Court hereby resolves the three listed motions as follows: (1) Thomas M. Jacobs shall serve as Plaintiff's expert and is GRANTED access to Defendant's protected information; (2) Robert L. White shall serve as Plaintiff's expert and is GRANTED access to Defendant's protected information; (3) James E. Dabbs, III, Dr. David Lucantoni, and the additional person identified shall not serve as Defendant's experts; and (4) the parties shall email to Chambers (Black_Chambers@ohsd.uscourts.gov) by 2/13/13 a joint proposed amended calendar order based on the Court's rulings, preserving the current dates for dispositive motions deadline and trial. IT IS SO ORDERED by Judge Timothy S. Black on 2/8/2013. (Court Reporter Jodie Perkins (Official).) (mr1) (Entered: 02/08/2013) |
| 02/15/2013 | 128 | Transcript of Proceedings (In-Chambers Conference) held on Friday, February 8, 2013, before Judge Timothy S. Black. 43 Pages. Court Reporter/Transcriber Jodie Perkins (Official), Telephone number 513-564-7500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.

NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms - Electronic Availability of Transcripts). Please read this policy carefully.

For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office. Redaction Request due 3/8/2013. Redacted Transcript Deadline set for 3/18/2013. Release of Transcript Restriction set for 5/16/2013. (mr1) (Entered: 02/15/2013) |
| 02/19/2013 | 129 | RESPONSE in Opposition re 116 MOTION for Partial Summary Judgment *That Plaintiff Info-Hold Is Not Entitled to Lost Profits Damages* filed by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Wood, Daniel) (Entered: 02/19/2013) |
| 02/19/2013 | 130 | RESPONSE to Motion re 115 MOTION for Partial Summary Judgment *THAT PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 02/19/2013) |
| | | |

A1041

| 02/25/2013 | 131 | REPLY to Response to Motion re 115 MOTION for Partial Summary Judgment *THAT PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Bretschneider, Barry) (Entered: 02/25/2013) |
| 02/26/2013 | 132 | Joint MOTION to Withdraw as Attorney *Christopher M. Alexander* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Text of Proposed Order Christopher M. Alexander) (Alexander, Christopher) (Entered: 02/26/2013) |
| 02/26/2013 | 133 | NOTICE of Appearance by Melancthon W Chatfield for Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. (Chatfield, Melancthon) (Entered: 02/26/2013) |
| 02/26/2013 | 134 | MOTION for Leave to File *Under Seal* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 02/26/2013) |
| 02/26/2013 | 135 | Joint MOTION to Withdraw as Attorney *David C. Wagner* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Text of Proposed Order Dave Wagner) (Alexander, Christopher) (Entered: 02/26/2013) |
| 02/27/2013 | 136 | ORDER GRANTING MOTION OF DEFENDANT MUZAK LLC FOR LEAVE TO FILE UNDER SEAL. Signed by Judge Timothy S. Black on 2/27/2013. (mr1) (Entered: 02/27/2013) |
| 02/27/2013 | 137 | ORDER granting 132 Motion to Withdraw as Attorney. Attorney Christopher M Alexander terminated. Signed by Judge Timothy S. Black on 2/27/2013. (mr1) (Entered: 02/27/2013) |
| 02/27/2013 | 138 | ORDER granting 135 Motion to Withdraw as Attorney. Attorney David C Wagner terminated. Signed by Judge Timothy S. Black on 2/27/2013. (mr1) (Entered: 02/27/2013) |
| 03/04/2013 | 139 | ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO INJUNCTIVE RELIEF (Doc. 115 ). Signed by Judge Timothy S. Black on 3/4/2013. (mr1) (Entered: 03/04/2013) |
| 03/08/2013 | 141 | ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO LOST PROFITS DAMAGES (Doc. 116 ). Signed by Judge Timothy S. Black on 3/8/2013. (mr1) (Entered: 03/08/2013) |
| 03/12/2013 | 142 | [FORMER DOCUMENT 142] Joint MOTION for Extension of Time New date requested 4/5/2013. by Plaintiff Info-Hold, Inc. (Attachments: # 1 Text of Proposed Order) (Wood, Daniel) Modified to remove pdf on 3/12/2013 (mtw). (Entered: 03/12/2013) |
| 03/12/2013 | 143 | Joint MOTION for Extension of Time. New date requested 4/5/2013 by Plaintiff Info-Hold, Inc. (Attachments: # 1 Text of Proposed Order) (Wood, Daniel) Modified to clarify docket text on 3/12/2013 (mtw). (Entered: 03/12/2013) |
| 03/12/2013 | | |

| | | |
|---|---|---|
| | | Notice of Correction re [FORMER DOCUMENT 142] Joint MOTION for Extension of Time by Plaintiff Info-Hold, Inc.: Document removed at Counsel's request - incomplete pdf filed in error. Counsel immediately refiled as 143 Joint Motion. Clerk terminated motion associated with filing error. (mtw) (Entered: 03/12/2013) |
| 03/13/2013 | 144 | NOTICE of Appearance by James Kwak for Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. (Kwak, James) (Entered: 03/13/2013) |
| 03/13/2013 | 145 | NOTICE of Appearance by Melissa Anne Rogers for Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. (Rogers, Melissa) (Entered: 03/13/2013) |
| 03/14/2013 | | NOTATION ORDER This civil action is before the Court on the parties' joint motion for extension of time for completing expert depositions (Doc. 143 ). For good cause shown, the motion is hereby GRANTED. The new deadline for completing expert depositions is 4/5/13. All remaining calendar deadlines remain as set. IT IS SO ORDERED by Judge Timothy S. Black on 3/14/2013. (mr1) (Entered: 03/14/2013) |
| 03/22/2013 | 146 | [FORMER DOCUMENT 146] MOTION to Withdraw as Attorney by Plaintiff Info-Hold, Inc.. (Chatfield, Melancthon) Modifiedto remove PDF on 3/25/2013 (jlw). (Entered: 03/22/2013) |
| 03/22/2013 | 147 | MOTION of Info-Hold, Inc. for Leave to File Under Seal (Attachments: # 1 Proposed Text of Proposed Order) (Wood, Daniel) Modified to edit text to reflect document title and to regenerate NEF on 3/25/2013 (mr1). (Entered: 03/22/2013) |
| 03/25/2013 | | Notice of Correction re: 146 MOTION to Withdraw as Attorney Motion was unsigned. Counsel will refile a signed copy of the motion. (jlw) (Entered: 03/25/2013) |
| 03/27/2013 | 148 | [FORMER DOCUMENT 148] MOTION to Withdraw as Attorney by Plaintiff Info-Hold, Inc. (Chatfield, Melancthon) Modified to remove pdf on 3/29/2013 (mtw). (Entered: 03/27/2013) |
| 03/28/2013 | 149 | MOTION to Withdraw as Attorney by Plaintiff Info-Hold, Inc.. (Chatfield, Melancthon) (mtw). (Entered: 03/28/2013) |
| 03/29/2013 | | Notice of Correction: Per Clerk's instructions, counsel refiled motion to withdraw (Docs 148 and 149 ). Clerk determined that the motions were signed, but signature was hidden due to an Adobe formatting issue. Clerk removed, scanned and re-docketed 149 , regenerating the notice of electronic filing. Clerk removed [Former document 148] and terminated the motion created by this filing because it is duplicative of 149 . (mtw) (Entered: 03/29/2013) |
| 04/05/2013 | 150 | *** STRICKEN per 4/15/2013 Notation Order *** MOTION for Reconsideration re 101 Response (non motion), *and Order (Doc. 126)* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Wood, Daniel) Modified to edit text for clarity and to on 4/15/2013 (mr1). (Entered: 04/05/2013) |
| 04/09/2013 | 151 | *** STRICKEN per 4/15/2013 Notation Order *** EXHIBIT D re 150 MOTION for Reconsideration re 101 Response (non motion), *and Order (Doc.* |

| | | |
|---|---|---|
| | | *126)* by Plaintiff Info-Hold, Inc.. (Wood, Daniel) Modified docket text on 4/10/2013 (eh1). Modified to edit text for clarity on 4/15/2013 (mr1). (Entered: 04/09/2013) |
| 04/11/2013 | 152 | *** STRICKEN per 4/15/2013 Notation Order *** MOTION for Partial Summary Judgment ( Responses due by 5/6/2013), Supplemental MOTION for Reconsideration re 150 MOTION for Reconsideration re 101 Response (non motion), *and Order (Doc. 126)* by Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Wood, Daniel) Modified to edit text for clarity on 4/15/2013 (mr1). (Entered: 04/11/2013) |
| 04/11/2013 | 153 | Second Supplemental MOTION for Partial Reconsideration of Court's Order Granting Defendants' Motion for Partial Summary Judgment on Info-Holds' Claims of Inducement of Infringement Against Muzak Holdings, LLC and Muzak LLC and Dismissing Muzak Holdings LLC from the Case by Plaintiff Info-Hold, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Wood, Daniel) Modified to edit text to reflect document caption on 4/15/2013 (mr1). (Entered: 04/11/2013) |
| 04/12/2013 | | NOTATION ORDER: This case is before the Court on Plaintiff's Motion for Leave to File Under Seal (Doc. 147 ). The time for a responsive pleading having passed, and none having been filed, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 4/12/2013. (mr1) (Entered: 04/12/2013) |
| 04/15/2013 | 154 | ORDER granting 149 Motion to Withdraw as Attorney. Attorney Melancthon W Chatfield terminated. Signed by Judge Timothy S. Black on 4/15/2013. (mr1) (Entered: 04/15/2013) |
| 04/15/2013 | | NOTATION ORDER: This case is before the Court on multiple filings by Plaintiff (Docs. 150, 151, 152, 153). The Court notes that they are duplicative in nature and have been filed over the course of six days, each successive pleading adding matters ad seriatim which had been overlooked in the preceding pleading. Pursuant to Fed. R. Civ. P. 12(f)(1), the Court hereby STRIKES the entries at 150, 151 and 152 and vacates all associated response/reply deadlines. Plaintiff's Second Supplemental Motion for Partial Reconsideration of Courts Order Granting Defendants Motion for Partial Summary Judgment on Info-Holds Claims of Inducement of Infringement Against Muzak Holdings LLC and Muzak LLC and Dismissing Muzak Holdings LLC from the Case (Doc. 153 ) remains pending for adjudication, and all response/reply deadlines shall be calculated from Doc. 153's filing date of 4/11/2013. In the event of filing errors in the future, Counsel shall NOT file additional duplicative pleadings as new docket entries, but shall instead contact Mary Rogers, Courtroom Deputy, Direct: Dial: 513-564-7529, or by Email: mary_rogers@ohsd.uscourts.gov, for assistance in correcting an entry. IT IS SO ORDERED by Judge Timothy S. Black on 4/15/2013. (mr1) (Entered: 04/15/2013) |
| 04/15/2013 | 155 | Joint MOTION *FOR THE ENTRY OF AGREED UPON STIPULATIONS AND EXTENSIONS REGARDING EXPERT DISCOVERY* by Defendant Muzak Holdings LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 04/15/2013) |

| 04/15/2013 | 156 | ORDER GRANTING JOINT MOTION FOR THE ENTRY OF AGREED UPON STIPULATIONS AND EXTENSIONS REGARDING EXPERT DISCOVERY. Signed by Judge Timothy S. Black on 4/15/2013. (mr1) (Entered: 04/15/2013) |
| 04/18/2013 | 157 | Unopposed MOTION for Leave to File *under Seal* by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Kwak, James) (Entered: 04/18/2013) |
| 04/19/2013 | | NOTATION ORDER: This case is before the Court on Counter Defendant's Unopposed Motion for Leave to File Under Seal (Doc. 157 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 4/19/2013. (mr1) (Entered: 04/19/2013) |
| 04/22/2013 | 158 | Unopposed MOTION for Leave to File *UNDER SEAL* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 04/22/2013) |
| 04/22/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 158 ). As it is unopposed and and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 4/22/2013. (mr1) (Entered: 04/22/2013) |
| 04/29/2013 | 159 | RESPONSE in Opposition re 153 Supplemental MOTION for Reconsideration re 150 MOTION for Reconsideration re 101 Response (non motion), *and Order (Doc. 126)* filed by Defendants Muzak Holdings LLC, Muzak LLC. (Bretschneider, Barry) (Entered: 04/29/2013) |
| 04/29/2013 | 160 | MOTION for Partial Summary Judgment *That Plaintiff Info-Hold is not Entitled to Reasonable Royalty Damages and for Dismissal* by Defendant Muzak LLC. Responses due by 5/23/2013 (Attachments: # 1 Memorandum in Support, # 2 Bretschneider Declaration, # 3 Bretschneider Declaration Ex. 1, # 4 Bretschneider Declaration Ex. 2, # 5 Text of Proposed Order) (Bretschneider, Barry) (Entered: 04/29/2013) |
| 04/29/2013 | 161 | MOTION for Summary Judgment *OF NON-INFRINGEMENT OF CLAIMS 3,6,13,19 AND 24 OF U.S. PATENT NO. 5,991,374* by Defendant Muzak LLC. Responses due by 5/23/2013 (Attachments: # 1 Text of Proposed Order) (Bennett, John) (Entered: 04/29/2013) |
| 04/29/2013 | 162 | MOTION to Strike *THE EXPERT REPORTS OF ROBERT L. WHITE AND TO PRECLUDE MR. WHITE'S TESTIMONY* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bennett, John) (Entered: 04/29/2013) |
| 04/29/2013 | 165 | MOTION for Partial Summary Judgment *That Claims 3, 6, and 24 of U.S. Patent No. 5,991,374 are Anticipated, or in the Alternative, That all Asserted Claims are Invalid for Lack of Enablement* by Defendant Muzak LLC. Responses due by 5/23/2013 (Attachments: # 1 Memorandum in Support, # 2 Statement of Undisputed Material Facts, # 3 Merritt Declaration, # 4 Merritt Declaration Ex. 1, # 5 Merritt Declaration Ex. 2, # 6 Merritt Declaration Ex. 3, # 7 Merritt Declaration Ex. 4, # 8 Merritt Declaration Ex. 5, # 9 Merritt Declaration Ex. 6, # 10 Merritt Declaration Ex. 7, # 11 Merritt Declaration Ex. |

A1045

| | | |
|---|---|---|
| | | 8, # 12 Forys Declaration Ex. A, # 13 Text of Proposed Order) (Anderson, Michael) (Entered: 04/29/2013) |
| 05/13/2013 | 169 | REPLY to Response to Motion re 153 Supplemental MOTION for Reconsideration re 150 MOTION for Reconsideration re 101 Response (non motion), *and Order (Doc. 126) Re: Muzak LLC Inducement* filed by Plaintiff Info-Hold, Inc.. (Wood, Daniel) (Entered: 05/13/2013) |
| 05/14/2013 | 170 | Unopposed MOTION for Leave to File *Under Seal* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 05/14/2013) |
| 05/15/2013 | 171 | Unopposed MOTION for Leave to File *Under Seal* by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Text of Proposed Order) (Kwak, James) (Entered: 05/15/2013) |
| 05/15/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 170 ) and Plaintiff's Motion for Leave to File Under Seal (Doc. 171 ). As they are unopposed and and for good cause shown, these motions are hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 5/15/2013. (mr1) (Entered: 05/15/2013) |
| 05/21/2013 | 172 | Unopposed MOTION for Leave to File *Under Seal* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 05/21/2013) |
| 05/21/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 172 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 5/21/2013. (mr1) (Entered: 05/21/2013) |
| 05/21/2013 | 173 | RESPONSE in Opposition re 168 Plaintiff's Motion and Memorandum for Partial Reconsideration of the Court's Order on Defendants' Motion for Partial Summary Judgment on Lost Profits Damages by Defendant Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Bretschneider, Barry) Modified to create link and edit text for clarity on 5/22/2013 (mr1). (Entered: 05/21/2013) |
| 05/23/2013 | 174 | MOTION to Strike *Previously Undisclosed Infringement Contentions and Other Evidence Relied Upon in Plaintiff's Motion for Partial Summary Judgment of Infringement* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 05/23/2013) |
| 05/23/2013 | 175 | RESPONSE in Opposition re 165 MOTION for Partial Summary Judgment *That Claims 3, 6, and 24 of U.S. Patent No. 5,991,374 are Anticipated, or in the Alternative, That all Asserted Claims are Invalid for Lack of Enablement* filed by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Responses to Statement of Undisputed Material Facts) (Kwak, James) (Entered: 05/23/2013) |
| 06/04/2013 | 182 | REPLY to Response 173 to Motion re: 168 Sealed Motion for Partial Reconsideration of Order Granting Defendant's Motion for Partial Summary Judgment on Lost Profits Damages filed by Plaintiff Info-Hold, Inc. |

| | | (Attachments: # 1 Exhibit A) (Wood, Daniel) Modified to create links and edit text for clarity on 6/4/2013 (mr1). (Entered: 06/04/2013) |
|---|---|---|
| 06/04/2013 | 183 | Unopposed MOTION for Leave to File *Under Seal* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 06/04/2013) |
| 06/04/2013 | 184 | Unopposed MOTION for Leave to File *Under Seal* by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Text of Proposed Order) (Kwak, James) (Entered: 06/04/2013) |
| 06/05/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 183 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 6/5/2013. (mr1) (Entered: 06/05/2013) |
| 06/05/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 184 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 6/5/2013. (mr1) (Entered: 06/05/2013) |
| 06/06/2013 | 185 | REPLY to Response to Motion re 160 MOTION for Partial Summary Judgment *That Plaintiff Info-Hold is not Entitled to Reasonable Royalty Damages and for Dismissal* filed by Defendant Muzak LLC. (Bretschneider, Barry) (Entered: 06/06/2013) |
| 06/10/2013 | 187 | REPLY to Response to Motion re 165 MOTION for Partial Summary Judgment *That Claims 3, 6, and 24 of U.S. Patent No. 5,991,374 are Anticipated, or in the Alternative, That all Asserted Claims are Invalid for Lack of Enablement* filed by Defendant Muzak LLC. (Bretschneider, Barry) (Entered: 06/10/2013) |
| 06/10/2013 | 188 | MOTION to Strike *Previously Undisclosed Infringement Contentions and Other Evidence Relied Upon In Plaintiffs Opposition for Summary Judgment of Non-infringement* by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 06/10/2013) |
| 06/24/2013 | 194 | MOTION to Seal *Unopposed Motion of Defendant Muzak LLC for Leave to File Under Seal* by Defendant Muzak Holdings LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) (Entered: 06/24/2013) |
| 06/24/2013 | 195 | Unopposed MOTION for Leave to File *Under Seal* by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Text of Proposed Order) (Kwak, James) (Entered: 06/24/2013) |
| 06/25/2013 | | NOTATION ORDER: This case is before the Court on Defendant's Motion for Leave to File Under Seal (Doc. 194 ) and Plaintiff's Motion for Leave to File Under Seal (Doc. 195 ). As they are unopposed and for good cause shown, these motions are hereby GRANTED. IT IS SO ORDERED by Judge Timothy S. Black on 6/25/2013. (mr1) (Entered: 06/25/2013) |
| 07/11/2013 | 198 | Unopposed MOTION to Seal by Defendant Muzak LLC. (Attachments: # 1 Text of Proposed Order) (Bretschneider, Barry) Modified to clarify docket text on 7/12/2013 (jlw). (Entered: 07/11/2013) |

| | | |
|---|---|---|
| 07/12/2013 | | ORDER granting 198 Motion to Seal: NOTATION ORDER: This case is before the Court on Defendant's Unopposed Motion for Leave to File Under Seal (Doc. 198). As it is unopposed and for good cause shown, this motion is hereby GRANTED. IT IS SO ORDERED. Signed by Judge Timothy S. Black on 7/12/2013. (jlw) (Entered: 07/12/2013) |
| 07/15/2013 | 200 | NOTICE by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. *of Errata Regarding Plaintiff Info-Hold, Inc.'s Reply to Muzak, LLC's Opposition to Motion for Summary Judgment of Infringement and Opposition to Muzak, LLC's Motion to Strike Previously Undisclosed Infringement Contentions and Other Evidence* (Kwak, James) (Entered: 07/15/2013) |
| 07/17/2013 | 201 | Response re 200 Notice (Other), *Response of Defendant Muzak LLC to Plaintiff Info-Hold Inc.'s Notice of Errata Regarding Info-Hold's Summary Judgment Papers* by Defendant Muzak LLC. (Bretschneider, Barry) (Entered: 07/17/2013) |
| 08/01/2013 | 202 | Transcript of Proceedings (Evidentiary Hearing) held on Monday, July 23, 2012, before Magistrate Judge Karen L. Litkovitz. 58 Pages. Court Reporter/Transcriber Jodie Perkins (Official), Telephone number 513-564-7500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.

NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms - Electronic Availability of Transcripts). Please read this policy carefully.

For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office. Redaction Request due 8/22/2013. Redacted Transcript Deadline set for 9/3/2013. Release of Transcript Restriction set for 10/30/2013. (mr1) (Entered: 08/01/2013) |
| 08/20/2013 | 203 | ORDER DENYING PLAINTIFFS MOTIONS FOR RECONSIDERATION (Docs. 153 and 168 ). Signed by Judge Timothy S. Black on 8/20/2013. (mr1) (Entered: 08/20/2013) |
| 08/20/2013 | 204 | ORDER: GRANTING DEFENDANT'S MOTION TO STRIKE THE EXPERT REPORTS OF ROBERT L. WHITE AND TO PRECLUDE MR. WHITE'S TESTIMONY (Doc. 162 ) AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO REASONABLE ROYALTY DAMAGES (Doc. 160 ). Scheduling Order: Plaintiff has now been found not to be entitled to any measure of damages in this action and has conceded that it is not entitled to injunctive relief. (Docs. 130 , 139 ). Accordingly, in a memorandum to be filed by September 11, 2013, Plaintiff shall show cause why final judgment should not be entered against it and this case closed in this Court. Defendant may file a reply by September 18, 2013. The trial set to |

| | | |
|---|---|---|
| | | commence on October 15, 2013 is hereby VACATED, as is the Final Pretrial Conference of October 7, 2013. Signed by Judge Timothy S. Black on 8/20/2013. (mr1) (Entered: 08/20/2013) |
| 09/11/2013 | 205 | MOTION for Reconsideration re 204 Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold Is Not Entitled to Reasonable Royalty Damages by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. (Kwak, James) Modified text for clarity on 9/12/2013 (mr1). (Entered: 09/11/2013) |
| 09/11/2013 | 206 | RESPONSE TO ORDER TO SHOW CAUSE by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Kwak, James) (Entered: 09/11/2013) |
| 09/13/2013 | 207 | Reply re 206 Response to Order to Show Cause *Why Final Judgment Should Not Be Entered Against It* by Defendant Muzak LLC. (Bretschneider, Barry) (Entered: 09/13/2013) |
| 10/04/2013 | 208 | RESPONSE in Opposition re 205 MOTION for Reconsideration re 204 Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold Is Not Entitled to Reasonable Royalty Damages filed by Defendant Muzak LLC. (Bretschneider, Barry) Modified text for clarity on 10/7/2013 (mr1). (Entered: 10/04/2013) |
| 10/21/2013 | 209 | REPLY to Response to Motion re 205 MOTION for Reconsideration re 204 Order, Terminate Motions, Terminate Hearings,,,,,,,,, *Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's* filed by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Kwak, James) (Entered: 10/21/2013) |
| 11/13/2013 | 210 | ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION (Doc. 205 ) AND ENTERING FINAL JUDGMENT AGAINST PLAINTIFF. Signed by Judge Timothy S. Black on 11/13/2013. (mr1) (Entered: 11/13/2013) |
| 11/13/2013 | 211 | CLERK'S JUDGMENT AFFIRMING ORDER 210 . (mr1) (Entered: 11/13/2013) |
| 11/13/2013 | 212 | REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING PATENT OR TRADEMARK re: ORDER 210 . (mr1) (Entered: 11/13/2013) |
| 11/25/2013 | 213 | BILL OF COSTS by Defendant Muzak LLC. (Attachments: # 1 Motion and Memo In Support, # 2 Bill of Costs, # 3 Exhibit A, # 4 Exhibit A-1, # 5 Exhibit A-2, # 6 Exhibit A-3, # 7 Exhibit A-4, # 8 Exhibit B -Declaration of John Bennett) (Bennett, John) (Entered: 11/25/2013) |
| 11/25/2013 | 214 | NOTICE to Counsel re 213 Bill of Costs. The Bill of Costs will be held in abeyance until a judgment has become final and all other requirements of Local Rule 54.1 have been met and the Bill of Costs is re- filed. (sct1) (Entered: 11/25/2013) |
| 12/13/2013 | 215 | NOTICE OF APPEAL as to 139 Order on Motion for Partial Summary Judgment, 74 Order on Motion for Reconsideration, 141 Order on Motion for |

| | | Partial Summary Judgment, 204 Order, Terminate Motions, Terminate Hearings,,,,,,,, 77 Order on Motion for Leave to File, 211 Clerk's Judgment, 210 Order on Motion for Reconsideration, 88 Stipulation and Order, 203 Order on Motion for Reconsideration, Order on Sealed Motion, 60 Order by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. Filing fee $ 505. Appeal Record due by 12/27/2013. (Kwak, James) (Entered: 12/13/2013) |
|---|---|---|
| 12/16/2013 | | USCA Appeal Fees received $ 505 receipt number COL030469 re 215 Notice of Appeal filed by Info-Hold, Inc. (sr1) (Entered: 12/16/2013) |
| 12/20/2013 | | USCA Case Number 14-1167 for 215 Notice of Appeal, filed by Info-Hold, Inc. (jlw) (Entered: 12/20/2013) |
| 12/24/2013 | 216 | NOTICE by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc. *of Filing Transcript Purchase Order* (Attachments: # 1 Exhibit A Part 1 - Transcript Purchase Order, # 2 Exhibit A Part 2 - Certificate of Service) (Kwak, James) (Entered: 12/24/2013) |
| 12/27/2013 | 217 | MOTION for Sanctions by Defendant Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Bretschneider, Barry) Modified to clarify docket text on 12/30/2013 (jlw). (Entered: 12/27/2013) |
| 12/27/2013 | 218 | MOTION to Declare this Case Exceptional Pursuant to 35 U.S.C. § 285 and to Award Muzak Attorneys Fees and Expenses by Defendants Muzak Holdings LLC, Muzak LLC. (Attachments: # 1 Memorandum, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Text of Proposed Order, # 7 Bretschneider Declaration, # 8 Bretschneider Declaration Exhibit A, # 9 Bretschneider Declaration Exhibit B, # 10 Bretschneider Declaration Exhibit C) (Bretschneider, Barry) Modified to clarify docket text on 12/30/2013 (jlw). Modified entry for detail on 12/30/2013 (mr1). (Entered: 12/27/2013) |
| 12/27/2013 | 219 | BILL OF COSTS by Defendant Muzak LLC. (Attachments: # 1 Motion and Memo In Support, # 2 Bill of Costs, # 3 Exhibit A, # 4 Exhibit A-1, # 5 Exhibit A-2, # 6 Exhibit A-3, # 7 Exhibit A-4, # 8 Exhibit B - Declaration of John Bennett) (Bennett, John) (Entered: 12/27/2013) |
| 01/06/2014 | 220 | Unopposed MOTION for Extension of Time to File Response/Reply as to 218 MOTION for Attorney Fees *Defendant Muzak LLC's and Muzak Holdings LLC's Motion to Declare This Case Exceptional Pursuant to 35 U.S.C. § 285 and to Award Muzak Attorney Fees and Expenses* New date requested 1/16/2014. *and new date requested 2/6/2014 for Reply* by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Exhibit A - Joint Stipulation) (Kwak, James) (Entered: 01/06/2014) |
| 01/07/2014 | | NOTATION ORDER: This civil action is before the Court on Plaintiff's Unopposed Motion for Extension of Time (Doc. 220 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. Plaintiff shall file its response in opposition to Defendants' Motion to Declare this Case Exceptional Pursuant to 35 U.S.C. § 285 and to Award Muzak Attorney Fees and Expenses (Doc. 218 ) on or before 1/16/14. Defendants shall file their reply in support of this motion on or before 2/6/14. IT IS SO ORDERED by Judge Timothy S. Black on 1/7/2014. (mr1) (Entered: 01/07/2014) |

| 01/10/2014 | 221 | MOTION Emergency Motion Under L.R. 7.1(b)(3) Requesting the Court to Grant a Status Conference, to Strike Muzak's Motions with Respect to the Personal Allegations Made Against Outside Counsel James Kwak, and to Stay the Motion for Attorney Fees Pending Appeal re 218 MOTION for Attorney Fees *Defendant Muzak LLC's and Muzak Holdings LLC's Motion to Declare This Case Exceptional Pursuant to 35 U.S.C. § 285 and to Award Muzak Attorney Fees and Expenses*, 217 MOTION for Sanctions *Defendant Muzak LLC's Motion for Sanctions Pursuant to Rule 11, Fed. R. Civ. P. and Supporting Memorandum*, 219 Bill of Costs, by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Declaration of James L. Kwak) (Kwak, James) (Entered: 01/10/2014) |
| 01/13/2014 | 222 | RESPONSE to Motion re 221 MOTION Emergency Motion Under L.R. 7.1(b)(3) Requesting the Court to Grant a Status Conference, to Strike Muzak's Motions with Respect to the Personal Allegations Made Against Outside Counsel James Kwak, and to Stay the Motion for Attorney Fees P filed by Defendant Muzak LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Bretschneider, Barry) (Entered: 01/13/2014) |
| 01/13/2014 | 223 | REPLY to Response to Motion re 221 MOTION Emergency Motion Under L.R. 7.1(b)(3) Requesting the Court to Grant a Status Conference, to Strike Muzak's Motions with Respect to the Personal Allegations Made Against Outside Counsel James Kwak, and to Stay the Motion for Attorney Fees P filed by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Declaration of James L. Kwak) (Kwak, James) (Entered: 01/13/2014) |
| 01/14/2014 | | NOTATION ORDER. This Court hereby ORDERS that briefing and resolution of Muzak's motion for attorney fees (Doc. 218 ) and motion for sanctions (Doc. 217 ) is hereby STAYED until after the Court of Appeals resolves the pending appeal (whereafter this Court will set a briefing schedule on these motions). *See Pharmacia & Upjohn Co. v. Mylan Pharms.,* 182 F.3d 1356, 1360 n. 2 (Fed Cir. 1999); *Astrazeneca AB v. Mutual Pharm. Co., Inc.,* No. Civ. A 00-4731, 2003 WL 22794863 at *2 (E.D. Pa. Nov. 12, 2003); *see also* Notes of Advisory Committee on 1993 Amendments to Rule 58. IT IS SO ORDERED by Judge Timothy S. Black on 1/14/2014. (mr1) (Entered: 01/14/2014) |
| 01/16/2014 | 224 | Unopposed MOTION to Enter Stipulation of the Parties to Stay Muzak, LLC's Motions on Costs (Doc. 219) Pending Appeal re 214 Notice (Other), 219 Bill of Costs, 213 Bill of Costs, by Counter Defendant Info-Hold, Inc., Plaintiff Info-Hold, Inc.. (Attachments: # 1 Declaration of James L. Kwak) (Kwak, James) (Entered: 01/16/2014) |
| 01/17/2014 | | NOTATION ORDER: This civil action is before the Court on Plaintiff's Unopposed Motion to Enter Stipulation of the Parties to Stay Muzak LLC's Motions on Costs (Doc. 219 ) Pending Appeal (Doc. 224 ). As it is unopposed and for good cause shown, this motion is hereby GRANTED. Briefing and resolution of Defendants' Motion to Tax Costs (Doc. 219 ) is STAYED until after the Court of Appeals resolves the pending appeal (after which this Court will set a briefing schedule on this motion). IT IS SO ORDERED by Judge Timothy S. Black on 1/17/2014. (mr1) (Entered: 01/17/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/30/2014 11:24:33 | | | |
| PACER Login: | tm1162 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:11-cv-00283-TSB-KLL |
| Billable Pages: | 25 | Cost: | 2.50 |

A1052

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

11 MAY -3 PM 1: 54

U.S. DISTRICT COURT
SOUTHERN DIST OHIO

| | | |
|---|---|---|
| INFO-HOLD, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. **1:11 CV 283** |
| | ) | |
| v. | ) | Judge: |
| | ) | SPIEGEL, J. |
| Muzak Holdings, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Muzak, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff Info-Hold, Inc., by its counsel and for its Complaint against, Muzak Holdings, LLC and Muzak, LLC alleges as follows:

## THE PARTIES

1.      Plaintiff Info-Hold, Inc. ("Info-Hold") is a Delaware corporation with its principal place of business at 4120 Airport Rd., Cincinnati, OH 45226.

2.      Upon information and belief, Defendant Muzak Holdings, LLC, ("Muzak Holdings") is a Delaware limited liability company with its principal place of business at 3318 Lakemont Blvd, Fort Mill, South Carolina 29708 and Defendant Muzak, LLC, ("Muzak") is a Delaware limited liability company with its principal place of business at the same address.

3.    Muzak Holdings and Muzak have committed acts of patent infringement in the United States, including this district, and conduct continual, substantial and systematic business in this district.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 35 U.S.C. Sections 1 *et seq.* and 28 U.S.C. Sections 1331 and 1338(a).

5.    Venue properly lies in this judicial district pursuant to 28 U.S.C. Sections 1391(b) and (c) and 1400(b).

## BACKGROUND FACTS

6.    United States Letters Patent relevant to this action, entitled "Programmable Messaging System for Controlling Playback of Messages on Remote Music On-Hold-Compatible Telephone Systems and Other Message Output Devices," were duly and legally issued to Joey C. Hazenfield on November 23, 1999 as Patent No. 5,991,374 ("the '374 patent").

7.    On October 24, 2007 Joey C. Hazenfield executed an assignment, which assigned his rights under the '374 patent, including the right to sue and recover for past and future damages, to plaintiff Info-Hold.

8.    At all times subsequent to its issuance, and prior to its assignment, Info-Hold was the sole licensee under the patent.

9.    Defendants Muzak Holdings and Muzak have committed and continue to commit acts of infringement in violation of 35 USC Section 271, including but not limited to, making, using, selling, offering for sale and/or importing on-hold messaging systems and methods

claimed by the '374 patent and/or material components thereof, having no substantial non-infringing use.

## COUNT 1 FOR PATENT INFRINGEMENT AGAINST MUZAK HOLDINGS, LLC

10.     This cause arises under the Patent Act of 1952, 35 U.S.C. Section 1 *et seq.*, particularly 35 U.S.C. Section 271 and alleges patent infringement.

11.     Plaintiff restates and realleges all the allegations contained in paragraphs 1-10 of this Complaint as if fully rewritten and set forth herein.

12.     Upon information and belief, Defendant Muzak Holdings makes, uses, sells, and offers for sale, a product known as the "Encompass LE 2".

13.     The Encompass LE 2 infringes the '374 patent.

14.     Plaintiff has reviewed Muzak Holdings' representations and statements regarding the Encompass LE 2 via their website and otherwise in order to ascertain the product's functions and characteristics.

15.     After a review of the available information, Info-Hold alleges that Muzak Holdings, through the Encompass LE 2, infringes the '374 patent by direct infringement, inducing direct infringement and by contributing to the infringement of the patent by others.

16.     Muzak Holdings' acts of infringement have been, are and will continue to be willful and deliberate, and in reckless disregard of Plaintiff's patent rights.

17.     Defendant's acts complained of herein have caused, and if not enjoined will continue to cause irreparable harm and damage to Plaintiff for which there is no adequate remedy at law, and have caused Plaintiff actual monetary damage of an amount not yet determined.

**COUNT 2 FOR PATENT INFRINGEMENT AGAINST MUZAK HOLDINGS, LLC**

18. Plaintiff restates and realleges all the allegations contained in paragraphs 1-17 of this Complaint as if fully rewritten and set forth herein.

19. Upon information and belief, Defendant Muzak Holdings makes, uses, sells, and offers for sale a product known as the "Encompass MV."

20. The Encompass MV infringes the '374 patent.

21. Plaintiff has reviewed Muzak Holdings' representations and statements regarding the Encompass MV, via their website and otherwise, in order to ascertain the product's functions and characteristics.

22. After a review of the available information, Info-Hold alleges Muzak Holdings, through the Encompass MV, infringes the '374 patent by direct infringement, inducing direct infringement and by contributing to the infringement of the patent by others.

23. Muzak Holdings' acts of infringement have been, are and will continue to be willful and deliberate, and in reckless disregard of Plaintiff's patent rights.

24. Defendant's acts complained of herein have caused, and if not enjoined will continue to cause irreparable harm and damage to Plaintiff for which there is no adequate remedy at law and have caused Plaintiff actual monetary damages in an amount not yet determined.

**COUNT 3 FOR INFRINGEMENT AGAINST MUZAK, LLC**

24. Plaintiff restates and realleges all the allegations contained in paragraphs 1-23 of this Complaint as if fully rewritten and set forth herein.

25. This cause arises under the Patent Act of 1952, 35 U.S.C. Section 1 *et seq.*, particularly 35 U.S.C. Section 271 and alleges patent infringement.

26. Upon information and belief, Defendant Muzak makes, uses, sells, and offers for sale, a product known as the "Encompass LE 2".

27. The Encompass LE 2 infringes the '374 patent.

28. Plaintiff has reviewed Muzak's representations and statements regarding the Encompass LE 2 via their website and otherwise in order to ascertain the product's functions and characteristics.

29. After a review of the available information, Info-Hold alleges that Muzak, through the Encompass LE 2, infringes the '374 patent by direct infringement, inducing direct infringement and by contributing to the infringement of the patent by others.

30. Muzak's acts of infringement have been, are, and will continue to be willful and deliberate, and in reckless disregard of Plaintiff's patent rights.

31. Defendant's acts complained of herein have caused, and if not enjoined will continue to cause irreparable harm and damage to Plaintiff for which there is no adequate remedy at law and have caused Plaintiff actual monetary damages in an amount not yet determined.

## COUNT 4 FOR INFRINGEMENT AGAINST MUZAK, LLC

32. Plaintiff restates and realleges all the allegations contained in paragraphs 1-31 of this Complaint as if fully rewritten and set forth herein.

33. Upon information and belief, Defendant Muzak makes, uses, sells, and offers for sale a product known as the "Encompass MV."

34. The Encompass MV infringes the '374 patent.

35.  Plaintiff has reviewed Muzak's representations and statements regarding the Encompass MV, via their website and otherwise, in order to ascertain the product's functions and characteristics.

36.  After a review of the available information, Info-Hold alleges that Muzak, through the Encompass MV, infringes the '374 patent by direct infringement, inducing direct infringement and by contributing to the infringement of the patent by others.

37.  Muzak's acts of infringement have been, are and will continue to be willful and deliberate, and in reckless disregard of Plaintiff's patent rights.

38.  Defendant's acts complained of herein have caused, and if not enjoined will continue to cause, irreparable harm and damage to Plaintiff for which there is no adequate remedy at law and have caused Plaintiff actual monetary damages in an amount not yet determined.


WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.  That a judgment be entered that Defendants Muzak Holdings and Muzak have infringed and continue to infringe United States Letters Patent No. 5,991,374 and that such infringement is willful;

B.  That Defendants Muzak Holdings and Muzak, their agents, sales representatives, employees, associates, distributors, attorneys, successors and assigns, and any and all persons or entities acting as, through, under or in active participation with any or all of them, be enjoined and restrained preliminarily and permanently from making, using, offering for sale or selling within the United States, or importing into the United States, any products or any methods that infringe the said United States Patent.

C.  That a judgment be entered that Defendants, jointly and severally, be required to pay over to Plaintiff all damages sustained by it due to such patent infringement and that such damages be trebled pursuant to 35 U.S.C. Section 284 for the willful acts of infringement complained of herein;

D.  That this case be adjudged exceptional under U.S.C. Section 285, thereby entitling Plaintiff to an award of its reasonable attorneys fees and that such reasonable attorney fees be awarded;

E.  That Plaintiff be awarded its costs and prejudgment interest on all damages; and

F.  For any and all other such relief as the Court deems just and equitable.

Plaintiff demands a trial by jury.

Dated: May 3, 2011

Daniel Joseph Wood (0037632)
4120 Airport Road
Cincinnati, Ohio 45226
Telephone: (513) 248-5600
Facsimile: (513) 248-5609
Trial Attorney for Plaintiff Info-Hold

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |
|---|---|
| INFO-HOLD, INC., | |
| Plaintiff, | Civil Action No.  1:11-cv-283 |
| v. | Judge Michael R. Barrett |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## ANSWER AND COUNTERCLAIM OF DEFENDANTS
## MUZAK HOLDINGS LLC AND MUZAK LLC TO THE COMPLAINT

Pursuant to Fed. R. Civ. P. 12, Defendants hereby file their Answer responding to the numbered paragraphs of the Complaint and Jury Demand filed by Plaintiff Info-Hold, Inc. ("Plaintiff" or "Info-Hold") as follows:

### THE PARTIES

1.      Admitted.

2.      Admitted, except that the correct names of the defendants are Muzak Holdings LLC and Muzak LLC.

3.      Denied.

### JURISDICTION AND VENUE

4.      Defendants admit that this action purports to be an action for patent infringement arising under the Patent Laws of the United States as codified in Title 35 of the United States Code and that this Court has subject matter jurisdiction over Plaintiff's claims for patent

infringement under 28 U.S.C. § 1338(a). Defendants deny any such patent infringement as alleged by Plaintiff or that Plaintiff's claims have any merit.

5.    Defendants admit that venue lies in this district but deny that venue in this district arises from the commission of infringing acts in this judicial district, and deny any such patent infringement or other acts as alleged by Plaintiff.

## **BACKGROUND FACTS**

6.    Defendants admit that U.S. Patent No. 5,991,374 ("the '374 patent") issued on November 3, 1999, that the '374 patent identifies Joey C. Hazenfield as the sole inventor, and that the '374 patent is entitled "Programmable Messaging System For Controlling Playback of Messages on Remote Music On-Hold-Compatible Telephone Systems and Other Message Output Devices." Defendants deny the remaining allegations of paragraph 6 of the Complaint.

7.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7, and therefore deny those allegations.

8.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8, and therefore deny those allegations.

9.    Denied.

## **COUNT 1**

## **FOR PATENT INFRINGEMENT AGAINST MUZAK HOLDINGS LLC**

10.    Defendants admit that this action purports to be an action for patent infringement arising under the Patent Laws of the United States as codified in Title 35 of the United States Code. Defendants deny any such patent infringement as alleged by Plaintiff and deny that Plaintiff's claims have any merit.

2

**A1063**

11.     Defendants incorporate their responses to paragraphs 1-10 of the Complaint above as if the same were set forth fully herein.

12.     Denied.  Muzak Holdings LLC is a corporate holding company that does not make, sell, offer for sale, use or import any products or perform any services with respect to such products.

13.     Denied.

14.     Defendants are without knowledge or information sufficient to form a belief as to the allegations in paragraph 14, and, therefore, deny those allegations.

15.     Defendants admit that Info-Hold makes the allegations of paragraph 15. Defendants otherwise deny the allegations of paragraph 15 and specifically deny that Defendants have committed any acts of direct or indirect infringement of the '374 patent.

16.     Denied.

17.     Denied.

## COUNT 2

### FOR PATENT INFRINGEMENT AGAINST MUZAK HOLDINGS LLC

18.     Defendants incorporate their responses to paragraphs 1-17 of the Complaint above as if the same were set forth fully herein.

19.     Denied.  Muzak Holdings LLC is a corporate holding company that does not make, sell, offer for sale, use or import any products or perform any services with respect to such products.

20.     Denied.

21.     Defendants are without knowledge or information sufficient to form a belief as to the allegations in paragraph 21, and, therefore, deny those allegations.

A1064

22.    Defendants admit that Info-Hold makes the allegations of paragraph 22. Defendants otherwise deny the allegations of paragraph 22 and specifically deny that Defendants have committed any acts of direct or indirect infringement of the '374 patent.

23.    Denied.

24.    Denied.

## COUNT 3

## FOR PATENT INFRINGEMENT AGAINST MUZAK LLC

24.    [numbering sic] Defendants incorporate their responses to paragraphs 1-24 of the Complaint above as if the same were set forth fully herein.

25.    Defendants admit that this action purports to be an action for patent infringement arising under the Patent Laws of the United States as codified in Title 35 of the United States Code.  Defendants deny any such patent infringement as alleged by Plaintiff or that Plaintiff's claims have any merit.

26.    Muzak LLC denies that it makes or uses the Encompass LE2 product.  The allegations of paragraph 26 are otherwise admitted.

27.    Denied.

28.    Defendants are without knowledge or information sufficient to form a belief as to the allegations in paragraph 28, and, therefore, deny those allegations.

29.    Defendants admit that Info-Hold makes the allegations of paragraph 29. Defendants otherwise deny the allegations of paragraph 29 and specifically deny that Defendants have committed any acts of direct or indirect infringement of the '374 patent.

30.    Denied.

31.    Denied.

4

**A1065**

## COUNT 4

## FOR PATENT INFRINGEMENT AGAINST MUZAK LLC

32.     Defendants incorporate their responses to paragraphs 1-31 of the Complaint above as if the same were set forth fully herein.

33.     Muzak LLC denies that it makes or uses the Encompass MV product.  The allegations of paragraph 33 are otherwise admitted.

34.     Denied.

35.     Defendants are without knowledge or information sufficient to form a belief as to the allegations in paragraph 35, and, therefore, deny those allegations.

36.     Defendants admit that Info-Hold makes the allegations of paragraph 36. Defendants otherwise deny the allegations of paragraph 36 and specifically deny that Defendants have committed any acts of direct or indirect infringement of the '374 patent.

37.     Denied.

38.     Denied.

39.     Each and every allegation of the Complaint not specifically admitted herein is denied.

## AFFIRMATIVE DEFENSES

As their separate affirmative defenses to Plaintiff's claims and allegations, Defendants allege as follows:

## FIRST AFFIRMATIVE DEFENSE

40.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

41.    Defendants have not infringed and do not infringe any valid and enforceable claim of the '374 patent.

## THIRD AFFIRMATIVE DEFENSE

42.    One or more of the claims of the '374 patent are invalid for failure to comply with one or more of the provisions of Part II of Title 35 of the United States Code, including Sections 102 and 103.

## FOURTH AFFIRMATIVE DEFENSE

43.    One or more of the claims of the '374 patent are invalid for failure to comply with Section 112 of Title 35 of the United States Code.

## FIFTH AFFIRMATIVE DEFENSE

44.    On the basis of proceedings in the U.S. Patent and Trademark Office during prosecution of the application that matured into the '374 patent and during the reexamination of the '374 patent, and statements made or actions taken by or on behalf of the applicant therein, Plaintiff is estopped from asserting the '374 patent to cover any acts of Defendants or any product manufactured or sold by Defendants.

## SIXTH AFFIRMATIVE DEFENSE

45.    On information and belief, damages to Plaintiff, if any, are limited by 35 U.S.C. §§ 286 and 287.

## SEVENTH AFFIRMATIVE DEFENSE

46.    Under the principles of equity made applicable to actions for patent infringement by virtue of 35 U.S.C. § 283, Plaintiff is not entitled to injunctive relief.

### EIGHTH AFFIRMATIVE DEFENSE

47.     Plaintiff's claims against Defendants are barred in whole or in part by laches.

### NINTH AFFIRMATIVE DEFENSE

48.     Plaintiff's claims against Defendants are barred in whole or in part by absolute intervening rights.

### TENTH AFFIRMATIVE DEFENSE

49.     Plaintiff's claims against Defendants are barred in whole or in part by equitable intervening rights.

### ELEVENTH AFFIRMATIVE DEFENSE

49.     Plaintiff's claims against Defendants are barred in whole or in part by virtue of Plaintiff's unclean hands in bringing this action against Defendants without carrying out the minimum factual inquiry necessary to establish a basis for Plaintiff's allegations of patent infringement against Defendants.

### TWELFTH AFFIRMATIVE DEFENSE

50.     Plaintiff's claims against Defendants are barred in whole or in part by discharge in bankruptcy.

51.     Defendants specifically reserve the right to assert each and every other defense which may become evident in the course of discovery.

### COUNTERCLAIM FOR DECLARATORY JUDGMENT

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendants for their Counterclaim against Plaintiff Info-Hold, Inc. ("Info-Hold"), allege as follows:

1.     Defendants Muzak LLC and Muzak Holdings LLC are Delaware limited liability companies with their principal places of business in Fort Mill, South Carolina.

A1068

2.      Info-Hold alleges that it is a Delaware corporation with its principal place of business in Cincinnati, Ohio.

3.      Defendants' counterclaim relates to claims for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

4.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a), and the Declaratory Judgment Act.

5.      Personal jurisdiction and venue are proper in the Southern District of Ohio because Info-Hold is subject to the personal jurisdiction of this Court by virtue of its having pleaded claims for patent infringement against Defendants in this action and by having its principal place of business in this district.

6.      Info-Hold alleges in its Complaint in this action that it is the owner of all right, title, and interest in U.S. Patent No. 5,991,374 ("the '374 patent"), which issued on November 13, 1999.

7.      Info-Hold alleges that Defendants have directly and indirectly infringed the '374 patent.

8.      Muzak Holdings LLC is a corporate holding company that does not make, sell, offer for sale, use or import any products or perform any services with respect to such products and thus has performed no acts which could constitute direct or indirect infringement of the '374 patent.

9.      On April 16, 2010, the United States Patent and Trademark Office ("PTO") ordered reexamination of claims 1, 2, 5 and 7-36 of the '374 patent in Reexamination Control No. 90/009,671.

10.     On February 11, 2011, the PTO examiner issued an Action finally rejecting as unpatentable (and thus invalid) all of the independent claims of the '374 patent as well as many of the dependent claims of the '374 patent.

11.     Instead of traversing the final rejection of claims of the '374 patent, Info-Hold filed an amendment on March 25, 2011, in which claims 1, 2 and 5 were cancelled, claims 37-39 were added and all of the independent claims of the '374 patent were either canceled or substantively amended to overcome the prior art cited by the PTO examiner.

12.     On March 29, 2011, the PTO examiner issued a decision, called a Notice of Intent to Issue Reexamination Certificate, accepting Info-Hold's amendments and cancellations of the claims of the '374 patent and indicating that the claims of the '374 patent subject to reexamination were patentable as amended.  The issuance of the Notice of Intent to Issue Reexamination Certificate made irrevocable Info-Hold's surrender of claimed subject matter by the amendment and/or cancellation of claims of the '374 patent in the amendment Info-Hold filed March 25, 2011.  On information and belief, according to the PTO's PAIR website, the PTO issued the reexamination certificate on June 1, 2011.

13.     Defendants do not directly or indirectly infringe the '374 patent now, nor have they ever done so.

14.     Defendants do not directly or indirectly infringe any valid claim of the '374 patent that is or will be extant after issuance of the reexamination certificate that was extant in the original '374 patent prior to the reexamination.  The '374 patent is unenforceable against Defendants, and Defendants are free from liability for infringement of the '374 patent, as a result of absolute and equitable intervening rights, as to the claims of the '374 patent that were not extant in the original '374 patent prior to the reexamination.

9

A1070

15.     The '374 patent is invalid for failure to comply with one or more sections of Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 102, 103 and 112.

16.     As a consequence of the foregoing, there exists an actual and justiciable controversy between Plaintiff and Defendants with respect to the alleged infringement and the validity of the '374 patent.

17.     Defendants are entitled to judgment from this Court that the '374 patent is not infringed by Defendants, is invalid and is unenforceable against Defendants.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Defendants demand trial by jury of all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Defendants request that this Court enter judgment:

a)     that Info-Hold take nothing against Defendants by its Complaint in this action;

b)     finding, declaring and adjudging in favor of Defendants and against Plaintiff Info-Hold, dismissing with prejudice all claims of Info-Hold against Defendants;

c)     finding, declaring and adjudging that every asserted claim of the '374 patent is invalid and/or unenforceable;

d)     finding, declaring and adjudging that Defendants do not infringe any valid and enforceable claim of the '374 patent, directly or indirectly, either literally or under the doctrine of equivalents, nor have they ever done so;

e)     finding, declaring and adjudging that any patent infringement claims Plaintiff may have against Defendants are barred by absolute and/or equitable intervening rights;

f)     finding this to be an exceptional case under Section 285 of Title 35 of the United States Code, and awarding to Defendants its costs (including expert witness fees), disbursements

10

**A1071**

and reasonable attorney's fees incurred in this action and such other relief as may be appropriate; and

       g)     granting such other and further relief as this Court may deem just and proper.

Dated: June 17, 2011                Respectfully submitted,

                                     /s/ Kevin W. Kirsch
                                     Kevin W. Kirsch (0081996)
                                     John Bennett (0074506)
                                     BAKER & HOSTETLER LLP
                                     312 Walnut Street, Suite 3200
                                     Cincinnati, Ohio 45202-4074
                                     Telephone: (513) 929-3499
                                     Facsimile: (513) 929-0303
                                     kkirsch@bakerlaw.com
                                     jbennett@bakerlaw.com

                                     *Attorneys for Defendants*

Of Counsel:

Barry E. Bretschneider
John P. Corrado
Michael E. Anderson
Morrison & Foerster LLP
1650 Tysons Boulevard, Suite 400
McLean, Virginia 22102-4220
Telephone: (703) 760-7700
Facsimile: (703) 760-7777
BBretschneider@mofo.com
JCorrado@mofo.com
MAnderson@mofo.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 17, 2011, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to counsel of record, and I also served the foregoing via electronic mail to the following:

Daniel Joseph Wood, Esq.
4120 Airport Road
Cincinnati, OH 45226
danw@infohold.com

/s/ Kevin W. Kirsch
Kevin W. Kirsch (0081996)

12

A1073

**I.**     **105.2(d)(i): THE CONSTRUCTION OF TERMS ON WHICH THE PARTIES AGREE**

| Number | Claim Term or Phrase | Agreed Construction |
|---|---|---|
| 1. | Messages | Separate units of audio and/or visual information for playback and having an identifiable beginning and end. |
| 2. | Message Playback Device | A device configured to select and access from its storage device one or more stored messages and to play those messages through an output |
| 3. | Selecting messages | Choosing one or more specific messages |
| 4. | Selected messages | Previously chosen messages |
| 5. | Selected ones of said messages | Specific, individual, previously chosen messages |
| 6. | Communication link | The communications channel that links two or more communicating devices, and which exists whether or not devices are in communication |
| 7. | "storage device for storing messages and for playing selected ones of said messages" | A device containing messages that are individually selectable and configured to play messages selected from its storage. |
| 8. | Display device | An output device for presentation of information in visual form. |
| 9. | "Data signal" | A communication between computers that contains data that identifies selected playback sites, and the circumstances under which messages are to be played at the specified sites, such as the time of day and sequence of messages. |
| 10. | "identification data" | Data contained in the control signal that identifies the playback device(s) that are selected to receive commands. |
| 11. | "list data" | Data contained in the control signal that identifies the specific messages to be played by the message playback devices. |
| 12. | "user selectable menu items for | A list of options on a computer screen that can be selected by a person operating |

| Number | Claim Term or Phrase | Agreed Construction |
|---|---|---|
| | selection by an operator to define relationships between playback devices and said messages" | the computer to determine the message(s) that will be played on one or more specific playback devices, and the circumstances under which the messages(s) will be played. |
| 13. | "second computer" | A second computer which is different from the first computer and the message playback devices. |
| 14. | "Playlist" | A user-selected list comprising a selection available messages on a message playback device and the order in which the selected messages will play. |
| 15. | Remotely located | Not in the immediate vicinity of; such as in another room, building or city. |
| 16. | sets of messages | playlists |
| 16. | operator | Person using a computer remotely located from the message playback device(s) |
| 17. | to provide said accessed message to said output in accordance with said control signals | To deliver a message accessed from the playback device's storage to an output for play in conformity with specific control signals |
| 18. | "with respective telephone systems" | With the telephone systems connected to said remote message playback devices being used in an MOH application |

| Disputed Claim Term | Plaintiff Proposed Construction | Plaintiff Citation To Intrinsic Evidence | Plaintiff's Citation to Proposed Extrinsic Evidence | Defendants' Proposed Construction | Defendant Citation To Intrinsic Evidence | Defendant Citation to Proposed Extrinsic Evidence |
|---|---|---|---|---|---|---|
| through an output of said message playback device when a caller is placed on hold" | playback devices is capable of playing selected ones of said messages through either an audio, or visual, or audio-visual output of said message playback device to be heard by an outside party to a telephone call who is placed on hold by a user of an MOH telephone systems | 34, 58-63; Col. 3:63-4:3; Col. 4:63-54; Col. 5 Ln 9-13, 26-28; Col. 10 Ln 51-55.]  *[374 Reexam Pros. History, Final Office Action, mailed February 11, 2011 at pages 4-6, 17-18.] | | visual output of said message playback device, only the selected individual messages previously chosen to be played when a caller is placed on hold | 20, 21-24, 27, 37, 40, 52; Col. 1:8- Col 2:2; Col. 2:9-26; Col. 2:35-50; Col. 2:48-51; Col. 2:58-64; Col. 3:51-65; Col. 4:41-54; Col. 4:58-5:49; Col. 5:18-40; Col. 5:50- Col. 7:5; Col. 6:24-36; Col. 9:35-Col. 10:17; Col. 10:62-Col. 12:53; Col. 12:26-46; Col. 14:32-34; Col. 14:48-51; Col. 19:60--20:5.  '374 Pros. History, Amendment dated Sept. 3, 1998 at 8-9; '374 Reexam Pros. History, Response to Office Action dated October 22, 2010 at 5; Amendment dated March 10, 2011 at 28-32; Amendment dated March 24, 2011 at 26-28; Amendment dated | Dictionary, 3d Ed. (1997) at 1048. |

Case: 1:11-cv-00283-TSB-KLL Doc #: 31 Filed: 03/22/12 Page: 6 of 16 PAGEID #: 104

| Disputed Claim Term | Plaintiff Proposed Construction | Plaintiff Citation To Intrinsic Evidence | Plaintiff's Citation to Proposed Extrinsic Evidence | Defendants' Proposed Construction | Defendant Citation To Intrinsic Evidence | Defendant Citation to Proposed Extrinsic Evidence |
|---|---|---|---|---|---|---|
| | | | | | March 11, 2011 at 27-32. | |
| 3. "generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message when a caller is placed on hold on the respective telephone system" | Producing a control signal using said computer to command said message playback device located at said remote site to play said selected message to be heard by an outside party to a telephone call who is placed on hold by a user of an MOH telephone systems | ('374 C1) Col. 4 Ln 12-16. *[Col. 2 Ln 6-19, 32-34;58-63; Col. 3:63-4:3; Col. 4:63-5:4; Col. 5 Ln 9-13, 26-28; Col. 10 Ln 51-55.] *['374 Reexam Pros. History, Final Office Action, mailed February 11, 2011 at pages 4-6, 17-18.] | None | Using the computer to create a control signal that directs the message playback device at the chosen remote location to play a previously chosen message when a caller is placed on hold on the telephone system that is connected to that remote location. | Claim 22 Fig. 1-4; 11, 13, 17, 20, 21-24, 27, 37, 40, 52; Col. 1:8-Col. 2:2; Col. 2:11-26; Col. 2:35-50; Col. 2:48-51; Col. 3:51-65; Col. 4:41-54; Col. 5:18-40; Col. 5:50-Col. 7:5; Col. 12:26-46; Col. 14:48-51; Col. 19:60--20:5. '374 Pros. History, Amendment dated Sept. 3, 1998 at 8-9; '374 Reexam Pros. History, Response to Office Action dated October 22, 2010 at 5; Amendment dated March 10, 2011 at 28-32; Amendment dated March 24, 2011 at 26- | American Heritage College Dictionary, 3d Ed. (1997) at 567, 1048. |

| Disputed Claim Term | Plaintiff Proposed Construction | Plaintiff Citation To Intrinsic Evidence | Plaintiff's Citation to Proposed Extrinsic Evidence | Defendants' Proposed Construction | Defendant Citation To Intrinsic Evidence | Defendant Citation to Proposed Extrinsic Evidence |
|---|---|---|---|---|---|---|
| | | | | | 28: Amendment dated March 11, 2011 at 27-32. | |
| 4. "when callers are placed on hold on the respective telephone systems" | Producing control signals for commanding message playback devices located at 2 or more selected remote sites to play different playlists to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems | ('374 C1) Col. 5 Ln 36-40.

*[Col. 2 Ln 6-19, 32-34,58-63; Col. 3:63-4:3; Col. 4:63-5:4; Col. 5 Ln 9-13, 26-28; Col. 10 Ln 51-55.]

*['374 Reexam Pros. History, Final Office Action, mailed February 11, 2011 at pages 4-6, 17-18.] | None | when that caller is placed on hold on the telephone system connected to the playback devices at each site. | Claim 26

Fig. 1-4, 17, 20, 23, 24, 27, 34, 40, 52; Col. 1:8-Col. 2:2; Col. 2:9-26; Col. 2:35-40; Col. 2:58-64; Col. 3:38-65; Col. 4:45-49; Col. 4:58-5:59; Col. 5:18-40; Col. 5:50-Col. 7:5; Col. 8:20-30; Col. 10:62-Col. 12:53; Col. 14:32-35; Col. 19:61-Col. 20:16

'374 Pros. History, Amendment dated Sept. 3, 1998 at 8-9; '374 Reexam Pros. History, Response to Office Action dated October 22, 2010 at 5; Amendment dated March 10, 2011 at 28- | American Heritage College Dictionary, 3d Ed. (1997) at 567, 1048. |

| Disputed Claim Term | Plaintiff Proposed Construction | Plaintiff Citation To Intrinsic Evidence | Plaintiff's Citation to Proposed Extrinsic Evidence | Defendants' Proposed Construction | Defendant Citation To Intrinsic Evidence | Defendant Citation to Proposed Extrinsic Evidence |
|---|---|---|---|---|---|---|
| | | | | | 32; Amendment dated March 24, 2011 at 26-28; Amendment dated March 11, 2011 at 27-32. | |
| 5. "Storing a library of discrete and individually accessible messages at each of said remote sites for playback on the respective message playback device when a caller is placed on hold" | Storing a group of separate, individually accessible messages on the respective message playback devices and situated at remote locations, through an output to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems | ('374 C1) Col. 5. Ln 56-61.<br><br>*[Col. 2 Ln 6-19, 32-34:58-63; Col. 3:63-4:3; Col. 4:63-5:4; Col. 5 Ln 9-13, 26-28; Col. 10 Ln 51-55.]<br><br>*['374 Reexam Pros. History, Final Office Action, mailed February 11, 2011 at pages 4-6, 17-18.] | None | Storing a group of messages that are individually identifiable and separately accessible from the storage of a playback device located at each of said remote sites so that each message can be played back by the message playback device at each site when a caller to that site is placed on hold. | Claim 28<br><br>Figs 1-4, 11, 17, 20, 23, 24, 27, 34, 40, 52; Col. 1:8-Col. 2:2; Col. 2:9-26; Col. 2:35-40; Col. 2:48-51; Col. 2:58-64; Col. 3:38-65; Col. 4:45-49; Col. 5:18-40; Col. 5:50-Col. 7:5; Col. 7:49-59; Col. 8:20-30; Col. 9:35-Col. 10:17; Col. 10:62-Col. 12:53; Col. 14:32-35; Col. 14:48-51; Col. 19:61-Col. 20:16.<br><br>'374 Pros. History, Amendment dated Sept. 3, 1998 at 8-9; '374 Reexam Pros. | American Heritage College Dictionary, 3d Ed. (1997) at 1048. |

| Disputed Claim Term | Plaintiff Proposed Construction | Plaintiff Citation To Intrinsic Evidence | Plaintiff's Citation to Proposed Extrinsic Evidence | Defendants' Proposed Construction | Defendant Citation To Intrinsic Evidence | Defendant Citation to Proposed Extrinsic Evidence |
|---|---|---|---|---|---|---|
| | | | | | | Collegiate Dictionary (1990) at 271. |
| 10. "to provide said accessed message to said output in accordance with said control signals when a caller is placed on hold" | To deliver a message accessed from the playback device's storage to an output in conformity with specific control signals for play when an outside party to a telephone call is placed on hold by a user of an MOH telephone system | Col. 6 Ln 51-58: Col. 20:66-21:7; Col. 21 Ln 8-16, 21-25; Col 7 Ln 6-11; Col. 8 Ln 51-59. Col.1 Ln 16-19; Col. 1 Ln 16-19; Col. 6 Ln 45-47; Col. 6:67-7:3 Col. 20 Ln 11-14. Col. 2 Ln. 6-11; Col. 7 Ln 62-67; Col 8 Ln 1-4; Col. 20, Ln. 32-44; Col. 20, Ln 55-62; Col. 21 Ln 4-7; Col. 21 Ln 50-52; Col. 22 Ln 9-12, 54-59; Col. 23 Ln 4-6; Col. 24 Ln 3-16, 29-46, 47-54; Col. 25 Ln 4-13, 14-20; Col. 26 Ln 13-41. | None | To deliver a message accessed from the playback device's storage to an output in conformity with specific control signals for play when a caller is placed on hold | Claims 7, 17.<br><br>See citations regarding "control signal" above.<br><br>Fig. 1-4; Col. 1:9 - Col. 2:2; Col. 3:51-57; Col. 4:45-49; Col. 5:50-Col. 7:5, Col. 19:50-20:16.<br><br>'374 Pros. History, Amendment dated Sept. 3, 1998 at 8-9; '374 Reexam Pros. History, Response to Office Action dated October 22, 2010 at 5: | See citations regarding "control signal" above. |

A1096

construction "[a]bsent a formal relationship or incorporation during prosecution" of the patent at issue. *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004).

## IV. CONSTRUCTION OF DISPUTED CLAIM TERMS

The primary claim construction dispute in this case involves the collection of claim phrases that all include the limitation "when a caller is placed on hold." Muzak will address this group first, and then end with a discussion of the remaining four disputed claim terms.

### A. The Playback of Messages "When a Caller Is Placed On Hold"

As introduced above, the disputed claim terms in this case include a group of six phrases that all incorporate slight variations of the limitation "when a caller is placed on hold"—all of which serve to limit the respective claims to systems in which the output is connected to a telephone system that plays the selected message or sequence of messages at the time a caller is placed on hold.

#### 1. "When a caller is placed on hold" in claim phrases (1) – (6).

##### a. *The limitation "when a caller is placed on hold" should be given its ordinary meaning.*

The disagreement surrounding the first two of these disputed claim phrases focuses almost exclusively on the language "when a caller is placed on hold":

Claim Phrase (1) – "*when a caller is placed on hold*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| when a caller is placed on hold | when an outside party to a phone call is placed on hold by a user of an MOH telephone system |

601348500

**A1424**

Claim Phrase (2) – "*when callers are placed on hold* on the respective telephone systems"

| Muzak Construction | Info-Hold Construction |
|---|---|
| when that caller is placed on hold | producing control signals for commanding message playback devices located at 2 or more selected remote sites to play different playlists |
| on the telephone system connected to the playback devices at each site | to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems |

Muzak's position with respect to (1) and (2) above is that the phrase "when a caller is placed on hold" is easily understood on its face and does not require any special, technical definition. The experience of being placed on hold is common to the vast majority of the public, including the Court and potential members of the jury, and the specification does not deviate from that common understanding of the term. As such, the phrase does not require further construction. Indeed, Info-Hold's more complicated construction of "on hold" serves only to muddle a concept that would otherwise be clear.

The additional phrase "on the respective telephone systems" likewise need not be burdened by an overly technical construction. "Telephone system" refers to just that, and the term "respective" should only be given enough of a construction to clarify its antecedent—namely the playback devices at each site connected to the telephone system at that site. *See Phillips*, 415 F.3d at 1314 ("the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Unlike Info-Hold's construction, which appears—at least for claim phrase (2)—to read the temporal limitation "when" out of the phrase "when a caller is placed on hold," Muzak's

8

A1425

proposed construction is consistent with the plain meaning of the claim language, the specification, and the prosecution history. As addressed further below, Muzak's construction also is consistent with the context in which the phrase "when a caller is placed on hold" is used in the claims, and with the construction of other claim terms that the parties have agreed upon, such as "messages" and "playlists."

The specification of the '374 patent describes the advantages of the claimed invention over existing systems by emphasizing its ability to manage and control playback to on-hold callers at the time they are placed on hold. Exh. A, col. 1, line 9, to col. 2, line 2. For example, the patent distinguishes existing analog (cassette tape) and digital systems as not allowing a user to program "*when* an individual message is to be played … or modify the sequence with which the stored messages are played." *Id.* at col. 1, lines 40-44 (emphasis added); *see also* col. 19, lines 60-64. According to the patent, controlled playback is an improvement over these "endless loop" systems because it allows a user, for example, "to more effectively maintain a promotional program for customers placed on-hold." *Id.* at col. 7, lines 2-3.

This on-hold feature was also emphasized by the patentee during the reexamination of the '374 patent. When the Examiner rejected claims that did not include the phrase "when a caller is placed on hold," the patentee amended all of the independent claims except claim 1 to incorporate this limitation in order to overcome the prior art. In doing so, the patentee clarified that "the message playback devices are in communication with respective telephone systems and play selected messages *when* a caller is placed on hold on the telephone system." *See, e.g.*, March 10, 2011 Amendment at p. 28 (attached hereto as Exhibit C) (emphasis added).[2] Elsewhere, the patentee emphasized that the claims as amended require that "signals are

---

[2] The complete prosecution and reexamination histories for the '374 patent were previously submitted to the Court as part of Appendix B to the parties' Joint Claim Construction Submission (Dkt No. 32, filed March 22, 2012). *See id.* at B2-B6.

9

601348500

generated, or selected tracks are played, *when* a caller is placed on hold" and that the "processor provides a selected message for play *when* a caller is placed on hold." *Id.* at p. 29 (emphasis added).

Notwithstanding the plain language of the claims and the intrinsic record, Info-Hold argues that "when a caller is placed on hold" means "to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems." The deficiencies in this construction are numerous. First, it is unclear to whom the term "outside parties" refers. The term is at best confusing and at worst introduces concepts such as third parties to existing phone calls, which are not described in the patent specification. Presumably, Info-Hold simply has in mind the person who has dialed in and is to be placed on hold—*i.e.*, the "caller" who is "placed on hold" as claimed by the patent. If that is the case, Info-Hold should offer a construction, as Muzak has done, that simply and clearly states just that.

More fundamentally, the Info-Hold construction appears to eliminate the temporal limitation of the claims, which requires the controlled playback of discrete messages from their beginnings and at the time a caller is placed on hold. According to Info-Hold, it apparently would be sufficient that a caller placed on hold hear messages already in play—*i.e.*, be dropped into the middle of a continuous message loop. In other words, Info-Hold has read the word "when" entirely out of the claim, attempting to make it read on the very type of systems criticized, rejected, and disclaimed by the patentee in the specification of the patent. This construction is not consistent with the plain meaning of the claim language, the teachings of the specification, or the applicant's statements during prosecution, and cannot be correct. *Phillips*, 415 F.3d at 1312-1317.

10

Moreover, Info-Hold's conflicting interpretations of the same claim language violate the rule that claim language should be construed consistently throughout a patent. *See, Rexnord Corp.*, 274 F.3d at 1342 ("a claim term should be construed consistently with its appearance . . . in other claims of the same patent"). As will be seen below, Info-Hold's position with respect to "when a caller is placed on hold" is inconsistent across the various disputed claim phrases. In claim phrases (2) – (5), Info-Hold appears to read "when" out of the claims, while in claim phrases (1) and (6), Info-Hold construes "when" to mean "when," just as Muzak does.

Finally, Info-Hold unnecessarily complicates the construction of claim phrases (1) and (2) by introducing extraneous terms and ideas such as "outside party," "MOH" telephones, the production of "control signals," and "two or more selected remote sites"—none of which find reference in the identified claim language. In accordance with the "heavy presumption" that claim terms carry their ordinary and customary meaning, this Court should adopt the plain, straightforward construction proposed by Muzak. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1358, 1366 (Fed. Cir. 2002); *Phillips*, 415 F.3d at 1314. "When a caller is placed on hold" means just that—"when a caller is placed on hold." No further construction is required.

> **b. The limitation "when a caller is placed on hold" should be construed in the broader context of the '374 patent claims.**

Claim phrases (3) – (6) in this group also incorporate the limitation "when a caller is placed on hold" and should be construed consistently with Muzak's constructions above. *Rexnord Corp.*, 274 F.3d at 1342. In addition, the remaining phrases all include language directed in varying ways to the playback of selected messages, thus requiring, when considered as a whole, that playback commence at the time the caller is placed on hold:

> Claim Phrase (3) – "*generating a control signal using said computer for said message playback device corresponding to said selected remote site*

11

601348500

**A1428**

*to play said selected message when a caller is placed on hold on the respective telephone system*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| using the computer to create a control signal that directs the message playback device at the chosen remote location to play a previously chosen message | producing a control signal using said computer to command said message playback device located at said remote site to play said selected message |
| when a caller is placed on hold on the telephone system that is connected to that remote location | to be heard by an outside party to a telephone call who is placed on hold by a user of an MOH telephone systems |

Claim Phrase (4) – "*storing a library of discrete and individually accessible messages at each of said remote sites for playback on the respective message playback device when a caller is placed on hold*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| storing a group of messages that are individually identifiable and separately accessible from the storage of a playback device located at each of said remote sites so that each message can be played back by the message playback device at each site | storing a group of separate, individually accessible messages on the respective message playback devices and situated at remote locations, through an output |
| when a caller to that site is placed on hold | to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems |

Claim Phrase (5) – "*for playing selected ones of said messages through an output of said message playback device when a caller is placed on hold*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| for playing, through an audio or audio-visual output of said message playback device, only the selected individual messages previously chosen to be played | each of a plurality of said message playback devices is capable of playing selected ones of said messages through either an audio, or visual, or audio-visual output of said message playback device |
| when a caller is placed on hold | to be heard by an outside party to a telephone call who is placed on hold by users of an MOH telephone systems |

12

601348500

**A1429**

Claim Phrase (6) – "*to provide said accessed message to said output in accordance with said controls signals when a caller is placed on hold*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| to deliver a message accessed from the playback device's storage to an output in conformity with specific control signals for play | to deliver a message accessed from the playback device's storage to an output in conformity with specific control signals for play |
| when a caller is placed on hold | when an outside party to a telephone call is placed on hold by a user of an MOH telephone system |

The use of the limitation "when a caller is placed on hold" in the larger context of these four claim limitations further demonstrates that Muzak's construction is correct.   For example, claim phrase (3) requires the system to "play a previously chosen message when a caller is placed on hold," and the parties have separately agreed that a message is a "separate unit[] of audio and/or visual information for playback having an identifiable beginning and end."  *See* Exh. B at 2.  Thus, playing a previously chosen message when a caller is placed on hold must mean that the message is played from its identified beginning when (*i.e.*, at the moment) a caller is placed on hold.  This is consistent with the context and plain meaning of the claim terms and the parties' agreed constructions.  It also comports with common sense and the specification's criticism of prior continuous loop systems.

Consider, for example, an advertisement message such as the message shown in Figures 21 and 22 of the '374 patent.  Exh. A.  The '374 patent describes these exemplary messages as having "introduction, read, and trail times."  *Id.* at col. 12, line19.  Thus, when managing individual messages, a user is prompted with the "introduction time in seconds, reading time in seconds, and trailer time in seconds."  *Id.* at col. 9, line 66 to col. 10, line 2; *see also id.* at figure 21 (providing "intro time" of 4 seconds, "read time" of 18 seconds, and "music up and out" times of 22 and 27 seconds respectively).  Further, the specific examples in the patent include a

13

601348500

A1430

lead-in that announces the name of the advertising business—here, "Bank One"—which is not repeated again in the message. *Id.* at Figures 21 and 22.

The precise detail at this point in the disclosure of the '374 patent illustrates the degree of control over message playback described and claimed by the '374 patent. Obviously, an advertiser would prefer that a caller-on-hold hear a thirty-second advertisement from its beginning, when the name of the advertiser is announced. Indeed, to read the claim otherwise, and allow a caller to be dropped into the middle of an advertisement, would not only be inconsistent with the patent, but also would defeat a primary object of the '374 invention to "more effectively maintain a promotional program for customers placed on-hold." *Id.* at col. 7, lines 2-3.

This holds true whether one is playing a single message, as contemplated by claim phrase (3), or a selection of multiple messages, as described in claim phrases (4) and (5). The parties' agreed constructions specifically define "sets of messages" and "playlists" as lists of messages having a specific order of play. *See* Exh. B at 3. The '374 specification repeatedly emphasizes the importance of control over the sequence of messages played. *See, e.g.*, Exh. A at col. 6, lines 34-36, col. 12, lines 62-63, and col. 14, lines 33-34; *see also id.* at col. 10, lines 62-67 (describing the assignment of position values to messages that determine playback sequence). Dropping a user into the middle of a message or into the middle of a queue would defeat the purpose of the controlled sequencing as described in the '374 patent.

Similarly, Muzak's construction is consistent with the use of the limitation "when a caller is placed on hold" in the larger context of claim phrase (6), which indicates that a message is delivered from memory to the output of the playback device when the caller is placed on hold. Clearly, a message cannot be played back until it is accessed from memory and delivered to the

14

601348500

A1431

output of the playback device. Because claim phrase (6) requires that the message be accessed and delivered for playback when the caller is placed on hold, it necessarily follows that the message cannot already be in play at the time the caller is placed on hold. For this reason as well, the claims of the '374 patent must be read to exclude playing messages on an endless loop system.

In sum, the larger context of the '374 patent claims and the parties' agreed constructions of related terms all support Muzak's plain meaning construction of "when a caller is placed on hold." To read the term "when" out of the claims, as Info-Hold seems to suggest, would eliminate the temporal aspect of controlled message playback that is integral to the '374 invention as claimed and as described in the specification and prosecution history.

### 2. Remaining playback limitations of claim phrases (3) – (6).

Apart from the dispute over the phrase "when a caller is placed on hold," a close review of the parties' respective positions on the other message playback limitations of claim phrases (3) – (6) shows that the differences between the proposed constructions are relatively narrow. Looking at claim phrase (6) above, the respective constructions are in fact identical up to the "place on hold" limitation. With respect to phrase (6) and for the reasons already provided, this Court should adopt the cleaner, more straightforward construction offered by Muzak.

Elsewhere, the differences are more significant. The parties' pertinent constructions of claim phrase (3)—again setting aside the dispute over "when a caller is placed on hold"—are as follows:

| | |
|---|---|
| **Muzak** | using the computer to create a control signal that directs the message playback device at the chosen remote location to play a previously chosen message |
| **Info-Hold** | producing a control signal using said computer to command said message playback device located at said remote site to play said selected message |

601348500

Case: 14-1167 Case: 14-1167 CASE PARTICIPANTS ONLY Document: 47 Document: 24-5 Page: 249 Page: 245 Filed: 06/20/2014 Filed: 06/20/2014

Case: 1:11-cv-00283-TSB-KLL Doc #: 40 Filed: 06/08/12 Page: 20 of 28 PAGEID #: 491

Both constructions refer to the creation or production of a control signal by the computer that then directs the playback device at the desired remote location to play the desired message. However, when one reads the parties' respective constructions with a view toward their relative utility to a prospective jury, the benefit of the plain language of Muzak's construction is apparent. Info-Hold's repetition of patentese like "said computer," "said message playback device," "said remote site," etc. should be rejected in favor of the plain language proposed by Muzak—"phraseology that can be taught to a jury of lay people." *See SKW Ams. v. Euclid Chem. Co.*, 231 F.Supp.2d 626, 639 (N.D. Ohio 2002) ("[I]n the end, claim construction must result in a phraseology that can be taught to a jury of lay people. It is not enough simply to construe the claims so that one skilled in the art will have a definitive meaning.").

Finally, claim phrases (4) and (5) above also require message playback to take place when a caller is placed on hold, with phrase (4) focusing on storage of the message to be played, and phrase (5) focusing on the playback device "output" through which the message is played.

The parties' pertinent constructions of claim phrase (4) are as follows:

| Muzak | storing a group of messages that are individually identifiable and separately accessible from the storage of a playback device located at each of said remote sites so that each message can be played back by the message playback device at each site |
|---|---|
| Info-Hold | storing a group of separate, individually accessible messages on the respective message playback devices and situated at remote locations, through an output |

Muzak proposes a straightforward construction that is consistent with its separate construction of "when a caller is placed on hold" (*see supra*) and its separate construction of "discrete and individually accessible messages" (*see* Part IV.B *infra*). Moreover, Muzak's

16

proposed construction is fully consistent with the specification. *See, e.g.*, Exh. A, col. 4, line 41, to col. 5, line 17 (describing various types of message storage on the playback devices).

The deficiencies of Info-Hold's proposed construction of phrase (4)—apart from its treatment of "when a caller is placed on hold" as already addressed—are two-fold. First, Info-Hold's construction of the clause "discrete and individually accessible messages" is inconsistent with its agreed construction of that clause in the parties' Joint Claim Construction Submission, where Info-Hold agrees to the construction "messages that are individually identifiable and separately accessible from the playback device's storage." *See* Exh. B at p. 9 (disputed claim term #6); *see also* Part IV.B *infra*. Info-Hold should be held to this latter construction, which— as will be seen below—is essentially identical to that proposed by Muzak. *See, Rexnord Corp.*, 274 F.3d at 1342 ("a claim term should be construed consistently with its appearance . . . in other claims of the same patent").

More fundamentally, Info-Hold's proposed construction of phrase (4) is deficient because it fails to refer to the playback of stored messages as provided in the claim phrase. This silence as to what happens to the stored messages at the time a caller is placed on hold renders Info-Hold's proposed construction incomplete and nonsensical. The Court should reject Info-Hold's construction for this reason as well.

Turning finally to claim phrase (5), apart once again from the parties' respective constructions of "when a caller is placed on hold," there is little substantive difference between the two proposed constructions:

| | |
|---|---|
| **Muzak** | for playing, through an audio or audio-visual output of said message playback device, only the selected individual messages previously chosen to be played |

601348500

| Info-Hold | each of a plurality of said message playback devices is capable of playing selected ones of said messages through either an audio, or visual, or audio-visual output of said message playback device |
|---|---|

Both constructions require the playback of selected messages through the output of the playback device. Again, however, Info-Hold's construction is unnecessarily wordy and convoluted and should be rejected in favor of Muzak's more straightforward proposal.

### B.    Other Disputed Claim Terms

Claim (7) – "*computer*"

| Muzak Construction | Info-Hold Construction |
|---|---|
| a programmable electronic device that receives, processes, and presents data | a programmable electronic device capable of performing data processing functions and having a memory device, an input device, and a display. |

The term "computer," as was well known in the art at the time the application resulting in the '374 patent was filed and fully consistently with the description in the '374 specification, should be construed as "a programmable electronic device that receives, processes, and presents data." This proposed construction captures both the core functionality that defines a basic computer, as well as the functionality necessary for the "computer" as claimed in the broadest independent claims of the '374 patent. Moreover, it captures this functionality in a manner that is consistent with the specification, but without improperly importing additional, extraneous limitations.

Both technical and general dictionaries uniformly define "computer" by reference to its ability to receive, process, and present data.[3] The '374 patent specification also consistently

---

[3] *See McGraw-Hill Dictionary of Scientific and Technical Terms (5th Ed. 1994)* at 428 ("a device that receives, processes, and presents data") (attached hereto as Exhibit D); *Microsoft Press Computer Dictionary (2nd Ed. 1994)* at 87 ("[a]ny machine that does three things: accepts structured input, processes it according to prescribed rules, and produces the results as output") (attached hereto as Exhibit E); *Webster's Ninth New Collegiate Dictionary (1990)* at 271 ("a programmable electronic device that can

18

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

## REMARKS

This Amendment is submitted in response to the final Office Action mailed February 11, 2011. Claims 1-36 are pending in the application after this amendment and claims 1, 2, 5, and 7-36 are subject to this reexamination. Claims 1, 3, 6, 7, 13, 17, 19, 22-28, 30, and 32-35 have been amended herein. Patent Owner respectfully requests reconsideration in view of the amendments and the following remarks.

Patent Owner's representative, David W. Dorton, spoke with Examiner Roland G. Foster and requested a personal interview. Because the interview could not be conducted before the date for responding to this Office Action, the Examiner agreed to postpone taking action on this amendment until after the interview.

## Allowable Subject Matter

Claims 13, 19, 24, 25, and 35 were indicated to contain allowable subject matter. Patent Owner thanks the Examiner for recognizing the patentable subject matter of these claims. Claims 13, 19, 24, 25, and 35 have been rewritten in independent form, along with claims 3 and 6 that were not subject to this reexamination, and are now in complete condition for allowance.

## Claims Rejected Under 35 U.S.C. §102

Claims 7, 11, 16, 22, 23, 26, 27, 30-34, and 36 stand rejected under 35 U.S.C. §102(b) as being anticipated by the U.S. Patent No. 5,133,081 to Mayo. Claims 7, 22, 26, 30, and 32-34 are the only independent claims of this rejected group. Claim 7 has

-27-

A1534

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

been amended to recite that the computer generates screens that include user selectable menu items for selection by an operator to define relationships between the plurality of message playback devices and the messages. Claim 7 has also been amended to recite that the message playback devices are in communication with respective telephone systems and play selected messages when a caller is placed on hold on the telephone system. Support for these amendments can be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2; and with reference to col. 11, line 26 – col. 12, line 53; and FIGS. 19-28. Accordingly, no new matter is added.

Mayo '081 is directed to a message broadcast system for transmitting radio frequency messages and does not teach, or even suggest, playing messages to a caller placed on hold. Mayo '081 also does not teach, or even suggest a computer that generates user selectable menu items for selection by an operator to define relationships between messages and playback devices at remote sites. Rather, the liquid crystal display (LCD) 506 is only configured to display a message title and ID code. (See Mayo '081 at col.9, lines 24-33.) For at least these reasons, Patent Owner respectfully requests that the rejection of claim 7 over Mayo '081 be withdrawn.

Independent claims 22, 26, and 33 have been amended to recite that the message playback devices are in communication with respective telephone systems and that the message playback devices play selected messages when a caller is placed on hold. Claims 32 and 34 have been amended to recite that the optical disk systems

-28-

A1535

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

are in communication with respective telephone systems, and that signals are generated, or selected tracks are played, when a caller is placed on hold.  Claim 30 has been amended to recite that the message output apparatus comprises a music on-hold-compatible telephone system and that the processor provides a selected message for play when a caller is placed on hold.  Support for these amendments can be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2. Accordingly, no new matter is added.

Patent owner submits that independent claims 22, 26, 30, 32, 33, and 34 are in condition for allowance because Mayo '081 fails to teach, or even suggest, a music-on-hold-compatible telephone system or playing messages or generating signals when callers are placed on hold, as discussed above with respect to claim 7.  For at least these reasons, Patent Owner respectfully requests that the rejections of claims 22, 26, 30, 32, 33, and 34 over Mayo '081 be withdrawn.

Claims 11 and 16 each depend from independent claim 7; claim 23 depends from independent claim 22; claim 27 depends from independent claim 26; claim 31 depends from independent claim 30; and claim 36 depends from independent claim 34. Accordingly, claims 11, 16, 23, 27, 31, and 36 are in condition for allowance for at least the same reasons discussed above with respect to independent claims 7, 22, 26, 30, and 34, and Patent Owner respectfully requests that the rejections of these claims over Mayo '081 also be withdrawn.

-29-

A1536

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

Claims 1, 2, 5, and 7 stand rejected under 35 U.S.C. §102(b) as being anticipated by the DAD486x reference. Claims 1 and 7 are the only independent claims of this rejected group. Claim 7 has been amended as discussed above. Claim 1 has been amended to recite that the message playback devices communicate with respective telephone systems and play selected messages when a caller is placed on hold. Support for these amendments can be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2. Accordingly, no new matter is added.

Patent Owner asserts that amended claims 1 and 7 are in condition for allowance because DAD486x fails to teach, or even suggest, message playback devices communicating with telephone systems or playing messages when callers are placed on hold. For at least these reasons, Patent Owner respectfully requests that the rejections of claims 1 and 7 over DAD486x be withdrawn.

Claims 2 and 5 each depend from independent claim 1 and are in condition for allowance for at least the same reasons discussed above for claim 1. Accordingly, Patent Owner respectfully requests that the rejections of claims 2 and 5 also be withdrawn.

### Claims Rejected Under 35 U.S.C. §103

Claims 17-19 and 21 stand rejected under 35 U.S.C. §103(a) as being unpatentable over Mayo '081 in view of U.S. Patent No. 5,726,909 to Krikorian. Claims 8-10, 14, 15, 28, and 29 stand rejected under 35 U.S.C. §103(a) as being unpatentable

-30-

A1537

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

over Mayo '081 in view of U.S. Patent No. 5,796,951 to Hamner et al. Claim 20 stands rejected under 35 U.S.C. §103(a) as being unpatentable over the combination of Mayo '081 and Krikorian '909, in further view of Hamner '951. Claim 12 stands rejected under 35 U.S.C. §103(a) as being unpatentable over Mayo '081 in view of the DAD486x reference. Claims 8-10, 14, 15, 28, and 29 stand further rejected under 35 U.S.C. §103(a) as being unpatentable over Mayo '081 in view of U.S. Patent No. 5,504,921 to Dev et al.

Claims 17 and 28 are the only independent claims of this rejected group. Claim 17 has been amended to recite that the computer generates screens that include user selectable menu items for selection by an operator to define relationships between the plurality of message playback devices and the messages. Claim 17 has also been amended to recite that the message playback devices are in communication with respective telephone systems and play selected messages when a caller is placed on hold on the telephone system. Claim 28 has been amended in a similar manner and is now directed to a method of programming message playback devices located at multiple remote sites and communicating with respective telephone systems. Amended claim 28 further recites that messages are played back on the respective message playback devices when a caller is placed on hold. Support for these amendments can be found with reference to the original issued U.S. Patent No. 5,991,374 at col. 1, line 64 - col.2, line 2; col. 5, lines 54-57; col. 6, lines 5-23; col. 6, line 62 - col.7, line 3; FIGS. 1-2; and with reference to col. 11, line 26 – col. 12, line 53; and FIGS. 19-28. Accordingly, no new matter is added.

-31-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

Patent Owner asserts that independent claims 17 and 28 are in condition for

allowance because Mayo '081 fails to teach or suggest playback devices

communicating with telephone systems or playing messages when a caller is placed on

hold, as discussed above, and because Krikorian '909, Hamner '951, DAD486x, and

Dev '921 fail to cure these deficiencies.  Accordingly, Patent Owner respectfully

requests that the rejections of claims 17 and 28 be withdrawn.

Claims 18-21 each depend from independent claim 17, and claim 29 depends

from independent claim 28.  Accordingly, claims 18-21 and 29 are in condition for

allowance for at least the same reasons discussed above with respect to independent

claims 17 and 28, and Patent Owner respectfully requests that the rejections of these

claims also be withdrawn.

Claims 8-10, 12, 14, 15 each depend from independent claim 7.  Patent Owner

asserts that these claims are in condition for allowance because Mayo '081 fails to

teach or suggest playback devices communicating with telephone systems or playing

messages when a caller is placed on hold, as discussed above with respect to claim 7,

and because Krikorian '909, Hamner '951, DAD486x, and Dev '921 fail to cure these

deficiencies.  Accordingly, Patent Owner respectfully requests that the rejections of

claims 8-10, 12, 14, and 15 also be withdrawn.

-32-

Application Serial No. 90/009,671
Reply to Office Action dated February 11, 2011
Amendment dated March 10, 2011

**CONCLUSION**

    In view of the amendments and remarks set forth herein, Patent Owner respectfully requests early and favorable indication of allowance.  If there are any questions regarding the foregoing, the Examiner is respectfully asked to contact the undersigned attorney.

    Patent Owner does not believe that any fees are due as a result of this communication.  However, if any fees are deemed necessary to complete this communication, the Commissioner may consider this to be a request for such and charge any necessary fees to Deposit Account No. 23-3000.

                  Respectfully submitted,

                  WOOD, HERRON & EVANS, L.L.P.

                  By:  /David W. Dorton/
                        David W. Dorton, Reg. No. 51,625

2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
(513) 241-2324 (voice)
(513) 241-6234 (facsimile)

-33-

A1540

At different places in the patent, e.g., the claims, the specification, including the Detailed Description of the invention; the elements that comprise a control signal are disclosed. And while a user can choose when a future control signal will be transmitted, nowhere in the patent is it stated that one of the components of a control signal is a choice, or decision, about when the messages begin to play once a control signal is received by a playback device.

If there is no *decision* to be made by a user about when messages begin to play, as part of a control signal, then, that means there is an automatic, default, predetermined, unchangeable, fixed time when they will play. And with the '374 system, the messages begin to play as soon as a control signal is received and processed.

This fact is established by Muzak's own citations to the patent. For example, Muzak references Claim 1 of the '374 patent. Yet that claim specifically states that, "each of said message playback devices" can "access" and "provide said messages to said output until different ones of said messages are selected." ('374 Patent, Col. 20 Ln 44-48). The playback device receives the control signal and then accesses and provides the selected messages to the audio output. It does this without hesitation; straight away; immediately, without any triggering event other than receipt of the control signal itself. Nothing in the patent refutes this, or even suggests a different way the apparatus operates. And when "different … messages are selected" then *they* will begin to play; as soon as the control signal is implemented.

**2.  "For playing selected ones of said messages through an output of said message playback devices when a caller is placed on hold."**

This claim phrase is one of six terms and phrases, which are targeted by Muzak, that involve the issue of when messages are played relative to if and when someone is placed on hold. Because of the redundancy of that approach and the importance of the underlying issue, Plaintiff has addressed the common components, "to be played when" and "caller" in detail, in Section C, immediately following.

6

**A1565**

For the reasons enunciated in that full explication, the phrase, "for playing selected ones of said messages through an output of said message playback devices when a caller is placed on hold," in the context of the '374 patent means, "each of the selected message playback devices is capable of playing selected ones of said messages through either an audio, or visual, or audio-visual output of said message playback device to be heard by an outside party to a telephone call who is placed on hold by a user of an MOH telephone system." (In common parlance, MOH means music-on-hold-compatible as is also expressed in the title of the patent.)

     **C.**    **Common Support and Explanation for Proper Construction of Repetitive Claim Terms  "To Be Played When a Caller is Placed On Hold" ('374 C1, Claims 7, 17, 22-23, 26-28, 30).**

Of the ten claim terms and phrases identified as "disputed" in the parties' Joint Claim Construction Chart, six of them (Nos. 2, 3, 4, 5, 7, and 10) include phrases containing a variation of "to be played when a caller is placed on hold."  The other significant terms contained in those disputed phrases are either not in dispute or are addressed separately.  Therefore, Plaintiff believes it to be appropriate to focus, here, on the elements of that phrase and have their final construction apply in each claim in which they are found.  As has been held in this District, "the same terms should be given the same meaning throughout the patent. *Fin Control Sys. Pty, Ltd. v. OAM, Inc.,* 265 F.3d. 1311, 1318 (Fed. Cir. 2001) ("The same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the **t**erms have different meanings at different portions of the claims**.**")." *Bradford Co. v. Afco Mfg., 2006 U.S. Dist. LEXIS 88547* (S.D. OH 2006).

For proper focus, the phrase will be separated into "To be played when" and "Caller."

**"To be played when"**

This language is ground zero for Muzak's assault.  It has repeatedly represented to Plaintiff, and will doubtless assert here, that the on-hold messaging system disclosed in the '374 patent begins to play an on-hold message *only* when the hold button is pressed, i.e., when a party is placed

on hold. Muzak would benefit from such a construction because it says that its accused on-hold messaging systems "play" messages continuously, whether or not someone is currently on hold, or has just been placed on hold.

Muzak claims that its "continuous play" system would not infringe a patent claim where a specific, triggering event (pressing the hold button) is required to initiate message play, that is, a system where the "Hold" button is the "Play" button. If Info-Hold's patented system and Muzak's accused systems each worked that way, Muzak would have a strong argument against infringement. But such is not the case.

And as the Court looks to the patent specification for support for each party's proposed constructions, the following will become clear: nowhere does it say that messages start playing when the hold button is pressed; nowhere does it say that messages are not playing when no one is on hold, and; nowhere does it say when messages *stop* playing so that they can *start* playing again when the hold button is pressed, as Muzak's theory would require.

If Info-Hold had invented a system according to Muzak's alleged model, it would have had to (as in, required by law) show, somewhere, how it worked. And if the system started playing messages *only* when the hold button was pressed, it would have had to (as in, required by law) show that very thing somewhere in the specification.

An inventor in search of a patent has an inescapable obligation to disclose what he has invented. What scenario could be conjured up to explain how any reference at all to such an important function could be AWOL from the place where it's required to be disclosed: the specification?

The claim language being challenged here by Muzak, is the language that was ruled patentable by the PTO in its reexamination of the '374 patent. If the claim language, reviewed by the examiner, mandated Muzak's construction, then the complete absence of any references to such

8

**A1567**

functionality in the specification would have mandated a different ruling in the reexamination.  But it did not.

In order to receive a patent, an inventor is required to surrender his "secret recipe" in exchange for the right to exclude: complete disclosure in exchange for a temporary monopoly. Thus, a full explanation of how an invention works is demanded.  Candor and honesty are required and fidelity to those elements is scrutinized by the PTO and by the courts.  Accordingly, inventors, and the attorneys who prosecute their patents, take care to ensure that whatever they claim a patent does is amply expressed and fully detailed in the specification.

In this invention, the question of whether messages only play when the hold button is pressed is too important to have been left to implication, or common understanding, without need of mention.  And it's, frankly, inconceivable that the inventor and the attorneys (who prosecuted a patent intended to reveal a system that started playing the on-hold messages when the hold button was pressed) all failed to notice that there wasn't a word about that "hold button" thing anywhere in the entire specification.

Muzak offers only a recitation of part of a phrase.   But that approach has been tried before and been repeatedly and emphatically rejected.

"Medrad would have us look at the words of the claim with no context of what an RF coil does and how it works. We have repeatedly rejected that approach."  *Medrad Inc. v MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005) (Internal citations omitted) (Emphasis added).

 "[U]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.*

In this case, Muzak is ignoring, or attempting to obfuscate, the clear explanation of how the invention actually works, as properly and adequately detailed in the specification.  And while Muzak's motive can be understood, following such an approach would deprive this Court of

9

considering the invention as a whole and reconciling a particular term or phrase with the complete description of what was actually created.

"It is therefore entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *Id.*

And, again citing the leading cases on claim construction, the CAFC reinforces the relationship between claim terms and the rest of the patent.

"[C]laims 'must be read in view of the specification, of which they are a part,'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)), and "[t]he construction that stays true to the claim language and *most naturally aligns with the patent's description of the invention* will be, in the end, the correct construction," *id.* at 1316**."** *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007) (Other internal citations omitted) (Emphasis in original).

And it cannot be overlooked that the claims do <u>not</u> state that the messages <u>cannot</u> be playing when no one is on hold. The claims require only that they be played during the time someone is on hold. That purpose can be, *and is*, achieved by having the messages play all the time; continuously; repetitively. If the invention called for the playback devices to be idle; silent for significant periods of time, then the inventor would have to spell out when messages were <u>not to be played</u> if that were a feature he was claiming as his invention.

If that were the inventor's intention, then that functionality would have to be explained in the specification with something to the effect of: *upon pressing the hold button, it generates a signal that activates the message playback device thereby causing a message to begin playing. In the absence of such a signal from the hold button, the playback device will sit idle and no messages will play.* But there is no such wording in the specification.

Which brings us back to the vital role the specification plays in claim construction.

10

A1569

"The pertinence of the specification to claim construction is reinforced by the manner in which a patent is issued. The Patent and Trademark Office ("PTO") determines the scope of claims in patent applications not solely on the basis of the claim language, but upon giving claims their broadest reasonable construction "in light of the specification as it would be interpreted by one of ordinary skill in the art." In re Am. Acad. of Sci. Tech. Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004)." *Phillips* at 1316.

Thus, by having been ruled patentable by the PTO in the 2011 Reexamination Procedure, the claim language at issue here was ruled consistent with the details disclosed in the specification. So, the PTO clearly determined that "to be played when" does not mean "to be played only when" and the patentable claim language does not require a playback device to sit idle until the hold button is pressed.

But while there is no evidence whatever in the specification to indicate that the inventor intended pressing a hold button to be the triggering act to initiate play of a message, there <u>is</u> ample support for Plaintiff's contention that pressing the hold button is not a necessary precondition to initiate message play. Column 5 Lines 26-28 explains that the "server… generates control signals to the message playback devices at the selected remote sites to play the selected messages." (Nothing about a hold button.)

Column 3 Lines 59-65 of the specification reference how the server uses data from customers' computers to "command" the players to "play" the selected messages. (Nothing about a hold button.).

Column 10 includes an explanation of how a playlist, originating at a user's computer, contains root tables that include, *inter alia,* "a date on which to send the command to play the message playlist to the message playback devices." (Lines 51-55) (Nothing about a hold button.)

11

**A1570**

Thus, Muzak's interpretation would read an improper limitation into the claim language of the '374 patent. But surprisingly, that limitation is not imported from the specification, as case after case warns against. It is simply imported from the ether.

### And for Further Support of Its Position Plaintiff Offers Muzak's References!

Not only does Muzak's construction fail to find support in the specification, its *own references* make Info-Hold's case. For the second disputed claim term of the parties' Joint Claim Construction Submission, i.e., "*for playing selected ones of said messages through an output of said message playback devices when a caller is placed on hold*," Muzak cites Col. 2, Ln 58-64 in support of its proposed construction. However, that section of the specification explains that when the receiver circuit in a playback device receives the control signals from the server, it "commands" the playback device "to play the message tracks specified in the [] signals *at the time* and in the sequence *requested* by the client computer from which the message playlist data for the [] signals originated." (Emphasis added).

Muzak goes on to cite Col. 3, Ln 51-65, as support for its proposed construction of the same claim term. But this reference doesn't help either! It, instead, reinforces Info-Hold's position by stating, "the server receives message playback data, including sequences of selected messages [and] uses the message playback data to *command* message playback devices at selected remote sites *to play selected messages*." (Emphasis added).

Despite being offered by Muzak, both cited references* make clear that the playback devices in the '374 system take their orders from the server, not the hold button. As spelled out throughout the patent, the server transmits control signals to the playback devices and the playback devices act to implement those commands.

(* Muzak's shotgun approach in trying to bag any advantageous construction to any claim involving when on-hold messages play is exceeded only by its truly remarkable fusillade of "favorable" specification references. For example, in support of the above-referenced, second

12

**A1571**

claim phrase, Muzak cites to 14 drawings, as well as the bulk of Column 1 (Ln 8-67) spilling over to Column 2 Ln 2. Then, most of Column 2 is commandeered, to wit: Lines 9-26. 35-50, 48-51 (Overlapping lines in separate, successive references? Why not cite lines 35-51?), and 58-64. These are followed by no less than a score of additional references, supposedly in support of its proposed construction of that single phrase. When one includes the two references to Claims 7 and 17, which offer nothing more than the phrase itself, and the fourteen drawings, Muzak is offering the Court, for its careful consideration, 42 references "in support" of its contention that the '374 patent discloses an on-hold messaging system in which the message playback device <u>will not play</u> messages until the hold button is pressed.

On its face, this appears to be a "word search" run amok, without review or editing. Plaintiff cannot fathom how citing the *entire* BACKGROUND OF THE INVENTION section of the specification, or citing 14 schematic diagrams, satisfies Muzak's duty to identify *specific* supporting references or how it advances the Court's claim construction function. Instead of having to analyze focused, on-point, specification references Plaintiff, and the Court, are unnecessarily burdened with poring over myriad references that too often are simply irrelevant, or, as pointed out above, actually support the *other* party's position. And this approach of piling on references - including drawings - whether actually supportive or not, appears to be the pattern rather than the exception.)

Finally, as the patent makes clear (e.g., Claim 6 and disputed claim phrase 2), the system can be used for on-hold, overhead, audiovisual, and other multi-media applications. And even Muzak doesn't claim that a message playback device knows what device its output is connected to. And there is certainly no "on-hold" function for a visual display sign or an overhead message apparatus. So the player could not possibly have to wait for a "hold" button to be pushed before it began to play the selected messages or it would (also) be useless in those other applications.

13

A1572

Thus, it is simply untenable, wishful thinking on Muzak's part to assert that the '374 system requires a hold button to be pressed before a message playback device begins to play the messages. It plays messages when the server tells it to.  And the server tells it to by transmitting control signals to it.

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction," *Phillips* at 1316, *Ormco Corp.* at 1313.

**"Caller"**

While Muzak never isolates the term, it uniformly "defines" a caller as a "caller." Presumably, Muzak means one who makes a call to the user of an MOH compatible telephone system.   However, it is clear from the specification, as insight into the inventor's intent, and from real world experience, as would be possessed by one of ordinary skill in the art, that at the time of the invention, no phone system, anywhere, limited the ability to place someone on hold to *only* someone who called in to that phone system.

Instead, it is universally understood that once a call has been "connected," i.e., there are two (or more) people on the phone with each other, that any party with a telephone system that has on-hold capability can place the other(s) on hold.  Period.  Thus, from the MOH user's perspective, it is the other, or outside, party who would be placed on hold, regardless of who dialed whom.  So, while it would not be a surprise that a business would receive more incoming calls from customers and prospects than it might make outgoing calls, for purposes of the invention, the ratio of incoming to outgoing calls is not controlling; what the inventor invented is.

Specifically, the '374 specification contains at least the following supportive references:

\*       Providing "a *customer* with music or audio promotion of products or services while the *customer* is placed on-hold and waiting for assistance."  (Col. 1 Ln 16-19).

14

**A1573**

\* Using an "MOH telephone system to accommodate *customers* awaiting assistance via telephones…." (Col. 6 Ln 45-47).

\* How the invention "allows a system user to more effectively maintain a promotional program for *customers* placed on hold…." (Col. 7 Ln 2-3).

\* The ability for managers to "use the system to program the information they wish to provide their *customers* via a MOH telephone system…." (Col. 20 Ln 12-14). (Emphasis added for all).

So, the inventor has made it clear, consistent with the state of music on hold compatible telephone systems of the day, that while "caller" is a convenient term for the circumstances, its use was not intended to limit the scope of the invention.

"A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part." *Phillips* at 1316 (Citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))

Therefore, the term "caller" in the context of this invention means "an outside party to a phone call with the user of an MOH compatible telephone system."

Accordingly, then, the example of the disputed term "when a caller is placed on hold" means "when an outside party to a phone call is placed on hold by a user of an MOH telephone system."

*Muzak's Next Example of "Play - When" is One Example Too Many*

3. **"Generating a control signal using said computer for said message playback device corresponding to said selected remote site to play said selected message when a caller is placed on hold on the respective telephone system." ('374 C1, Claim 22)**

This phrase is the next example of disputed claim language where the real issue is the "play-when" question addressed in Section C. But it is one example too many.

The "control signal" element is addressed above and there is no dispute over the "respective

15

A1574

telephone system" element.

For "generating," Info-Hold proposes the use of "producing" as opposed to Muzak's "to create a control signal," in order to recognize that a control signal is a translation, or conversion, of a data signal. The term "data signal" has an agreed construction is this case. It is "a communication between computers that contains data that identifies selected playback sites, and the circumstances under which messages are to be played at the specified sites, such as the time of day and sequence of messages." (Joint Claim Construction Submission, Agreed Term 9)

Data signals are converted into control signals, which are the signals, which *inter alia* tell the message playback devices *when* to play the messages. Which brings us to the problem.

*Muzak's Agrees Elsewhere to What it Disputes Here*

The problem, here, for Muzak, is that a data signal cannot possibly "identif[y]… the circumstances under which messages are to be played" as Muzak agrees it does, if, as Muzak also claims, messages <u>only</u> play "when a caller is placed on hold." A command to press the hold button is NOT an element contained within a data signal. So, if a data signal identifies when messages are to be played, then the hold button does not control. And if the hold button does control when messages are played, then data signals do not, as Muzak agrees they do.

So, while a control signal might be seen as being created as to form, it is not as to content. Its content comes from the antecedent data signal. Also, Info-Hold's use of the term "command" is consistent with other parts of the patent, whereas, Muzak's us of "directs" is not.

   4.   **"When callers are placed on hold on the respective telephone systems." ('374 C1, Claim 26)**

Seeking judicial construction of this claim phrase would be perplexing were it not such an unabashed example of Muzak's strategy as spelled out in Section C. The "respective telephone systems" element is not in dispute. The element "on hold" is not, *per se,* in dispute, either.

People are placed on hold when they are placed on hold. Not one second before or after. So there is only one word in this phrase that Muzak is after (again). Muzak is simply taking

16

A1575

another crack at "callers," which is addressed in Section C.

     **5.**      **Storing a library of discrete and individually accessible messages at each of said remote sites for playback on the respective playback device when a caller is placed on hold. ('374 C1, Claim 28)**

This is the next example of a claim phrase being disputed for the sole purpose of offering the Court another opportunity to construe "caller" and a variation of "to be played when," as detailed in Section C. In this phrase, it's "for playback… when." The element of "discrete and individually accessible messages" is the next term listed for construction, and no other term in this phrase is in dispute.

As spelled out in detail in Section C, in the '374 system, messages start to play upon receipt and implementation of control signals. Message play does not depend on the hold button being pressed as a triggering act. And any user of an MOH telephone system can place any outside party to a telephone call on hold, regardless of who called whom.

Therefore, "storing a library of discrete and individually accessible messages at each of said remote sites for playback on the respective playback device when a caller is placed on hold," in the context of the '374 Patent, means "storing a group of separate, individually accessible messages on the respective message playback devices and situated at remote locations, for playback through an output to be heard by outside parties to telephone calls who are placed on hold by users of respective MOH telephone systems."

     **6.**      **"Discrete and individually accessible messages" ('374 C1 Patent, Claims 22, 24, 26, 28)**

The parties propose identical language for the construction of this claim phrase with the exception that Muzak's proposed construction adds the limitation, "from the playback device's storage," which is simply not contained in, nor explanatory of, any element in the disputed phrase. Plaintiff simply asserts that the construction of the phrase should be restricted to the actual phrase in dispute.

Regardless of what language is contained in the rest of the patent, the disputed phrase, and

<div align="center">17</div>

<div align="center">A1576</div>

only the disputed phrase, is what the Court is being asked to construe. Therefore, "discrete and individually accessible messages" means "messages that are individually identifiable and separately accessible."

### 7. "When a caller is placed on hold" ('374 C1 Patent, Claims 7, 17, 22, 28)

In the context of this invention, "when a caller is placed on hold" means "when an outside party to a phone call is placed on hold by a user of an MOH telephone system." See Section C.

### 8. "Programmable to" ('374 C1 Claims 1, 7, 17, 13, 19)

Some words have more than one meaning. Plain and simple. Other words, such as "sanction," not only have different meanings, they have opposite meanings. (Sanction, as both penalty and authorization.) Such is the nature of the English language. Yet, somehow, it lives on.

So it is with the word "program." It can mean your favorite T.V. show, or the pamphlet they hand out at your daughter's play or at a sporting event, or the dietary regimen you pay $50 a month for, or the software code so few of us are trained to write, or it could mean setting your VCR to record your favorite, um, program. What does "program" mean? Noun? Verb? How about "programming" or "programmed" or "programmable"? Easier?

But while this phenomenon can be mildly perplexing, it is navigable. And, fortunately, rather than being charged with having to explain the linguistic paradoxes of the English language, judges in patent cases only have to construe disputed claim terms as they would have been understood by the person of ordinary skill in the relevant art at the time of the invention, as used within the context of the invention.

In the context of the '374 invention, we start with the title: "*Programmable Messaging System For Controlling Playback of Messages on Remote Music-On-Hold- Compatible Telephone Systems And Other Message Output Devices.*" An invention that was awarded a Patent (and survived a PTO Reexamination) as being a <u>programmable</u> system for controlling the playback of messages on remote devices has already been established (and re-established) as a system that's

18

A1577

data is unrelated to inputting data, and presenting data, somehow, can't involve a visual display, such as a screen. Those puzzling distinctions about a well-known and commonly understood device are all that kept "computer" from being an agreed term in this case.

Muzak openly and notoriously uses computers in its systems, but effectively, offers the definition of an adding machine, here.

Therefore, a "computer," in the context of the invention, means "a programmable electronic device capable of performing data processing functions and having a memory device, an input device, and a display."

### 10. "to provide said accessed message to said output in accordance with said control signals when a caller is placed on hold"

This is Muzak's final stab at "when a caller is placed on hold." The Court will recognize that no other words in this phrase need judicial construction here. Yet, Muzak is, apparently, not satisfied with having this Court construe "when a caller is placed on hold" in disputed term 7, which, in its entirety reads, "when a caller is placed on hold."

Nor, it seems is Muzak satisfied with "when callers are placed on hold on the respective telephone systems," as in term 4. Neither of those are otherwise encumbered with claim term baggage beyond reference to the phone system itself and the use of the plural form of "caller."

And, again, this is despite the previously cited rule that when a term is construed, that is the construction that obtains throughout the patent. See, *Bradford Co. v. Afco Mfg., 2006 U.S. Dist. LEXIS 88547* (S.D. OH 2006).

In the context of the '374 patent, the instant claim phrase means "to deliver a message accessed from the playback device's storage to an output in conformity with specific control signals for play when an outside party to a telephone call is placed on hold by a user of an MOH telephone system."

But in its Brief in Support of Proposed Claim Constructions ("Muzak Brief" or "MB"), Muzak unilaterally defines "when" and "played" in a way favorable to its case. Having avoided any give and take with Plaintiff, before filing the Joint Submission, and hoping to avoid scrutiny by the Court, because 'when' is not a disputed term, Muzak defines its most important single term the way it wants. MB at 17.

Any party who would devote so much of their Claim Construction Brief to a single word would surely have known how important it was going to be, back when the parties were 'consulting' about agreed and disputed terms and preparing the Joint Claim Construction Submission. Yet, Muzak never raised the term "when" to be discussed, debated, or defined. With knowledge aforethought, it reserved *sub silentio* the right to construe 'when' for itself, and exploited it by using it to weave a false picture of how the patent-in-suit functions.

The same is true with the term "played." It was never identified or discussed as an independent term in need of construction. Nor was it identified as a significant term. Yet, Muzak relies heavily on its own, back door construction. Muzak owed it to the Court to signify the claim terms it deems most significant in the case with the other party. As contemplated by the Local Rules, the parties can agree or not on a construction, but the important terms MUST be addressed. Here, they were not. And it appears that these key terms were left out of consideration, not by omission, but by commission.

Claim terms "defined" by other than intrinsic evidence are claim terms defined extrinsically. Muzak extracted or concocted its definition for "when (i.e. at the moment)" from somewhere. Even if it's, "*that's the word on the Arab street*" or "*that's what the kids are saying these days*" it came from somewhere other than the patent or the

2

A1636

prosecution history.  That makes it extrinsic.  Thus, it required mention and attribution.  It got neither and is objectionable.

Muzak urges the Court to see through this artifice and not incorporate Muzak's surreptitious constructions into its analysis.

**RESPONSE ARGUMENT**

*A Patentee Must Disclose What the Invention Is*

Under the Patent Act, 35 U.S.C. Sec. 112, requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it…."  In exchange for a temporary "exclusive right" to use an invention, full disclosure, by the inventor, of exactly how his invention works "shall" be provided.

The gist of that bargain is that an inventor gets protection for what he or she discloses.  If your invention is novel, useful, non-obvious, and disclosed, you can get a patent.  Yet, what Muzak is saying about the '374 patent simply cannot be found in the patent specification.  The specification does not disclose, and therefor cannot be, the invention Muzak represents it to be.

The specification in the '374 patent fully discloses the actual invention it covers.  It's only Muzak, in a tight spot on infringement, that has gone off the menu, arguing that the '374 operates in a way no one else in the world thinks it does.  It has been through the PTO twice and neither time did the examiner find anything like Muzak describes.  If they had, there wouldn't be a '374 patent.  If Muzak is right, then Hazenfield got a patent for his remotely programmable messaging system without ever telling the world how the darned thing works.

"To be played when"

3

**A1637**

This little morsel is the key to Muzak's argument. It contains both of the words that are critical to Muzak's case for the on-hold messaging application of the whole invention. But Muzak doesn't begin its analysis with this claim phrase. Muzak first parses the words and creates an *ad hoc* definition for "when."

Muzak begins with "when a caller is placed on hold." In that phrase, the term "when" seems obvious and harmless. It was Disputed Claim Term 7, but as part of its plan, Muzak bumped it up to Number 1. The idea is to maximize the appearance of agreement on its simplest use and then invoke *Rexnord Corp.* for the proposition that it should have the same meaning throughout a patent.

Muzak is understandably eager to start with that phrase. It says, "' when a caller is placed on hold' is easily understood on its face and does not require any special, technical definition." MB at 8. Info-Hold agrees. It doesn't require any special technical definition. But other claim phrases containing 'when' might require closer scrutiny. And they all need to comport with the specification.

Muzak then simply and innocently (and parenthetically) construes "when" to mean, "at the moment." Muzak Brief at 17. Where did *that* come from? 'When' may mean "at the **moment**" for a **moment**ary event, like pressing the hold button, but it sure doesn't mean "at the moment" *when* you're talking about how different life was *when* you were in prison.

There are no "accessing" or "selecting" or "playing" references in this simplest of phrases. Nothing that involves any more time than a moment. So Muzak has established 'when' to be a very short time. Again, this term was never brought up in any

4

**A1638**

discussions between the parties relating to claim construction. Under the radar is the best place for this gambit.

Muzak later (and also innocently) hypothesizes a scenario that results in the term "played" to mean, "starts to play." Muzak needs this construction too, to paint the '374 patent as requiring a message to start "from its identified beginning" when someone is placed on hold. But if something is to be "played" at a single point in time, like a *moment*, you can't really *play* it, you can only *start* to *play* it. And because a message has a beginning, then it *starts to play* from the *beginning* at that referenced point in time, i.e., when the hold button was pressed, which, as we all know, only takes a "moment." And all you can do in a moment is 'start' something, or 'press' something, or make something up.

EVERY message referenced in this patent has an identifiable beginning (and end). EVERY message starts to play from its identified beginning. But that doesn't mean every person on hold hears it from the beginning or that the message playback device sits idle until someone is put on hold. And <u>that's</u> what Muzak can't find in the specification. Here's Muzak's play:

> *Tie the word 'when' to a single, brief act.* (That rules out "while" or any concept of 'when' that covers a longer time period like, "when I was in prison.")

> *Lay out the case as if "played" means "start to play."* ('Start' implies a terminus, like a beginning. That will come in handy.)

> *Stress that a message has a beginning.* ('Beginning' implies a terminus, like a start. That will come in handy.)

> *Portray a sample message script as being the uniform model.* (Caught a break here. Client's name early in the message is a windfall. Run with it.)

> *Misstate criticism of lack of sequencing by competitors.* (Turn 'when' a message occurs in a sequence, into 'when' it starts to play and make *that* the criticism.)

5

**A1639**

*Reassemble the key words.*  (We have "beginning" and "start" and "message" and "play."  Just turn that into message/starts/play/beginning.)

*JUST SAY IT.*  (A *message* must *start* to *play* from its *beginning*.)

According to Muzak's argument, the thing that happens at the 'when,' is that a message is played.  Because a message *is to be played* when a caller is placed on hold.  But Muzak should be careful what it wishes for.   Because if Muzak wants its narrow, unsourced "*at the moment*" construction for "when," then the message MUST START playing *when* a person is placed on hold, and then, MUST STOP playing *after* that person has been placed on hold, i.e., *while on hold*.  If the message isn't stopped as soon as a person is on hold (after being placed there), but continues to play, then "when" has to mean *when* and *while*, i.e., " at the moment" someone is placed on hold <u>and</u> while they remain on hold.  And because Muzak sometimes talks about callers hearing an entire message and because Muzak also talks about a sequence of messages being played, then Muzak must believe someone will be on hold and be hearing them.  That means whoever is on hold will have been on hold for a period of time, not just 'at the moment' they were placed on hold.

To be *placed* on hold is to be *put in* the hold condition.  Companies want their messages <u>to be played when</u> a customer is in the hold condition.  The '374 does that.  No rational artisan would think this invention was designed to play a message for one second.  And the language of the claim term simply does not say that a message is "to be started when" someone is put on hold.  So, Muzak has to be reading that limitation into the term.  Muzak wants "played" to mean *starts to play* and "when" to mean *at the moment*.  Yet neither of these crucial claim terms were listed, isolated, discussed, or defended by Muzak before their surprise appearances in its brief.

6

A1640

_Will the Real 'Sequencing' Please Stand Up_

Muzak knows it has to cite some specification references in "support" of its proposed claim constructions. But there just aren't any good ones. That's Muzak's dilemma. So, Muzak resorts to alchemy. It tries to transmute simple and straightforward specification passages into something they are not, in order to pass off this unclaimed, unexplained, and _sui generis_ "start at its beginning" capability as "sequencing."

But that is not a question of sequencing. It's a question of when a message starts playing. Muzak says the specification contains criticism of other systems because they can't start a message from the beginning when someone is put on hold. MB at 9. The specification does not say that. It criticizes those devices as being "disadvantageous" because they do not allow a user to "add or delete a message from a playlist or modify the sequence with which the stored messages are played." '374 Patent Col. 1 Ln 40-44 (Muzak's own citation). That's sequencing.

_"When" a Message Plays Refers to its Location in a Sequence_

Muzak's reference to the use of "when" in that passage is misleading, as well. The specification rightly states that previous systems would not let a user "program when" a given message would occur in a message sequence. But the use of the word _when_ in that passage refers when it occurs, not when it starts.

For example, if a bank's "free checking" message follows the "hours and location" message in a sequence, then that identifies when it plays: right after the "hours and location" message. If the bank changes, or modifies, the sequence by inserting its "auto loan" message between the other two, then that's when the "free checking" message plays: right after the "auto loan" message. So, by modifying the sequence,

utilizing the programming (skip-play) function of the system, the bank has changed <u>when</u> the message plays. And if the bank modifies the message sequence again, so that the "auto loan" message plays every third message, it will have, once again, changed <u>when</u> that message is to be played. That's what the 'when' is about in that specification language.

<u>Muzak's Motive Scenario</u>

Muzak attempts to lay out an explanation for <u>*why*</u> the '374 must start a message from the beginning, i.e., a motivation. A motive will help sell the idea that it really works that way. Muzak creates a scenario with the following passages from Muzak's brief, beginning at page13. The passages are accurate. The conclusion is not.

Muzak first cites "*exemplary messages*" from Figs. 21-22, where *"the specific examples in the patent include a lead-in that announces the name of the advertising business- here, "Bank One"- which is not repeated again in the message.*" MB at 13-14. These sample "messages," for which there is no basis to conclude actually existed, are the first step in Muzak's specious scenario intended to frame Info-Hold as touting the advantages of starting messages from the beginning. (This is offered after Muzak has specifically acknowledged that limitations from the specification <u>cannot</u> be imported into the claim terms. MB at 5.)

After attempting to create a binding, restrictive, rule from a mythical message, Muzak continues. *"Obviously an advertiser would prefer that a caller-on-hold hear a thirty-second advertisement from its beginning, when the name of the advertiser is announced."* Id at 14. Where is it written that an on-hold message must <u>always</u> include the customer's name at the beginning? Would Muzak's argument change if the

8

A1642

advertiser's name came at the end of the message? How does Muzak break the bad news to *its* advertisers that *its* system doesn't start a message from the beginning (where their name is)?

Simply stated, even a client's preferences must yield to the limitations of the invention. And a customer's desires can't be imported into the claim language any more than can a single embodiment of the invention or a particular picture of a proposed message.

Undaunted, however, Muzak carries on. "*The '374 specification repeatedly emphasizes the importance of control over the sequence of messages played.*" Id. But as detailed above, "control over the <u>sequence</u>" is just that. To talk about the sequence of messages is to say nothing at all about whether the first message in the sequence begins to play, from the beginning, and <u>only</u> when the hold button is pressed.

And Muzak closes with the punch line. *"Dropping the caller into the middle of a message or the middle of a queue would defeat the purpose of the controlled sequencing as described in the '374 patent."* Id. Incorrect. "Controlled sequencing," means being able to control the sequence. And as detailed above, the '374 system accomplishes that "purpose" very nicely, thank you, without having to make a message playback system do what it was never designed or intended to do, i.e., be fully loaded and raring to go, yet forced to sit idle until the hold button is next pressed.

Muzak has cooked up this potluck dish in order to create a false template against which its own systems would be judged. The recipe is easy. An "exemplary message" here, a concocted criticism of competitors, there, add a healthy portion of manufactured mid-message-itis and, *viola*; you've got a system that Muzak might not infringe.

With this exercise in wish fulfillment, Muzak purports to have shown the Court that Info-Hold produces only 30-second messages and every one of them has the advertiser's name mentioned at the beginning.  According to Muzak, that name placement turns out to be a big part of the reason why the '374 system <u>had to</u> be designed to always play the first message, from its beginning, at the moment someone is placed on hold.  (Who knew?)

So, it's clear.  The system has to work that way because the messages are written that way.  Because advertisers like for their names to be heard.  And it's bad medicine to drop a caller into the middle of a message.  Lucky for Muzak.  Because its on-hold system plays the messages all the time; continuously.  That's a whole different thing.  Like night and day.  A horse of a different color.  Two ships passing in the night.  Move along, nothing to see here.  No harm no foul.  Like night and day.  Lucky for Muzak.

Everyone is entitled to their own opinion, but not their own facts.  Muzak has not just improperly imported a limitation or two into the claim language; it has improperly imported an entire invention!

<u>*Muzak's Theory Gets Hung Up On - by Multiple Phones*</u>

Muzak's Claim Submission cites references disclosing an MOH telephone system with multiple phones, (e.g., '374 Fig. 2) yet it fails to address how its proposed construction squares with such a system when two or more telephones and extensions are being used simultaneously.

It was well known to persons of ordinary skill in the art, at the time of this invention, as it is today, that a single audio source is sufficient to service an entire MOH business telephone system. (See '374 Patent Claim 6.)  That common understanding,

10

**A1644**

shared by the inventor of the '374 system, is consistent with Info-Hold's proposed construction of whether a hold button is the necessary and sole trigger for initiating message play.  What is inconsistent with that reality is Muzak's position.  Because a system built according to Muzak's model would only work on a single-line phone with no extensions.

Muzak is clear about how it envisions the '374 system working when someone calls the business.  Employee #1 answers the phone, and the party is placed on hold. According to Muzak, that means a message starts to play from "its identified beginning." And when employee #2, on another line, places another party on hold just seconds later, according to Muzak, that means a message starts to play from "its identifiable beginning."  With only seconds separating the two hold events, it seems that employee #2 *must* cause the *same* message to start to play, "from its identified beginning," when he hits the hold button on his phone?

Does the current message stop and immediately start again?  Perhaps the system leaps ahead to play the next message "from its identified beginning" because it can't go backwards to start the first message over again.  Dare we conjecture about a third caller or, PTO forbid, a busy call center?  How would a constantly interrupted or restarted *first* message square with Muzak's professed concern for what "*an advertiser would prefer*"? When do the messages just get to play, so people on hold can hear them?

Or, perhaps the system just doesn't work that way at all.

The specification says absolutely nothing about hold buttons being pressed in quick succession or how a message playback device handles such a situation.  Yet, that situation happens every day, every hour, every minute all over the country.  How can that

11

**A1645**

be?  How can the disclosure not explain how the playback devices jump ahead (or back) to start a new 'first message' from its identified beginning <u>every time</u> someone is placed on hold?  Nor is there is anything at all in the claims or the specification of the '374 patent that discloses separate playback devices for separate phone lines or extensions. So, of course, there could be nothing in Muzak's brief that addresses this obvious, real life circumstance.

Texas law enforcement lore teaches "one riot, one Ranger."  The '374 patent teaches "one phone system, one playback device."  It's an insoluble dilemma for Muzak.

*<u>This Just In</u>*

And now, Muzak may have inadvertently delivered a self-inflicted knockout blow by its actions on another issue in this case.  In its Response in Opposition (Dkt. #43, filed on June 12, 2012) to Info-Hold's Motion for Discovery (Dkt. # 37) Muzak attached, as Exhibit 21, a copy of a patent application filed on behalf of Joey C. Hazenfield, the inventor of the '374 patent.  Attached here, as Exhibit A.

While Muzak only attached one page of the application, it spells out clearly in the ABSTRACT that the application is for a system wherein: "Said sistem (*sic*) enables the user to <u>start</u> a pre-recorded audio or visual message <u>at the beginning *each time* a caller is placed on hold in the telephone system.</u>" (emphasis added).  Muzak could probably find quite a few explicit references in *that* specification explaining how to make a message start from the beginning each time someone is put on hold.  But not in this one.

Given Muzak's knowledge, and use, of this 2003 patent application, it falls somewhere between disingenuous and duplicitous for it to unabashedly assert that Hazenfield's 1996 invention of the '374 system dictates "that [a] message is played from

its identified beginning when (i.e., at the moment) a caller is placed on hold."  Muzak

Brief at 11.  Muzak knows better.

    Muzak knows that in 2003 Hazenfield was seeking a patent on a system where a

selected message would be played from the beginning each time someone was placed on

hold.  Muzak also knows that Hazenfield had already secured the '374 patent.  Now

Muzak has been caught arguing that Hazenfield was applying for a patent for such a

system when he already had one in (Muzak's version of) the '374.  The truth, of course,

is that Hazenfield's '374 patent <u>wasn't</u> a *start at the start* messaging system.  And he

knew it.  That's why he invented *another* system that *was* and applied for a patent on it.

*What's Going On*

    It turns out that this whole issue is not so complicated.  Muzak has been forced to

assert its stated position in order to avoid the damaging admission that its system works

the same way the '374 system works: the user makes site and message choices on his

office computer and sends them to the server; the server sends the corresponding control

signals to a message playback device, which initiates a message sequence in accordance

with those control signals, and those messages play continuously until a new command

from the server tells it to do something else.

    In the law of Domestic Relations, it only takes one marriage partner, and a

stubborn assertion, to establish 'irreconcilable differences' in a divorce petition.

Likewise, in Patent Law, it only takes a few sentences, and a purpose, for one party to

create a claim term chasm.  But instead of simply holding one's ground and being

rewarded with an assured result in divorce proceedings, all Muzak has earned with its

proposed constructions is a dispute.  And disputes over claim terms are resolved by

13

A1647

Discrete, Individually accessible, Selected ones, etc.

Muzak focuses like a laser beam on the fact that a "discrete" message has "an identifiable beginning."  MB at 13.   But it does not express the same zeal for the fact that a message also has an "identifiable… end."  Joint Submission, Agreed Constructions, Term 1, "Messages."

The only difference between a message's identifiable beginning and its identifiable end is that one is at the beginning of the message and the other is at the end of the message.  And the only *actual* purpose for such a requirement is so individual messages can be accessed and inserted, in any chosen order, into a playlist (or skipped and left out).

And, once again, another of Muzak's specification references, Col. 2 Ln 6-54, includes language that makes Info-Hold's point.  "A user can select messages for play from the message directory… as well as specify the sequence in which the selected messages are to be played…." Col. 2 Ln 22-26.  It would be impossible for a user to create a sequence of different, selected messages if he couldn't manipulate individual messages.  One can't write sentences without control over discrete, individually accessible words.  And one can't create words without control over discrete letters of the alphabet.

Conversely, a user could not "select" a message to be part of a playlist if that message were indistinguishable from, or inextricably connected to, all the other messages stored in a storage device (like buried in the middle of a tape or a digital loop).  You can't extract an individual cherry, once it's been through the blender and transmogrified into a Slurpee.

17

A1651

Conclusion

     More so even than securing the patent in the first place, surviving the Reexamination is of particular moment in this case because part of the Reexamination focused on the very claims and issues raised here. The reason that Muzak could focus on language in the selected "on-hold" claims is because that language was examined at the PTO and ruled patentable in the Reexamination Procedure and, therefore, is part of the patent-in-suit.

     The PTO had the claim language and the specification before it. The examiner compared what the claim language said with what the specification disclosed and understood what the invention was. If the PTO examiner had determined that a selected message was to begin playing only upon the hold button being pressed and that the message had to play from its identified beginning, then Info-Hold submits that any such claims would not have been allowed. Those claims would have been declared unpatentable because there is simply no support for such an interpretation anywhere in the specification.

     There must be a complete disclosure for the claimed invention to be awarded a patent. See *Ariad Pharms., Inc. v. Eli Lilly & Co.,* 598 F.3d. 1336 (Fed. Cir. 2010) (*en banc*) ("Every patent must describe an invention.") If that were not the case, then a claim for "a vehicle capable to transport any number of passengers to any time period in the future or the past" could be allowed. But no one has patented a time machine, yet, because they can't satisfy the requirement to disclose what the invention is and how it would really work.

18

**A1652**

"Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of "invention"--that is, conceive of the complete and final invention with all its claimed limitations--and disclose the fruits of that effort to the public." *Id* at 1353 (underscore added).

In this case, the specification manifestly satisfies that requirement.  It reveals how, in an on-hold application, a message sequence is communicated, via control signals from the server, and implemented by the message playback device so that the selected messages are *playing when customers are placed on hold*.  This is repeatedly made clear in the specification, as identified throughout Plaintiff's brief.  "It is part of the *quid pro quo* of the patent grant and ensures that the public receives a meaningful disclosure in exchange for being excluded from practicing an invention for a period of time." *Id* at 1354 (internal citation omitted).

Muzak's proposed constructions of phrases involving "when," "played" and "programmable to" are nothing more than linguistic sleight-of-hand and suspect conduct in the preparation of the Joint Submission on claim terms.  Its conduct regarding *when* and *played* is particularly egregious.  But fortunately it is not final.  "Where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning." *Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp.*, 309 F.3d. 1365 at 1370 (Fed. Cir. 2002).

The '374 specification points away from Muzak's improper and *ad hoc* constructions and towards Info-Hold's proper constructions.  That's because the '374 is simply not the invention Muzak says it is.  Info-Hold welcomes close scrutiny of the specification, which it feels will support its proposed constructions.  "Ultimately, the

19

A1653

interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* (Internal citations omitted)

Plaintiff respectfully requests the Court to adopt its proposed constructions for the disputed claim terms in this case.

Respectfully submitted,

Dated: July 6, 2012

/s/ Daniel J. Wood
Daniel Joseph Wood (0037632)
4120 Airport Road
Cincinnati, Ohio 45226
Telephone: (513) 248-5600
Facsimile: (513) 248-5609
danw@infohold.com

Attorney for Plaintiff Info-Hold, Inc.

20

**A1654**

Case: 14-1167 Case: 14-1167 CASE PARTICIPANTS ONLY Document: 28-5 Document: 47 Page: 289 Filed: 06/20/2014 Filed: 06/20/2014

Case: 1:11-cv-00283-TSB-KLL Doc #: 55 Filed: 08/17/12 Page: 10 of 12 PAGEID #: 978

messages and then those messages are presented to the output, *which means they're* ***played to whoever is on hold***. So that's the way the system is claimed."[9]  (Why didn't Plaintiff think of that?)

**CONCLUSION**

Muzak's challenge in the claim construction phase of this case was a daunting one: successfully argue for constructions of claim terms when those proposed constructions have no support in the patent specification.  It is akin to having to defend the proposition that Franklin Roosevelt discovered America.

A clever sophist who found himself in that position might argue something like: well, there *was* an America back in the late 18th century, but it was dissolved when several states seceded.  Sure, it was restored (on paper) but animosity and antagonism continued between the states that had made up the Confederacy continued to make and enforce laws that were grounded in the very evil that caused the rebellion in the first place.

No, the "America" of the late 19th and early 20th centuries, with its twin personalities of Jim Crow, poll taxes, and deprivation of fundamental rights in the south contrasted with the liberty and equal justice that prevailed in the north, was not "one nation."  The America we know today, the only <u>real</u> America, was created when F.D.R. brought us together to fight our way out of economic depression and to crush international repression.  Together we defeated economic despair and worldwide military aggression.

When the "New Deal" was implemented and totalitarianism was cast into the trash bin of history, yes, THAT'S when we became the great nation we know and love

---

[9] Hearing Transcript, Pg 50 Ln 12-15 (emphasis added) (impact in original).

today.  THAT'S when the true America was discovered!  F.D.R. rocks!  He was the true

Father of our Country!

If one changes a liberty or two for a claim term or two, one, clever in such tasks,

can cobble together a similar, best-we-can-do-under-the-circumstances, theory for the

disagreeable task of trying to explain how a hold button *on* a phone, connected to nothing

*but* the phone, can initiate a chain of events across time and space wherein multiple

computers and other machines, which are hundreds of miles apart, perform a series of

independent, time-consuming, causal functions at near light speed, so that messages can

be heard *attualmente* (i.e., at the moment).

Or, Muzak could just admit that, in the on-hold application of the '374 patent,

selected messages are played to whoever is on hold.  Oh, wait!  They did.

<div style="margin-left:50%">

Respectfully submitted,

</div>

Dated: August 17, 2012            /s/ Daniel J. Wood              

<div style="margin-left:50%">

Daniel Joseph Wood (0037632)
4120 Airport Road
Cincinnati, Ohio 45226
Telephone: (513) 248-5600
Facsimile: (513) 248-5609
danw@infohold.com

Attorney for Plaintiff Info-Hold, Inc.

</div>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendants. | |

**MOTION OF DEFENDANTS MUZAK HOLDINGS LLC AND MUZAK LLC FOR**
**PARTIAL SUMMARY JUDGMENT ON INFO-HOLD'S CLAIMS OF INDUCEMENT**
**OF INFRINGEMENT AGAINST MUZAK HOLDINGS LLC AND MUZAK LLC AND**
**DISMISSING MUZAK HOLDINGS LLC FROM THE CASE**

For the reasons stated in the accompanying Memorandum of Law and Statement of Undisputed Material Facts, both of which have been filed under seal pursuant to order of the Court, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Muzak Holdings LLC and Muzak LLC (collectively, "Muzak") respectfully move this Court for an order granting partial summary judgment for Muzak on Info-Hold's claims of induced infringement against Muzak Holdings LLC and Muzak LLC and dismissing Muzak Holdings LLC from the case.

Dated:  December 3, 2012

Respectfully submitted,

/s/ John F. Bennett
Kevin W. Kirsch (0081996)
John Bennett (0074506)
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:  (513) 929-3499
Facsimile:  (513) 929-0303

**A2515**

**CONFIDENTIAL MATERIAL REMOVED**
**SUBJECT TO PROTECTIVE ORDER**

# Pages Between A2520-A2764

it began marking its '374-related products <u>even before</u> the '374 patent issued.

Exhibit B contains two pictures of products marked with a "patent pending" sticker. (Bates No. IH008621 through IH008622).

Properly Bates-numbered documents were timely provided to Muzak. Proof of delivery was returned to Info-Hold (Exhibit C FedEx Tracking Receipt, October 5, 2012 at 9:44am, signed for by K. Delacruz and supporting documentation) and Muzak's counsel acknowledged receipt of same during a meet and confer telephone conference on October 5, 2012. These events illustrate that Muzak cannot prevail, as a matter of law, on a claim that Info-Hold failed to mark its products and has provided "no evidence" to the contrary.

<u>*Notice of Direct Infringement*</u>

After laying out its case that Info-Hold did not properly mark its '374 products, Muzak goes on to assert that certain 2006 communications between the parties did not rise to the level of providing direct notice of infringement to Muzak. While this issue might have relevance in other areas, such as willfulness, it is only relevant to this motion <u>if</u> Info-Hold had not properly marked its products under the '374 patent. Marking, by itself, is proper notice under 35 U.S.C. 287(a). However, had Info-Hold not properly marked, then providing an alleged infringer with direct notice, such as an accusation of infringement, would constitute sufficient notice to start the damages time period.

It should be clear that Plaintiff asserts that the cited telephone call between Daniel J. Wood and Michael Zendan, both in context and in the actual conversation, <u>did</u> constitute sufficient notice to Muzak of infringement. Info-

Hold provided a copy of the patent to Muzak prior to that call. (See Exhibit I,

Bates No. IH008089-IH008090). Info-Hold asked Muzak's general counsel to

secure a review and letter from a patent attorney (See Exhibit I, Bates No.

IH008089-IH008090). Mr. Zendan specifically denied infringement during the

call. (See Exhibit D, pg 4 ln 2-15, pg 10 ln 18-22, pg 11 ln 1-12 pg 16 ln 20-21)

(One does not deny what one is not accused of.)

      But Mr. Zendan's denial did not end the conversation. Neither did Info-

Hold respond with words to the effect of, "Info-Hold knows that," or "Info-Hold

is not saying Muzak's products infringe the patent it sent you," or "infringe?

Who said anything about infringing?" Instead, after his denial, Mr. Zendan was,

again, directed to the claims of the patent directed to overhead music and message

(See Exhibit D, pg 15 ln 1-16) applications and again directed to review those

claims in light of Muzak's products and to get an advice of counsel analysis if Mr.

Zendan felt he was not qualified to perform such a review. Attached as Exhibit

D, transcript of phone conversation.

      Viewing the totality of facts and circumstances, a question of fact remains

as to whether that telephone call provided Muzak with notice that at least some of

its products infringed the '374 patent. But beyond that, the clear evidence

provided to Muzak that Info-Hold had already been marking its '374-related

products precludes Muzak from prevailing on this point.

_Failure of Licensees to Mark_

      Info-Hold's response to this issue is the same as to the previous one. Even

if Info-Hold's licensees under the "Settlement and Patent License Agreement"

# Exhibit D

Transcription of Phone Call Between Mike Zendan and Dan Wood

Page 1

Transcription of Phone Call Between

Mike Zendan and Dan Wood

-----------------------------------------------------

DIGITAL EVIDENCE GROUP

1726 M Street NW, Suite 1010

Washington, DC  20036

(202) 232-0646

104f5460-0251-4934-b0e3-de1ca8bbe723

Transcription of Phone Call Between Mike Zendan and Dan Wood

| | |
|---|---|
| 1   (Phone ringing) | 1   ideas and to, you know, tell when they want a |
| 2   VOICEMAIL:  Hi, you've reached Mike | 2   production and so forth.  But everything that we do |
| 3   Zendan of Muzak's legal department.  Please leave | 3   is all -- I mean, it's manually. |
| 4   me a message and I'll make every effort to call you | 4   And we do all our systems through -- you |
| 5   back by close of business today. | 5   know, through systems that are available.  I mean, |
| 6   In the alternative you can email me at | 6   we buy our stuff from Nel-Tech and from Premier and |
| 7   mikez@muzak.com.  If you need immediate attention, | 7   Mackenzie, so there isn't any kind of proprietary |
| 8   please feel free to call my paralegal, Shannon | 8   system that we have, number one.  And number two, |
| 9   Homesley, at Extension 3263.  I'll look | 9   none of our systems right now from the standpoint |
| 10  forward to speaking with you. | 10  of getting content to people is proprietary, and |
| 11  RECORDED VOICE:  Please leave a message | 11  the website doesn't do it. |
| 12  at the tone.  When finished you may hang up or | 12  I mean, so I don't know, you know.  We |
| 13  press pound -- please hold while I transfer your | 13  looked through your patent, and we don't have |
| 14  call. | 14  patent people here, but I'm just not seeing the |
| 15  (Phone ringing) | 15  possibility of infringement here. |
| 16  CANDACE:  Thank you for calling Muzak. | 16  DAN WOOD:  Yeah. |
| 17  This is Candace.  How may I help you? | 17  MIKE ZENDAN:  And so that -- and that's |
| 18  DAN WOOD:  By punching in the fourth | 18  why I'm giving you a call and that's why the letter |
| 19  digit on the extension that I didn't get to.  I was | 19  was short.  I mean, the letter was short because |
| 20  trying to get to Shannon at 3263. | 20  we're coming from the standpoint of, you know, we |
| 21  CANDACE:  May I place you on hold? | 21  buy it from Nel-Tech, we buy it from Premier and we |
| 22  DAN WOOD:  Sure. | 22  buy it from Mackenzie.  I mean, if you guys have |
|                                    Page 2 |                                    Page 4 |
| 1   CANDACE:  Thank you. | 1   got a claim against them and, you know, there is a |
| 2   (Phone ringing) | 2   legitimate claim, I guess it will affect us because |
| 3   DAN WOOD:  Dan Wood. | 3   we buy equipment from them. |
| 4   MIKE ZENDAN:  Dan, Mike Zendan from | 4   DAN WOOD:  Right. |
| 5   Muzak.  How are you? | 5   MIKE ZENDAN:  But I mean there's no |
| 6   DAN WOOD:  Hi, Mike.  How are you? | 6   system that we go out and sell that's a Muzak |
| 7   MIKE ZENDAN:  I'm doing well. | 7   system that somehow, you know, is interactive or |
| 8   DAN WOOD:  Getting some club sandwich out | 8   gets messages to people or anything like that.  The |
| 9   of my mouth. | 9   website is a great tool for us, but that's |
| 10  MIKE ZENDAN:  No problem. | 10  something where, you know, a client's got to come, |
| 11  DAN WOOD:  Thanks for getting back to me. | 11  they say, hey, look, this is what I want for a |
| 12  MIKE ZENDAN:  No problem. | 12  script or this is how I want to change my billing |
| 13  DAN WOOD:  I'm returning your call so -- | 13  or this or that, we take that information.  It's |
| 14  MIKE ZENDAN:  Yeah.  I mean, I got your | 14  more of an information, you know.  It's a pull as |
| 15  follow-up letter.  I mean, I don't know what to | 15  opposed to push.  We don't push anything after |
| 16  tell you at the end of the day, Dan.  I mean, I | 16  that. |
| 17  don't know what you're looking at to suspect | 17  You know, we've got to take that |
| 18  somehow we're crossing your patent. | 18  information and then we have to either create tapes |
| 19  We've got an online procurement system | 19  or whatever we do and we mail it to them.  Or, you |
| 20  obviously, and you're probably familiar with it | 20  know, if it's a phone download we actually take the |
| 21  from poking around online, but what it is, you | 21  information and then we'll later on phone download |
| 22  know, it allows a client to come and share script | 22  them a message or something on a Premier or |
|                                    Page 3 |                                    Page 5 |

Pages 2 to 5

104f5460-0251-4934-b0e3-de1ca8bbe723

A2814

Transcription of Phone Call Between Mike Zendan and Dan Wood

**Page 6**

1 Mackenzie or Nel-Tech, whatever the appropriate
2 equipment is.
3 But there is no, you know, interactive
4 management kind of system that I think really
5 speaks to your patent. So that's why I was
6 curious. That's why the letter was the letter. I
7 mean, are you guys seeing something that --
8 DAN WOOD: Well, yeah. Let me just say
9 two things in general to --
10 MIKE ZENDAN: All right.
11 DAN WOOD: -- lay the landscape here.
12 First of all, neither we nor you have to, you know,
13 have invented the wheel here. If it -- these are
14 often combination patents, and it's just whether or
15 not the devices perform the function.
16 MIKE ZENDAN: Uh-huh.
17 DAN WOOD: And, you know, the threshold
18 element for us is whether or not you have a system
19 that can remotely control message selection and
20 sequencing at one or more locations from a single
21 computer.
22 MIKE ZENDAN: I would say no. I mean,

**Page 7**

1 again, Dan, I mean I don't want to be short with
2 you because --
3 DAN WOOD: No, no, that's fine.
4 MIKE ZENDAN: -- we're both busy people.
5 But at the end of the day, I mean, if you're
6 telling me that Mackenzie or Nel-Tech or Premier
7 based on that, I would think that you would've gone
8 to them first. I mean, if they've got equipment,
9 then let me know if I'm infringing your patent
10 because I'm using their equipment because they have
11 that kind of technology. Other than that, I mean
12 we don't do anything special here with respect to
13 control. We don't control any of that stuff via
14 computer.
15 DAN WOOD: No, I didn't mean you being
16 the controller.
17 MIKE ZENDAN: Yeah.
18 DAN WOOD: I meant Brenda at the Des
19 Moines office can control the message selection at
20 her Duluth office through your system.
21 MIKE ZENDAN: She can tell us, hey, I
22 want a different message in Duluth, and then we go

**Page 8**

1 and we produce the message and we send it to her
2 so --
3 DAN WOOD: No, I mean --
4 MIKE ZENDAN: -- but not via a computer,
5 but I mean --
6 DAN WOOD: If there are ten messages
7 already in her device, whether it's a special box
8 or whether it's the computer, if she has ten
9 messages stored in Duluth and she wants the
10 Christmas message to start playing, she can get on
11 her computer in Des Moines and hit a few buttons
12 and lo and behold, through the magic of science --
13 MIKE ZENDAN: Yep.
14 DAN WOOD: -- the Christmas message will
15 start playing in Duluth at the time she commanded
16 it to play.
17 MIKE ZENDAN: Dan, I'm not aware of that
18 functionality. I mean, I've talked to our people,
19 and unless there's functionality like that that I'm
20 not aware of that Mackenzie or -- again, we haven't
21 gone to Mackenzie or Nel-Tech or anybody and asked
22 for anything special. We just buy it off the

**Page 9**

1 shelf, whatever they have.
2 DAN WOOD: Okay. Well, look, could you
3 do this then, Mike? I don't have one of your
4 systems. Could you give us something that outlines
5 exactly what it is, what the components are? And,
6 you know, if they're all bought from other people
7 that's --
8 MIKE ZENDAN: Yeah. I mean, Dan, I don't
9 know how we've gotten on your radar, and again I
10 want to be -- you know, I want to put a fork in
11 this as quickly as possible. Everything that we
12 get -- I mean, I would suspect that if Mackenzie
13 has a website and Nel-Tech has a website and
14 Premier has a website, that's what we buy. I mean,
15 that's what we buy from them.
16 And, you know, I'm not going to put
17 together some white paper that says, hey, look,
18 this is what we're buying from them. I mean, that
19 -- it's on their websites what we can buy. I mean,
20 that's what we buy. And we haven't commissioned
21 anything. I mean, we buy off the shelf. I think a
22 lot of competitors are out there probably with you

Pages 6 to 9

104f5460-0251-4934-b0e3-de1ca8bbe723

A2815

Transcription of Phone Call Between Mike Zendan and Dan Wood

**Page 10**

1 guys. I mean, they're in the same boat where we
2 just buy off the shelf.
3     Now, those systems, I can't tell you for
4 sure that everything that they offer, you know,
5 doesn't infringe your patent, but what you're
6 describing is nothing that we purchase from them.
7 I mean, I don't know of a system that we have out
8 in the field that has that kind of capability.
9     DAN WOOD: Well, that --
10     MIKE ZENDAN: I don't even know if they
11 offer it.
12     DAN WOOD: Well, that would be a
13 meaningful point, but that is what I'm operating
14 under, the premise that you have a system that
15 absolutely allows for that. And I have that on
16 pretty good authority, like I said, but I don't
17 have one so, you know, there (crosstalk).
18     MIKE ZENDAN: I think that's incorrect.
19 I mean, I guess I've got to just tell you. I mean,
20 that is simply incorrect that we have a system that
21 somehow as you describe it, and as I from my
22 understanding of the patent, let the client go to a

**Page 11**

1 computer and somehow miraculously interact with us
2 and select -- I mean, they've got a CD or a tape or
3 a hard drive unit that -- I mean, they would
4 control that CD, tape or hard drive unit according
5 to however Nel-Tech and Premier and Mackenzie
6 instruct you to operate that unit.
7     I mean, there's no computer that they can
8 go to that we maintain or interact or have software
9 with or do anything that allows them to interact
10 with that outside of, you know, the instructions
11 that Nel-Tech, Premier and Mackenzie would give
12 that client.
13     DAN WOOD: Okay. Well, we'll --
14     MIKE ZENDAN: That's why -- I guess
15 that's what I'm struggling with. I don't, you
16 know --
17     DAN WOOD: Well, and I'm struggling to
18 make our position clear.
19     MIKE ZENDAN: Yeah.
20     DAN WOOD: So let me make these two
21 points.
22     MIKE ZENDAN: Yeah.

**Page 12**

1     DAN WOOD: You understand that if you
2 purchased from let's say Nel-Tech --
3     MIKE ZENDAN: Yep.
4     DAN WOOD: -- a product that in fact
5 infringed on somebody's patent --
6     MIKE ZENDAN: Yep.
7     DAN WOOD: -- that the prohibition
8 against infringement goes to making, using, selling
9 or offering for sale.
10     MIKE ZENDAN: I understand, Dan.
11     DAN WOOD: Okay.
12     MIKE ZENDAN: But, I mean, when we buy
13 this stuff we get -- you know, we get indemnity
14 from the client. I mean, I'm not trying to
15 minimize -- look, if it's -- if there's bad action
16 happening, I want to know.
17     But I'm telling you from the standpoint
18 of being the technological expert, I'd be looking
19 to those guys first and asking them the question,
20 hey, are you selling it out there, and then, yeah,
21 well, you know, you get your injunction and you get
22 it stopped or you get some kind of royalty for the

**Page 13**

1 infringement.
2     DAN WOOD: Sure.
3     MIKE ZENDAN: But I mean I can't answer
4 your technical questions for you because we don't
5 manufacture the stuff and we haven't asked them to
6 manu -- I mean, we just buy off-the-shelf stuff so
7 that's what I'm struggling with.
8     DAN WOOD: I mean, I'm trying not to
9 particularly frame this in very technical terms.
10     MIKE ZENDAN: Right.
11     DAN WOOD: Again, that's why I brought up
12 this mythical Brenda --
13     MIKE ZENDAN: Right.
14     DAN WOOD: -- in mythical Des Moines, and
15 you're telling me right now that you don't believe
16 that Muzak vends a product where some director of
17 personnel or messages or advertising or any person
18 can sit in one office, go on his or her computer,
19 and send commands that will control the messages
20 played overhead or on hold at a site down the
21 road? You're telling me right now that Muzak does
22 not offer such a product?

Pages 10 to 13

104f5460-0251-4934-b0e3-de1ca8bbe723

A2816

Transcription of Phone Call Between Mike Zendan and Dan Wood

1　　　MIKE ZENDAN: With respect to overhead?
2　We're talking about the music, how they control
3　their music?
4　　　DAN WOOD: Either/or.
5　　　MIKE ZENDAN: Well, music, yeah, we have
6　a system where there probably is some control of
7　the music --
8　　　DAN WOOD: Well --
9　　　MIKE ZENDAN: -- on a satellite dish.
10　Yeah, absolutely, but not messaging and --
11　　　DAN WOOD: Well, music and messages and
12　message and music combined are indistinguishable.
13　　　MIKE ZENDAN: Uh-huh.
14　　　DAN WOOD: So that's not a distinction
15　that I'm honoring. Music or messages are the same
16　thing.
17　　　MIKE ZENDAN: Well, I mean, when you sent
18　this to me, we're focusing on on-hold. If you're
19　asking me that somehow your patent speaks -- I'll
20　look again at your patent. You're talking about
21　our music overhead now and controlling that
22　music --

Page 14

1　　　DAN WOOD: Yes.
2　　　MIKE ZENDAN: -- through remote, and you
3　believe your patent speaks on that?
4　　　DAN WOOD: Yes. I can --
5　　　MIKE ZENDAN: Well, I'll take at that.
6　　　DAN WOOD: I can even direct you to the
7　places or, you know, you can go without my
8　direction, but it specifically spells out overhead,
9　on-hold, and other things. It's too cumbersome for
10　even me to read, you know, unless it comes up.
11　　　MIKE ZENDAN: Uh-huh.
12　　　DAN WOOD: I'm just -- I'm trying to scan
13　right now, but yes, overhead music is
14　indistinguishable for purposes of this patent from
15　music lists, content, voice messages on-hold over
16　the telephone is --
17　　　MIKE ZENDAN: Well, wait a minute. But
18　you're saying this has nothing to do -- I mean,
19　because I've been focusing on on-hold because
20　that's how your letters were -- I thought they were
21　focusing on on-hold.
22　　　You're telling me that you want us to

Page 15

1　basically look at our technology from the
2　standpoint of our music on -- not music on hold,
3　not on-hold messages, but with respect to music
4　that you would hear in a store basically, any one
5　of our clients --
6　　　DAN WOOD: Yes.
7　　　MIKE ZENDAN: -- that somehow your patent
8　-- and you're telling me that your patent speaks on
9　that?
10　　　DAN WOOD: If Chicago is
11　controlling the overhead music in Detroit by using
12　a computer in Chicago to make the selections and
13　the sequence, then I say, yes, read our patent in
14　that light.
15　　　MIKE ZENDAN: Selection and -- all right.
16　But selection and sequence of what?
17　　　DAN WOOD: Of the music. You can lay out
18　-- you know, play these four songs in this order
19　starting on the 11th at 8:00 a.m.
20　　　MIKE ZENDAN: No. No, our stuff doesn't
21　do that.
22　　　DAN WOOD: Well, what is it that you

Page 16

1　thought a minute ago that --
2　　　MIKE ZENDAN: You can change your
3　program.
4　　　DAN WOOD: Yeah, on command by remote
5　(crosstalk).
6　　　MIKE ZENDAN: You change your whole --
7　yeah, your whole -- you think it speaks of changing
8　your whole -- if I'm playing -- you know, we have
9　-- you know, if you're partnered with XM you know
10　how satellite radio or our service works. You've
11　got --
12　　　DAN WOOD: Something --
13　　　MIKE ZENDAN: -- 60 or 70 -- you know, 60
14　or 70 programs, right, that you can typically pick
15　from.
16　　　DAN WOOD: Uh-huh.
17　　　MIKE ZENDAN: There are some clients who
18　can say, you know, I want a different program. You
19　know, I want -- instead of listening to, you know,
20　we call it FM-1 and it's like a hot hits kind of
21　program or something you'd hear on the radio -- I
22　want to listen to classical.

Page 17

Pages 14 to 17

104f5460-0251-4934-b0e3-de1ca8bbe723

A2817

Transcription of Phone Call Between Mike Zendan and Dan Wood

| Page 18 | Page 20 |
|---|---|
| 1     DAN WOOD: Well -- <br> 2     MIKE ZENDAN: Now, you can't pick the <br> 3 song, but you basically say, hey, it's like turning <br> 4 the dial on your -- you know, it's like turning the <br> 5 dial on your radio. <br> 6     DAN WOOD: All right. This is coming <br> 7 back to me now. It was my impression that <br> 8 messages, on-hold telephone messages, are recorded <br> 9 dry in this system, and background music is stored <br> 10 as well, and they are married by command, but that <br> 11 there are on-hold voice messages for the telephone <br> 12 encompassed in the device that I was made aware of. <br> 13 You're flatly refuting that? <br> 14     MIKE ZENDAN: You know what, Dan? I'm <br> 15 not following you. I apologize. But I will look <br> 16 at the patent, but you're now -- because we've gone <br> 17 a couple directions. First we were talking about <br> 18 on-hold. <br> 19     DAN WOOD: Right. <br> 20     MIKE ZENDAN: Now -- then we were talking <br> 21 about music. <br> 22     DAN WOOD: That's right. | 1     MIKE ZENDAN: I mean, I guess we'd love <br> 2 to have it, but I don't think the clients would buy <br> 3 it. I mean, the reason why clients come to us -- I <br> 4 mean, I don't know how big your business is, but -- <br> 5 however big, you can tell me or you can don't tell <br> 6 me, but, you know, our clients typically come to us <br> 7 because they don't -- you know, there's a certain <br> 8 amount of interactivity that I think any client <br> 9 might like. But at the end of the day they're <br> 10 running their businesses so they don't necessarily <br> 11 always want to pick the song. <br> 12     I mean, they pick a genre. You know, <br> 13 when they're telling us to make a message for us -- <br> 14 for them, you know, and when they go to our website <br> 15 and they say, look, I want the message to say, hey, <br> 16 you know, we have -- we've got, you know, something <br> 17 on special today, two for 99 cents, and I'd like to <br> 18 -- you know, for that particular message when you <br> 19 send me the disk, you know, put it on a bed that is <br> 20 jazzy -- <br> 21     DAN WOOD: Sure. <br> 22     MIKE ZENDAN: -- or classical or this or |

| Page 19 | Page 21 |
|---|---|
| 1     MIKE ZENDAN: And now what are you <br> 2 talking about? <br> 3     DAN WOOD: Now I'm having a recollection. <br> 4     MIKE ZENDAN: Okay. You have a <br> 5 recollection. You can help me out then. <br> 6     DAN WOOD: The recollection is that -- <br> 7     MIKE ZENDAN: Uh-huh. <br> 8     DAN WOOD: -- we're back to on-hold. <br> 9     MIKE ZENDAN: We're back to on-hold. <br> 10     DAN WOOD: Yep. And that on-hold <br> 11 messages with voice content alone are recorded and <br> 12 stored in Duluth, and there is also music stored in <br> 13 Duluth, and you can get on your computer in <br> 14 De Moines and choose the on-hold message sequence <br> 15 you want and the music that will back it up. <br> 16     MIKE ZENDAN: No. I mean, I'd love to <br> 17 have that capability but, you know -- <br> 18     DAN WOOD: Well, we do it. <br> 19     MIKE ZENDAN: Well, to tell you the <br> 20 truth -- <br> 21     DAN WOOD: You'd love to have it <br> 22 (indiscernible). | 1 that. But, you know, they don't sit there and <br> 2 choose any kind of -- I mean, we don't give them <br> 3 the -- you know, that's our job. We always say <br> 4 that that's what you pay us for is that we're the <br> 5 music experts and, you know, we help you pick <br> 6 genres or appropriate music or whatever like that. <br> 7 So I mean we've never seen it as a huge market. <br> 8     DAN WOOD: Well, then what do they do the <br> 9 day after the two-for-99 sale? <br> 10     MIKE ZENDAN: Well, they contact -- I <br> 11 mean, usually we do it on a quarterly rotation. I <br> 12 mean, you can go to our website and you can look, <br> 13 but most -- I think most of our standard clients <br> 14 are on a quarterly rotation. So you -- the next <br> 15 quarter you tell us something different. <br> 16     DAN WOOD: But they're stuck with the two <br> 17 hot dogs for 99 cents for three months? <br> 18     MIKE ZENDAN: Well, I mean for a standard <br> 19 quarterly rotation. If you want to go something <br> 20 more often, we're going to charge you a lot more <br> 21 money. I mean, you could do it every day if you <br> 22 wanted to, but we're going to charge you. |

Pages 18 to 21

104f5460-0251-4934-b0e3-de1ca8bbe723

A2818

Transcription of Phone Call Between Mike Zendan and Dan Wood

1  DAN WOOD: Do they have control over
2  playing that message on Monday but getting it out
3  of the sequence on Tuesday?
4  MIKE ZENDAN: No. I mean, we would have
5  to send them a new disk, or unless a Nel-Tech --
6  unless any of those devices you can press don't
7  play the message. I guess you could probably, you
8  know, still have music on hold and either, you
9  know, decommission your playback device by pressing
10  stop or, you know, taking the tape out or the CD
11  out or something.
12  DAN WOOD: Well, here's -- you know,
13  we're at a minor impasse right here right now.
14  Here's what I'm going to have to do is trace back
15  on where I got this information.
16  MIKE ZENDAN: Yeah, absolutely because I,
17  you know --
18  DAN WOOD: Either confirm it or --
19  MIKE ZENDAN: Yeah.
20  DAN WOOD: -- or get it refuted.
21  MIKE ZENDAN: Yeah.
22  DAN WOOD: And if I confirm it, I'll

Page 22

1  MIKE ZENDAN: Yeah, I understand. So I
2  guess we're in good company, Dan, so you guys are
3  going to be some really wealthy people if you can
4  enforce that one. I'll take a look at it but, you
5  know, we're -- there's a lot of people in that same
6  boat, so you will have basically associated
7  yourself with an unbelievably successful company.
8  DAN WOOD: Oh, you're just trying to make
9  me salivate all over the place.
10  MIKE ZENDAN: I mean, I'm sure you're
11  already -- that's why I got the letter in the first
12  place. You guys probably think that you've got
13  something here, but I will look at it from a music
14  -- it just would stun me that you've got that --
15  something that broad that says that I can't -- you
16  know, my clients can't change the channel of their
17  music without paying you a guys royalty. And if
18  that's true, like I say, I'll be in good company
19  with a lot of other people.
20  DAN WOOD: There you go. Well, you know,
21  there is the element of the computers and so on.
22  It's not just reaching out with a long arm and

Page 24

1  bring many more particulars to your attention.
2  MIKE ZENDAN: Yeah, absolutely.
3  DAN WOOD: But I'm pretty much -- and the
4  other side of that is to go back and review the
5  language in the patent regarding overhead messages
6  or music. That music and messages are
7  indistinguishable. I don't think we (crosstalk).
8  MIKE ZENDAN: That would be a wild kind
9  of thing. I mean, that's -- I mean, that would be
10  a hell of a broad patent that, I mean --
11  DAN WOOD: Well, it would, and that's
12  what (crosstalk).
13  MIKE ZENDAN: That's a pretty -- and I
14  think there's a lot of obviousness because it's
15  almost like changing -- I mean, you'd be changing
16  the channel. You're basically changing a channel.
17  I mean, it would be like a radio. You change the
18  channel, and I mean Echo Star, you can change your
19  channel. DirecTV, you can change your channel. I
20  mean, anybody, you know, XM who you're partnered
21  with, Sirius, everybody can change your channel.
22  DAN WOOD: -- 1995, Mike.

Page 23

1  turning the dial.
2  MIKE ZENDAN: Uh-huh.
3  DAN WOOD: But anyway, let's each perform
4  our agreed function here and --
5  MIKE ZENDAN: So you'll get back to me
6  with some more particulars about what you --
7  DAN WOOD: I will.
8  MIKE ZENDAN: -- what you think you heard
9  from someone --
10  DAN WOOD: Including if I find out that I
11  was fed a bill of goods.
12  MIKE ZENDAN: Okay.
13  DAN WOOD: Even if that's the case, I'll
14  get back to you and let you know that. And you'll
15  look at this thing in the light of overhead music.
16  MIKE ZENDAN: The music thing, yeah. All
17  right.
18  DAN WOOD: Thanks for getting back to me.
19  I enjoyed this, and we'll talk soon.
20  MIKE ZENDAN: Sounds good, Dan. Bye-bye.
21  DAN WOOD: Okay, bye.
22  (End of recording)

Page 25

Pages 22 to 25

104f5460-0251-4934-b0e3-de1ca8bbe723

A2819

Transcription of Phone Call Between Mike Zendan and Dan Wood

```
                                                    Page 26
1                    CERTIFICATION

2

3        I, Ilene Watson, do hereby certify that

4   the foregoing is a correct transcript from the

5   electronic sound recording provided for

6   transcription and prepared to the best of my

7   professional skills and ability.

8

9

10

11

12

13   ___Ilene Watson___          September 13, 2012

14   Ilene Watson

15   AAERT Cert. No. 447

16   Certified Court Transcriptionist

17

18

19

20

21

22
```

0074643d-b852-418e-ae28-527726d16b4a

**CONFIDENTIAL MATERIAL REMOVED
SUBJECT TO PROTECTIVE ORDER**

# Pages A2821-A2867

MORRISON | FOERSTER

2000 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20006-1888

TELEPHONE:202.887.1500
FACSIMILE:202.887.0763

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

NORTHERN VIRGINIA, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

May 9, 2011

Writer's Direct Contact
202.887.1525
JCorrado@mofo.com

Via Overnight Delivery and E-Mail danw@infohold.com

Daniel J. Wood, Esq.
General Counsel
Info-Hold, Inc.
4120 Airport Road
Cincinnati, Ohio 45226

Re: Settlement and Patent License Agreement dated September 18, 2009 by and between Info-Hold., Inc., Trusonic, Inc. and Mood Media Corporation (f/k/a Fluid Music Canada, Inc.)

Dear Dan:

In response to your message of May 3, 2011 to L. Elfenbein, Section 3.2.1 of the Settlement and Patent License Agreement, dated September 18, 2009 between Info-Hold and Trusonic, provides that royalty payment obligations under Section 3.1 of that Agreement "shall be terminated" as of the date that every "independent claim of the Info-Hold Patent asserted in the Pending Litigation is determined to be invalid or unenforceable" by any government body having competent jurisdiction and authority, including the United States Patent Trademark Office, "and from that date forward, no further Quarterly Review and Royalty Statements or royalty payments will be due."

On March 29, 2011 the Examiner in charge of the reexamination of the '374 Patent in Reexamination Control No 90/009,671 issued a Notice of Intent to Reissue Reexamination Certificate. This notice indicates that independent claim 1 of that patent has been canceled and replaced by new and different claim 37, and that the remaining independent claims 7, 17, 22, 26, 28, 30 and 32-34 have all been amended. Under the rules of the Patent and Trademark Office, as of the date of the Notice of Intent to Issue Reexamination Certificate, Info-Hold irrevocably surrendered all of the independent claims of the '374 patent asserted in the original litigation and as they stood when the Settlement and Patent License Agreement was executed. All of the independent claims of the '374 patent asserted in the original litigation and as they stood when the Settlement and Patent License Agreement was executed are now unenforceable since they no longer exist in the '374 patent.

dc-641434

A2878

MORRISON | FOERSTER

Daniel J. Wood
Info-Hold, Inc.
May 9, 2011
Page Two

Accordingly, Mood Media's payment obligations under section 3.1 of the Settlement and
Patent License Agreement terminated as of March 29, 2011, the date of the decision of the
PTO declaring that all of the independent claims of the '374 patent as they existed prior to the
reexamination are no longer enforceable, having been replaced by amended claims.

If you have any questions about the foregoing, please feel free to address your questions to
the undersigned.

Sincerely,

John P. Corrado

cc:     James Lanthier, Mood Media Corporation
        Barry E. Bretschneider, Morrison & Foerster LLP
        Charles W. Katz, Morrison & Foerster LLP

dc-641434

SALE-PARTICIPANTS-ONLY

Case: 1:11-cv-00283-TSB-KLL Doc #: 96-7 Filed: 12/13/12 Page: 1 of 10  PAGEID #: 2109

# Exhibit I

**Monica Thatcher**

| | |
|---|---|
| From: | Dan Wood |
| Sent: | Wednesday, June 28, 2006 12:51 PM |
| To: | Monica Thatcher |
| Subject: | FW: Scanned document from Dan Wood |

-----Original Message-----
From: Dan Wood
Sent: Tuesday, June 27, 2006 12:39 PM
To: 'Mike Zendan'
Subject: RE: Scanned document from Dan Wood

Mike,

If that is so, it was not intentionally.  Please explain how, and where, I have done so and please let me know if you plan to have an opinion letter prepared.

Thanks,

Dan

-----Original Message-----
From: Mike Zendan [mailto:MikeZ@muzak.com]
Sent: Thursday, June 22, 2006 5:06 PM
To: Dan Wood
Subject: RE: Scanned document from Dan Wood

Dan,

You attached letter inaccurately portrays our conversations and response.

Mike

Michael F. Zendan II

1

IH008083 - Confidential

**A2884**

Vice President and General Counsel
mikez@muzak.com
www.muzak.com


-----Original Message-----
From: Dan Wood [mailto:DanW@INFOHOLD.com]
Sent: Thursday, June 22, 2006 4:51 PM
To: Mike Zendan
Subject: Scanned document from Dan Wood

pls review attached letter <<Exchange.pdf>>

2

IH008084 - Confidential



June 24, 2006

Mr. Michael F. Zendan II, Esq.
V.P. and General Counsel
Muzak LLC
3318 Lakemont Blvd.
Fort Mills, SC 29708

Dear Mike:

      I am writing again to follow up on our conversations and to inform you that I am obliged to provide a report to the president of Info-Hold on the matter of my contacts with Muzak, including Muzak's position regarding the '374 patent.

      During our last telephone conversation, you repeatedly stated that you would undertake a more thorough review of the patent, with consideration of applications beyond on-hold messaging. To date, I have not been apprised of the results of any such analysis, including whether or not such has even occurred. As was alluded to in our phone calls, these issues are too important, to both companies, to leave them to a cursory, or general analysis of such a broad patent containing both system and method claims.

      Similarly, sweeping statements of non-infringement and lack of awareness of certain "functionalities" fall short of being a good-faith response to legitimate concerns over Info-Hold's rights to its own intellectual property.

      Therefore, I am urging you to accomplish your promise to review Info-Hold's patent claims by obtaining an opinion letter from an intellectual property attorney. Info-Hold feels that nothing short of such a letter will satisfy legitimate concerns that each of us has, regarding the scope of the claims and the similarity to any products vended by Muzak.

      We have been in communication on this issue since the beginning of 2006. As I mentioned, Info-Hold has not yet received a specific response, in writing, to the concerns that precipitated this dialogue. Your response can be broad enough to encompass details about suppliers and possible indemnification from them, if you wish. More information is favored over less information.

IH008085 - Confidential

A2886

But, I am urging you to at least respond with an opinion letter and enough details to genuinely advance our discussions about where our two companies stand relative to Info-Hold's '374 patent.

Thank you for your attention to this matter. I look forward to your response.

Sincerely,

Daniel J. Wood, Esq.
Voice: 513.248.5600 X 111
Fax: 513.248.5608
E-mail: danw@infohold.com

IH008086 - Confidential

A2887

Case: 1:11-cv-00283-TSB-KLL Doc #: 96-7 Filed: 12/13/12 Page: 6 of 10 PAGEID #: 2114



**Info-Hold, Inc.**
**4120 Airport Road**
**Cincinnati, OH 45226**

**Date:**       2/21/06

**To:**          Michael F. Zendan II

**From:**      Monica I. Thatcher
               **Toll Free:**  (800) 373-8200 ext. 108
               **Phone:**     (513) 248-5600 ext. 108
               **Fax:**         (513) 248-5608

**Pages: cover +      2**

*Mike2 @ lawzak.com*

IH008087 - Confidential

**A2888**

```
***********************
  ACTIVITY REPORT (TX)
***********************
```

(SUN) JUN 13 1999 15:54

| DOCUMENT # | TIME SENT | DURATION | RECIPIENT ID | MODE | PAGES | RESULT | DP |
|---|---|---|---|---|---|---|---|
| 4865174-811 | 4. 13 14:32 | 1'04" | 913103209357 | ECM | 2 | OK | |
| 4865174-812 | 4. 13 15:14 | 41" | 915207494058 | ECM | 1 | OK | |
| 4865174-813 | 4. 18  8:52 | 1'57" | 919015977197 | ECM | 0 | 7A0504 | |
| 4865174-813 | 4. 18  8:58 | 1'13" | 919015977197 | ECM | 2 | OK | |
| 4865174-814 | 4. 19 15:51 | 46" | 912522934490 | ECM | 2 | OK | |
| 4865174-815 | 4. 19 15:54 | 50" | 912522934490 | ECM | 2 | OK | |
| 4865174-816 | 4. 20 12:12 | 1'50" | 913106451126 | ECM | 2 | OK | |
| 4865174-817 | 4. 20 13:08 | 33" | 912522934490 | ECM | 1 | OK | |
| 4865174-818 | 4. 25 11:26 | 1'06" | 916015454566 | G3 | 1 | OK | |
| 4865174-819 | 4. 25 12:47 | | 919494210115 | | 0 | BUSY | |
| 4865174-820 | 4. 25 13:01 | 1'16" | 916015454566 | G3 | 1 | OK | |
| 4865174-821 | 4. 25 13:38 | 26" | 917608373858 | ECM | 1 | OK | |
| 4865174-822 | 4. 26  9:55 | 40" | 912127410334 | ECM | 2 | OK | |
| 4865174-823 | 4. 27 10:32 | 10'55" | 915852661615 | ECM | 16 | OK | |
| 4865174-824 | 4. 28 11:22 | 47" | 919196442120 | ECM | 1 | OK | |
| 4865174-825 | 5.  1 16:22 | 27" | 917037417666 | ECM | 1 | OK | |
| 4865174-826 | 5.  2  8:34 | 26" | 917608373858 | ECM | 1 | OK | |
| 4865174-827 | 5.  2  9:51 | 22" | 99366915 | ECM | 1 | OK | |
| 4865174-828 | 5.  2 10:02 | 25" | 916783200250 | ECM | 1 | OK | |
| 4865174-829 | 5.  3 11:39 | 44" | 918437744353 | ECM | 2 | OK | |
| 4865174-830 | 5.  3 11:53 | 17" | 916186249973 | ECM | 1 | OK | |
| 4865174-831 | 5.  4  9:14 | 10'25" | 96245152 | ECM | 12 | OK | |
| 4865174-832 | 5. 12 16:10 | 37" | 919196442120 | ECM | 1 | OK | |
| 4865174-833 | 5. 15 12:54 | 33" | 917137968291 | ECM | 1 | OK | |
| 4865174-834 | 5. 16  9:57 | 42" | 912127410334 | ECM | 2 | OK | |
| 4865174-835 | 5. 16 10:08 | 57" | 916096415901 | ECM | 2 | OK | |
| 4865174-836 | 5. 16 11:06 | 3'00" | 917169418520 | ECM | 7 | OK | |
| 4865174-838 | 5. 16 12:03 | 1'15" | 99366915 | ECM | 4 | OK | |
| 4865174-837 | 5. 16 12:05 | 1'13" | 99366915 | ECM | 4 | OK | |
| 4865174-839 | 5. 16 13:35 | | 9:8888192317 | | 0 | BUSY | |
| 4865174-840 | 5. 16 13:42 | 1'06" | 9:8668192317 | ECM | 3 | OK | |
| 4865174-841 | 5. 16 13:52 | 1'06" | 918668192317 | ECM | 3 | OK | |
| 4865174-842 | 5. 17 13:32 | 37" | 96723408 | ECM | 1 | OK | |
| 4865174-843 | 5. 17 13:39 | 19" | 97359310 | ECM | 2 | OK | |
| 4865174-844 | 5. 17 13:41 | 1'10" | 918654284483 | ECM | 2 | OK | |
| 4865174-851 | 5. 18 10:26 | 31" | 917608373858 | ECM | 1 | OK | |
| 4865174-846 | 5. 23 11:02 | 1'05" | 919195980388 | ECM | 3 | OK | |
| 4865174-847 | 5. 25 17:03 | 5'08" | 913035267368 | ECM | 30 | OK | |
| 4865174-848 | 5. 30 11:03 | 52" | 918772004319 | ECM | 3 | OK | |
| 4865174-849 | 5. 31  8:51 | 26" | 912168964036 | ECM | 1 | OK | |
| 4865174-850 | 5. 31 13:35 | 1'20" | 912604812717 | ECM | 1 | OK | |
| 4865174-851 | 6.  1 10:36 | 18" | 913125736250 | ECM | 1 | OK | |
| 4865174-852 | 6.  1 17:42 | 4'08" | 918054937792 | G3 | 13 | OK | |
| 4865174-853 | 6.  6  9:19 | 1'27" | 915624383632 | ECM | 4 | OK | |
| 4865174-854 | 6.  6 15:15 | 1'08" | 918668192317 | ECM | 3 | OK | |
| 4865174-855 | 6.  8 14:38 | 1'04" | 918773868688 | | 0 | B50100 | |
| 4865174-855 | 6.  8 14:44 | 5'00" | 918773868688 | ECM | 18 | OK | |
| 4865174-856 | 6.12 10:06 | 57" | 96245152 | ECM | 2 | OK | |
| 4865174-857 | 6.13  8:58 | 1'30" | 9:4:47780331 | ECM | 1 | OK | |
| 4865174-858 | 6.13 15:52 | 36" | 918033963264 | ECM | 3 | OK | |
| TOTAL | | 1H 15'15" | | | 169 | | |

IH008088 - Confidential



**info-hold**
*Creating Sound Solutions.*

FILE

February 21, 2006

**VIA FACSIMILE @ (803) 396-3264 AND REGULAR MAIL**
Mr. Michael F. Zendan II
Vice President and General Counsel
Muzak LLC
3318 Lakemont Blvd.
Fort Mill, SC 29708

RE:     **Response to Info-Hold Inquiry**

Dear Greg: *MIKE*

I appreciate the timely response to my initial contact with Muzak LLC. I further appreciate having been directed to the appropriate contact person. This will expedite communications between us.

While my original letter did, indeed, express an interest in possible mutual-marketing scenarios, it also contained language intended to "draw your attention" to an Info-Hold messaging device and the "U.S. Patent under which it is protected" as well the "similarities" between it and one of Muzak's products. By soliciting your "careful( ) review" of the materials I sent, I had intended to have you focus on whether any of your on-hold products might do what Info-Hold's patented Info-Link device does.

The brevity of your response, therefore, leaves open several important questions. At this time, I am unclear whether you, or other counsel, have reviewed the claims of the '374 Patent with an eye toward whether they read on any of your products. Or, whether your silence on that point was intended to indicate that such a requested review had been accomplished and that Muzak sees no possible legal issues with Info-Hold.

In light of the importance of these questions, to both companies, I am requesting that if you have caused a detailed analysis of the '374 patent to be done, and see no potential issues, that you so inform me directly and explicitly. If no such analysis has, to date, been undertaken, I specifically request that you do so.

If nothing else, the ability to control message selection at remote locations via computer, is a similarity between the referenced devices that Info-Hold feels deserves closer scrutiny.

**corporate office/studio**
**4120 airport road • cincinnati, oh 45226**
**tel: 888.infohold    fax: 513.248.5609    e-mail: moh@infohold.com    net: www.infohold.com**

IH008089 - Confidential



**info-hold**
*Creating Sound Solutions.*

   I would be happy to communicate with anyone who would be a part of such an analysis and offer my full cooperation and assistance should it be requested.

   Thank you for your attention to this matter. I look forward to hearing from you.

Sincerely,

Daniel J. Wood, Esq.


DJW/mit

cc:    JCH
       MCM
       File

corporate office/studio
4120 airport road • cincinnati, oh 45226
tel: 888.infohold    fax: 513.248.5609    e-mail: moh@infohold.com    net: www.infohold.com

IH008090 - Confidential

02-20-'06 10:05  FROM-MUZAK - EXECUTIVE    8033963264        T-223  P002/002 F-636

Michael F. Zendan II
Vice President and General Counsel



**m u z a k**

3318 Lakemont Blvd.

Fort Mill, SC 29708

803 396.3267 Tel

803 396.3264 Fax

803 524.6106 Cell

www.muzak.com

VIA FACSIMILE AND FIRST CLASS MAIL

February 20, 2006

Daniel J. Wood, Esq.
Info-Hold, Inc.
4120 Airport Road
Cincinnati, OH  45226

RE:    Your Undated Letters to Greg Rayburn and Muzak LLC's CEO

Dear Daniel:

Muzak LLC is in receipt of the above referenced letters.   Please direct all future correspondence or inquiries to me.

Muzak LLC currently utilizes equipment and technology from on-hold pioneers and industry leaders such as Mackenzie, Premier, and Neltech, and we have not seen a need to expand our offerings.  Should this change, we shall definitely keep your patented system in mind.

Sincerely yours,



Michael F. Zendan II

Cc:    Greg Rayburn

IH008091 - Confidential

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC., | Civil Action No.  1:11-cv-283 |
|        Plaintiff, | |
| v. | Judge Timothy S. Black |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
|        Defendants. | |

**PLAINTIFF, INFO-HOLD, INC.'S RESPONSE IN OPPOSITION TO MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS MUZAK HOLDINGS LLC AND MUZAK LLC FOR PARTIAL SUMMARY JUDGMENT ON INFO-HOLD'S CLAIMS OF INDUCEMENT OF INFRINGEMENT AGAINST MUZAK HOLDINGS LLC AND MUZAK LLC AND DISMISSING MUZAK HOLDINGS LLC FROM THE CASE**

This Memorandum in Opposition will separately address the inducement issues of Muzak Holdings LLC and Muzak LLC in separate sections.  Section I will address Muzak Holdings LLC and Section II will address Muzak LLC.  The footnotes are consecutive through the two Sections.

**SECTION I: INDUCEMENT BY MUZAK HOLDINGS LLC**

*Argument*

35 U.S. Sec. 271(b) provides that "whoever actively induces infringement of a patent shall be liable as an infringer."

Patent infringement is a tort.  Infringement of a system claim is a matter of strict liability.  Infringement of a method claim requires that all steps in the method be performed.[1] A party may be liable for inducing infringement if it is aware of the patent, and either (*a*)

---

[1] See *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011).

performs some of the steps and induces another party to perform the remaining steps or (*b*) induces other parties collectively to perform all of the claimed steps.[2] Thus, induced infringement of a patent can be found even if there is no single party who would be liable for direct infringement. Inducement also covers a broad range of activities.

> "[I]nducement does not require that the induced party be an agent of the inducer or be acting under the inducer's direction or control to such an extent that the act of the induced party can be attributed to the inducer as a direct infringer. It is enough that the inducer "cause[s], urge[s], encourage[s], or aid[s]" the infringing conduct and that the induced conduct is carried out. *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 n.13 (Fed. Cir. 2011); *see also Tegal Corp. v. Tokyo Electron Co*., 248 F.3d 1376, 1379 (Fed. Cir. 2001); *Nat'l Presto Indus., Inc. v. West Bend Co*., 76 F.3d 1185, 1196 (Fed. Cir. 1996) (analogizing inducement to aiding and abetting violations of criminal laws)."[3]

### Inducement Begins With Knowledge of the '374 Patent

This Court has been presented with repeated references to a telephone call between Daniel J. Wood and Michael Zendan, then General Counsel for Muzak and an officer of <u>both</u> Muzak LLC and Muzak Holdings LLC, which took place in June of 2006. Neither party in this case denies that the '374 patent was discussed during that call. However else that call and its content might impact other issues in this case, it is beyond dispute that Muzak Holdings LLC cannot deny specific, actual knowledge of the '374 patent after that date.

Muzak Holdings LLC, ("Holdings") claims that it cannot be liable for inducing infringement because it makes nothing, sells nothing, does nothing, and, therefore, induces nothing. While one *might* conjure up the angels on the head-of-a-pin riddle, one *actually* ponders how many employees it takes to perform Muzak Holdings' professed function, i.e., to do nothing. But because Holdings actually lists certain key employees on web pages

---

[2] See *Akamai Tech., Inc., v Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012).
[3] *Id* at 1308.

to identify any evidence that could possibly show Muzak Holdings had actual knowledge of any infringing acts."

All of the above are *indicia* of Muzak Holdings playing a significant role in providing customers, whether theirs or Muzak LLC's, with products that infringe the '374 patent. Holdings' activities were, and are, specifically designed to result in customers using Muzak on-hold and overhead music and messaging products for their intended purposes.

And, as noted, the U.S. Court of Appeals for the Federal Circuit has eliminated the requirement that, for inducing method infringement, all steps must be performed by a single actor or vicariously.[11] Thus, a defense previously available to Muzak, i.e., that in addition to the method steps performed by Muzak, the end-user performed one key step (message selection and scheduling) in the performance of the method, is no longer recognized.

Based upon the above, a jury could easily find that Muzak Holdings LLC actively induced infringement of the '374 patent. If the facts are otherwise, Muzak has not proved it, as a matter of law, by its motion. Muzak Holdings LLC should not be dismissed from this case.

## II: INDUCEMENT BY MUZAK LLC

In its MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS MUZAK HOLDINGS LLC AND MUZAK LLC FOR PARTIAL SUMMARY JUDGMENT ON INFO-HOLD'S CLAIMS OF INDUCEMENT OF INFRINGEMENT AGAINST MUZAK HOLDINGS LLC AND MUZAK LLC AND DISMISSING MUZAK HOLDINGS LLC FROM THE CASE, ("Memorandum")

---

[11] See *Akamai,* supra

Muzak LLC ("Muzak") asserts that "Info-Hold has adduced no evidence that could possibly support" a claim of inducement of infringement against Muzak LLC.[12]

That is a perplexing statement given what Muzak does. Muzak is the largest on-hold and overhead music and messaging company in the country. It actively and successfully markets remotely programmable messaging systems to customers throughout the United States. And it receives money in exchange for providing products that do what Info-Hold's '374 patent discloses. Its customer base is broad and impressive. (See Ex. G). It is also perplexing in light of the broad range of conduct that can establish inducement.

> "[I]nducement does not require that the induced party be an agent of the inducer or be acting under the inducer's direction or control to such an extent that the act of the induced party can be attributed to the inducer as a direct infringer. It is enough that the inducer "cause[s], urge[s], encourage[s], or aid[s]" the infringing conduct and that the induced conduct is carried out. [13]

Simply stated, Muzak has induced infringement of the '374 patent by providing the means for its customers to directly infringe the patent-in-suit and by performing, in conjunction with its customers, certain steps of Info-Hold's method claims.

*The Systems*

Muzak provides its on-hold and overhead music and messaging customers with message playback devices (the LE2 and the MV) that are capable of "playing selected ones" of messages previously stored on a "storage device" contained in the Muzak system. Muzak also provides its customers with the ability to control music

---

[12] Memorandum pg. 2 of 16
[13] *Akamai Tech. Inc., at* 1308 (Fed. Cir. 2012) (internal citations omitted).

Case: 14-1167 Case: 14-1167 CASE PARTICIPANTS ONLY Document: 32-45 Document: 47 Page: 32 Page: 245 Filed: 06/20/2014 Filed: 06/20/2014

Case: 1:11-cv-00283-TSB-KLL Doc #: 101 Filed: 12/27/12 Page: 9 of 14 PAGEID #: 2419

and message selections remotely from an end-user's computer. Through its marketing and licensing activities, Muzak enables its customers in practicing the claims of the '374 patent without authority to do so and "aids" them in their infringement by installing the systems and peripheral apparatus such as speakers,[14] through which the remotely programmed messages are heard by shoppers.

In short, Muzak markets a complete remotely programmable on-hold and overhead music and messaging system that infringes the '374 patent.[15] By providing the infringing systems, Muzak "causes" its customers to directly infringe the '374 patent. "Whoever actively induces infringement of a patent shall be liable as an infringer." [16]

_Knowledge of the Patent_

Muzak has had actual knowledge of the '374 patent since at least 2006. In June of that year, Muzak was contacted by letter and telephone to discuss the patent and Muzak's then current products. During that call, Muzak's General Counsel, Michael Zendan, denied that Muzak's products infringed the '374 patent, a copy of which had been previously provided to him. Regardless of the accuracy of that denial, Muzak was indisputably aware of the patent at that time. A reflexive, defensive denial of infringement, by one who admittedly is not versed in patent law, is not equivalent to a well-reasoned conclusion of non-infringement based upon careful analysis by counsel skilled in the field. Info-Hold repeatedly urged that Mr. Zendan or someone from Muzak secure such an opinion. But Muzak has offered no evidence that such advice or letter was ever sought or received from outside counsel.

---

[14] See Exhibit H.
[15] See Exhibit I
[16] 35 U.S.C. Sec. 271(b).

Instead, with actual knowledge of Info-Hold's patent, Muzak LLC continued to market programmable on-hold and overhead music and messaging systems that performed the very functions claimed in the '374 patent.

But because, even to this date, Muzak has not provided working models of the devices accused in this case, Info-Hold cannot speak with expert certainty as to specific components of the accused devices. However, those questions are, by definition, questions of fact for a jury to decide after hearing expert testimony, and so are not the stuff of a summary judgment at this point in this case.

It is sufficient for purposes of, and under the standards of, summary judgment that Muzak's own statements and representations make clear that its accused products infringe under the doctrine of equivalents by performing "substantially the same functions in substantially the same way to obtain the same result" as disclosed in the '374 patent.[17] At the very least, Info-Hold, as the non-moving party, has demonstrated the existence of a question of a material fact, which precludes summary judgment. And with regard to method claims in the patent, Muzak actually aided and assisted its customers by performing some of the steps in the patented methods.

_The New Standard For Inducing Infringement of a Method Claim_

Under the _en banc_ ruling by the Court of Appeals for the Federal Circuit in _Akamai Technologies, Inc., v Limelight Networks, Inc_.,[18] the previous requirement that induced infringement of a method claim required that each and every step of the method be performed by a single entity or agent has been eliminated. The new standard requires only that each step be performed.

---

[17] _Graver Tank Mfg., Co., v. Linde Air Products,_ 339 U.S. 605 (1950) at 608.
[18] 692 F.3d. 1301 at 1308 (Fed. Cir. 2012) (internal citations omitted).

> "That standard requires that the accused inducer [ ] knew of the asserted patents and performed or induced the performance of the steps of the claimed methods, and that all of those steps were in fact performed."[19]

Muzak spends a lot of money to advertise its on-hold and in-store music and messaging systems.  It does so to solicit customers to acquire and use the devices and systems accused and identified here.  By using the accused devices, Muzak's customers directly infringe the '374 patent.  Muzak receives recurring revenues from the infringing customers.  This is persuasive, if not dispositive, evidence that customers are continually using Muzak's products for their intended purpose.

Given the flurry of recent motion filings and the similarity of certain issues and points of law, Info-Hold will rest, here, on the simple but glaring point that Muzak LLC is the largest vendor of on-hold and overhead music and messaging systems in the country.  Layer after layer of advertisements, publications, news releases and flyers only guild the lily.   Muzak LLC markets, distributes, and services systems that practice the claims of the patent-in-suit without authority to do so.  In exchange, Muzak receives annual, recurring revenues.  That's the business it's in. That's what it does.

_Conclusion_

In light of the law and exhibits presented here, Info-Hold has met its burden, as the non-moving party.

In evaluating a motion for summary judgment, the Court must construe all facts and draw all justifiable inferences in favor of and draw all justifiable inferences

---

[19] Travel Sentry, Inc. v. Tropp, 2012 U.S. App. LEXIS 22691 at *26 (Fed. Cir. Nov. 5, 2012).

Case: 1:11-cv-00283-TSB-KLL Doc #: 101-7 Filed: 12/27/12 Page: 1 of 3  PAGEID #: 2455

# EXHIBIT G

World Music/list of clients we have installed audio/video equipment for        http://www.wmcmuzak.com/full_clients_list.html

Contact Us
800.492.4589
LATEST NEWS





ABOUT US | WHAT WE DO | OUR WORK | OUR PARTNERS | OUR CLIENTS

Client List | Testimonials

| Banks | Restaurants | Retail Continued |
|---|---|---|
| Boiling Springs Savings Bank | IHOP | ULTA |
| PNC Bank | Burger King | Aveda |
| Capital One | Friendly's | Bottle King |
| HSBC Bank | Wendy's | J. Crew |
| Mariner's Bank | Chipotle Restaurants | Saks Fifth Ave |
| Provident Bank | Cheeseburger in Paradise | Sears |
| TDBank | Qdoba | Sleepy's |
| Coldwell Banker | Applebees Restaurants | Sunglass Hut |
| | Texas Road House | T-Mobile |
| Country Clubs | KFC | Crate & Barrel |
| Alpine Country Club | Quiznos | CVS |
| Haworth Country Club | Bonefish Grill | LeGourmet Chef / Kitchen Collection |
| Brooklake Country Club | Bugaboo Creek Family Restaurants | Wine King Liquors |
| Bear Brook Country Club | Charlie Brown's Restaurants | |
| Baltusrol Country Club | Taco Bell | Supermarkets |
| | Outback Steakhouse | Supremo Supermarkets |
| Hotels | Carraba's | Shoprite Supermarkets |
| Courtyard by Marriott | Boston Market | Wakefern Food Corp |
| Clinton Inn Hotel | Sbarro | Quick Chek Food Stores |
| Wyndham Garden Hotel | Burger King | |
| Holiday Inn | Krispy Kreme | Other Clients |
| Sheraton Hotel | Mood Lounge | City of Clarkstown, NY Municipal buildings and Courtrooms |
| Hard Rock Hotel | | Beach Bum Tanning |
| The Ritz Carlton | Retail | City of Newark JFK and Ironbound Recreation Center |
| Crowne Plaza | Vitamin Shoppes | NJPAC |
| Marriott | Aeropostale | Montclair State University Football Stadium |
| Residence Inn by Marriott | Lord and Taylor | Hollywood Tans |
| Fairfield Inns and Suites | Gary's Wine and Marketplace | St. Pius X Church |
| | Barnes and Noble | East Orange General Hospital |
| Property Management | PETsMart | |
| Promenade Shops at Clifton (Briad Group) | Bed Bath and Beyond | |
| Alfred Sanzari Comp | Men's Warehouse | |
| Hekemian Corp Properties | Staples | |

About Us | What We Do | Our Partners | Our Clients | Contact Us | Work at Muzak
© 2012 World Music Corporation · Hours: M-F 8:30-4:30 | P. 800.492.4589 | Designed By: The Kraus Group

1 of 1                                                  12/27/2012 10:38 AM

IH013107

World Music/ NJ provider of drive-thru, video & sound systems for business          http://www.wmcmuzak.com/what_we_do.html

Contact Us
800.492.4589
LATEST NEWS





ABOUT US | WHAT WE DO | OUR WORK | OUR PARTNERS | OUR CLIENTS



**Muzak Services**

Commercial Free Music
The power of music is undeniable. We will help you create a memorable experience with music expertly tailored to your brand. Muzak, for over 75 years is the leading provider of business music. Shouldn't we be your music provider?

Voice
Whether you have one location or 1,000, your business has a brand voice all its own. With professionally produced on-hold and in-store messages that speak directly to your customers, Muzak will ensure that your voice is heard.

Sample 1

Sample 2

Sample 3

Sample 4

Digital Signage Broadcasting
Digital Signage is a versatile, engaging and dynamic new way to reach and entertain your customers using branded content or commercial television packages.

Choosing Muzak provides numerous advantages:
• Professionally skilled and certified employees adhering to strict quality assurance policies.
• A support team at Muzak to provide help with your account.
• Most service calls responded to within 24 hours.

About Us  |  What We Do  |  Our Partners  |  Our Clients  |  Contact Us  |  Work at Muzak
© 2012 World Music Corporation  |  Hours: M-F 8:30-4:30  |  P. 800.492.4589  |  Designed By: The Kraus Group

1 of 1                                                                                                12/27/2012 10:36 AM

IH013108

A3230

# EXHIBIT H

Case: 1:11-cv-00283-TSB-KLL Doc #: 101-8 Filed: 12/27/12 Page: 2 of 2  PAGEID #: 2459



**MUZAK LLC**
3318 LAKEMONT BOULEVARD
FORT MILL, SC 29708
PHONE#: (800)331-3340/ (803)396-1649

muzak

| INVOICE (R) : 698294 | | | |
|---|---|---|---|
| COMP | ACCOUNT# | INV-DATE | INV-AMOUNT |
| 100 | 727576 | 10/12/12 | |
| REMIT AMOUNT: | | | |
| **DUE:** 11/11/12 | | **TERMS:** NET 30 DAYS | |
| **LATE FEE OF:** | | 1.500%/MONTH | |

ACCOUNTS PAYABLE
ROYAL FARMS CORPORATE
3611 ROLAND AVENUE
BALTIMORE, MD 21211

RECEIVED

NOV 14 2012

Remit To: Muzak - National
PO Box 601968
Charlotte, NC 28260-1968

DETACH AND REMIT THIS PORTION WITH PAYMENT
KEEP THIS PORTION FOR YOUR RECORDS

FROM: MUZAK LLC  3318 LAKEMONT BLVD  FORT MILL, SC 29708
SITE: 730489 ROYAL FARMS #114, 10722 GEORGETOWN ROAD, LAUREL, DE 19956
SHIP: 730489 ROYAL FARMS, 10722 GEORGETOWN ROAD, LAUREL, DE 19956

| ACCT# | INVOICE | INV-DATE | ORDERED | COMPLETE | PO/REFER. | | SHIPTO | REP. | INV-TYPE | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 727576 | 698294 | 10/12/12 | 08/24/12 | 10/02/12 | STORE #114 | vivianl | 730489 | 1346 | UPGRADE | 1 |

| LINE | SC | DESCRIPTION | TAX% | QTY | UNIT | EXTENDED |
|---|---|---|---|---|---|---|
| 1. | 5212 | SOUND SYSTEM INSTALLATION | .0000 | 1 | | |
| 2. | 8651 | CABLES,CONNECTORS & HARDWARE | .0000 | 1 | | |
| 3. | 5212 | ENCOMPASS LE2 INSTALLATION | .0000 | 1 | | |
| 4. | 5212 | NATL. ACCT. LIFT RENTAL | .0000 | 1 | | |
| 5. | 8660 | ENG.FEE | .0000 | 1 | | |
| 6. | 8651 | CA-525T-W KLIPSCH 5" SURF MT SPRK | .0000 | 5 | | |
| 7. | 8651 | SM-82T-W ATLAS OUTDOOR SPRK | .0000 | 4 | | |
| 8. | 8651 | FAP-42T ATLAS REC SPRK | .0000 | 3 | | |
| 9. | 8651 | FAP42TR ATLAS TRIM RING | .0000 | 2 | | |
| 10. | 8651 | MUDMA2060 PASO 60 WATT DIG AMP | .0000 | 1 | | |
| 11. | 8651 | MUDMA3120 120 WATT PASO AMP | .0000 | 1 | | |
| 12. | 8651 | 25LVC 24 WATT LOWEL VC | .0000 | 1 | | |
| 13. | 8651 | 100LVC 100 WATT LOWEL VC | .0000 | 2 | | |
| 14. | 8651 | WME 150-592 ATLAS WALL MT LOCK SHLF | .0000 | 1 | | |
| 15. | 8655 | NATIONAL EQUIPMENT FREIGHT | .0000 | 1 | | |

Job completed
Thanks

IH013078

A3232

# EXHIBIT I

Case: 1:11-cv-00283-TSB-KLL Doc #: 101-9 Filed: 12/27/12 Page: 2 of 4 PAGEID #: 2461



# ENCOMPASS **LE2**

## MUZAK ENCOMPASS SOLUTIONS

The Encompass LE2 is Muzak's satellite based delivery device. Music and messaging content is delivered over Muzak's robust satellite infrastructure, providing your business the reliability of satellite with the flexibility of Online Control.

## DELIVERY

Satellite delivery offers broad programming access and maximum speed, via satellite dish. Content updates are instantly available, allowing your business the highest degree of convenience when it comes to playing and managing your music and messaging.

## CONTENT

With the Encompass LE2, enjoy maximum access to more than 70 music programs or narrow them down to just the programming you want to have available to play in your business. Or speak to us about one-of-a-kind custom music for your business. And for your messaging needs, the Encompass LE2 can deliver custom or pre-produced in-store and on-hold messages.

## FEATURES

+ Easy to read front panel LCD displays artist name and song title
+ Receive instant updates to your music around the clock
+ Stormy weather? Integrated rain fade feature ensures 100% uptime
+ Create multiple zones of music throughout your space (additional device required per zone)
+ Complement your music experience with in-store messages designed for your brand
+ Music and messaging on one device (1 Zone of messages in-store or on-hold)

## ENCOMPASS LE CONTROL SITE FEATURES

+ Change your music program selection instantly online
+ Schedule various music programs to play at different times of day
+ Upload and schedule in-store or on-hold messages
+ Multiple business locations? Create groups of devices at multiple locations by business type, region, promotions or whatever criteria is important to you
+ See "What's Playing Now," including current song and most recent playlist

## SUPPORT

For helpful customer assistance call Muzak at 800 331.3340.



800.331.3340 // WWW.MUZAK.COM

REV 04.02.11
**MUZ 005002**

Case: 1:11-cv-00283-TSB-KLL Doc #: 101-9 Filed: 12/27/12 Page: 3 of 4  PAGEID #: 2462

# Encompass MV



## Muzak Encompass Solutions℠

The Encompass MV is Muzak's premier Internet based music and messaging delivery device. Powerful yet intuitive, the Encompass MV weighs just 11.2 ounces and is small enough to fit in the palm of your hand. So get ready to enjoy the highest quality music and messaging experience Muzak has to offer!

## Delivery

The Encompass MV requires a simple broadband connection to receive updates to your music and messaging programs. No more waiting – just plug your unit in and it will begin your program automatically. Updating your content? The MV will check Muzak's servers each day for fresh content designed to meet your business needs – so your music and messaging are always up to date.

## Content

From purely one-of-a-kind custom music playlists to Core programming to Muzak's new suite of genre-based programming called Styles, the Encompass MV can bring you everything Muzak has to offer for your music and messaging needs.

## Setup

Setting up your MV should take less than 10 minutes of your time as long as your other audio components are functioning properly. The simple instruction sheet will clearly guide you through the plug and play process. Should you need assistance, the MV support team is just a phone call away. In the unlikely event that you need additional service, Muzak's nationwide network of skilled technicians are on-call to handle any problem, big or small.

## Features

+ Allows for two zones of music and messaging integration.
+ Easy-to-read front panel LCD displays artist name and song title.
+ Flexible, reliable solid-state flash memory storage.
+ Can store up to 500 hours of content.
+ Ability to add and remove songs from the playlist.
+ Time sensitive, efficient content updates.
+ 12 month Manufacturer's Warranty on parts and labor.
+ Encompass MV Control Site allows you to schedule your music and/or messages. *Note: Scheduling options depend on your setup and content.*

## Support

For helpful customer assistance call Muzak Central Product Support at 800 329.1179

 800 331.3340  //  WWW.MUZAK.COM

LOC REV 08 17 10
**MUZ 005116**

Case: 1:11-cv-00283-TSB-KLL Doc #: 101-9 Filed: 12/27/12 Page: 4 of 4 PAGEID #: 2463

# Encompass MV



Front



Back

## Environmental Operation Conditions & Physical Specifications

| | |
|---|---|
| Use | Indoor |
| Altitude | -975' to 9,900' |
| Temperature Range | 5°C to 70°C |
| Relative Humidity | 8 to 90% non-condensing |
| Weight (Without Power Supply) | 11.2 ounces |
| Dimensions (W x D x H) | 4.90" x 3.25" x 1.75" (including rubber standoffs) |
| Power (Supply Voltage) | Input: 90-230 VAC, 50/60 Hz  Output: 12 VDC @ 2 amps |
| Power Consumption | < 25 watts |
| Impedance | 10K ohm |
| Supported Connector Types | 2 RCA outputs: 1 S/PDIF coaxial RCA output, 1 S/PDIF optical fiber TOSLINK output |
| Signal Level | 0.5 to 1V |
| Device Approval | FCC Class A |
| Power Supply Approvals | FCC, UL, CSA, VDE |

## Network Distribution Specifications

| | |
|---|---|
| Stored File Size | <1MB per minute of audio |
| Update Frequency | Monthly, Bimonthly or Quarterly, depending upon program rotation |
| File Type | Encrypted, MPEG-1, Layer II |
| File System | Proprietary |
| File Transfer | Pull methodology via public Internet; Push methodology via corporate WAN |
| Protocols | FTP & HTTP |
| Store & Forward Ports | File transfer occurs via port 2000 for Push applications and port 25000 for Pull applications |
| Diagnostic Ports | Remote diagnostics may be performed via port 80 |
| Network Interface | 10/100 Base-T |

 muzak  800 331.3340 // WWW.MUZAK.COM

LSC REV 08 17 10
MUZ 005117

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC., | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendants. | |

## RESPONSE BY PLAINTIFF, INFO-HOLD, INC. TO MUZAK'S PROPOSED UNDISPUTED FACTS AND STATEMENT OF DISPUTED ISSUES OF MATERIAL FACT

Pursuant to the STANDING ORDER GOVERNING CIVIL MOTIONS FOR SUMMARY JUDGMENT, for Judge Black, United States District Judge for the Southern District of Ohio, Western Division, Plaintiff, Info-Hold, Inc., presents its Response to Proposed of Undisputed Facts and Statement of Disputed Issues of Material Fact in this case as part of its Response in Opposition to Motion of Defendants Muzak Holdings LLC and Muzak LLC for Partial Summary Judgment Limiting Damages to Those Accrued After May 3, 2011.

**SECTION A**

Responses to Proposed Undisputed Facts:

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Info-Hold has produced bates-numbered documents responsive to Muzak's request for evidence of marking.[1]

8. Admitted.

9. Admitted. The date of the picture does not establish when the marked, photographed device was in service.

10. Admitted.

11. Admitted.

12. Admitted. Info-Hold's relationship with SMI is not relevant to this case.

13. Admitted. This "undisputed fact" is in fact nothing more than the text of a discovery request.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted. As to the cited letters only.

21. Admitted.

22. Admitted. But not dispositive as to infringement. That statement, if true, only speaks to the "make…" element of infringement.[2]

---

[1] See Ex. B to Plaintiff's Response in Opposition Doc.#96.
[2] See 35 U.S.C. §271(a).

23. Denied. Muzak's own footnote 23 reference is a quote of Mr. Mason's recollection of "products previous to 2006." That is not an admission regarding any time or any products after some unspecified time in 2004 or 2005.

24-25. Admitted. But the cited correspondence was prior to the Wood-Zendan telephone call. So they do not establish the extent of notice given to Muzak.

26. Admitted. The "detailed analysis" and the "similarities" referenced in 24, above, speak to Muzak's products and the '374 patent.

27. Admitted. At that time, Info-Hold had not yet filed this action. And 18 months after filing, Muzak had still not provided Info-Hold with working models of the products accused in the lawsuit.

28. Admitted.

29. Admitted.

30. Admitted. Muzak's own citations make the point that Mr. Zendan questioned Info-Hold's "basis" for the letters, the call, and the pointed discussions about Muzak's products, as compared to the '374 patent, and that he specifically denied infringing the patent and asserted that Muzak was indemnified, by third-party manufacturers against infringement liability. Muzak cites all of this while asserting, at the same time, that Muzak never received notice of infringement. Muzak would have the Court believe that Mr. Zendan offered multiple denials and putative defenses for an issue that was never raised, i.e., infringement of the '374 patent.

31. Denied. As noted, above, Muzak systems were not available to Info-Hold other than by deceit or deception on Info-Hold's part. Mr. Wood had visited a Muzak

customer's office and seen the customer operate the system.[3]  Mr. Wood requested

the Mr. Zendan more closely examine Muzak's overhead music and messaging

system in light of the '374 patent (which had been provided to him), as opposed to

offering reflexive denials of infringement.  Mr. Wood promised to check the source

of his information (that Muzak's product infringed) in exchange for Mr. Zendan's

promise to review the "overhead music" (claims) of the '374 patent.  Out of concern

for the rights of the anonymous customer,[4] Mr. Wood did not disclose the basis for

his belief that, if Mr. Zendan or a qualified patent attorney examined the Muzak

system in light of the actual patent claims, he would realize that the '374 patent read

on the Encompass LE2 system.

32.     Denied.  Mr. Zendan's attention was repeatedly drawn to functions claimed in

the '374 patent and to how the Muzak system seemed to do what the '374 claimed

and what constitutes infringement.  The conversation was specific enough as to cause

Mr. Zendan to effectively admit infringement.  "You guys probably think that you've

got something here…something that broad that says I can't -- you know, my clients

can't change the channel of their music without paying you a (sic) guys royalty.  And

if that's true, like I say, I'll be in good company with a lot of other people."[5]  Mr.

Zendan repeatedly acknowledged the patent and certain claimed functions because

the issue was repeatedly raised.  --Dan Wood: "… and you're telling me right now

that you don't believe that Muzak vends a product where some director of …

advertising or any person can sit in one office, go on his or her computer, and send

---

[3] Transcript of Info-Hold, Inc. 30(b)(6) deposition. Pg. 23 Lines 5-13.
[4] Id.
[5] Transcript of Wood-Zendan Telephone Conversation. Doc# 96-2, Pg. 24 Lines 12-19. (Underscores added).

commands that will control the messages played overhead and/or on hold at a site down the road?  You're telling me right now that Muzak does not offer such a product?"  --Mike Zendan: "With respect to overhead?  We're talking about the music, how they control their music?"  --Dan Wood: "Either/or."  --Mike Zendan: "Well, music, yeah, <u>we have a system where there probably is some control of the music –</u> "  --Dan Wood: "Well-"  --Mike Zendan: -- on a satellite dish. <u>Yeah, absolutely,</u> but not messaging…." [6]  Moreover, Mr. Zendan claimed indemnity from third parties.  – Dan Wood: "[You understand] that the prohibition against infringement goes to making, using, selling, or offering for sale."  -- Mike Zendan: "I understand, Dan."  -- Dan Wood: "Okay."  -- Mike Zendan: "But, I mean when we buy this stuff we get – you know, we get indemnity from the client." [7]  That would be indemnity against exposure for infringement damages, which Muzak continues to claim was not brought up.

33.     Denied.  See #34 above.

34.     Denied.  See #34 above.

35.     Admitted.  The letter cited by Muzak, by its very language, focused on infringement; not merger, cooperation, joint venture, etc.

36.     Admitted.

37.      Admitted.  But Mr. Zendan deliberately did not explain how Mr. Wood had inaccurately represented the conversation, despite a specific request to do so. [8]

38.     Admitted.

39.     Admitted.

---

[6] *Id.* at Pg. 13 Lines 15-22; 14 Lines 1-16 (Underscores added).
[7] *Id.* at Pg. 12 Lines 7-14.  See also, Ln 18-19, "I'd be looking at those guys first…."
[8] See Ex. I to Plaintiff's Response in Opposition Doc.#96.

40.     Admitted.

41.     Admitted.

42.     Admitted.

43.     Admitted.

44.     Admitted.  Info-Hold was under no duty to do so.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

**<u>SECTION B</u>**

Statement of Disputed Issues of Material Fact:

I.      Whether Defendants Muzak received sufficient notice of infringement.

    a.  Did Muzak have actual knowledge of the '374 patent?

    b.  Did Mr. Wood raise the issue of infringement of the '374 patent in the
        telephone conversation between Wood and Zendan?

    c.  Did Michael Zendan admit infringement of the '374 patent?

II.     Whether Info-Hold sufficiently "marked" its products under the '374 patent.

III.    Whether the "Settlement and Patent License Agreement" between Info-Hold,
        Inc., Trusonic, Inc., and Mood Media Corporation automatically terminated,
        by operation of its terms, prior to May 3, 2011.

IV.     Whether any claim by Info-Hold for infringement damages prior to Muzak's

Chapter 11 Bankruptcy Proceedings was effectively discharged.

a.  Was Info-Hold a "known creditor?"

b.  Did Info-Hold receive adequate notice of the Chapter 11 proceedings and

of the deadline for filing a claim?

c.  (Post verdict of infringement) Are damages for willful infringement

dischargeable in Bankruptcy?

Respectfully submitted,

Dated: January 11, 2013          /s/ Daniel J. Wood
                                 Daniel J. Wood (0037632)
                                 4120 Airport Road
                                 Cincinnati, Ohio 45226
                                 Telephone: (513) 248-5600
                                 Facsimile: (513) 248-5609
                                 danw@infohold.com

                                 Counsel for Plaintiff
                                 Info-Hold, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK HOLDINGS LLC AND MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendants. | |

**MOTION OF DEFENDANTS MUZAK
HOLDINGS LLC AND MUZAK LLC FOR PARTIAL SUMMARY JUDGMENT THAT
PLAINTIFF INFO-HOLD IS NOT ENTITLED TO LOST PROFITS DAMAGES**

For the reasons stated in the accompanying Memorandum of Law and Statement of Undisputed Material Facts, filed concurrently herewith, and pursuant to Rule 56, FED. R. CIV. P., Defendants Muzak Holdings LLC and Muzak LLC (collectively, "Muzak") respectfully move this Court for an order granting partial summary judgment that Plaintiff Info-Hold, Inc., is not entitled to lost profits as a measure of damages against Muzak in this action.

Dated:  January 23, 2013

Respectfully submitted,

/s/ John F. Bennett
Kevin W. Kirsch (0081996)
John F. Bennett (0074506)
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:  (513) 929-3499
Facsimile:  (513) 929-0303
jkirsch@bakerlaw.com
jbennett@bakerlaw.com

Barry E. Bretschneider
John P. Corrado
Michael E. Anderson

601848363

**A3328**

**CONFIDENTIAL MATERIAL REMOVED
SUBJECT TO PROTECTIVE ORDER**

# Page A3630

Case: 14-1167 Case: 14-1167 PARTICIPANTS ONLY Document: 47 Document: 34-25 Page: 342 Filed: 06/20/2014 Filed: 06/20/2014

Case: 1:11-cv-00283-TSB-KLL Doc #: 160 Filed: 04/29/13 Page: 1 of 3  PAGEID #: 3397

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendant. | |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT
PLAINTIFF INFO-HOLD IS NOT ENTITLED TO REASONABLE ROYALTY
DAMAGES AND FOR DISMISSAL**

For the reasons stated in the accompanying Memorandum of Law and Statement of Undisputed Material Facts, and based on the Court's grant of Defendant Muzak LLC's ("Muzak") concurrently filed motion to exclude the testimony of Plaintiff Info-Hold, Inc.'s ("Info-Hold"), damages expert Robert L. White,[1] Muzak respectfully moves for partial summary judgment that Info-Hold cannot prove reasonable royalty damages.

Since the Court has already granted partial summary judgment that Info-Hold is not entitled to lost profits as a measure of damages in this action against Muzak and that Info-Hold is not entitled to injunctive relief, the Court should dismiss this action with prejudice on the basis that Info-Hold cannot prove it is entitled to any relief against Muzak in this action.

Dated:  April 29, 2013                    Respectfully submitted,

                                          /s/ Barry E. Bretschneider
                                          Kevin W. Kirsch (0081996)
                                          John Bennett (0074506)
                                          BAKER & HOSTETLER LLP
                                          312 Walnut Street, Suite 3200

---

[1]  Although the motion to exclude Mr. White's testimony is filed under seal pursuant to leave of Court granted in the Notation Order issued April 22, 2013, this motion is not filed under seal since it does not refer to Protected Information of either party.

602151539

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT THAT PLAINTIFF INFO-HOLD IS NOT ENTITLED TO
REASONABLE ROYALTY DAMAGES AND FOR DISMISSAL**

Based on the Court's grant of Defendant Muzak LLC's ("Muzak") concurrently filed motion to exclude the testimony of Plaintiff Info-Hold, Inc.'s ("Info-Hold"), damages expert Robert L. White[1] and the other undisputed facts developed in this motion, Muzak respectfully moves for partial summary judgment that Info-Hold cannot prove reasonable royalty damages.

Furthermore, since the Court has already granted partial summary judgment that Info-Hold is not entitled to lost profits as a measure of damages in this action against Muzak and that Info-Hold is not entitled to injunctive relief, the Court should dismiss this action with prejudice on the basis that Info-Hold cannot prove it is entitled to any relief against Muzak in this action.

**APPLICABLE LEGAL STANDARDS**

**A.      Summary Judgment Standards**

Summary judgment is proper under Rule 56 when the movant establishes there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See, e.g.*, FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "[T]he burden

---

[1]  Although the motion to exclude Mr. White's testimony is filed under seal pursuant to leave of Court granted in the Notation Order issued April 22, 2013, this motion is not filed under seal since it does not refer to Protected Information of either party.

the possible meaning of the statute."). See also, *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.* 897 F.2d 508, 509 (Fed. Cir. 1990) (affirming district court's decision not to award damages "because none were proven.").

Although the statute provides for the receipt of expert testimony in support of a reasonable royalty determination, it is not strictly necessary for the patentee to present expert testimony to prove reasonable royalty damages. *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370 (Fed. Cir. 2003). However, it is still necessary for the patentee to present evidence demonstrating the amount to be awarded. *Id.* at 1382.

## FACTUAL BACKGROUND

Since this motion is based on Info-Hold's inability to present evidence in support of its case, the statement of facts is necessarily brief and presupposes that the Court has excluded, in whole or material part, the testimony of Info-Hold's damages expert, Mr. White, as being unreliable and irrelevant under the standards set forth in *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 57, 589 (1993); and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), particularly in relying on the discredited "25 percent rule." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("This court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue.").

Beyond Mr. White, Info-Hold has no witness to present evidence on reasonable royalty damages. (UMF 1). In its initial disclosures under FED. R. CIV. P. 26(a)(1), served September 7, 2011, Info-Hold identified only two witnesses who were not connected with Muzak: Joey C. Hazenfield, Info-Hold's President/CEO, and Mark C. Mason of Info-Hold. (UMF 2). Mr. Hazenfield was disclosed as being knowledgeable on the subjects of "The development, marketing and business decisions pertaining to the Info-Hold product line; the conception, design, development and reduction to practice of the subject matter of the patent brought under

3

[sic] this suit." (UMF 3). Mr. Mason was disclosed as being knowledgeable on the subjects of "Features and functions of Defendants [sic] products and the impact on Info-Hold in the marketplace as a result of Defendants' offers for sale and sales of the Defendants' products and services." (UMF 4). The subjects on which Messrs. Hazenfield and Mason were disclosed to be knowledgeable do not include reasonable royalties. (UMF 5).

In its Rule 26(a)(1) disclosures, Info-Hold also stated in material part, "Info-Hold is unable to provide a computation of the damages that it is claiming as this computation is dependent upon information regarding the sales made by Defendants [sic] accused products, which information is solely in the possession of Defendant [sic]. … Pursuant to the provisions of Rule 26, Info-Hold will provide such a computation of damages when it obtains the information necessary to determine the damages it has suffered. Without waiving the above, Info-Hold's damages include, but are not limited to, the lost profits due to the Defendants [sic] sales of the infringing products." (UMF 6). Info-Hold has not in any way revised or supplemented its Rule 26(a)(1) disclosures. (UMF 7).

In its responses to Muzak's first set of interrogatories, served December 6, 2011, Info-Hold provided the following response to Interrogatory No. 6:

> 6. Identify the amount of damages You contend Info-Hold is entitled to and all legal and factual bases in support of Your contention, including identification of all Documents that You contend support such bases, and identification of all persons with knowledge of the facts set forth in Your answer to this interrogatory.
>
> **Response**: Plaintiff cannot answer this Interrogatory at this time due to uncertainty as to the extent to which Defendants' infringing acts have damaged it. However, Plaintiff asserts that [it] is eligible under the "Panduit" test and/or "Georgia Pacific" factors to receive damages based on lost profits, or in no event less than a reasonable royalty as compensation for infringement, as well as an enhanced damage award for Defendants' willful infringement.

(UMF 8). In its response to Interrogatory No. 1, which asked Info-Hold to identify "each individual who has knowledge of any of the matters or facts underlying the matters asserted in the claims, counterclaims and defenses in this case," Info-Hold identified Mr. Hazenfield, Mr.

Mason, James Dabbs and Daniel J. Wood, Esq., without disclosing the extent of their knowledge. (UMF 9).  In its response to Interrogatory No. 2, which asked Info-Hold to identify any person it had consulted to be or whom it expected to call at trial as an expert witness, Info-Hold disclosed only James Dabbs, whom it identified as being a technical expert.  (UMF 10).  Info-Hold has not in any way revised or supplemented its responses to Interrogatory Nos. 1, 2 and 6.  (UMF 11).

Info-Hold has not at any time presented any expert report on damages from any witness other than Robert L. White.  (UMF 12).  Furthermore, Info-Hold has not identified, or presented any disclosure pursuant to FED. R. CIV. P. 26(a)(2)(C) from, any other witness it may use at trial to present evidence of reasonable royalty damages under FED. R. EVID. 702, 703 or 705.  (UMF 13).

## ARGUMENT

### I.  INFO-HOLD HAS DISCLOSED NO WITNESS OTHER THAN THE EXCLUDED MR. WHITE WHO COULD PRESENT EVIDENCE TO SUPPORT ITS ENTITLEMENT TO REASONABLE ROYALTY DAMAGES

FED. R. CIV. P. 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The Sixth Circuit has repeatedly upheld a district court's decision to bar witness testimony under Rule 37(c)(1) for failure to disclose a witness under Rule 26(a), stating "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir.2003) (quoting *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)); *See also, Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (stating that Rule 37(c)'s "test [for the sanction of exclusion] is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.")

The Sixth Circuit has placed the burden on the party facing exclusion of its witness to prove that its failure to disclose the witness was harmless or substantially justified. *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d at 782. Furthermore, harmlessness "is key under Rule 37, not prejudice." *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003). This case does not present a situation where the failure to disclose was harmless. "[T]he advisory committee's note to Rule 37(c) 'strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" *Vaughn v. City of Lebanon*, 18 F. App'x 252, 264 (6th Cir. 2001).

There is no genuine dispute that, but for Mr. White, Info-Hold has disclosed no witness, expert or otherwise, to testify for it on the issue of reasonable royalty damages. If there were such a witness, Info-Hold's failure to disclose such a witness or to supplement its disclosures and discovery responses is hardly harmless, as reliance on such a witness at this late stage of the case, months after the close of discovery would be prejudicial to Muzak. Info-Hold has no justification for its failure to disclose and supplement, if there is such a witness.

## II. INFO-HOLD CANNOT PRESENT EVIDENCE OF THE "HYPOTHETICAL NEGOTIATION" THROUGH A PROPERLY DISCLOSED EXPERT WITNESS

Even if the Court finds that Info-Hold has properly disclosed witnesses it could call at trial to testify to reasonable royalty damages, the only witnesses disclosed by Info-Hold are not qualified to do so and have not submitted reports pursuant to FED. R. CIV. P. 26(a)(2)(C) as witnesses not required to submit reports under FED. R. CIV. P. 26(a)(2)(B) who are being called on to present evidence under FED. R. EVID. 702, 703 or 705. The reasonable royalty analysis is usually conducted based on a so-called hypothetical negotiation or the "willing licensor-willing licensee" approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. … The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not

6

occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme.  The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d 1301, 1324-25 (Fed. Cir. 2009).

If Info-Hold were to present Mr. Hazenfield, Mr. Mason or Mr. Wood, the only "non-experts" identified as witnesses by Info-Hold for any purpose, as a witness on reasonable royalty to testify as to the hypothetical negotiation, their testimony would be excluded under FED. R. CIV. P. 26(a)(2)(C) and FED. R. EVID. 702, 703 and 705.[2]  First, lay witnesses may only give opinions limited to ones that are "(a) rationally based on the witness's perception."  FED. R. EVID. 701(a).  Testimony as to how a "hypothetical," i.e., not actual, negotiation might proceed is not based on the perception of the witness of events within the personal knowledge of the witness.  Questions as to hypothetical circumstances are the types of questions that are classically propounded to experts.[3]

Second, presenting testimony on the hypothetical negotiation requires that the witness "reconstruct the market, a necessarily hypothetical exercise, to project economic results that did not actually occur." *Riles v. Shell Exploration & Prod. Co*., 298 F.3d 1302, 1311 (Fed. Cir. 2002).  Furthermore, "to prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."  *Id*.  Info-Hold's lay witnesses do not have the knowledge or expertise to provide such evidence based on personal knowledge.[4]

Consequently, even if the Court were to hold that one or more of Info-Hold's witnesses were properly disclosed as a trial witness on damages issues, that witness would not be able to

---

[2]  The only other identified witness, Mr. Dabbs, is a technical expert, not a damages expert.

[3]  Furthermore, it is questionable whether such testimony would be "helpful" to the trier of fact as required by FED. R. EVID. 701(b) and 702(a).

[4]  In particular, all of Info-Hold's identified witnesses are precluded by the default protective order in this case from access to the highly confidential, attorney eyes only Muzak documents necessary to present a damages case.

present testimony regarding reasonable royalty damages. There are no other even potential damages witnesses for Info-Hold to call at trial, leaving it with no admissible evidence on reasonable royalty damages. Since Info-Hold cannot present enough evidence to make out a *prima facie* case of reasonable royalty damages, Muzak should be granted summary judgment on the issue of reasonable royalty damages. *See*, e.g., *Apple, Inc. v. Motorola, Inc.*, 869 F.Supp.2d 901, 906 (N.D. Ill. 2012).

### III. BECAUSE INFO-HOLD IS NOT ENTITLED TO ANY RELIEF IN THIS ACTION AGAINST MUZAK, THE COURT SHOULD DISMISS THIS ACTION WITH PREJUDICE FOR FAILURE OF PROOF

The Court has already held in Dkt. No. 141 that Info-Hold is not entitled to its lost profits as a measure of damages in this action. With the grant of this motion, Info-Hold will be found not to be entitled to damages at all.[5] Info-Hold has conceded that it is not entitled to injunctive relief, and the Court has entered summary judgment accordingly. Dkt. Nos. 130, 139. As a result, Info-Hold is not entitled to any relief whatever against Muzak and can, indeed, to use the standard prayer from innumerable answers, take nothing from Muzak in this action. However, the questions of the validity of the '374 patent and its infringement by Muzak, raised in Info-Hold's complaint and pleaded as counterclaims in Muzak's answer, have not been finally adjudicated and remain before the Court for decision. The question remains, therefore, what to do about this case, since it is now "dead" except for issues of entitlement to attorney's fees and costs.

Muzak respectfully suggests that the proper resolution is to dismiss Info-Hold's complaint with prejudice. As pointed out by Judge Posner in *Apple v. Motorola*, the termination of a case for failure of proof does not render a case moot. 896 F.Supp.2d at 924. Instead, Info-Hold's predicament is the same as it would be if, after trial, the jury found that it had failed to prove damages and the Court determined that injunctive relief was not warranted on the merits

---

[5] Info-Hold has claimed no other measure of damages, such as the "restitution measured by the market value of an unauthorized use" posited by Judge Posner in *Apple, Inc. v. Motorola, Inc.*, 869 F.Supp.2d at 915-16.

considering the test for injunctive relief laid down in *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006). Under those circumstances, there is no question that the proper judgment would be dismissal of the complaint with prejudice. The same result should obtain here.

For purposes of entry of final judgment under FED. R. CIV. P. 54(a), Muzak would agree to the dismissal of its declaratory judgment counterclaims without prejudice in view of Info-Hold's failure of proof on its affirmative case against Muzak. Muzak reserves the right to file a motion for attorney's fees and costs under 35 U.S.C. § 285, 28 U.S.C. § 1927 and FED. R. CIV. P. 11, as appropriate.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment that Info-Hold is not entitled to reasonable royalty damages in this action. Furthermore, since the Court has already granted partial summary judgment that Info-Hold is not entitled to lost profits as a measure of damages or to injunctive relief, this action should be dismissed with prejudice for failure of proof that Info-Hold is entitled to any relief against Muzak.

Dated: April 29, 2013       Respectfully submitted,

/s/ Barry E. Bretschneider
Kevin W. Kirsch (0081996)
John Bennett (0074506)
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone: (513) 929-3499
Facsimile: (513) 929-0303
jkirsch@bakerlaw.com
jbennett@bakerlaw.com

Barry E. Bretschneider
Michael E. Anderson
Bridget S. Merritt
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW,
Suite 1100
Washington, DC 22036-5304
Telephone: (202) 861-1500

9

**A3786**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendant. | |

## DEFENDANT'S MOTION TO STRIKE THE
## EXPERT REPORTS OF ROBERT L. WHITE
## AND TO PRECLUDE MR. WHITE'S TESTIMONY

For the reasons stated in the accompanying Memorandum of Law, and based on the accompanying Declaration of Barry E. Bretschneider, Defendant Muzak LLC ("Muzak") moves to strike the expert reports and to preclude the testimony of Plaintiff Info-Hold, Inc.'s ("Info-Hold"), damages expert Robert L. White.[1]

Dated:  April 29, 2013            Respectfully submitted,

/s/ Barry E. Bretschneider
Kevin W. Kirsch (0081996)
John Bennett (0074506)
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:  (513) 929-3499
Facsimile:  (513) 929-0303
jkirsch@bakerlaw.com
jbennett@bakerlaw.com

Barry E. Bretschneider
Michael E. Anderson
Bridget S. Merritt

---

[1]  Although the accompanying memorandum of law and Declaration of Barry E. Bretschneider are filed under seal pursuant to leave of Court granted in the Notation Order issued April 22, 2013, this motion is not filed under seal since it does not refer to Protected Information of either party.

**CONFIDENTIAL MATERIAL REMOVED**
**SUBJECT TO PROTECTIVE ORDER**

# Pages Between A3823-A4887

assembled by Info-Hold in its opposition is a hodge-podge of attorney argument regarding what Info-Hold *might* present at trial and does not rise to the level of evidence from which a reasonable jury can make a damages award.  Info-Hold did not cite, let alone distinguish, *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.* 897 F.2d 508, 509 (Fed. Cir. 1990), in which the court affirmed a district court's decision not to award damages "because none were proven."  If the district court were required in all cases to award "some" damages, as Info-Hold argues, then the appellate court would have reversed *Gustafson*.  Info-Hold cannot prove any damages figure here, either.

## II. THE "EVIDENCE" CITED BY INFO-HOLD IS EITHER NOT IN THE RECORD OR IS NOT ADMISSIBLE AT TRIAL AS OFFERED

### A. Info-Hold Has Failed to Support its Opposition with Admissible Evidence

In its opposition, Info-Hold lists the "evidence" based on which it opposes Muzak's motion for summary judgment.  IH Br. at 4-7.  However, the cited evidence is either not in the record as required by FED. R. CIV. P. 56(c)(1) and/or is not presented in a form that is admissible in evidence at trial.  FED. R. CIV. P. 56(c)(2).  Info-Hold provides no declarations or other testimony to provide a foundation for the evidence Info-Hold offers.  In fact, Info-Hold admits to a certain degree of sandbagging in its opposition: "And while Info-Hold does not presently attempt to identify all of the evidence relevant to reasonable royalty damages that will ultimately be submitted at trial, there are numerous business documents of Muzak and Info-Hold indicating how the companies sold the accused products to their customers, the prices they obtained on the patented systems, etc."  IH Br. at 5.  This argument misses the point.  Muzak's motion for summary judgment is predicated on Info-Hold's lack of evidence under *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To avoid summary judgment, Info-Hold must make of record ***now***, not later at trial, the admissible evidence it has to show that there is a triable damages case for the Court (and jury) to consider.  Once again, as it did in opposing Muzak's motion for summary judgment of no lost profits damages, Info-Hold says it has evidence but does not actually provide it in admissible form.  *See*, Dkt. No. 141 at 4.

3

**A4927**

Furthermore, Info-Hold cannot rely on the provision of FED. R. EVID. 703 that permits experts to rely on facts or data that are not admissible to support their opinions since (a) Info-Hold would not be able to rely at trial on expert testimony as a way to get such inadmissible facts or data before the jury if Mr. White's reports are stricken, and (b) FED. R. EVID. 703 would permit Info-Hold to disclose such underlying facts or data to the jury "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Since there would be, by definition on this motion, no expert opinions for the jury to evaluate, Info-Hold has no basis for proffering evidence relied on by experts in this case without establishing its separate admissibility.  Without such evidence, Info-Hold has no reasonable royalty damages case to present to the jury.

For ease of consideration, Muzak will list the materials adduced by Info-Hold in bullet points and demonstrate why these materials are not admissible to create a triable damages issue:

- "[T]he documents relied upon by Mr. Paris and Mr. White in preparing their opinions even if neither testifies at trial."[3]  IH Br. at 4 – Info-Hold does not explain how this alleged evidence would get into the record at trial.  If Mr. White does not testify, as the Court will already have decided if it gets to this motion, Mr. Paris will not have to testify, either, so Info-Hold will have no witness to be the proponent offering Mr. White's or Mr. Paris' exhibits.  Info-Hold presents no declaration to show how these documents would be admitted at trial.  They are inadmissible under FED. R. EVID. 901(a) as not authenticated; in many cases under FED. R. EVID. 1006 as summaries for which the underlying documents have not been produced; and under FED. R. EVID. 802 as hearsay.

- White Exhibit 102, IH Br. at 5 – This exhibit purports to presents two Muzak documents, which Info-Hold seems to have found on its own since they were not produced by Muzak in discovery or they would bear Muzak Bates numbers.  Info-Hold has presented no declaration or other evidence to authenticate White Exhibit 102 or to establish the purpose for which White Exhibit 102 is offered; Info-Hold's brief fails to explain what fact of consequence to this action White Exhibit 102 makes more or less probable.  This

---

[3]  Info-Hold cites *Dow v. Mee*, *supra* at 1381-82, in support of this proposition, but a review of the cited pages reveals that the support for this proposition is the statement of the court that the district court on remand must *consider* the evidence supporting the excluded opinions of Dow's expert, Perc, who had testified at trial and the exclusion of whose testimony was reversed on appeal.  The court did not indicate what Perc's evidence might have been or give the district court any direction on how to evaluate that evidence.

4

exhibit is inadmissible under FED. R. EVID. 901(a) as not authenticated and as irrelevant under FED. R. EVID. 401 and 402.

- White Exhibits 103 and 104, IH Br. at 5 – Info-Hold presents no evidence to authenticate these unsworn charts or explain their relevance to the reasonable royalty determination.[4] As such, they are not part of the summary judgment record under FED. R. CIV. P. 56(c)(1) and are inadmissible under FED. R. EVID. 901(a) as not authenticated; under FED. R. EVID. 1006 as a summary for which the underlying documents have not been produced; and under FED. R. EVID. 802 as hearsay.

- White Exhibit 105c, IH Br. at 5 – This document purports to be a two-page excerpt of a website download of a Muzak Holdings LLC 10-K filing, the date of which is not indicated. Info-Hold has presented no declaration or other evidence to authenticate White Exhibit 105c or establish the purpose for which White Exhibit 105c is offered; Info-Hold's brief also fails to explain what fact of consequence to this action White Exhibit 105c makes more or less probable. This exhibit is inadmissible for lack of authentication under FED. R. EVID. 901(a), as irrelevant under FED. R. EVID. 401 and 402 and as hearsay under FED. R. EVID. 802 (since Muzak Holdings LLC is no longer a party to this action).

- White Exhibit 105d, IH Br. at 5 – This document is a Wegener press release, which Info-Hold seems to have found on its own. It was not produced in discovery, or it would bear a Muzak (or Wegener) Bates number. Info-Hold has presented no declaration or other evidence to authenticate White Exhibit 105d or establish the purpose for which White Exhibit 105d is offered; Info-Hold's brief also fails to explain what fact of consequence to this action White Exhibit 105d makes more or less probable. This exhibit is inadmissible for lack of authentication under FED. R. EVID. 901(a), as irrelevant under FED. R. EVID. 401 and 402 and as hearsay under FED. R. EVID. 802.

- White Exhibit 106, IH Br. at 5 – This document *appears* to be a Muzak invoice dated October 12, 2012, but it was not produced by Muzak in discovery, or it would bear a Muzak Bates number. Info-Hold has presented no declaration or other evidence to authenticate White Exhibit 106 or establish the purpose for which White Exhibit 106 is offered; Info-Hold's brief fails to explain what fact of consequence to this action White Exhibit 106 makes more or less probable. This exhibit is inadmissible for lack of authentication under FED. R. EVID. 901(a), as irrelevant under FED. R. EVID. 401 and 402 and as hearsay under FED. R. EVID. 802.

---

[4] If Mr. White's testimony is excluded, Info-Hold can lay no foundation for the admission of these exhibits.

- "Rebuttal Expert Report of David N. Paris and its Exhibits which are hereby collectively attached as Exhibit B," IH Br. at 5 – Info-Hold does not explain how it proposes to make Mr. Paris' report and exhibits admissible if Mr. Paris does not testify. Given that Info-Hold has moved to strike Mr. Paris' reports and exhibits as unreliable in "Plaintiff Info-Hold's Daubert Motion to Strike the Damages Expert Reports of David Paris Filed Under Seal," filed April 29, 2013, Info-Hold is trying to have its cake, and eat it, too.[5] In any event, Info-Hold has not presented any declaration or other evidence providing a foundation for these documents in the absence of testimony from Mr. Paris. These documents are not part of the summary judgment record under FED. R. CIV. P. 56(c)(1) and are inadmissible for lack of authentication under FED. R. EVID. 901(a), as irrelevant under FED. R. EVID. 401 and 402 and as hearsay under FED. R. EVID. 802.

- "Selected Muzak Financial Documents … collectively attached as Exhibit C," IH Br. at 5 – Info-Hold has again not provided a foundation for these documents under FED. R. EVID. 901(a). Its proffered explanation of their relevance, that "some of these documents establish that Muzak obtained 10% on sales of the accused devices made by its franchisees," is mere attorney argument without evidentiary support.

The documentary evidence relied on by Info-Hold is not admissible; Info-Hold has failed to make it properly of record by supporting its admissibility with declaration or other evidence. Thus, Info-Hold cannot use this documentary evidence to demonstrate genuine issues of material fact on its reasonable royalty damages case. FED. R. CIV. P. 56(c)(1) and (2). In the end, Info-Hold is relying on attorney argument, not evidence, to carry its burden of proof on reasonable royalty damages.

**B.    The Alleged Testimony of Mr. Hazenfield and Mr. Mason Is Not Properly In the Record on Summary Judgment**

At pages 5-7 of its brief, Info-Hold summarizes testimony it says Mr. Hazenfield and Mr. Mason "may" provide at trial on the issue of reasonable royalty damages. This alleged *potential* testimony is not sworn or presented in declaration form. When ruling on a motion for summary judgment, a court "may not consider unsworn statements." *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010) (unsworn expert report not made under penalty

---

[5] As noted above, Info-Hold cannot rely on the provision of FED. R. EVID. 703 that permits experts to rely on facts or data that are not admissible to support their opinions. Since Mr. White's testimony will have been excluded, Info-Hold would not be able to rely at trial on expert testimony as a way to get such inadmissible facts or data before the jury.

6

of perjury "cannot be considered on summary judgment"); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991) (unsworn affidavits could not establish genuine issues of material fact because "a court may not consider unsworn statements when ruling on a motion for summary judgment.").  In this case, however, the Court is not even presented with an unsworn *statement* from either witness, but instead is presented only with Info-Hold's counsel's summary of what each witness *might* say.  The Court may not consider Info-Hold's unsworn summary of the testimony Mr. Hazenfield and Mr. Mason *might* give on damages, as it is not "in the record" for purposes of FED. R. CIV. P. 56(c)(1).  Without that testimony, and without the inadmissible exhibits discussed above, Info-Hold has no damages case even under *Dow v. Mee*.

### C.    The Alleged Testimony of Mr. Hazenfield and Mr. Mason Raises Issues Which Info-Hold Did Not Properly Disclose in Discovery

Even if Info-Hold had presented sworn testimony from Mr. Hazenfield and Mr. Mason, Info-Hold cannot rely on their alleged testimony to defeat summary judgment.  As demonstrated by the undisputed facts presented by Muzak on this motion and Info-Hold's responses, there is no question that Info-Hold failed to disclose in discovery the alleged knowledge of Mr. Hazenfield and Mr. Mason to which they would testify in support of Info-Hold's damages case.

In its Initial Disclosures under FED. R. CIV. P. 26(a)(1)(C), Info-Hold stated that it "is unable to provide a computation of the damages that it is claiming as this calculation is dependent upon information regarding the sales made by Defendants['] accused products" and that, "[w]ithout waiving the above, Info-Hold's damages include, but are not limited to, the lost profits due to the Defendants['] sales of the infringing products."  SOF 6 and Info-Hold response thereto.  There is nothing in this disclosure to hint at a reasonable royalty damages theory supported by testimony from Mr. Hazenfield or Mr. Mason.  Info-Hold has never supplemented its Initial Disclosures on damages, except to the extent, Info-Hold alleges, Mr. White's expert reports might have provided additional disclosures.  SOF 7 and Info-Hold's response thereto.  However, Mr. White's reports do not refer to the alleged testimony from Mr. Hazenfield and Mr. Mason now proffered by Info-Hold.  *See*, Ex. 2 to I-H Br., *passim*.

On December 11, 2011, Info-Hold responded to Muzak's Interrogatory No. 6, inquiring as to the basis of its claim for damages, "Plaintiff cannot answer this Interrogatory at this time due to uncertainty as to the extent to which Defendants' infringing acts have damaged it. However, Plaintiff asserts that [it] is eligible under the 'Panduit' test and/or 'Georgia Pacific' factors to receive damages based on lost profits, or in no event less than a reasonable royalty as compensation for infringement, as well as an enhanced damage award for Defendants' willful infringement." SOF 8, admitted by Info-Hold. The interrogatory to which this answer responded requested the "identification of all persons with knowledge of the facts set forth in Your answer to this interrogatory," but Info-Hold did not identify any such persons.[6] *Id.* Info-Hold has never supplemented its interrogatory response on damages, except to the extent, Info-Hold alleges, Mr. White's expert reports have provided additional disclosures. SOF 11 and Info-Hold's response thereto.[7] Again, as noted above, Mr. White's reports do not refer to the alleged testimony from Mr. Hazenfield and Mr. Mason now proffered by Info-Hold.

Info-Hold's disclosures and discovery responses are so lacking in detail and obtuse that they amount to no disclosure at all of Info-Hold's current theory of damages, whatever it might be, or the relevance of the alleged testimony of Mr. Hazenfield and Mr. Mason to that damages theory.

Info-Hold's summary of the expected testimony of Mr. Hazenfield and Mr. Mason also begs the question of how Info-Hold proposes to tie that testimony to the determination of a

---

[6] Info-Hold **did** identify Mr. Hazenfield and Mr. Mason in response to Muzak's Interrogatory No. 2 as having knowledge relating to this case in general but did not state what the extent of that knowledge was. *See* SOF 9 and Info-Hold's response thereto (asserting that Info-Hold was under no duty to indicate the extent of the knowledge of the identified individuals).

[7] Info-Hold's statement in response to SOF 11 includes the following strange statement: "Info-Hold does not insinuate by this response that it will not further supplement its response to Interrogatory No. 2 by adding the name of Robert L. White and the subject of damages as captured by his reports on damages which have previously been produced to Muzak in compliance with Federal Rule of Evidence [sic, Civil Procedure] 26(a)(2)." Of course, such a supplementation would be far too late in view of the close of fact discovery on December 10, 2012. Furthermore, such a supplementation of the response to Interrogatory No. 2 would not add Mr. Hazenfield and Mr. Mason to the persons identified in response to Interrogatory No. 6 as having knowledge on damages issues.

8

reasonable royalty rate, which still "requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. American Maize-Products Co*., 185 F.3d 1341, 1350 (Fed. Cir. 1999). Info-Hold has not explained what royalty rate the proffered testimony supports or why. Info-Hold simply offers the testimony and implies that the jury, without any standards to guide them, will be able to come up with a reasonable royalty rate that satisfies the Federal Circuit's criteria for proper reasonable royalty damages determinations. Info-Hold has also not responded to Muzak's argument that the proffered testimony from Mr. Hazenfield and Mr. Mason would require them to express opinions which had to have been disclosed in reports under FED. R. CIV. P. 26(a)(2)(C), but were not. Dkt. No. 160-1 at 6-8. The alleged testimony of Mr. Hazenfield and Mr. Mason, even if it were in the record, is not admissible to create a genuine issue of material fact on Info-Hold's inability to prove any reasonable royalty damages at all.

Finally, Info-Hold argues at page 7 of its brief that the Hazenfield Assignment and Trusonic Agreement are somehow relevant to reasonable royalty damages at trial, overlooking its own expert's deposition testimony (as well as Mr. Paris' report) that neither is relevant to a reasonable royalty determination under the facts of this case. *See*, e.g., Memorandum in Support of Motion of Defendant Muzak LLC to Strike the Expert Reports of Robert L. White and to preclude Mr. White's Testimony, filed under seal April 29, 2013, at 10-11. Info-Hold also says that it "may additionally present evidence on damages through the cross examination of Muzak's witnesses," IH Br. at 7, but that assumes Info-Hold's damages case would survive a motion for judgment as a matter of law at the close of Info-Hold's case-in-chief and presumes that Muzak would even consider presenting such witnesses in its own case. Info-Hold cannot defeat summary judgment now by promising to submit evidence later in the case.

### D. Info-Hold's Statement of the Disputed Issues of Material Fact Defeats Its Own Opposition

The disputed issues of material fact identified by Info-Hold in its response to Muzak's statement of proposed undisputed material facts reveal the inadequacy of the evidence Info-Hold

proposes to present at trial to support its reasonable royalty case. Muzak does not refer below to the actual royalty rates and financial figures in Info-Hold's proposed disputed issues of fact in order to avoid having to file this reply under seal. However, detailed discussion of the actual numbers is not necessary to understand the flaws in Info-Hold's alleged disputed facts:

Disputed fact No. 1 relates to the range of royalty rates Info-Hold proposes to prove at trial. However, its opposition fails to explain how *any* of the alleged evidence proffered by Info-Hold, in the absence of Mr. White's testimony, proves such a range of rates or which rate within the proposed range the jury should adopt.

Disputed fact No. 2 relates to Muzak's alleged revenues on the accused devices. However, the revenue number Info-Hold proposes is based on Muzak AEO information and can be found only in Mr. White's inadmissible reports. Muzak's revenues are not a proper subject for testimony by Mr. Hazenfield or Mr. Mason anyway because they are precluded by the default protective order in place in this case from having access to such information. The same comments apply to disputed fact No. 3, which relates to whether the royalty rate should be applied to Muzak's alleged revenues on the accused devices.

Disputed fact No. 4 relates to the total reasonable royalty damages the jury should find. Again, neither Mr. Hazenfield nor Mr. Mason may have access to the information necessary to prove such a number, so their testimony could not be germane to the proof of such a number.[8]

The disputed issues of material fact Info-Hold's opposition proposes thus demonstrate the inadequacy of Info-Hold's opposition. Info-Hold has failed to explain how any of the evidence it says it would offer at trial in support of a reasonable royalty damages figure supports the facts it says are in dispute between the parties, even if that evidence were admissible, which it is not. Info-Hold's failure to present controverting evidence in admissible form dooms its opposition to

---

[8] Muzak also observes that if one applies the upper and lower limits of the reasonable royalty rate range proposed by Info-Hold in disputed fact No. 1 to the royalty base proposed by Info-Hold in disputed fact No. 3, the numbers one arrives at do not agree with the number set forth in disputed fact No. 4. Info-Hold seems to have made an error in arithmetic.

10

A4934

summary judgment. Info-Hold's opposition instead substitutes argument for evidence and guesswork for "sound economic proof."

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Muzak's original motion, the Court should grant partial summary judgment that Info-Hold is not entitled to reasonable royalty damages in this action. Furthermore, since the Court has already granted partial summary judgment that Info-Hold is not entitled to lost profits as a measure of damages or to injunctive relief, the Court should dismiss this action with prejudice for failure of proof that Info-Hold is entitled to any relief against Muzak.

Dated: June 6, 2013                 Respectfully submitted,

/s/ Barry E. Bretschneider
Kevin W. Kirsch (0081996)
John Bennett (0074506)
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone: (513) 929-3499
Facsimile: (513) 929-0303
kkirsch@bakerlaw.com
jbennett@bakerlaw.com

Barry E. Bretschneider
Michael E. Anderson
Bridget S. Merritt
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW,
Suite 1100
Washington, DC 22036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
bbretschneider@bakerlaw.com
meanderson@bakerlaw.com
bmerritt@bakerlaw.com

*Attorneys for Defendant Muzak LLC*

11

**A4935**

**CONFIDENTIAL MATERIAL REMOVED
SUBJECT TO PROTECTIVE ORDER**

# Pages A4946-A4948

*Apple* improperly rejected the holding of *Dow Chem. Co.* and improperly ignored the mandate of 35 U.S.C. § 284.[1] By relying on *Apple*, this Court entered an Order of partial summary judgment against Info-Hold, on the issue of reasonable royalty damages, which is in error under the Patent Act. The Court should reconsider its Order and deny Muzak's Motion.

### B. Muzak Identified a Purported Lack of Damages Witnesses as its Basis for Summary Judgment on the Issue of a Reasonable Royalty Rate but this Basis was Legally Insufficient

The Federal Rules of Civil Procedure authorize the entry of summary judgment upon a proper showing that there is a lack of a genuine, triable issue of material fact in a case. However, "the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' which it believes demonstrate the absence of a genuine issue of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323(1986). A party responding to a movant's motion for summary judgment may demonstrate that summary judgment is not proper by:

1. citing to parts of the record demonstrating that the facts are genuinely disputed (F.R.C.P. 56(c)(1)(A); <u>OR</u>

2. showing that the movant has not established the absence of a genuine dispute (F.R.C.P. 56(c)(1)(A). In other words, a motion for summary judgment can be defeated by citing to parts of

---

[1] Muzak has incorrectly argued that the holding of *Gustafson, Inc. v. Intersystems Industrial Products, Inc.*, 897 F.2d 508 (Fed. Cir. 1990) cannot be squared with *Dow Chem. Co.*'s mandate to award a reasonable royalty in all cases. The District Court's opinion which was being appealed in *Gustafson* dealt only with lost profits damages and the court's inability to consider the evidence related to lost profits. There is no indication in *Gustafson* that the Plaintiff had raised its entitlement to a reasonable royalty under 35 U.S.C. § 284 such that the issue could be decided by the Federal Circuit. *Gustafson, Inc.*, 897 F.2d at 509-510.

the record OR by demonstrating that the movant has not met its burden of demonstrating an absence of a genuine dispute.  As detailed below, Info-Hold has done both in this case.

In its Motion for Partial Summary Judgment, Muzak argued that Info-Hold did not have any witnesses which could opine on a reasonable royalty rate at trial and that it was therefore entitled to summary judgment.  Dkt. No. 160-1.  Specifically, Muzak asserted that: (1) Info-Hold has disclosed no witness other than the excluded Mr. White who could present evidence to support its entitlement to reasonable royalty damages; and (2) Info-Hold cannot present evidence of the "hypothetical negotiation" through a properly disclosed expert witness.  Dkt. No. 160-1 at pp. 5, 6.  In response to Muzak's Motion, Info-Hold argued that Muzak had not met its initial burden of  showing an absence of a genuine dispute on a reasonable royalty by arguing, *inter alia*, that 35 U.S.C. § 284 mandates a reasonable royalty  and because there is no legal obligation to provide expert testimony on damages.  Info-Hold also demonstrated that even if all of its witnesses were precluded from opining on damages, Info-Hold may introduce evidence of a reasonable royalty through the defendant's witnesses as well as through documents.  *See Dow Chem. Co.,* 341 F.3d at 1381(court should review documents of record to award reasonable royalty); *Versata Software, Inc. v. SAP Am., Inc.,* 2013 U.S. App. LEXIS 8838 (Fed. Cir. May 1, 2013) (upholding reasonable royalty award when only evidence pertaining to a reasonable royalty came from the Defendant's expert witness).  Info-Hold even cited to some of the documentary evidence existing in this case, which may be evaluated by the Court in making the reasonable royalty determination.  Info-Hold's response in opposition met the obligations of Federal Rule of Civil Procedure 56(c)(1)(B) by establishing that even if Muzak's assertions regarding Info-Hold's purported lack of damages witnesses were true, Muzak should not be

6

A4967

awarded summary judgment on the issue of damages because Muzak had not met its burden of establishing an absence of material fact regarding a reasonable royalty in this case.

Respectfully, it should not have been concluded that Muzak's Motion for Partial Summary Judgment imported an obligation on Info-Hold to "make of record now any admissible evidence it had to show that there is a triable damages case for the fact finder to consider." *See* Dkt. No. 204 at p. 12. Muzak's Motion for Partial Summary Judgment did not identify a lack of evidence pertaining to a reasonable royalty rate as its basis for summary judgment. *See* Dkt. No. 160-1. But, even if Muzak's Motion had identified such a basis, the law on summary judgment has never demanded that an opposing party come forward with all of the evidence in support of its position. Rather, all that is needed is enough evidence to demonstrate that the fact finder may be able to find in the opponent's favor on the issue in question. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. Moreover, Muzak's Motion cannot be said to have imposed an obligation on Info-Hold to come forward with any and all evidence pertaining to a reasonable royalty when *Muzak's argument did not allege that such evidence was lacking. See* Dkt. No. 160-1. Muzak's Motion alleged only that Info-Hold lacked damages witnesses – Info-Hold addressed those arguments and showed that even if true, Summary Judgment on the issue of a Reasonable Royalty should not be granted.

### C.     Info-Hold has Several Competent Damages Witnesses to Call at Trial

But, it is not true that Info-Hold does not have witnesses that may testify to a reasonable royalty rate at trial. In responding to Muzak's Motion, Info-Hold explained that even if its expert on damages, Robert White, had his report stricken and was precluded from testifying as an expert, there is a variety of evidence that may be evaluated by the Court pursuant to a *Georgia-Pacific* analysis in order to assess a reasonable royalty. The evidence cited to and discussed by

7

Info-Hold included the testimony of Mr. Hazenfield and Mr. Mason who were identified by Info-Hold pursuant to Federal Rule of Civil Procedure 26.   The Court rejected this argument stating:

> [i]f Plaintiff were to present Mr. Hazenfield, Mr. Mason, or Mr. Wood as witnesses on reasonable royalty damages to testify to a hypothetical negotiation, their testimony would be excluded under Fed. R. Civ. P. 26(a)(2)(C) and Fed. R. Evid. 702, 703, and 705.

Dkt. No. 204 at p. 11.  But, the provisions cited by the Court all relate to the admission of expert testimony.  Expert testimony is not required to establish damages in a patent case.  *See* 35 U.S.C. § 284.  Federal Rule of Evidence 701 pertains to opinion testimony by law witnesses.  Fed. R. Evid. 701.  The rule, titled Opinion Testimony by Lay Witnesses, provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Rule 701 permits lay testimony to be introduced to establish damages.  The committee notes to the 2000 amendment to Rule 701 explain:

> The amendment is not intended to affect the prototypical examples of the type of evidence contemplated by the adoption of Rule 701... For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.  *See, e.g., Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business).  Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed. R. Evid. 701 Committee Note (2000).  Pursuant to this rule, someone with the proper background – like the owner or CEO of a business – may qualify to give lay opinion testimony on a reasonable royalty rate.  *See Seitz v. Envirotech Sys. Worldwide Inc.*, 2008 U.S. Dist. LEXIS

8

17395 (S. D. Tex. Mar. 6, 2008)(finding that part of the job of a CEO is to stay abreast of market trends and competitors' products, which requires the study of market share reports and market research and accordingly finding that the CEO was qualified to provide lay opinion on a reasonable royalty rate). Mr. Hazenfield is the named inventor of the patent-in-suit and is also the President/CEO of Plaintiff Info-Hold. These facts were supplied by Plaintiff Info-Hold in its Rule 26 Initial Disclosures which were part of the summary judgment record. *See* Dkt. No. 160-3. Some of these facts were expanded upon by Info-Hold in the Declaration of Joey Hazenfield filed with the Court on April 29, 2013 in support of Info-Hold's Motion to Strike Dr. Paris (hereinafter the "Hazenfield Declaration"). Info-Hold's Initial Disclosures further described the subject of the information in Mr. Hazenfield's possession:

> The development, marketing and business decisions pertaining to the Info-Hold product line; The conception, design, development and reduction to practice of the subject matter of the patent brought under this suit.

*Id.* The listed subjects of information are precisely the type relied upon by the Court in *Seitz* in finding that a CEO was qualified to provide a lay opinion on a reasonable royalty rate. *See Seitz*, 2008 U.S. Dist. LEXIS 17395. The court in *Georgia-Pacific* similarly considered the testimony of the plaintiff's CEO admissible and relevant as to the reasonable royalty rate issue. The Court found it important that the CEO would have made the final decision concerning the hypothetical royalty to be negotiated with the Defendant. *Georgia-Pacific Corp.*, 318 F. Supp. At 1142. Muzak has deposed Mr. Hazenfield regarding his opinion on a reasonable royalty rate. His testimony on this issue can accordingly not be considered unexpected or prejudicial to Muzak. *See* Excerpts from the Deposition of Joey Hazenfield which were filed with the Court as Exhibit 7 to Info-Hold's Motion to Strike Dr. Paris which was filed under seal with the Court on April 29, 2013; *Murata Mfg. Co., Ltd v. Bel Fuse, Inc.*, No. 03 C 2934, 2008 WL 656045 *2-*3 (N.D.

9

A4970

Ill. Mar. 5, 2008); 8 C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure 2049.1,

p. 604 (2d ed. 1994) (There is no need as a matter of form to submit a supplemental disclosure to

include information already revealed by a witness in a deposition).  Respectfully, the Court's

decision to the extent it found that Info-Hold did not have witnesses to call at trial to testify to a

reasonable royalty is not supported by Info-Hold's disclosure of its president and CEO, Mr.

Hazenfield, and is inconsistent with Federal Rule of Evidence 701.  *See Id.*; *see also 405 Condo*

*Associates LLC v. Greenwich Insurance Co.*, 11 Civ. 9662 (S.D.N.Y. Dec. 24, 2012); *Carnegie*

*Mellon Univ. v. Marvell Tech. Group. Ltd.*, 2013 U.S. Dist. LEXIS 58331 (W.D. Pa. Apr. 24,

2013); *Lativafter Liquidating Trust v. Clear Channel Communs., Inc.*, 345 Fed. Appx. 46. (6th

Cir. 2008).

Similarly, Mark Mason is qualified as a lay witness who may opine on a reasonable

royalty rate in this case.  Mark was disclosed in Info-Hold's initial disclosures as having

information related to:

> Features and functions of Defendants products and services and the impact of
> Info-Hold in the marketplace as a result of Defendants' offers for sale and sales of
> the Defendants' products and services.

Mark is a long time employee of Info-Hold and is qualified to speak to things like:

1. How Muzak's infringing sales effected Info-Hold including the loss of sales and revenue
   (related to Georgia Pacific factors 4, 5, 11);
2. Utility and advantages of the invention over prior modes (Georgia Pacific factor 9);
3. The nature of the patented invention, character of commercial embodiment, and benefits
   of those who have used the invention (Georgia Pacific factor 10);
4. The extent to which the infringer has made use of the invention and the value of such use
   (Georgia Pacific factor 11);
5. Commercial relationship between Info-Hold and Muzak (Georgia Pacific factor 5).

*See* Info-Hold's Response in Opposition to Muzak's Motion for Partial Summary Judgment

which was filed under seal with the Court on May 23, 2013 at pp. 5 – 6.  These are all *Georgia-*

*Pacific* factors where lay testimony is allowed. This is evidenced in that *Georgia-Pacific*

10

**A4971**

considers expert testimony a completely separate factor. *Georgia-Pacific Corp.*, 318 F. Supp. at 1142 (*Georgia-Pacific* factor 14 is "Opinion testimony of qualified experts"). Mr. Mason should be permitted to offer lay opinion testimony on a reasonable royalty rate.

And though the Court has stricken Bob White from offering testimony as an expert witness in this case, he should also be permitted to offer testimony on a reasonable royalty as a lay witness under Federal Rule of Evidence 701. Mr. White is a certified public account who has a 16 year history of performing tax and audit work for Info-Hold. *See* Info-Hold's Response in Opposition to Muzak's Motion for Partial Summary Judgment filed under seal with the Court on May 23, 2013 at pp. 16 – 18. This experience with the company has made him knowledgeable as to how the patented technology is sold and knowledgeable as to the industry of Info-Hold and Muzak and the industry's common practices. Mr. White's deposition, which details his long history with Info-Hold, has been filed with the Court. Mr. White's experience with Info-Hold has provided him with particularized knowledge of the Plaintiff and the industry which should enable him to provide lay testimony on the reasonable royalty issue. *See First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 204, 207 (2006) (A lay witness accountant may testify on the basis of facts or data perceived in his role as an accountant based on his personal knowledge of the company); *Tenn-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 402-04 (3d Cir. 1980) (admitting lay opinion testimony by an accountant concerning damages); *Ryan Development Company, L.C. v. Indiana Lumbermens Mut. Ins.*, 711 F.3d 1165 (10th Cir. March 27, 2013).

Because Info-Hold may properly offer at least the lay opinion testimony of Mr. Hazenfield, Mr. Mason, and Bob White on the issue of a reasonable royalty rate, it should not be concluded that Info-Hold has no damages witnesses for trial. The Court in this case has

11

**A4972**

essentially imposed an obligation on Info-Hold to present expert testimony in order to demonstrate what a reasonable royalty rate would be in this case, but neither *Georgia-Pacific* nor any other body of law imposes such an obligation. *See* 35 U.S.C. § 284. Info-Hold respectfully requests that the Court reconsider its Order to the extent it found that Info-Hold has no witnesses to present testimony on a reasonable royalty.

### D. Federal Rule of Civil Procedure 56 Does not Require Evidence be Submitted in Admissible Form and Muzak has not Argued that the Evidence Cited by Info-Hold *Cannot be* Reduced to an Admissible Form

In addition to the testimony of Mr. Hazenfield and Mr. Mason, Info-Hold's Response in Opposition identified at least the following documentary evidence which could be evaluated by the Court to establish a reasonable royalty:

- The documents relied upon by Mr. Paris and Mr. White in preparing their opinions on damages even if neither testifies (this is accepted by *Dow Chem. Co.* 341 F.3d at 1381-82. Both expert's reports were submitted with Info-Hold's Response in Opposition);

- Business documents of Muzak and Info-Hold which show how the companies sold the relevant products, the prices they obtained, etc. (illustrative documents were filed with Info-Hold's Response in Opposition);

- Info-Hold's assignment of the patent-in-suit from Mr. Hazenfield (a copy of which was filed with Info-Hold's Response in Opposition);

- The License of the Patent-in-Suit to Trusonic (a copy of which was filed with the Response in Opposition); and

- Evidence presented through the cross-examination of Muzak's witnesses (*see Versata Software*, 2013 U.S. App. LEXIS 8838 (Fed. Cir. 2013)).

12

A4973

At the summary judgment stage, the Court should have construed these documents in Info-Hold's favor as evidencing a reasonable royalty rate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court did not and instead provided:

> There are no potential damages witnesses for Plaintiff to call at trial whatsoever, leaving it with no admissible evidence on reasonable royalty damages. All the additional "evidence" referred to in Plaintiff's memorandum in opposition is either not in the record as required by Fed. R. Civ. P. 56(c)(a) and/or is not presented in a form that is admissible in evidence at trial. Fed. R. Civ. P. 56(c)(2).

But, Federal Rule 56 does not require that evidence submitted for summary judgment be in a form that is admissible at trial. Rule 56, as amended in 2010, "allows a party making or opposing a summary judgment motion to cite to materials in the record including, among other things, 'depositions, documents, electronically stored information, affidavits, or declarations' and the like." *ForeWord Magazine, Inc. v. OverDrive, Inc.*, 2011 U.S. Dist. LEXIS 125373 *4 -*5 (W.D. Mich. Oct. 31, 2011). If the opposing party believes that such materials cannot be presented in a form that would be admissible in evidence, that party must file an objection. *Id.*; Fed. R. Civ. P. 56(c)(2). "Significantly, the objection contemplated by the amended rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Id.*; *Brown v. Siemens Healthcare Diagnostics, Inc.*, 2012 U.S. Dist. LEXIS 106569 (D. Md. 2012); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292-94 (11th Cir. 2012) (evidence that can be reduced to an admissible form is properly considered on summary judgment). "The revised Rule clearly contemplates that the proponent of evidence will have the ability to address the opponent's objections." *ForeWord Magazine, Inc.*, 2011 U.S. Dist. LEXIS 125373 *4 -*5.

Muzak's Motion for Partial Summary Judgment argued that Info-Hold did not have any witnesses to present evidence pertaining to a reasonable royalty rate. The Motion did not argue that Info-Hold has no admissible evidence pertaining to a reasonable royalty. Muzak did not

13

A4974

even raise the issue of admissibility of Info-Hold's evidence pertaining to a reasonable royalty rate until after Info-Hold had submitted various documents to the Court in conjunction with its Response in Opposition to Muzak's Motion – these arguments were made by Muzak in its Reply in Support. But, there are at least two problems with Muzak's arguments pertaining to the issue of admissibility. First, Muzak did not argue that the evidence cited by Info-Hold in its Response in Opposition could not be reduced to a form that is admissible at trial, it argued that some of the evidence cited by Info-Hold was not submitted in an admissible form. Muzak's objection is not relevant under Federal Rule of Civil Procedure 56 as that rule was amended in 2010. Second, even if Muzak's objection were proper, Info-Hold has not been provided with the opportunity to respond which is clearly contemplated by the Rules. *See ForeWord Magazine, Inc.*, 2011 U.S. Dist. LEXIS 125373 at *4 -*5.

The evidence submitted by Info-Hold in conjunction with its Response in Opposition may be reduced to a form which is admissible at trial. For example, Info-Hold submitted various Muzak business documents (including MUZ006403, MUZ006416, MUZ007017, and MUZ007074 submitted collectively as Exhibit C to Info-Hold's Response), which were relied upon by Muzak's damages expert Mr. Paris, in forming his opinion of a reasonable royalty rate. Pursuant to at least Federal Rule of Evidence 803 (6), these documents are not excluded from trial by the rule against hearsay. These documents enabled Mr. Paris to conclude that a royalty of 1-2% would be reasonable in this case. *See* Deposition of Mr. Paris which was filed under seal as Exhibit 3 to Info-Hold's Motion to Strike Dr. Paris; *see also* Reports of Dr. Paris which were filed under seal as Exhibits 1 and 2 to Info-Hold's Motion to Strike Dr. Paris. At the summary judgment stage the Court should find that these documents evidence a reasonable royalty rate. This is so even if Muzak does not call Mr. Paris to testify at trial. *See Dow Chem.*

*Co.* 341 F.3d 1370, 1381 (Fed. Cir. 2003); 35 U.S.C. § 284.  To the extent that Muzak might attempt to argue these documents are hearsay, Info-Hold will, if needed, subpoena Muzak to produce a corporate officer that is knowledgeable as to the contents of the documents to testify at trial.  *See* Fed. R. Civ. P. 45; *Gerald Godec v. Bayer Corp.*, Case No. 1:10-cv-224, 2012 U.S. Dist. LEXIS 49249 at *2 - *5 (N.D. Ohio April 9, 2012) (refusing to quash subpoenas compelling the presence and testimony at trial that had been served on four of defendant's employees by plaintiff).

In addition to business documents, Info-Hold submitted to the Court an October 24, 2007 assignment of the patent-in-suit from Mr. Hazenfield to Info-Hold and a September 18, 2009 license of the patent-in-suit to Trusonic in support of its opposition.  The Federal Circuit has emphasized that while a court should not utilize inapposite licenses in determining a reasonable royalty rate, licenses arising out of litigation may be relevant to the reasonable royalty inquiry. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).  When a license arising out of litigation is the most reliable license on the record, it may be considered as evidence of a reasonable royalty rate.  *Id.* at 872.  It has been considered an indication of relevance that the license in question was to the patent-in-suit.  *Id.*  The assignment of the patent-in-suit to Info-Hold and the Trusonic License may not be perfect evidence of a reasonable royalty in this case, but they are both directed to the patent-in-suit and are accordingly probative of a reasonable royalty rate.  And even if the actual assignment and license documents are not admissible, their contents may be testified to by Mr. Hazenfield who executed both documents and has personal knowledge of their contents.  *See* Exhibits D and E to Info-Hold's Response in Opposition to Muzak's Motion for Partial Summary Judgment; s*ee also* Excerpts of Deposition of Joey C. Hazenfield which was attached as Exhibit 7 to Info-Hold's Motion to strike Dr. Paris which was

15

A4976

filed under seal with the Court on April 29, 2013 (discussing the license and assignment of the patent-in-suit as well as other licenses to related patents); *see also* Hazenfield Declaration. Pursuant to *Dow Chem. Co.* and 35 U.S.C. § 284 this is all evidence which should be reviewed by the Court and utilized to award a reasonable royalty. *Dow Chem. Co.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003); 35 U.S.C. § 284.

### E. There is Evidence in Admissible Form of Record that Supports a Reasonable Royalty Award in this Case

Finally, even if the Court were to maintain its position that Info-Hold had a duty to come forward with evidence in admissible form to survive summary judgment, there is admissible evidence of record in this case which tends to show what a reasonable royalty rate would be. For example, the Hazenfield Declaration discusses the royalty Mr. Hazenfield obtains for Info-Hold's utilization of the patent-in-suit. *See* Hazenfield Declaration at ¶¶ 10 – 11. This royalty is derived from Mr. Hazenfield's assignment of the patent-in-suit to Info-Hold. Additionally, the Assignment of the patent-in-suit to Info-Hold and the license of the patent-in-suit to Trusonic were both submitted with Info-Hold's Response in Opposition. Though the documents were not submitted as part of a declaration, Muzak has cited to these same documents in its summary judgment motions and has not once questioned their authenticity. In light of the language of 35 U.S.C. §284 which requires the award of a reasonable royalty, Info-Hold respectfully submits that all evidence of record which tends to suggest what a reasonable royalty would be in this case should be considered by the Court and that there is admissible evidence of record enabling the Court to make a reasonable royalty determination. *See Dow Chem. Co.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003); 35 U.S.C. § 284.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| INFO-HOLD, INC. | |
| Plaintiff, | Civil Action No. 1:11-cv-283 |
| v. | Judge Timothy S. Black |
| MUZAK LLC, | Magistrate Judge Karen L. Litkovitz |
| Defendant. | |

## INFO-HOLD, INC.'S MEMORANDUM SHOWING CAUSE WHY FINAL JUDGMENT SHOULD NOT BE ENTERED AGAINST IT

On August 20, 2013, this Court issued its Order Granting Defendant's Motion to Strike the Expert Reports of Robert L. White and to Preclude Mr. White's Testimony and Granting Defendant's Motion for Partial Summary Judgment that Plaintiff Info-Hold Is Not Entitled to Reasonable Royalty Damages.  The Court ruled that: 1) Info-Hold's proffered expert on damages, Robert White, had not been shown to possess sufficient "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence to determine a fact in issue" and therefore struck his expert reports and testimony (Dkt. No. 204 at p. 10); and 2) in light of having struck Mr. White, "[t]here are no potential damages witnesses for Plaintiff to call at trial whatsoever, leaving it with no admissible evidence on reasonable royalty damages" and therefore granted Muzak's Motion for partial summary judgment (Dkt. No. 204 at p. 12).

Despite the Court's Order on summary judgment, this case cannot be closed because the Patent Act mandates the award of a reasonable royalty to Info-Hold upon a showing that its

patent has been infringed by Muzak.  *See* 35 U.S.C. § 284.  35 U.S.C. § 284 provides in relevant part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringed, together with interest and costs as fixed by the court.
>
> When the damages are not found by a jury, the court shall assess them….

35 U.S.C. § 284.  As explained by Info-Hold in its Motion for Reconsideration, which is being filed in conjunction with this Memorandum and which is incorporated herein by reference, the reasoning of cases finding that 35 U.S.C. § 284's mandate to award a reasonable royalty may be evaded upon a court's conclusion that there is little to no evidence of damages in the record, and upon which this Court relied in rendering its decision on summary judgment, is flawed and inconsistent with the clear language of the statute.  Congress intended for all patent owners that establish an infringement to obtain a measure of damages.  *See* 35 U.S.C. § 284.  The statute is not ambiguous in this regard.  *Id.*  Accordingly, no event will justify a failure to award a reasonable royalty to Info-Hold should this court find that Muzak has infringed Info-Hold's patent.  The Court's conclusion that Info-Hold is not entitled to any measure of damages in this action should not stand.[1]  This case should go forward so that the issue of infringement may be determined by this Court and the promise of 35 U.S.C. § 284 fulfilled.  This is especially true given that Section 284 additionally entitles Info-Hold to its costs upon a finding of infringement and because Info-Hold has made a claim for attorneys fees in this case.  The Court should hear

---

[1] As explained in Info-Hold's Motion for Reconsideration, the Court's Order (Dkt. No. 204) should additionally be reconsidered because: 1) Muzak's identified basis for summary judgment was not legally sufficient; 2) Info-Hold has competent witnesses that may offer lay opinion testimony on the reasonable royalty issue; 3) the Federal Rules of Civil Procedure do not require that evidence submitted in conjunction with summary judgment briefing be in a form that is admissible at trial; and 4) there is evidence in admissible form that tends to show what a reasonable royalty rate would be of record in this case.

repeated argument that the Court is obligated to find *some* damages in its favor (seemingly regardless of the evidence or lack thereof) upon a showing of infringement, citing 35 U.S.C. § 284 as support. Dkt. 206 at 1-2. However, Info-Hold still does not understand the general principle that courts may not enter patent damages awards without supporting evidence or on the basis of speculation or conjecture. *See*, e.g., *Whitserve LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29-33 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868-73 (Fed. Cir. 2010). In particular, Info-Hold does not squarely address the case law cited in Muzak's summary judgment papers, Dkt. Nos. 160-1 at 2-3 and 185 at 2-3, to the effect that even though a patentee may be entitled to damages not less than a reasonable royalty upon a finding of infringement, the patentee still has to prove what those damages are with admissible evidence. *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 361 (3d Cir. 1981), cited with approval in *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1406, 1407 (Fed. Cir. 1990) ("The statute requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute.").

Info-Hold's response to the order to show cause also misapprehends the thrust of the Court's order. As Muzak reads Dkt. No. 204, what the Court is saying to Info-Hold in colloquial terms is this: "I have stricken Mr. White's expert reports and precluded him from testifying. I have granted summary judgment to Muzak of no reasonable royalty damages. I previously granted Muzak summary judgment of no injunctive relief and no lost profits damages. What is left of your case against Muzak? Tell me why I shouldn't dismiss your complaint in its entirety." In response, all Info-Hold tells the Court of substance is, "You have it wrong on reasonable royalty damages."[1] Info-Hold does not give the Court any basis for allowing this case to

---

[1] Info-Hold's argument that it should be allowed to proceed with its case because it is entitled to costs and attorney's fees (Dkt. No. 206 at 2) falls of its own weight because such costs and fees are awarded only to prevailing parties (and attorney's fees are awarded only in exceptional cases under 35 U.S.C. § 285). A party that is not entitled to a remedy because it cannot prove damages (and concedes it is not entitled to injunctive relief, Dkt. No. 130) is hardly a prevailing party.

continue on a theory of damages other than the theories already rejected by the Court for lack of proof.

Finally, even though Info-Hold seems not to have appreciated the issue, Muzak is constrained to point out that if the Court just enters final judgment that Info-Hold take nothing on its complaint, thus dismissing the complaint with prejudice, such a judgment would not itself be final and appealable under Rule 54(b), FED. R. CIV. P., because it is based solely on Info-Hold's inability to prove entitlement to a remedy and would not adjudicate Muzak's counterclaim for declaratory judgment of invalidity and non-infringement. Dkt. No. 5. *See*, e.g., *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1071-72 (Fed. Cir. 2008); *cf.*, *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1311 (Fed. Cir. 2009). As stated in Muzak's motion for summary judgment of no reasonable royalty damages, though, Muzak would consent to the dismissal of its declaratory judgment counterclaim without prejudice to its reinstatement if this action were ever remanded by the Court of Appeals for further proceedings. Dkt. No. 160-1 at 9.

## CONCLUSION

For the foregoing reasons, the Court should hold that Info-Hold has not properly shown cause why final judgment should not be entered against it. The Court should therefore enter final judgment dismissing Info-Hold's complaint with prejudice and dismissing Muzak's declaratory judgment counterclaims without prejudice.

Dated: September 13, 2013                    Respectfully submitted,

                                             /s/ Barry E. Bretschneider
                                             Kevin W. Kirsch (0081996)
                                             John F. Bennett (0074506)
                                             BAKER & HOSTETLER LLP
                                             312 Walnut Street, Suite 3200
                                             Cincinnati, Ohio 45202-4074
                                             Telephone: (513) 929-3499
                                             Facsimile: (513) 929-0303
                                             kkirsch@bakerlaw.com
                                             jbennett@bakerlaw.com

## II.  INFO-HOLD HAS FAILED TO EXPLAIN WHY THE COURT SHOULD RECONSIDER ITS ORDER STRIKING MR. WHITE'S EXPERT REPORTS AND PRECLUDING HIM FROM TESTIFYING

Since the exclusion of Mr. White's expert testimony was the express condition precedent for Muzak's motion for partial summary judgment of no entitlement to reasonable royalty damages, Dkt. No. 160-1 at 1, 5-6, Muzak will address that portion of Info-Hold's motion for reconsideration first.

First, Info-Hold fails to address at all an independent basis for the Court's striking of Mr. White's expert reports and preclusion of testimony:  Mr. White's improper reliance on the entire market value rule.  Dkt. No. 204 at 8-9.  Even if the Court were to permit Mr. White to testify as to a reasonable royalty rate, his improper reliance on the entire market value rule taints his testimony on the royalty base to which the royalty rate would be applied and requires its exclusion.  *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 56, 60, 68-69 (Fed. Cir. 2012).

Moreover, since Muzak's sales and other data relevant to a royalty base are Attorney Eyes Only Protected Information, no Info-Hold lay witness could testify to them.[8]  For this reason alone, the Court may deny reconsideration since Info-Hold has not even attempted to show that the Court's exclusion of Mr. White's royalty base testimony was improper and cannot show that evidence of royalty base is admissible through any other witness.

Info-Hold's claim that Mr. White used the 25% rule only as an "alternative," Dkt. No. 205 at 17-18, falls of its own weight:  any objective reading of Mr. White's reports shows that he relied on the 25% rule as the basis for his royalty rate opinion, not as a mere "alternative."  This issue was fully briefed by the parties on the original motion to strike at Dkt. No. 162, Muzak's Mem. at 9-11 and 15; Dkt. No. 177, Info-Hold's Mem. at 11; Dkt. No. 186, Muzak's Reply at 3-5.  Info-Hold is simply rearguing the position it lost before.  Info-Hold asks the Court to allow Mr. White to discuss *Deere* and *Minco* at trial as long as he does not discuss the 25% rule.  Dkt.

---

[8]  Furthermore, no such lay witness would be permitted to view the exhibits to Mr. Paris's report Info-Hold claims it could rely on as evidence of Muzak's sales.  Dkt. No. 205 at 14-15.

The Court's decision, furthermore, was correct. Although Info-Hold argues at length as to what Messrs. Hazenfield and Mason **could** have testified to, it is undisputed that **none** of that testimony is **"in the record"** on this summary judgment motion as required by Rule 56(c)(1), FED. R. CIV. P., which requires citation to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." The only places the Court might find what Messrs. Hazenfield and Mason would purportedly testify to are in Info-Hold's briefing itself. Dkt. No. 180, Info-Hold Mem. at 4-7; Dkt. No. 205 at 8-11. However, attorney arguments in briefs are not "materials in the record"; they are not evidence at all. *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence."). Thus, regardless of Info-Hold's arguments regarding the admissibility of the testimony of Messrs. Hazenfield and Mason under Rule 701, Info-Hold neglected to put any such testimony "in the record." The time-tested way to put proffered testimony into a summary judgment record is by declaration. Info-Hold has no excuse for failing to do so.

Info-Hold's arguments regarding the disclosure of Messrs. Hazenfield and Mason as witnesses and the admissibility of their testimony under Rule 701 are equally misplaced. As a threshold matter, Messrs. Hazenfield and Mason may not testify regarding reasonable royalty damages because they were not properly disclosed as witnesses who would testify regarding reasonable royalties or other damages. Neither witness was described as having knowledge of reasonable royalty damages in Info-Hold's Rule 26(a)(1) initial disclosures or in Info-Hold's response to Interrogatory No. 6 of Muzak's first set of interrogatories, which asked for an "identification of all persons with knowledge of the facts" supporting Info-Hold's contended factual and legal bases for claiming damages. Dkt. No. 160-1 at 3-5; Dkt. No. 160-4 at 5; Dkt. No. 185 at 7-8.[12]

---

[12] Moreover, Interrogatory No. 6 required Info-Hold to "Identify the amount of damages You contend Info-Hold is entitled to and all legal and factual bases in support of Your contention, including

13

Info-Hold's "response" regarding the admissibility of the evidence on which it relies to defeat summary judgment, *id*. at 14-16, falls far short of the mark. Info-Hold makes a blanket assertion that the documents referenced in its Opposition "may be reduced to a form which is admissible at trial," but fails to establish how it would do so for any of the documents it relies on. *Id*. at 14.

Besides remaining silent on the critical threshold admissibility issues of authentication and foundation, Info-Hold does not properly address Muzak's hearsay objections or any other admissibility problems identified by Muzak in its summary judgment reply. Dkt. No. 205 at 14-16; Dkt. No. 185 at 4-6. Info-Hold yet again neglected to authenticate any of its evidence with an affidavit or declaration. In colloquial terms, Info-Hold does not explain how it would get any of this evidence in before the jury at trial.

Info-Hold discusses this alleged evidence at page 12 of its motion, to which Muzak responds in bullet-point form:

- If Mr. Paris does not testify at trial – the Court should remember that Info-Hold's motion to strike Mr. Paris's reports, and thus the exhibits to those reports, remains undecided – how does Info-Hold propose to get the documents relied upon by him and Mr. White, whose expert testimony is already precluded, in evidence? Info-Hold does not say, and Muzak will certainly not be calling Mr. Paris as a witness until after the close of Info-Hold's case-in-chief, if the case gets that far. The exhibits to Mr. Paris's reports are the only evidence of royalty base on which Mr. White relied, so without Mr. White's expert testimony or Mr. Paris's testimony during its case-in-chief, Info-Hold has no royalty base evidence it can present to the jury in its case-in-chief. Without royalty base evidence, Muzak is entitled to judgment as a matter of law on reasonable royalty damages at the close of Info-Hold's case.

- Info-Hold says it will offer "[b]usiness documents of Muzak and Info-Hold which show how the companies sold the relevant products, the prices they obtained, etc.," referring to the unauthenticated documents attached to Info-Hold's summary judgment opposition. Info-Hold says it will subpoena a knowledgeable Muzak corporate officer to testify as to the documents. Dkt. No. 205 at 15. Putting aside the fact that Info-Hold did not present this argument in its original summary judgment

18

A5008

opposition, Info-Hold does not explain how it proposes to serve such subpoenas. Muzak's corporate officers reside in North and South Carolina, beyond the subpoena range of the Court.  Furthermore, although Info-Hold claims that "illustrative documents" were filed with Info-Hold's opposition, it does not indicate which documents those are or explain how any of them creates a genuine issue of material fact on royalty rate or royalty base.

- Info-Hold offers the assignment of the '374 patent from Mr. Hazenfield to Info-Hold and the Trusonic license as evidence of a reasonable royalty rate.  This offer is ironic, as Info-Hold's expert Mr. White admitted that neither was pertinent to a reasonable royalty determination.  Dkt. No. 162, Muzak Mem. at 10-11.  Info-Hold does not explain how the jury is supposed to use this non-pertinent material to reach a properly supported reasonable royalty verdict.

In short, Info-Hold uses its reconsideration motion as an opportunity to "re-do" its showings on admissibility of its summary judgment evidence, but this "re-do" is far from sufficient to show it has admissible evidence that would stave off summary judgment. *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010) (a nonmoving party successfully opposes summary judgment when "the evidence presents a sufficient disagreement to require submission to a jury") (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)).

In the end, Info-Hold has no satisfactory explanation for its failure to present sufficient evidence to stave off summary judgment in its opposition.  No one prevented Info-Hold from providing declarations from Messrs. Hazenfield and Mason.  Nothing prevented it from asking for more time to file its opposition under Rule 54(d) if it could not present facts essential to justify its opposition.  The Court should thus disregard anything Info-Hold presents in its motion for reconsideration that was not presented with its original opposition.  The Court's decision granting summary judgment of no reasonable royalty damages was correct on the "materials in the record" before it and should not be reconsidered.

19





Positive
As of: Jun 10, 2014

**STEVE SCIPIO and PATRICK PATTERSON, individually and d/b/a Cymande Music; LEOSONG COPYRIGHT SERVICE, LTD., a United Kingdom limited stock company, Plaintiffs-Appellants v. SONY MUSIC ENTERTAINMENT, INC., et al., Defendants-Appellees**

**No. 05-5134**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**06a0170n.06; *173 Fed. Appx. 385*; *2006 U.S. App. LEXIS 5615*; *2006 FED App. 0170N (6th Cir.)*; *Copy. L. Rep. (CCH) P29,127***

**March 3, 2006, Filed**

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE. 99-00128. Aleta A. Trauger.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, musicians and a copyright company, sued defendants, record company and a music group, alleging copyright infringement, fraud, unfair competition and "reverse passing off" in violation of § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)*. The United States District Court for the Middle District of Tennessee granted summary judgment in favor of defendants. Plaintiffs appealed.

**OVERVIEW:** Plaintiffs alleged that the music group unlawfully "sampled" one of their songs. The parties negotiated but never executed a settlement agreement. Defendants asserted that plaintiffs had ratified the agreement which constituted as an accord and satisfaction. The appellate court found that the agreement was never ratified and plaintiffs should not be equitably estopped from pursuing their infringement claims. Defendants conceded that the agreement was never executed by the parties. By referring to an executed agreement in writing, plaintiffs' state of mind was clear that distribution of the funds by itself would not execute the agreement. The agreement did not provide for ratification either by defendants reducing their share of the foreign royalties or by plaintiffs collecting what remained after they did. Promissory estoppel did not

173 Fed. Appx. 385, *; 2006 U.S. App. LEXIS 5615, **1;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

apply because defendants did not set forth the promise upon which they detrimentally relied and no injustice would result from refusing to enforce the agreement as an accord and satisfaction because defendants could raise a counterclaim for unjust enrichment. Similarly, equitable estoppel did not apply because defendants could assert counterclaims.

**OUTCOME:** The judgment was reversed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN1] See M.D. Tenn. R. 8(b)(7)(g).

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] An appellate court reviews a district court's grant of summary judgment de novo. And while an appellate court generally reviews a denial of a *Fed. R. Civ. P. 59(e)* motion to alter or amend a judgment for abuse of discretion, to the extent the motion seeks reconsideration of a grant of summary judgment, the court reviews de novo the denial of a *Rule 59(e)* motion. Summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
[HN3] See *Fed. R. Civ. P. 56(e)*.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
[HN4] The United States Supreme Court has expressly rejected the notion that *Fed. R. Civ. P. 56(e)* alters the

standard stated in *Fed. R. Civ. P. 56(c)* for granting summary judgment. Rather, a party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant. *Fed. R. Civ. P. 56(e)* advisory committee's notes to 1963 Amendments (noting that *Rule 56(e)* only calls for summary judgment when "appropriate"). And the non-movant's failure to respond does not free the movant of the burden of establishing that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Contracts Law > Performance > Accord & Satisfaction*
[HN5] According to Tennessee's long-standing definition of an accord and satisfaction. An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement. In other words, the accord of "accord and satisfaction" is a form of contract. The satisfaction of a disputed debt (or of an undisputed yet unliquidated debt) is offered in consideration for the substitute performance.

*Contracts Law > Performance > Accord & Satisfaction*
*Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence*
[HN6] The party asserting the defense of accord and satisfaction must prove by a preponderance of the evidence both that a contract existed and that the contracting plaintiff agreed to accept lesser payment rendered in satisfaction of the original performance or payment for which the parties contracted.

*Contracts Law > Performance > Accord & Satisfaction*
[HN7] With regard to the defense of accord and satisfaction, whether a later agreement between contracting parties represents an accord and satisfaction so as to extinguish their original relationship or whether it is simply an executory accord is a matter of the intention of the parties. More precisely, to constitute a valid accord and satisfaction it is also essential (1) that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; (2) that the debtor shall intend it as a satisfaction of such

173 Fed. Appx. 385, *; 2006 U.S. App. LEXIS 5615, **1;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

obligation, and (3) that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential (4) that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction. The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.

***Contracts Law > Performance > Accord & Satisfaction***
[HN8] Matters of intention are generally resolved by the trier of fact. An accord and satisfaction is established by the intentions of the parties at the time of the transaction and the issue is a question of fact to be determined by the trier of fact. Unless the evidence thereof is insufficient to submit to the jury or is undisputed and not open to opposing inferences, accord and satisfaction, including the various elements thereof, is ordinarily a question of fact to be determined by the jury or by the court where it is the trier of the facts.

***Contracts Law > Formation > Acceptance > General Overview***
[HN9] Tennessee courts have often assessed the existence of an agreement as a matter of law. Instances may arise in which an acceptance, on the part of the offeree, will be presumed; or where, in the circumstances, the offeree will be held estopped to deny acceptance. Such a case will arise where a check was mailed to a party and cashed, on the face of which appeared, in full settlement of account.

***Contracts Law > Performance > Accord & Satisfaction***
[HN10] With regard to accord and satisfaction, it is not enough for a debtor merely to write on a voucher or on his check such words as "in full payment" or "to balance account" where there has been no such dispute or antecedent discussion as to give reasonable notice to the creditor that the check is being tendered as full satisfaction.

***Contracts Law > Performance > Accord & Satisfaction***
[HN11] An accord and satisfaction is a type of contract and is governed by the law of contracts. An accord is a form of contract, governed by the general rules for

contracts, including the elements of offer and acceptance.

***Contracts Law > Formation > General Overview***
***Contracts Law > Formation > Acceptance > General Overview***
***Contracts Law > Formation > Offers > General Overview***
[HN12] A proposition by one party and an acceptance by the other constitutes an agreement binding on both. No contract is complete without the mutual assent of the parties, and an offer to sell imposes no obligation until it is accepted according to its terms. An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance. Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

***Contracts Law > Formation > Acceptance > General Overview***
***Contracts Law > Formation > Acceptance > Methods of Acceptance > General Overview***
[HN13] With regard to contracts and the issue of acceptance, "execute" means to complete; to sign; to sign, seal, and deliver.

***Contracts Law > Types of Contracts > Implied-in-Law Contracts***
[HN14] An implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists.

***Contracts Law > Consideration > Promissory Estoppel***
[HN15] Promissory estoppel arises in equity when (1) there is a promise, (2) that the promisor should have reasonably expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produces reliance or forbearance of that nature, (4) under circumstances such that the promise must be enforced if injustice is to be avoided.

***Contracts Law > Consideration > Promissory Estoppel***
[HN16] Under Tennessee law regarding promissory estoppel states that when one man by his promise induces another to change his situation, repudiation of the

173 Fed. Appx. 385, *; 2006 U.S. App. LEXIS 5615, **1;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

promise would amount to a fraud. Where (1) one makes a promise, (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and (3) where such promise does in fact induce such action or forbearance, it is binding, (4) if injustice can be avoided only by enforcement of the promise.

**Contracts Law > Defenses > Equitable Estoppel > Elements**
[HN17] Equitable estoppel is a more general version of promissory estoppel. Equitable estoppel arises, when one by his acts, representations or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

**Contracts Law > Consideration > Promissory Estoppel**
**Contracts Law > Defenses > Equitable Estoppel > Elements**
[HN18] Unlike with promissory estoppel, the party asserting estoppel need not have relied upon a promise by the party to be estopped. But as with promissory estoppel, the touchstone for relief is whether the claimant will be prejudiced unless the opposing party is barred from doing what it otherwise has a right to do. The punishment must match the crime.

**COUNSEL:** For STEVE SCIPIO, individually dba Cymande Music, Plaintiff-Appellant: James E. Zwickel, Nashville, TN

For PATRICK PATTERSON, individually dba Cymande Music, Plaintiff-Appellant: James E. Zwickel, Nashville, TN

For LEOSONG COPYRIGHT SERVICE, LTD., a United Kingdom limited stock company, Plaintiff-Appellant: James E. Zwickel, Nashville, TN

For SONY MUSIC ENTERTAINMENT, INC., et al., Defendant-Appellee: Jay S. Bowen, Amy E. Neff, Bowen, Riley, Warnock & Jacobson, Nashville, TN

**JUDGES:** Before: CLAY and COOK, Circuit Judges; RICE, District Judge. *

* The Honorable Walter Herbert Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

**OPINION BY:** COOK

**OPINION**

[*387] COOK, Circuit Judge. Plaintiffs, 1970s musicians, [**2] allege that a contemporary music group unlawfully "sampled" one of their songs in a 1996 release. Prior to Plaintiffs filing a complaint, the parties negotiated but never executed a settlement agreement (the "1998 Proposed Agreement" or the "Proposed Agreement"). When those negotiations broke down, Plaintiffs filed this action. After five years of litigation, continued settlement discussions, and negotiations under the guidance of a court-appointed mediator, Defendants eventually moved for summary judgment, alleging that Plaintiffs through their conduct had ratified the Proposed Agreement. The district court granted Defendants' motion, holding that Plaintiffs did ratify the pre-litigation agreement, that such agreement constituted an accord and satisfaction, and that, in addition, Plaintiffs should be equitably estopped from further pursuing their claims. This appeal followed. We determine that the Proposed Agreement was never ratified and that Plaintiffs should not be equitably estopped from pursuing their infringement claims. Accordingly we reverse the district court's grant of summary judgment to Defendants.

**I. Factual and Procedural Background**

1

1 Defendants filed two motions for summary judgment in this matter. The district court denied the first because it relied on inadmissible evidence gathered from the settlement negotiations. Defendants filed a renewed motion, relying only on admissible evidence, which the district court granted. Plaintiffs filed a brief in opposition to the first motion, but failed to respond to the second, even after they were granted five extensions by the district court. Accordingly, in its memorandum and order granting summary judgment, the district court followed local court rules and adopted the Defendants' Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment. Middle District of Tennessee Local Rule 8(b)(7)(g) reads:

Case: 14-1167 Case: 14-1467 Document: 47 Document: 3875 Filed: 06/20/2014 Filed: 06/20/2014

Page 5

173 Fed. Appx. 385, *387; 2006 U.S. App. LEXIS 5615, **2;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

[HN1] Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.

We find no error in the district court's application of this rule and adopt, as that court did, the Defendants' Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment.

[**3] **A. Negotiations Concerning the Proposed Agreement**

Plaintiffs (alternatively, the "Scipio Plaintiffs") are Steve Scipio and Patrick Patterson, members of the early 1970s British funk group Cymande; Cymande Music, a joint venture entered into by Scipio and Patterson; and Leosong Copyright Service ("Leosong"), the administrator of Cymande Music. Around 1972, Cymande released a musical composition entitled "Dove;" [2] Plaintiff Leosong is the administrator and licensor of all rights in "Dove" outside the United States; and Copyright Management, Inc. ("CMI"), a non-party, was (for the relevant periods) the administrator and licensor of all rights in "Dove" in the United States. Defendants (alternatively, the "Fugee Defendants") include the members of the contemporary music group The Fugees, Sony Music Entertainment, Inc., ("SMEI"), and various other music publishers. The complaint alleges that The Fugees infringed the Scipio Plaintiffs' copyrights [3] in "Dove" by sampling without [*388] authorization sections of the song in the title track of The Fugees' 1996 album, *The Score.* [4] The plaintiffs also alleged fraud, unfair competition, and "reverse passing off" in violation of § 43(a) [**4] of the Lanham Act, *15 U.S.C. § 1125(a).*

2    To hear "Dove," go to http://www.cymande.co.uk/music/music.htm (click on "Cymande 1972," and then song six, "Dove").
3    Defendants point out that the Plaintiffs' ownership of the "Dove" copyright has been asserted, but never proven. Though perhaps true,

that issue concerns the merits of Plaintiffs' infringement claims, which we do not reach.
4    For an excerpt, go to http://www.artistdirect.com/nad/store/ar tist/album/0,,226252,00.html (scroll down to song nine).

In 1997 and 1998, the parties conducted extensive negotiations culminating in the Proposed Agreement, under which the parties would have jointly owned the rights to "The Score": Plaintiffs receiving 75% of the song's royalties, and Defendants 25%. The negotiations broke down, in part because Plaintiffs alleged that the Fugee Defendants failed to disclose to them during negotiations that "The Score" contains a second unauthorized sample -- one from artist Dennis Coffey's "Scorpio. [**5] " (The Proposed Agreement required SMEI to warrant that "The Score" "[did] not infringe upon the rights of any other party.") In addition, Defendants failed to respond to Plaintiffs' demands for a worldwide accounting of profits obtained from the release of *The Score.* The Proposed Agreement was never executed.

**B. Defendants' and Plaintiffs' Conduct Immediately Following the 1998 Negotiations**

*Defendants' Conduct.* In April 1998, for reasons that remain unclear given the parties' failure to reach an agreement, SMEI began forwarding to CMI -- Plaintiffs' agent and the administrator of "Dove" in the United States -- payments derived from domestic exploitation of "The Score." In addition, immediately following the negotiations, Defendants gave notice to the foreign collection societies to reduce their claim to foreign royalties of "The Score" from 100% to 25%. This enabled Plaintiffs to collect the remaining 75% of The Score's foreign royalties without conflict, since, according to deposition testimony, when there are conflicting claims to a work, foreign collection societies will retain the disputed funds in escrow.

*Plaintiffs' Conduct with respect to Domestic Royalties.* [**6] In April 1998, CMI opened an escrow account on behalf of Plaintiffs at the Music Row branch of Nationsbank (later, Bank of America) to maintain the domestic royalty payments it was receiving from Defendants pursuant to the Proposed Agreement (the "Nations Escrow"). Defendants' payments were deposited in the account, beginning with a check in the amount of approximately $ 400,000. The Nations Escrow was in

Case: 14-1167 Case: 14-167 Document: 47 Document: 28-5 Page: 385 Filed: 06/20/2014 Filed: 06/20/2014

Page 6

173 Fed. Appx. 385, *388; 2006 U.S. App. LEXIS 5615, **6;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

CMI's name, and Terry Smith (Plaintiffs' primary agent at CMI) and James Zwickel (Plaintiffs' counsel) were the sole authorized signatories of the account. Any withdrawals from the Nations Escrow required the authorization of both Smith and Zwickel. Defendants lacked any control over the account.

*Plaintiffs' Conduct with respect to Foreign Royalties.* In March 1998, Plaintiff Leosong registered a claim with the foreign collection societies for 75% of the royalties from foreign exploitation of "The Score." Also in March, Defendants reduced their claim on the foreign royalties to 25%. By September, when a third party withdrew its claim for the royalties, Leosong's claim to the 75% was the only other claim. Plaintiffs have thus far collected over £ 134,000 in foreign royalties.

[**7] **C. Plaintiffs' Posture in the Complaint**

The Scipio Plaintiffs filed this action in February 1999. The complaint acknowledged [*389] that in connection with the pre-litigation negotiations Defendant SMEI, on behalf of all defendants, had already paid approximately $ 400,000 into the Nations Escrow. SMEI had attached to the payment a statement that the check represented a payment for all units sold, equal to 100% of the mechanical royalties due by SMEI at the maximum compulsory rate; however, according to the complaint, the amount was based only upon a "partial accounting" -- of units sold within the United States -- rather than the full accounting of worldwide sales that Plaintiffs allegedly had requested.

Importantly, paragraph 69 of the complaint noted that neither SMEI nor Plaintiffs "[were] entitled to distribute [the Nations Escrow] funds unless and until there exists an executed agreement in writing establishing the rights of the respective parties to the profits of 'The Score.'" The same paragraph also noted that the parties had negotiated the Proposed Agreement, but that such agreement provided that it would not be effective until executed by all parties to it.

The complaint [**8] represented that all funds theretofore paid by SMEI to CMI -- *i.e.,* all funds in the Nations Escrow -- would be tendered to the court. None were.

**D. Status of the Domestic Royalties**

In May 1999, Terry Smith, Leosong's agent at CMI,

sought and was granted permission from Leosong to remove the funds from the Nations Escrow and to transfer them into an account in the name of "Copyright Management International." Smith's fax to Leosong requesting permission for the transfer displayed a "Copyright Management International" letterhead, and listed Smith as the company's chairman. The purported rationale for the transfer was that the balance of the account had exceeded the amount the FDIC would insure in a conventional account. Copyright Management *International,* as opposed to CMI (Copyright Management, *Incorporated*), has never been the administrator of Cymande's catalog in the United States. [5]

> [5] Terry Smith's deposition of September 8, 2004, offers more detail on Copyright Management International, LLC: Sometime in late 1998 or 1999, CMI transferred its assets to Copyright Management International LLC; in return it received a 50 percent interest in the LLC and a commitment from Zeal Entertainment, the other 50 percent holder, to assume responsibility for the LLC's day-to-day operations and to provide additional funding. Smith acknowledged, however, that the Nations Escrow was never transferred to Copyright Management International LLC, and thus that his instruction that the account "remain" in Copyright Management International LLC's name was in error.

[**9] In fact, the funds from the Nations Escrow were deposited in a Salomon Smith Barney account at Chase Manhattan Bank in the name of Trigon Corporation, a stranger to the current litigation with no claim to proceeds from the exploitation of "The Score." [6] By the middle of 2002, Trigon had changed its name to Copyright.net, and the funds that were originally in the Nations Escrow had migrated from the Smith Barney account to an account at US Bank. There they were used to secure a loan by US Bank to either CMI or Trigon (by then "Copyright.net"). In early 2003, US Bank foreclosed on the loan and seized the funds securing it.

> [6] In his deposition, notwithstanding the fact that his signature was required for the funds to be removed from the Nations Escrow, Smith disclaimed any knowledge of how the funds were transferred from CMI to Trigon's Smith Barney account at Chase.

Case: 14-1167 CASE PARTICIPANTS ONLY Document: 47 Page: 395 Filed: 06/20/2014

Page 7

173 Fed. Appx. 385, *389; 2006 U.S. App. LEXIS 5615, **9;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

### E. Status of the Foreign Royalties

Leosong placed the foreign royalties payments it received on Cymande's behalf [*390] in an operating account. [**10] Brian Scholfield, the CEO of Music Copyright Solutions (which acquired Leosong in January 2002) testified that the funds were accounted for as a "suspense account," *i.e.,* an unallocated liability in Leosong's financial records, rather than a separate bank account with designated dollars.

### F. Litigation History

Plaintiffs commenced suit on February 16, 1999. The parties continued negotiations and eventually retained a mediator and scheduled mediation for December 2002. Defendants failed to attend the mediation and Plaintiffs moved for sanctions. Defendants' response included an affidavit of Jay Bowen, Defendants' attorney, setting forth reasons why the settlement had not been concluded and indicating his belief that a settlement could be effected if more time were granted.

On January 24, 2003, the parties notified the district court that a settlement had been reached. The settlement was never approved, however, as Defendant SMEI was given leave to discuss the details of the settlement with its insurance company. Plaintiffs moved for a status conference in September 2003, and Defendants responded, attaching a second declaration of Jay Bowen. In that affidavit, Bowen stated [**11] that he never reached a final agreement with Plaintiffs' counsel James Zwickel, and that as late as February 2003 he had received a draft of an agreement containing numerous material terms never before discussed. Many of those terms, however, had been left *unmarked* in an otherwise marked-up version of the 1998 Proposed Agreement. Even the 75/25 ownership split detailed in the Proposed Agreement was marked "not discussed or agreed" in the attachment to Bowen's second declaration.

*Defendants' (First) Motion for Summary Judgment.* In late 2003, Defendants learned that the funds they had paid to CMI were no longer being held in the Nations Escrow. In January 2004, they filed a motion to strike the complaint, a motion for summary judgment, and a motion for leave to amend their answer (to add the affirmative defense of accord and satisfaction). The motion for summary judgment is the only one relevant here. Defendants contended that in 1998 the parties "entered into a settlement," that Defendants met their obligations

under the settlement by "recognizing Plaintiffs' 75% ownership interest in The Score and paying Plaintiffs their appropriate share of the funds derived from exploitation [**12] of that work" (J.A. 231), and that Plaintiffs "ratified the 1998 Settlement by accepting several hundred thousand dollars of Defendants' payments . . . and by seeking money under the terms of the 1998 Settlement from Defendants' foreign representatives." (J.A. 232.) Defendants supported the motion with a statement of facts and a third declaration by Jay Bowen. In contrast to Defendants' posture in September 2003, the statement of facts and the memorandum supporting Defendants' motion stated that the parties "agreed" to the material terms of the 1998 Proposed Agreement. Jay Bowen's third declaration simply stated that the parties "began negotiating a settlement" and that the terms of that agreement "were memorialized in an unsigned document entitled 'Settlement/Co-Administration Agreement.'" This same document would later be attached to the renewed motion for summary judgment as the Proposed Agreement.

In the January 2004 motion, Defendants first put forth the arguments for accord and satisfaction and equitable estoppel that are relevant to this appeal. They asserted that the parties either ratified the [*391] Proposed Agreement, or that equity demanded that Plaintiffs be estopped from otherwise [**13] pursuing their claims.

According to Defendants, the Proposed Agreement was ratified by Defendants' performance of their obligations under the agreement and Plaintiffs' acceptance of that performance. Defendants performed their obligations, they asserted, by paying the over $ 400,000 due under the agreement with respect to the domestic exploitation of "The Score" and by reducing their claims to the foreign royalties -- actions they would not have undertaken but for the existence of Proposed Agreement. And Plaintiffs accepted that performance, ratifying the Proposed Agreement, when they made claims upon the foreign royalties and when they "allow[ed]" "[parties] associated with Plaintiffs to withdraw a large portion of the escrowed funds." (J.A. 255.)

The Defendants alternatively argued that Plaintiffs should be equitably estopped from asserting the invalidity of the Proposed Agreement. Defendants claimed that they had "*expected* that the 1998 Settlement . . . resolved

Case: 14-1167 Case: 14-1167 Document: 47 Document: 39-5 Page: 390 Page: 390 Filed: 06/20/2014 Filed: 06/20/2014

Page 8

173 Fed. Appx. 385, *391; 2006 U.S. App. LEXIS 5615, **13;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

Plaintiffs' claims" (J.A. 257)(emphasis added), that but for the agreement they would not have performed as they did, and thus that it would be inequitable to allow Plaintiffs to accept the benefits of the agreement [**14] and yet continue to pursue their claims.

The district court denied Defendants' motion for summary judgment. The court found many of Defendants' factual allegations inadmissible because they were based upon information Bowen had received from Plaintiffs' attorney James Zwickel in the course of mediation and settlement negotiations and were not "otherwise discoverable." *See* FED. R. EVID. 408. The court thereby excluded Defendants' allegations pertaining to the disappearance of the Nations Escrow funds and to Plaintiffs' affirmative steps to collect the royalties from "The Score's" foreign exploitation.

The court went further, however, to say that summary judgment would still be inappropriate even if the statements in Bowen's third declaration were admissible. It held that "a genuine issue of material fact exists as to whether plaintiffs have entered into an accord and satisfaction regarding their claims, particularly considering the fact-specific nature of the inquiry into the parties' intent that is at the center of an accord and satisfaction defense." (J.A. 717.) For similar reasons, it held that summary judgment on estoppel grounds was also [**15] inappropriate.

*Defendants' Renewed Motion for Summary Judgment.* In June 2004, Defendants filed a renewed motion for summary judgment, supported not by Jay Bowen's declaration, but instead by the testimony of Plaintiff Steve Scipio and Brian Scholfield, the corporate representative of Plaintiff Leosong. Defendants also filed a memorandum of law and a statement of undisputed facts.

Plaintiffs, despite being granted five motions to extend their deadline, failed to respond. [7] Accordingly, in its memorandum and order granting Defendants' renewed motion for summary judgment, the [*392] district court adopted the entire statement of facts supporting Defendants' renewed motion. [8] This eliminated several points of contention. Most importantly, the statement of facts represented that "as a result of negotiations, the parties agreed to the material terms of the 1998 Settlement." Plaintiffs previously contended that the parties never agreed on the material terms of the Proposed Agreement.

7   The purported reason for Plaintiffs' delay was (after the death of Plaintiffs' counsel's mother in August) to enable Plaintiffs' counsel to obtain the transcript of Terry Smith's September 8, 2004 deposition in a related case, Case No. 3:04-0368. Plaintiffs' original deadline to respond to Defendants' June 8, 2004 renewed motion for summary judgment was September 1, 2004. Smith, who was Plaintiffs' agent and who assisted Plaintiffs' counsel in the related case, was available for Plaintiffs to interview at any time following the June 8 motion.

[**16]

8   *See supra* note 1.

Defendants' renewed motion for summary judgment and accompanying memorandum of law subtly departed from their previous motion for summary judgment. First, Defendants retreated from their position that they "met their contractual obligations under the 1998 Settlement. . . ." In the renewed motion, they maintained that they had performed -- though perhaps not *fully* performed -- under the Proposed Agreement. Second, they emphasized a new argument as to how Plaintiffs acted intentionally to ratify the Proposed Agreement: In paragraph 69 of the complaint, Plaintiffs asserted that neither Defendants nor Plaintiffs "[were] entitled to distribute [such] funds unless and until there exists an executed agreement in writing establishing the rights of the respective parties." (J.A. 56.) Defendants contended in their renewed motion that by allowing the funds to be removed from the Nations Escrow, they ratified the Proposed Agreement *thereby.*

*District Court's Grant of Summary Judgment.* In a terse opinion, the district court granted Defendants' renewed motion for summary [**17] judgment. It "adopt[ed] by reference as if repeated" its Memorandum in response to the earlier motion, and, as noted, because of Plaintiffs' default it accepted Defendants' statement of facts. Puzzlingly, however, it stated that "had [the previous motion for summary judgment] been supported by admissible evidence, it would have been granted." (J.A. 1149.) This contradicted its statement in the previous memorandum that it "could not . . . find [that an accord and satisfaction existed] based only upon the vague statements contained in Mr. Bowen's declaration, even if they were not otherwise barred." (J.A. 717.)

*Plaintiffs' Motion to Amend and District Court's Denial of that Motion.* On November 3, 2004, Plaintiffs

Case: 14-1167 Case: 14-1167 Document: 47 Document: 47 Page: 391 Page: 391 Filed: 06/20/2014 Filed: 06/20/2014

Page 9

173 Fed. Appx. 385, *392; 2006 U.S. App. LEXIS 5615, **17;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

filed a *Rule 59* motion for a new trial, or to alter or amend the district court's October 20, 2004 judgment. *See FED. R. CIV. P. 59(a), 59(e)*. On December 1, 2004, the court denied this motion, which it noted could only be granted "if there [were] a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." (J.A. 1567.) [**18] The only plausible argument in Plaintiffs' motion was that Terry Smith's deposition, the transcript of which was not available until late September, constituted new evidence. But, the court held, Smith was available to Plaintiffs long before *Defendants* had taken that deposition, and Plaintiffs "could have deposed him themselves or secured his affidavit testimony in a timely fashion so as to submit it for the court's consideration." (J.A. 1568.)

The Scipio Plaintiffs now appeal the district court's grant of summary judgment to Defendants and its subsequent denial of their motion to alter or amend that judgment.

## IV. Analysis

### A. Standard of Review

[HN2] We review the district court's grant of summary judgment de novo. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 405 (6th Cir. 2004). And while we [*393] generally review a denial of a *Rule 59(e)* motion to alter or amend a judgment for abuse of discretion, to the extent the motion seeks reconsideration of a grant of summary judgment, we review de novo the denial of the motion. *Columbia Gas Transmission, Corp. v. Limited Corp.*, 951 F.2d 110, 112 (6th Cir. 1991). Summary judgment shall be [**19] granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*.

Plaintiffs' failure to respond to Defendants' renewed motion for summary judgment does not itself doom their complaint. According to *Federal Rule of Civil Procedure 56(e)*:

> [HN3] When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but

the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.*

(emphasis added). [HN4] The Supreme Court has expressly rejected the notion that *Rule 56(e)* alters the standard stated in *Rule 56(c)* for granting summary judgment. Rather, "[a] [**20] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir. 1979)(citing *Adickes v. Kress & Co.*, 398 U.S. 144, 159, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). See FED. R. CIV. P. 56(e) advisory committee's notes to 1963 Amendments (noting that *Rule 56(e)* only calls for summary judgment when "appropriate"). And, more pertinent to the situation here, the non-movant's failure to respond does not free the movant of the burden of establishing that "the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*.

The application of Middle District of Tennessee Local Rule 8(b)(7)(g) to this case means that there is no dispute as to the facts supporting Defendants' renewed motion for summary judgment. That still leaves us to examine whether, on the basis of those facts, the district court correctly granted Defendants' motion for summary judgment and denied Plaintiffs' motion to alter or amend. We review those [**21] decisions de novo, on the basis of Tennessee law.

### B. Accord and Satisfaction

#### 1. Legal Definitions and Burdens

Sections IV, VI, and VII of Plaintiffs' brief challenge the district court's conclusion that the parties ratified the Proposed Agreement and that the agreement constituted and accord and satisfaction under Tennessee law.

[HN5] According to Tennessee's long-standing definition of an accord and satisfaction:

> An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in

Case: 14-1167 Case: 14-1167 Document: 47 Document: 39-5 Page: 393 Filed: 06/20/2014 Filed: 06/20/2014

Page 10

173 Fed. Appx. 385, *393; 2006 U.S. App. LEXIS 5615, **21;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement.

*Lytle v. Clopton, 149 Tenn. 655, 663, 261 S.W. 664 (Tenn. 1923)*(quotation omitted). In other words,

[*394] The *accord* of "accord and satisfaction" is a form of contract. The satisfaction of a disputed debt (or of an undisputed yet unliquidated debt) is offered in consideration for the substitute performance.

*Ward v. Wilkinson, No. 01-A-01-9803-CH-00151, 1999 Tenn. App. LEXIS 250, [**22] at *4 (Tenn. Ct. App. Apr. 19, 1999).* [HN6] The party asserting the defense of accord and satisfaction must prove by a preponderance of the evidence both that a contract existed *and* that "the contracting plaintiff agreed to accept lesser payment rendered in satisfaction of the original performance or payment for which the parties contracted." *1999 Tenn. App. LEXIS 250 at *4-5* (emphasis omitted).

In the latter inquiry, [HN7] "whether a later agreement between contracting parties represents an accord and satisfaction so as to extinguish their original relationship or whether it is simply an executory accord is a matter of the intention of the parties." *Rhea v. Marko Constr. Co., 652 S.W.2d 332, 334 (Tenn. 1983)*(citing *Restatement (Second) of Contracts § 281, cmt. e* (1981)). More precisely:

To constitute a valid accord and satisfaction it is also essential [1] that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; [2] that the debtor shall intend it as a satisfaction of such obligation, and [3] that such intention shall be made known to the creditor in some unmistakable manner. [**23] It is equally essential [4] that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction.

The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.

*Lytle, 149 Tenn. at 663-64* (quoting 1 Corpus Juris, 529). [HN8] Matters of intention are generally resolved by the trier of fact:

An accord and satisfaction is established by the intentions of the parties at the time of the transaction and the issue is a question of fact to be determined by the trier of fact . . . . Unless the evidence thereof is insufficient to submit to the jury or is undisputed and not open to opposing inferences, accord and satisfaction, including the various elements thereof, is ordinarily a question of fact to be determined by the jury or by the court where it is the trier of the facts.

*Helms v. Weaver, 770 S.W.2d 552, 553-54 (Tenn. Ct. App. 1989)*(internal citations omitted). That said, [HN9] Tennessee courts have often [**24] assessed the existence of an agreement as a matter of law:

Instances may arise in which an acceptance, on the part of the offeree, will be presumed; or where, in the circumstances, the offeree will be held estopped to deny acceptance. Such a case will arise where a check was mailed to a party and cashed, on the face of which appeared, "in full settlement of account."

*Lytle, 149 Tenn. at 663. But see Quality Care Nursing Services, Inc. v. Coleman, 728 S.W.2d 1, 3-4 (Tenn. 1987)*(quoting 6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, § 1277 (1951) for the proposition that: [HN10] "It is not enough for the debtor merely to write on a voucher or on his check such words as 'in full payment' or 'to balance account' where there has been no such dispute or antecedent discussion as to give reasonable notice to the creditor that the check is being tendered as full satisfaction.").

[*395] 2. The Proposed Agreement, If Ratified, Constituted a Valid Accord and Satisfaction.

A precise parsing of the Tennessee cases regarding what *may* constitute an accord and satisfaction is

Case: 14-1167 Case: 14-1167 Document: 47 Document: 39-5 Page: 395 Filed: 06/20/2014 Filed: 06/20/2014

Page 11

173 Fed. Appx. 385, *395; 2006 U.S. App. LEXIS 5615, **24;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

unnecessary because the Proposed Agreement, if ratified, clearly *would*. The Fugee Defendants' [**25] Statement of Undisputed Facts establishes that "prior to the filing of [the] lawsuit, Plaintiffs' representatives and The Fugees' representatives negotiated[] a joint ownership agreement . . . that constituted a final settlement and release of Plaintiffs' claims" and that "the parties agreed to the material terms of [that agreement]." (J.A. 764.) Moreover, the face of the Proposed Agreement, itself entitled "Settlement/Co-Administration Agreement," indicates that its purpose was to "resolve" the dispute between the parties. The agreement provided for joint ownership of "all of the worldwide right, title, and interest in and to the copyright [of 'The Score']." (J.A. 367.) *See Bowater N. Am. Corp. v. Murray Mack, Inc., 773 F.2d 71, 76 (6th Cir. 1985)*("The settlement agreement here is clearly an Accord and Satisfaction. The central intent of the agreement was to substitute the undertakings of the agreement for the claims asserted by plaintiff in the original litigation. The settlement agreement clearly embodies those substituted undertakings.").

The central question thus is not whether the Proposed Agreement *could have* operated as an accord and satisfaction. [**26] Nor is it whether the combination of Defendants' subsequent conduct (tendering the domestic royalties and reducing their stake in the foreign royalties) and Plaintiffs' subsequent conduct (arguably allowing the domestic funds to be moved, and collecting the foreign royalties) *itself* operated as an accord and satisfaction. [9] Rather, the question is whether through their conduct the parties ratified the Proposed Agreement, *such that* it would operate as an accord and satisfaction. For this inquiry, a more general examination of contract law principles is required. *See* 1 TENN. JURIS., ACCORD AND SATISFACTION § 1 [HN11] ("An accord and satisfaction is a type of contract and is governed by the law of contracts.")(citing *R.J. Betterton Mgt. Servs., Inc. v. Whittemore, 733 S.W.2d 880, 882 (Tenn. Ct. App. 1987))*; *Cole v. Henderson, 61 Tenn. App. 390, 454 S.W.2d 374, 384 (Tenn. Ct. App. 1969)*("An accord is a form of contract, governed by the general rules for contracts, including the elements of offer and acceptance.")

[9] Defendants do not argue, for example, that a brief statement attached to the $ 400,000 payment operated analogously to the words, "in full

settlement of account," mentioned in *Lytle*. *See Lytle, 149 Tenn. at 663*.

[**27] **C. "Ratification"**

1. Offer and Acceptance

"[HN12] A proposition by one party and an acceptance by the other constitutes an agreement binding on both. No contract is complete without the mutual assent of the parties, and an offer to sell imposes no obligation until it is accepted according to its terms." 1 TENN. JURIS., CONTRACTS § 16. According to the *Restatement (Second) of Contracts § 30* (1981):

> (1) An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance.

> (2) Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

[*396] 2. Meeting of the Minds

The Proposed Agreement provided that it "[would] not be binding upon the parties until duly executed by each party" (J.A. 373), and Defendants' concede that the 1998 Settlement was never executed by the parties. [10] Thus Defendants can only uphold the Proposed Agreement as an accord and satisfaction based upon something [**28] *outside* of the text of the agreement.

10 [HN13] "Execute" means "to complete; to sign; to sign, seal, and deliver." BALLENTINE'S LAW DICTIONARY (3d ed. 1969).

The first possibility is that there was a meeting of the minds that Plaintiffs could accept the Proposed Agreement either by exercising dominion over the funds in the Nations' Escrow or by claiming the portion of the foreign royalties that remained after Defendants reduced their claimed share. With respect to the former, it should be noted that nothing in the statement of undisputed facts

or the record indicates that Defendants tendered the domestic royalty payments to CMI with the expectation that Plaintiffs, by distributing those funds, would accept the terms of the Proposed Agreement. Defendants insist that but for the Proposed Agreement, they would not have tendered any funds, suggesting that at the time they tendered the funds, they were under the *erroneous* belief that the Proposed Agreement had already been ratified. [11] But if Defendants so believed, [**29] then they certainly did not think that Plaintiffs' acceptance of the funds would *ratify* the Proposed Agreement -- because they (allegedly) already considered it ratified! Defendants insist that they tendered the funds under the belief that the Proposed Agreement had disposed of Plaintiffs' claims; they thus foreclose the possibility that there was a meeting of the minds that the Proposed Agreement *could be ratified* by Plaintiffs' distribution of the tendered funds.

> [11] "Erroneous" because -- as Defendants maintain throughout -- ratification of the Proposed Agreement occurred only when Plaintiffs' agents authorized the transfer of the funds out of the Nations Escrow or when Plaintiffs collected the foreign royalties.

To illustrate *Plaintiffs'* state of mind regarding the funds in the Nations Escrow, Defendants point to language in paragraph 69 of the complaint: that neither Defendants nor Plaintiffs "[were] entitled to distribute [the Nations Escrow] funds unless and until there exists an executed [**30] agreement in writing establishing the rights of the respective parties to the profits of 'The Score.'" (J.A. 29.) The implication, Defendants contend, is that by "distributing" the funds in the account, the Plaintiffs knew they would *ratify* the Proposed Agreement. But this commits a mistake of logic. Just because Plaintiffs would not be "entitled" to distribute the funds in the absence of a ratified agreement does not mean that they could ratify it by the distribution. In fact, by referring to "an executed agreement *in writing*" (emphasis added), the complaint makes Plaintiffs' state of mind all the more clear: distribution by itself would not execute the agreement.

Many of the same arguments apply to the foreign royalties. The Proposed Agreement did not provide for ratification either by Defendants reducing their share of the foreign royalties or by Plaintiffs collecting what remained after they did. Moreover, the second argument

above -- that the complaint revealed that Plaintiffs could ratify the agreement by taking certain actions with respect to the Nations Escrow funds -- is inapplicable here. The complaint made no mention of the status of [*397] the foreign royalties -- even [**31] to the point of suggesting that Plaintiffs would not be "entitled" to collect the royalties in the absence of an executed agreement -- so Defendants cannot argue that it evidenced a meeting of the minds that Plaintiffs could ratify the Proposed Agreement by collecting them.

### 3. Promissory Estoppel

Despite all the talk of "ratification," Defendants' real theory is that the Proposed Agreement became a binding accord and satisfaction by operation of the doctrine of promissory estoppel. [12] In Section I.A of their argument, entitled "The 1998 Settlement Represents An Enforceable Award," Defendants argue that although "the 1998 Settlement was never executed," it is nonetheless binding because "where a party receives the benefit of performance under a contract that lacks a formality of execution . . . that party is estopped to assert the invalidity of the contract." (Appellees' Br. 20.) The cases Defendants cite for this proposition are straight promissory estoppel cases -- they concern municipalities that were estopped from asserting the technical invalidity of service contracts whose benefits they had received, rather than private parties who had agreed to the terms of, but never executed, [**32] a settlement agreement. In *Trull v. City of Lobelville, 554 S.W.2d 638 (Tenn. Ct. App. 1976)*, the court held that after enjoying the benefits of a contract, a city could not avoid its contractual obligations by alleging that the city officials who executed the contract lacked authority to do so. And in *Brown v. City of Manchester, 722 S.W.2d 394 (Tenn. Ct. App. 1986)*, the court cited *Trull* in concluding that a city was bound to compensate an official according to the terms of an "Executive Proclamation" that the mayor was allegedly unauthorized to promulgate. *Id. at 397*.

> [12] Defendants wisely do not contend that a separate implied-in-fact contract -- that is, one implied by the conduct of the parties -- constituted an accord and satisfaction. They clearly seek to uphold the Proposed Agreement, a written contract, as an accord and satisfaction, and [HN14] "an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." 1 TENN.

Page 13

173 Fed. Appx. 385, *397; 2006 U.S. App. LEXIS 5615, **32;
2006 FED App. 0170N (6th Cir.); Copy. L. Rep. (CCH) P29,127

JURIS., CONTRACTS § 98 (citing *Fletcher Realty, Inc. v. Hayslope Properties, 712 S.W.2d 478, 481 (Tenn. Ct. App. 1986)).*

[**33] A case more analogous to this one is *Customized Transp., Inc. v. Bradford, No. 96-1110, 1997 U.S. App. LEXIS 13847 (6th Cir. June 9, 1997),* an unpublished Sixth Circuit case applying Michigan law. In *Bradford,* the court held that promissory estoppel prohibited a defendant from arguing that an oral settlement agreement -- pursuant to which the plaintiff waived its right to file an appeal -- was invalid under the Statute of Frauds. The defendant there faxed a revised draft of the agreement to the plaintiff's agent, and the agent told the defendant that the draft was "acceptable," thus executing the oral contract. The court noted that in Michigan,

> [HN15] Promissory estoppel arises in equity when (1) there is a promise (2) that the promisor should have reasonably expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produces reliance or forbearance of that nature (4) under circumstances such that the promise must be enforced if injustice is to be avoided.

*1997 U.S. App. LEXIS 13847 at *12* (citation omitted). The court held that all elements were met, in part because the plaintiff, relying on the agreement, did not file [**34] an appeal during the statutory period. The court held the settlement agreement [*398] binding in its entirety. *1997 U.S. App. LEXIS 13847 at *12-15.*

Tennessee's law of promissory estoppel is nearly identical to Michigan's:

> [HN16] When one man by his promise induces another to change his situation, repudiation of the promise would amount to a fraud. Where [1] one makes a promise [2] which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and [3] where such promise does in fact induce such action or forbearance, it is binding [4] if injustice can be avoided only by enforcement of the promise.

*Stones River Utils., Inc. v. Metro. Gov't, 981 S.W.2d 175, 177 (Tenn. Ct. App. 1998)(quoting Foster & Creighton Co. v. Wilson Contracting Co., 579 S.W.2d 422, 427 (Tenn. App. 1979)).* If the facts here supported those criteria, the Scipio Plaintiffs should be estopped from denying the validity of the Proposed Agreement, and the district court's grant of summary judgment to the Fugee Defendants should be affirmed. Alas, they do not.

The first problem is that Defendants do not set forth [**35] the promise upon which they detrimentally relied. When Defendants speak of their "erroneous" belief that the Proposed Agreement was ratified, they suggest that the Proposed Agreement was. the relevant promise, *i.e.,* that they relied on that promise when they tendered the domestic royalties and reduced their stake in the foreign royalties. The problem with this is that the Proposed Agreement specified that it would not be binding until duly executed -- which it never was -- so it could not reasonably have been expected to induce Defendants' reliance. Moreover, that theory would be inconsistent with Defendants' contention that the Proposed Agreement did not become binding until *Plaintiffs* took various actions. As the district court noted, "the Fugee Defendants apparently did not consider [the Nations Escrow] funds to have been accepted by plaintiffs while they were held in escrow" -- and thus they did not consider the Proposed Agreement yet ratified. [13] The next possibility, which appears at page 26 of Defendants' brief and which they articulated at oral argument, is that Defendants tendered the funds relying on a promise that if Plaintiffs were to distribute those funds from [**36] the Nations Escrow, Plaintiffs would ratify the Proposed Agreement thereby. But this faces the same difficulties discussed earlier: 1) Defendants tell us that they only learned of the Nations Escrow -- and that the Proposed Agreement could be ratified by distribution -- upon reading paragraph 69 of the complaint, long after they had tendered the funds; and 2) the complaint did not authorize ratification by distribution.

[13] Defendants likely felt they *had* to take this position. The only reason they were allowed to amend their answer to include the affirmative defense of accord and satisfaction was that they discovered new information nearly five years into the litigation -- specifically, that the Nations Escrow funds were missing. Since *the complaint*

spoke of Plaintiffs having tendered the funds in the Nations Escrow, Plaintiffs would have otherwise been barred from asserting five years later that their tendering of those funds ratified the Proposed Agreement.

The second problem is that no injustice would [**37] result from refusing to enforce the Proposed Agreement as an accord and satisfaction, because any injury to Defendants could be cured by Defendants amending their answer to plead a counterclaim for unjust enrichment, as opposed to the affirmative defense of accord and satisfaction. Unlike in *Bradford,* where the plaintiff's reliance on the promise resulted in his [*399] appeal being procedurally barred, there is nothing here that could not be solved by the Scipio Plaintiffs' repaying to Defendants the funds they have collected: Defendants' alleged reliance has not harmed their defense of the infringement claims they ask the court to bar. Indeed, Defendants did not learn of the alleged ratification of the Proposed Agreement until nearly five years into the litigation. And until that point, they were in no way harmed *by their ignorance* that the Nations Escrow funds had been distributed. Justice may require that the funds be repaid -- or subtracted from Plaintiffs' damages if they prevail on their infringement claims. But justice does not require that the Proposed Agreement be given effect as an accord and satisfaction of Plaintiffs' underlying claims.

We find that the Scipio Plaintiffs [**38] should not be barred by the doctrine of promissory estoppel from asserting the invalidity of the Proposed Agreement. Together with our conclusion that there was no meeting of the minds that the Proposed Agreement could be ratified by any method other than written execution, we find that the Proposed Agreement does not operate to bar the Scipio Plaintiffs' infringement claims.

**D. Equitable Estoppel**

Defendants' alternate theory is that Plaintiffs' infringement claims should be barred under the doctrine of *equitable* estoppel, because Plaintiffs "affirmatively, knowingly, and repeatedly accepted the benefits of the 1998 Settlement." As with the Defendants' promissory estoppel theory, equity does not require such a result.

[HN17] Equitable estoppel is a more general version of promissory estoppel:

> Equitable estoppel arises, when one by his acts, representations or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

1 [**39] TENN. JURIS., ESTOPPEL § 25 (citation omitted). [HN18] Unlike with promissory estoppel, the party asserting estoppel need not have relied upon a promise by the party to be estopped. But as with promissory estoppel, the touchstone for relief is whether the claimant will be prejudiced unless the opposing party is barred from doing what it otherwise has a right to do. The punishment must match the crime.

As noted, a conversion or unjust enrichment action would remedy Defendants' alleged injury without precluding Plaintiffs' infringement claims. We thus conclude that Plaintiffs need not be equitably estopped from pursuing this action. We do not reach the question -- central to an unjust enrichment analysis -- of whether equity requires Plaintiffs to refund the moneys they have thus far collected.

**V. Conclusion**

We find that the parties have not ratified the Proposed Agreement and that Plaintiffs should not be estopped from denying its validity under the principle of promissory estoppel. We find further that Plaintiffs should not be equitably estopped from pursuing their infringement claims. Accordingly we reverse the district court's grant of summary judgment to Defendants. This renders [**40] moot Plaintiffs' appeal of the denial of their *Rule 59(e)* motion.





Positive
As of: Jun 10, 2014

**LATIVAFTER LIQUIDATING TRUST, Plaintiff-Appellee, v. CLEAR CHANNEL COMMUNICATIONS, INC., Defendant-Appellant.**

**Case No. 08-5959**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*09a0578n.06*; *345 Fed. Appx. 46*; *2009 U.S. App. LEXIS 18767*; *2009 FED App. 0578N (6th Cir.)*

**August 18, 2009, Filed**

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [**1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE.
*Lativafter Liquidating Trust v. Clear Channel Communs., Inc., 2008 U.S. Dist. LEXIS 50846 (E.D. Tenn., July 1, 2008)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, internet streaming services provider, sued defendant, an operator of 1200 radio stations, for breach of contract, promissory estoppel, and negligent misrepresentation. A jury found for plaintiff on the breach of contract claim and awarded it $ 40 million in damages. The U.S. District Court for the District of Tennessee denied defendant's motion for judgment as a matter of law, or in the alternative, a new trial. Defendant appealed.

**OVERVIEW:** Defendant first argued that no contract existed as there was no meeting of the minds and that the parties' volleys of emails and draft proposals were simply negotiations. Viewing the evidence in plaintiff's favor, the jury reasonably could have concluded that the parties reached an agreement on the material terms. An "updated draft" contained all the "deal points," and although there was not yet approval for a 3-year term, that approval was manifested by defendant's subsequent assurances to plaintiff that they "had a deal." The court could not say that reasonable minds could not differ as to the conclusions to be drawn from the evidence. A board member and investor who had researched plaintiff's financial condition had particularized knowledge of plaintiff's value and it was not an abuse of discretion to allow his lay opinion testimony under *Fed. R. Evid. 701*

on plaintiff's projected value if it had maintained the contract with defendant. Diminished-value damages were in order and were not outside the contemplation of the contracting parties. The district court determined the date of the breach, and it did not abuse its discretion by awarding prejudgment interest.

**OUTCOME:** The court affirmed the judgment of the district court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court reviews a district court's denial of a *Fed. R. Civ. P. 50(b)* motion de novo.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
[HN2] In a diversity case, when a *Fed. R. Civ. P. 50* motion for judgment as a matter of law is based on the sufficiency of the evidence, an appellate court applies the standard of review of the state whose substantive law governs the matter.

*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
*Civil Procedure > Trials > Judgment as Matter of Law > Judgments Notwithstanding Verdicts*
[HN3] In Tennessee, the standards governing trial courts in ruling on motions for directed verdict or JNOV are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion

must be denied.

*Contracts Law > Formation > Definite Terms*
*Contracts Law > Formation > Meeting of Minds*
[HN4] An enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced.

*Contracts Law > Remedies > General Overview*
*Contracts Law > Remedies > Foreseeable Damages > General Overview*
[HN5] The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed. Generally speaking, in Tennessee damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
*Evidence > Testimony > Lay Witnesses > Opinion Testimony > General Overview*
[HN6] An appellate court reviews for abuse of discretion a district court's evidentiary rulings, including rulings on witness testimony under *Fed. R. Evid. 701*.

*Evidence > Testimony > Lay Witnesses > Opinion Testimony > General Overview*
[HN7] See *Fed. R. Evid. 701*.

*Evidence > Testimony > Lay Witnesses > Opinion Testimony > General Overview*
[HN8] Most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

345 Fed. Appx. 46, *; 2009 U.S. App. LEXIS 18767, **1;
2009 FED App. 0578N (6th Cir.)

*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

[HN9] An appellate court reviews for an abuse of discretion a district court's prejudgment-interest award.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*

[HN10] There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law.

*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*

[HN11] Tennessee law favors awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received.

**COUNSEL:** For LATIVAFTER LIQUIDATING TRUST, Plaintiff - Appellee: Martin Blair Bailey, Herbert S. Sanger, Jr., Attorney, Wagner, Myers & Sanger, Knoxville, TN.

For CLEAR CHANNEL COMMUNICATIONS, INC., Defendant - Appellant: James C. Martin, Donna Marie Doblick, Attorney, Colin E. Wrabley, Reed Smith, Pittsburgh, PA; Patricia A. Foster, Attorney, Richard M. Goehler, Frost Brown Todd, Cincinnati, OH.

**JUDGES:** BEFORE: BATCHELDER, Chief Judge, CLAY, Circuit Judge; and COX *, District Judge.

* The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

**OPINION BY:** ALICE M. BATCHELDER

**OPINION**

[*47] **ALICE M. BATCHELDER, Chief Judge.** In this contract dispute, Defendant-Appellant Clear

Channel Communications, Inc. ("Clear Channel") appeals a jury award of compensatory damages and the district court's award of pre-judgment interest to Plaintiff-Appellee Eon Streams, Inc. ("Eon"). [1] For the reasons that follow, we AFFIRM.

1 On July 23, 2007, the district court granted Eon's motion to substitute "Lativafter Liquidating Trust" as the real party in interest.

**I.**

Clear Channel operates a network of approximately [**2] 1200 radio stations. Prior to going out of business, Eon provided internet streaming services, which allow radio stations to broadcast live programming on their websites. In January 2004, Eon and Clear Channel entered into a one-year, automatically renewable Service Agreement, under which Eon would provide internet streaming for some of Clear Channel's stations.

Later that year, Stephen Newman, Eon's chief executive officer, approached Brian Parsons, Clear Channel's Vice President of Technology, with a proposal for Eon to provide ad-insertion technology [2] for Clear Channel's internet broadcasts. On October 13, 2004, Newman e-mailed Parsons a "Letter of Agreement" ("LOA") that would amend the Service Agreement between Clear Channel and Eon. Under the proposed LOA, Eon would, among other things, develop and implement internet ad-insertion technology for Clear Channel. In return, Clear Channel was to extend the Service Agreement for a minimum three-year term and move all streaming radio stations within its network to Eon.

2 Ad-insertion technology allows a station to insert advertisements into its "streamed" internet broadcasts to replace the advertisements that air on the station's local [**3] radio broadcasts.

On October 19, 2004, Parsons sent an e-mail to Newman and Emma Woods of Eon, and to Kim Johnson, Clear Channel's Vice President of Sales and Marketing. Parsons began the e-mail by stating: "I am going to have to start from scratch on this but wanted to make sure the deal points were put into and verified via email first." Parsons then listed the deal points as including: (1) a three-year term under which Eon would be Clear Channel's preferred streaming partner; (2) Eon's maintaining competitive pricing, quality, and features; (3)

345 Fed. Appx. 46, *47; 2009 U.S. App. LEXIS 18767, **3;
2009 FED App. 0578N (6th Cir.)

Clear Channel's maintaining editorial control of network and branding; and (4) a 15% commission for Eon on any internet advertisement sale within Clear [*48] Channel's network. The same day, Johnson "replied to all" to note that the 15% commission would be on advertisement sales initiated by Eon, not on all sales.

After another round of revisions between Eon and Clear Channel, Woods e-mailed Parsons what she referred to as "hopefully the final version" of the LOA on October 21, 2004. The next day, Parsons e-mailed Newman an "updated draft" of the LOA. Parsons wrote: "[A]s a reminder, I won't be able to get an answer on a three-year commitment until [**4] I confirm with my cohort VPs." The attached "updated draft" included all the deal points Parsons had listed in his October 19 e-mail, including the three-year term.

Parsons attended Eon's January 2005 board meeting and informed the board that the contract was "in legal" but assured them: "[W]e have a deal, so nobody has to worry about anything here; we do have a deal." At some point after that board meeting, Newman met with Jeffrey Littlejohn, a Clear Channel Senior Vice President. Newman testified that Littlejohn told him: "We've absolutely got a deal."

Over the next several months, Eon sought to secure a written expression of that deal so it could show potential investors that Eon had a solid commitment from Clear Channel. In an effort to get a signed LOA, Newman presented Parsons with several new proposals suggesting changing the term from three years to a one-year or two-year renewable term, and even expressing a willingness to eliminate Eon's commission on advertisement sales it initiated. Meanwhile, Eon began developing the ad-insertion technology. Parsons regularly met with Eon during this time. Representatives of Eon and Clear Channel together met with potential advertising customers. [**5] Clear Channel's internal communications referred to Eon's responsibilities to develop the ad-insertion technology and expressed an objective of moving all streaming stations over to Eon.

Parsons even joined Eon's board of directors. The minutes of Eon's April 2005 board meeting reflect that Parsons announced that Clear Channel was "committed to executing the written contract . . . ." At Eon's July 2005 board meeting, Parsons assured the directors that a signed contract would be sent that day. That contract, however, never arrived.

In September 2005, Clear Channel signed an agreement with Akamai Technologies, Inc., one of Eon's competitors, to serve as Clear Channel's streaming provider. In November 2005, Clear Channel notified Eon of its intent to let its Service Agreement with Eon expire. In May 2006, Eon sold substantially all of its assets to a third party for $ 17 million.

Eon filed suit against Clear Channel, alleging breach of contract, promissory estoppel, and negligent misrepresentation. Both parties unsuccessfully moved for summary judgment, and the case proceeded to a jury trial. Following Eon's evidence and again at the close of all evidence, Clear Channel unsuccessfully moved [**6] for judgment as a matter of law under *Rule 50(a)*. A jury found for Clear Channel on Eon's promissory estoppel and negligent misrepresentation claims, but found for Eon on the breach of contract claim and awarded Eon $ 40 million in damages. Clear Channel filed a post-verdict *Rule 50(b)* motion for judgment as a matter of law, or, in the alternative, a new trial; and Eon moved to alter the judgment to include pre-judgment interest. The district court denied Clear Channel's motion and granted Eon's, bringing the total award to approximately $ 44.2 million. Clear Channel timely filed its Notice of Appeal.

[*49] **II.**

Clear Channel makes several arguments on appeal. First, it argues it was entitled to judgment as a matter of law because there was no "meeting of the minds" regarding Eon's proposed LOA, and thus no contract for it to breach. Next, Clear Channel contends that the district court erred in allowing Grady Vanderhoofen, an Eon board member, to testify regarding Eon's diminished value and that Vanderhoofen's testimony was, in any event, insufficient evidence of Eon's damages. Finally, Clear Channel argues that the district court erred in awarding Eon pre-judgment interest.

**A. Was [**7] there a contract?**

[HN1] We review a district court's denial of a Rule 50(b) motion *de novo*. *Radvansky v. City of Olmsted Falls, 496 F.3d 609, 614 (2007)*. [HN2] "[I]n a diversity case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, this court applies the standard of review of the state whose substantive law governs the matter." *American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 471 (6th Cir. 2004)* (citing *Morales v. Am. Honda Motor Co., 151 F.3d 500,*

Case: 14-1167 Case: 14-1167 Document: 47 Page: 401 Filed: 06/20/2014

Page 5

345 Fed. Appx. 46, *49; 2009 U.S. App. LEXIS 18767, **7;
2009 FED App. 0578N (6th Cir.)

506 (6th Cir.1998)). [HN3] In Tennessee,

> The standards governing trial courts in ruling on motions for directed verdict or JNOV . . . are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions [**8] to be drawn from the evidence, the motion must be denied.

*Potter v. Ford Motor Co.*, 213 S.W.3d 264, 267-68 (Tenn. Ct. App. 2006) (quoting *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994)) (internal citations omitted).

Clear Channel argues that the LOA regarding Eon's ad-insertion technology was not a contract because Clear Channel never accepted the terms of any of Eon's various offers. It contends that there was no meeting of the minds between it and Eon and that their volleys of e-mails and draft proposals were simply ongoing negotiations that never culminated in a mutual agreement.

Eon, on the other hand, argues that Parsons's October 22 e-mail with the attached "updated draft" of the LOA set forth an express contract between the parties. Eon contends that "[t]he jury could legitimately have concluded that the only open item in November 2004 was whether Clear Channel would confirm a three-year term for the Letter of Agreement." Eon submits that "[t]he jury could have concluded that any doubt on this point was removed when Parsons attended the Eon board meeting in January 2005 and manifested Clear Channel's unqualified and unconditional acceptance by stating 'we have a deal.'" In other [**9] words, Eon argues that the evidence was sufficient for the jury to find that an express contract existed as of October 22, 2004, the date of the final LOA draft, or at least by January 2005, the date of Parsons's appearance before the Eon board.

[HN4] "[A]n enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." *Rice v. N.N. Inc., Ball & Roller Div.*, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006) (quoting *Jamestowne on Signal,* [*50] *Inc. v. First Federal Sav. & Loan Ass'n,* 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)). Taking "the strongest legitimate view of the evidence in favor of" Eon, and "discarding all countervailing evidence" in favor of Clear Channel, *Potter,* 213 S.W.3d at 267, the jury reasonably could have concluded that the parties reached an agreement on the LOA's material terms. In replying to Emma Wood's October 21, 2004, e-mail containing the "hopefully [] final version" of the LOA, Parsons attached an "updated draft" containing all the "deal points" listed by Woods in her version. True, Parsons cautioned that he would have to get approval for a three-year term from his fellow Clear Channel Vice Presidents. This [**10] approval, however, was manifested by Parsons's and Littlejohns's subsequent assurances to Eon CEO Stephen Newman that they "had a deal." Moreover, the conduct of the parties also served as evidence that the deal was sealed: Eon and Clear Channel even made joint sales calls to potential advertising customers. Even if we were inclined to reach an opposite determination, we cannot say "that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Potter,* 213 S.W.3d at 267.

**B. Should the district court have allowed Vanderhoofven to testify, and was his testimony sufficient evidence of Eon's damages?**

Grady Vanderhoofven is a venture capitalist, the Executive Vice-President of Southern Appalachian Fund (which invested in Eon), and was a member of Eon's board. Vanderhoofven testified that Eon's value would have been $ 57 million with the Clear Channel contract, instead of the $ 17 million it sold for in 2006. As an investor in Eon, Vanderhoofven in 2005 investigated Eon's financials, retaining a market research firm to verify Eon's market potential. When he became a member of Eon's board in March 2005, he received Eon's monthly financial reports, including income [**11] statements, balance sheets, and cash flow statements. Vanderhoofven testified that between June 2004 and June 2005, the number of stations Eon was streaming increased by over 500%. After June 2005, however, the revenue from Clear Channel began to dwindle, and Vanderhoofven determined that Clear Channel was moving its streaming business to another company. Vanderhoofven based his $

Case: 14-1167 Case: 14-1167 Document: 47 Document: 47 Page: 402 Page: 402 Filed: 06/20/2014 Filed: 06/20/2014

Page 6

345 Fed. Appx. 46, *50; 2009 U.S. App. LEXIS 18767, **11;
2009 FED App. 0578N (6th Cir.)

57 million valuation on the revenue Clear Channel had been generating for Eon prior to the discontinuation of their business, and the projection for the 12-month period prior to Eon's sale.

Clear Channel argues, as an initial matter, that Eon cannot recover damages for its diminished value because Tennessee does not recognize diminished-value damages outside the context of commercial real estate, and because a potential loss in Eon's value was not contemplated by the parties when they entered into the contract.

In *BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001)*, the Tennessee Supreme Court upheld a diminished-value award to a shopping center whose value had decreased when its anchor tenant breached a covenant of continuous occupancy. The court held that its conclusion [**12] was in line with general contract remedies: [HN5] "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed[.]" *Id.* (quoting *Lamons v. Chamberlain, 909 S.W.2d 795, 801 (Tenn. Ct. App.1993)).* "Generally speaking," the court recognized, "damages for breach of contract include only such as are incidental [*51] to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." *Id.* (quoting *Simmons v. O'Charley's, Inc., 914 S.W.2d 895, 903 (Tenn. Ct. App.1995)).* The court in *BVT Lebanon* did not limit its holding to the commercial real estate context; indeed, it relied on basic principles of contract law to place the plaintiff in the position it would have enjoyed had the contract been kept.

Here, had Clear Channel not breached the contract, Eon would have had a fixed-term agreement to stream internet broadcasts for hundreds of radio stations, obviously increasing its attractiveness to potential investors and buyers. And by the time Clear Channel executives assured Stephen Newman and the Eon board that a deal was in place, [**13] Clear Channel knew that Eon was seeking assurances to mollify investors; Clear Channel knew that the amended Service Agreement was integral to Eon's financial health. Diminished-value damages were in order here and were not outside the contemplation of the contracting parties.

Clear Channel contends that even if diminished-value damages are allowed in this setting,

they cannot be proven without expert testimony, and that Vanderhoofven's testimony as a lay opinion witness under *Federal Rule of Evidence 701* was improper. [HN6] "'We review for abuse of discretion a district court's evidentiary rulings, including rulings on witness testimony under *Rule[] 701 . . . of the Federal Rules of Evidence.'" United States v. White, 492 F.3d 380, 398 (2007)* (quoting *JGR, Inc. v. Thomasville Furniture Indus., Inc., 370 F.3d 519, 524 (6th Cir.2004)).* That Rule provides:

> [HN7] If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on [**14] scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Fed. R. Evid. 701.* The advisory commission notes to the 2000 amendments to *Rule 701* provide:

> [HN8] [M]ost courts have permitted the owner *or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993)* (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.* (emphasis added).

As an investor who researched Eon's financial condition, and later as a member of Eon's board, Vanderhoofven had personal, particularized knowledge

345 Fed. Appx. 46, *51; 2009 U.S. App. LEXIS 18767, **14;
2009 FED App. 0578N (6th Cir.)

of Eon's value. The district court did not abuse its discretion in permitting him to testify about Eon's projected value [**15] if it had retained Clear Channel's business. Moreover, contrary to Clear Channel's assertions, Vanderhoofven's testimony rested on a sufficient foundation -- his personal research into Eon's financial reports. [3]

> 3   On March 13, 2009, Clear Channel moved this Court to certify three questions of law to the Supreme Court of Tennessee under Tennessee Supreme Court Rule 23. Specifically, Clear Channel asked us to inquire of that court: "(1) whether Tennessee would permit a corporate plaintiff to recover $ 40 million in diminished value damages for a breach of contract that does not involve either permanent damage to real estate or a covenant of continuous occupancy; (2) whether Tennessee permits a plaintiff to recover diminished value damages for a breach of an implied contract; and (3) whether Tennessee required diminished value damages to be proven by expert testimony." Because we hold that an express contract existed between Eon and Clear Channel, that the Tennessee Supreme Court in *BVT Lebanon* did not limit its holding to the real estate context, and that *Federal Rule of Evidence 701* permits Vanderhoofen's testimony, we hereby **DISMISS** Clear Channel's motion to certify.

   [*52]   **C. Should the district   [**16]   court have awarded Eon pre-judgment interest?**

[HN9] We review for an abuse of discretion a district court's prejudgment-interest award. *Gentek Bldg Products, Inc. v. Sherwin-Williams Co., 491 F.3d 320, 333 (2007)* (quoting *Anderson v. Whittaker Corp., 894 F.2d 804, 809 (6th Cir.1990)).* [HN10] "There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law." *Daily v. Gusto Records, Inc., 14 F. App'x 579, 591 (6th Cir. 2001)* (citing *Mass. Benefit Ass'n v. Miles, 137 U.S. 689, 11 S. Ct. 234, 34 L. Ed. 834 (1891)).* [HN11] Tennessee law favors "awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Intern., Inc., 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000).* The court determined that "Eon's demise was assured when Clear Channel breached the parties' contract on September 9, 2005." The court then calculated interest as accruing from that date at a rate equal to 4.666%, the average rate [**17] from September 9, 2005 to December 14, 2007. The district court did not abuse its discretion in awarding Eon prejudgment interest.

**III.**

Accordingly, we **AFFIRM** the judgment of the district court.

Page 1





Positive
As of: Jun 10, 2014

**LIDOCHEM, INC., a New Jersey Corporation and FRANK DEAN, Plaintiffs - Appellants, v. STOLLER ENTERPRISES, INC., et al., Defendants - Appellees**

**No. 10-1686**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**12a1003n.06; *500 Fed. Appx. 373*; *2012 U.S. App. LEXIS 19266*; *2012 FED App. 1003N (6th Cir.)*; *2012-2 Trade Cas. (CCH) P78,060***

**September 12, 2012, Filed**

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [**1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants, a distributor and chemist, appealed summary judgment by the United States District Court for the Western District of Michigan in favor of appellees, a competitor, its owner and representative, and a company and its president, on claims of false or misleading promotion under §

43(a)(1)(B) of the Lanham Act, *15 U.S.C.S. § 1125(a)(1)(B)*, tortious interference with business interests, injurious falsehood, civil conspiracy, and defamation.

**OVERVIEW:** As to the Lanham Act claims, the court held that the company and its president did not engage in commercial speech by providing the owner with a false laboratory report because the president was not engaged in promotion to influence consumers to purchase goods or services from the company. However, a reasonable factfinder could determine that the owner engaged in commercial speech for the purpose of influencing consumers. The owner's claim that the distributor's fertilizer contained a toxin was false, the false statements were material in that they influenced purchasing decision, the owner knowingly placed his false statements into the stream of interstate commerce, and there was evidence of a causal link between the statements and harm to the distributor. A jury could reasonably find tortious interference based on the false statements, a civil conspiracy to create a false lab report, and injurious falsehood based on the material and substantial part the

Case: 14-1167 Case: 14-1167 CRITICAL DOCUMENTS ONLY Document: 47 Page: 405 Filed: 06/20/2014 Page: 405 Filed: 06/20/2014

Page 2

500 Fed. Appx. 373, *; 2012 U.S. App. LEXIS 19266, **1;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

false statements played in harming the distributor's business. The chemist's defamation claim failed because there was no proof of a false and defamatory statement concerning the chemist.

**OUTCOME:** Summary judgment was affirmed as to all claims brought by the chemist individually, as well as the distributor's defamation claim and the Lanham Act claim against the company and its president. Summary judgment was reversed as to the Lanham Act claim against the competitor and its owner and representative. Summary judgment was also reversed as to the tortious interference, injurious falsehood, and civil conspiracy claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
[HN1] Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a), (c).* The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. An appellate court considers the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law.

*Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act*
[HN2] Section 43(a) of the Lanham Act, *15 U.S.C.S. §*

*1125(a),* precludes any person from making any false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. *§ 1125(a)(1)(B).* This remedial statute is broadly construed to provide protection against a variety of deceptive commercial practices, including false advertising and promotion.

*Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act*
[HN3] Commercial speech is expression related solely to the economic interests of the speaker and his audience. Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. Yet, the commercial speech covered by the Lanham Act extends beyond the classic advertising campaign into other forms of promotion used to influence consumers to purchase goods or services. Speech does not have to resemble a typical advertisement to be commercial.

*Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act*
[HN4] To determine what conduct falls within *15 U.S.C.S. § 1125(a)(1)(B),* most courts have held that contested representations must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a classical advertising campaign, but may consist instead of more informal types of promotion, the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. At a minimum, commercial speech must target a class or category of purchasers or potential purchasers, not merely particular individuals. A disparaging statement about another's product must be published and must identify some means through which the defendant disseminated information to a particular class of consumers. The required level of dissemination to the relevant purchasing public will vary according to the specifics of the industry. The touchstone is whether the contested representations are part of an organized campaign to penetrate the relevant market. Where the

500 Fed. Appx. 373, *; 2012 U.S. App. LEXIS 19266, **1;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

market is small and the potential purchasers limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Lanham Act.

***Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act***
[HN5] To state a cause of action under *15 U.S.C.S. § 1125(a)(1)(B)* in the Sixth Circuit, the plaintiff must show: 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff. The second element allows a plaintiff to establish a Lanham Act violation without proving actual confusion or a lost sale; that is, a communication that has a tendency to deceive is enough if all the other elements are met.

***Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act***
***Evidence > Inferences & Presumptions > Presumptions > General Overview***
[HN6] To state a cause of action under *15 U.S.C.S. § 1125(a)(1)(B)* in the Sixth Circuit, the third element, requiring proof of deception, and the fifth element, requiring proof of injury, are components of causation generally. The deception element asks whether the defendant's misstatements caused the consumer to be deceived. This element requires a showing of actual deception or, at the least, a tendency to deceive a substantial portion of the intended audience. A plaintiff may show either that the defendants' statements were literally false or that the statements were true but misleading or confusing. If the plaintiff proves that the statements were literally false, the plaintiff may prevail without evidence that the false statements actually misled consumers because actual deception is presumed. The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff. The literal falsity rule may allow a plaintiff to obtain injunctive relief, but it does not assist the plaintiff in recovering marketplace damages without other proof that such damages occurred.

***Torts > Vicarious Liability > Agents > General Overview***
***Torts > Vicarious Liability > Employers > General Overview***
[HN7] Vicarious liability may arise either from an employment or agency relationship.

***Civil Procedure > Summary Judgment > Evidence***
***Civil Procedure > Summary Judgment > Opposition > Supporting Materials***
***Civil Procedure > Summary Judgment > Supporting Materials > General Overview***
[HN8] *Fed. R. Civ. P. 56(c)(3)* provides that a court need consider only the cited materials, but it may consider other materials in the record. Thus, while the litigant must cite particular parts of materials in the record, *Rule 56(c)(1)(A)*, courts are not precluded from exercising the discretion granted to them in *Rule 56(c)(3)* to review other materials in the record.

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
[HN9] An appellate court applies the same *Fed. R. Civ. P. 56* standard that was applied by the district court.

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
***Civil Procedure > Appeals > Standards of Review > De Novo Review***
[HN10] An appellate court reviews a *Fed. R. Civ. P. 59(e)* motion to alter or amend the judgment de novo, using the same standard that was applied by the district court, just as it does in the *Fed. R. Civ. P. 56* context.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants***
***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***
[HN11] As to summary judgment, the non-moving party may not rest on his pleadings but must produce evidence to show that there is a genuine issue of material fact for trial.

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***

500 Fed. Appx. 373, *; 2012 U.S. App. LEXIS 19266, **1;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

[HN12] An appellate court's examination of a summary judgment ruling is de novo. In conducting such review, the United States Supreme Court counsels appellate courts to review the summary judgment record taken as a whole. In accordance with the Supreme Court's guidance, an appellate court conducts independent review of the factual record to decide that summary judgment was properly granted or to decide that reversal of summary judgment is required.

***Torts > Business Torts > Commercial Interference > Business Relationships > Elements***
[HN13] To prevail on a claim of tortious interference with a business relationship under Michigan law, a plaintiff must prove the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another. A plaintiff must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's business relationship. Tortious interference may be caused by defamatory statements.

***Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements***
[HN14] A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means.

***Torts > Business Torts > Trade Libel > Elements***
[HN15] Under Michigan law, a person who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and he knows that the statement is false or acts in reckless disregard of its truth or falsity. The communication of such an injurious statement to a third party must play a material and substantial part in inducing others not to deal with the plaintiff, with the result that the plaintiff suffers special damage, in the form of loss of trade or other dealings. The plaintiff must prove that the injurious statement is actually false.

***Evidence > Testimony > General Overview***
[HN16] Witnesses are immune from causes of action based on testimony given during a legal proceeding.

***Torts > Intentional Torts > Defamation > Defamation Per Quod***
***Torts > Intentional Torts > Defamation > Defamation Per Se***
***Torts > Intentional Torts > Defamation > Elements > General Overview***
[HN17] As to defamation, the elements are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod).

***Torts > Intentional Torts > Defamation > Procedure***
***Torts > Procedure > Statutes of Limitations > Accrual of Actions > Occurrence of Tort***
[HN18] A one-year statute of limitations applies to defamation, and any such claim accrues when the defamatory statement is made.

**COUNSEL:** For LIDOCHEM, INC., a New Jersey Corporation, FRANK DEAN, Plaintiffs- Appellants William David Howard, Law Office, Grand Rapids, MI.

For STOLLER ENTERPRISES, INC., a Texas Corporation, JERRY STOLLER, MICHAEL WRIGHT, MCKENZIE WRIGHT LABORATORIES, LLC, DAVID ALEXANDER, Defendants - Appellees: Barry G. Flynn, Gordon & Rees, Houston, TX.

**JUDGES:** Before: BOGGS and STRANCH, Circuit Judges, and THAPAR, * District Judge. THAPAR, District Judge, dissenting in part.

> \* Hon. Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

500 Fed. Appx. 373, *; 2012 U.S. App. LEXIS 19266, **1;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

**OPINION BY:** JANE B. STRANCH

**OPINION**

[*374] **JANE B. STRANCH, Circuit Judge.** LidoChem, Inc., and Frank Dean appeal the district court's grant of summary judgment in favor of Stoller Enterprises, Inc., Jerry Stoller, David Alexander, Michael Wright, and McKenzie Wright Laboratories, LLC in this dispute between business competitors in the Michigan farm-chemicals market. The district court ruled that LidoChem and Dean could not prevail on their claims for false or misleading promotion under the Lanham Act, *15 U.S.C. § 1125(a)(1)(B)*, tortious interference with business interests, [**2] injurious falsehood, and civil conspiracy. The court also ruled in favor of Stoller Enterprises and Alexander on the defamation claim. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

**I. FACTS**

Don and Lisa Pucillo formed LidoChem as a New Jersey corporation in 1981 to distribute chemical products. LidoChem entered the agricultural chemical business [*375] in western Michigan in the late 1990's. In 1999, LidoChem hired chemist Frank Dean, a Texas resident, and sales representative Gerry Gelder, a Michigan resident, to assist LidoChem with its business expansion. Dean and Gelder worked for Stoller Enterprises before they joined LidoChem.

LidoChem's products were blended by The Andersons, a large midwestern chemical manufacturer. LidoChem sold its products to Michigan distributors, including Zeeland Farm Services and Green Valley Agriculture. The distributors then sold the products to farmers. Stoller Enterprises is a Texas corporation engaged in the sale of agricultural chemicals in Michigan and other farm markets. Jerry Stoller owns the company, and David Alexander serves as a Michigan sales representative. Michael Wright, also a Texas resident, is President of McKenzie [**3] Wright Laboratories, LLC.

In 2000, the Pucillos joined Valagro, an Italian speciality-fertilizer company, in a business venture to form a new Delaware corporation called Nutrecology, Inc. Nutrecology employed Dean to develop a liquid fertilizer, Nutrefol, to compete with Stoller Enterprises' similar product, Foli-Zyme. Nutrecology utilized LidoChem's distribution network in Michigan to market the product.

In March 2001, Gelder and a salesman for Zeeland Farm Services met with the owners of Boersen Farms, a large farming operation in western Michigan and one of Zeeland's largest customers. Gelder asked the Boersens to try LidoChem's and Nutrecology's products for the 2001 growing season, instead of the Stoller Enterprises products that Boersen used in 2000. Dennis Boersen alleged that Gelder told him that Nutrefol would work like Foli-Zyme to enhance the growth of soybeans, but Gelder denied making any such representation. Boersen agreed to try Nutrefol and purchased the product through LidoChem's distributors, Zeeland Farm Services and Green Valley Agriculture.

In May 2001, Boersen sprayed a mixture of Nutrefol and Roundup on 2500 acres of soybeans, but the plants turned yellow and became [**4] stressed. Boersen contacted Wally Gerst, a distributor for Stoller Enterprises, for advice. After examining the soybean fields, Gerst recommended the use of Stoller products to encourage plant recovery.

In July 2001, Gerst asked Stoller and Alexander to accompany him to Boersen Farms to discuss the effect of Nutrefol on the soybeans. Stoller assured Boersen that Nutrefol contained a substance that was harmful to soybeans. Stoller obtained a Nutrefol sample from the farm, and Gerst obtained a copy of Nutrefol's material safety data sheet (MSDS) [1] from Zeeland Farm Services.

> 1 A material safety data sheet details the health effects of a hazardous chemical, provides the signs and symptoms of exposure, and lists any medical conditions generally known to be aggravated by exposure to the chemical. *See Gass v. Marriott Hotel Servs., Inc., 558 F.3d 419, 430 (6th Cir. 2009).*

LidoChem and Dean alleged that Stoller orchestrated a plan to ruin their reputations within the farm chemicals industry by making misrepresentations that Nutrefol contained "poison" so that LidoChem could not compete in the marketplace. They asserted that Stoller's animosity against them developed for several reasons: LidoChem [**5] hired Dean and Gelder away from Stoller Enterprises; Dean applied for a provisional patent shortly after joining LidoChem utilizing research Stoller Enterprises claimed to own; and Stoller blamed Dean for the death of Stoller's [*376] son. LidoChem and Dean

Case: 14-1167 Case: 14-1167 Document: 17 Document: 4-1 Page: 409 Filed: 06/20/2014 Filed: 06/20/2014

Page 6

500 Fed. Appx. 373, *376; 2012 U.S. App. LEXIS 19266, **5;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

produced proof that Stoller advanced a scheme to represent falsely that Dean added 2-phenylbutyric acid (2-PBA) to Nutrefol, a chemical that Stoller claimed was toxic to plants and caused the reduced soybean harvest at Boersen Farms. As a result of Stoller's alleged statements, Nutrecology pulled Nutrefol from the market in late 2001. In addition, LidoChem and Dean presented proof that Stoller repeatedly encouraged Boersen Farms and its attorneys to file a lawsuit against LidoChem, Dean, Nutrecology, The Andersons, Zeeland Farm Services, and Green Valley Agriculture in Michigan state court. LidoChem asserted that, once the lawsuit became public and farmers, distributors, and blenders became aware of the false claim that Nutrefol contained a toxic chemical, LidoChem lost its business relationships and its ability to compete.

At issue are several communications Stoller made to others. On September 13, 2001, Stoller sent a memorandum to Calvin [**6] Hartzog, Product Development Manager for Stoller Enterprises, with copies to Alexander and Gerst. Stoller alleged that Nutrefol was toxic and damaged Boersen Farms' soybeans. He directed Hartzog to send the Nutrefol sample obtained from Boersen Farms to Dr. Benjamin Mosier, a chemist, with instructions to analyze the sample for any toxic ingredients.

In a September 14 email to Gerst, Stoller reported that Nutrefol's MSDS sheet was wrong and that the Nutrefol sample was being analyzed for toxins. Stoller also stated that LidoChem, Dean, Gelder, Zeeland Farm Supply, and Green Valley Agriculture were liable for the Boersens' 2001 crop damage, but he surmised that they might have little money to pay a judgment, while The Andersons had "deep pockets." Stoller predicted that The Andersons would refuse to blend products for LidoChem if Boersen Farms named The Andersons as a defendant in a lawsuit.

Sometime thereafter, Stoller learned that Dr. Mosier did not find any toxic chemicals in Nutrefol. Not satisfied, Stoller instructed Hartzog to arrange for Michael Wright of McKenzie Wright Laboratories to re-test the Nutrefol sample. According to Hartzog, Stoller knew that McKenzie Wright would provide [**7] the test result Stoller wanted. [2]

> 2 According to Hartzog, McKenzie Wright provided a favorable test report in early 2001 when Stoller Enterprises added thiourea, a banned

Class 3 carcinogen, to a new farm-chemical product. When Dr. Mosier reported that cotton plants grown with the product tested positive for thiourea in the leaves, Stoller instructed Hartzog to find a different laboratory, and Hartzog located McKenzie Wright.

In March 2002, Stoller met with Wright, Hartzog, and Mark Wiltse, EPA registration specialist for Stoller Enterprises. Stoller directed Wright to issue a report finding that the Nutrefol sample taken from Boersen Farms contained 2-PBA and that the 2-PBA was masked by long-chain fatty acids. Wright produced the false report for Stoller in June 2002. Hartzog notified Alexander of the false test result, exclaiming, "We got 'em." Stoller also informed Alexander about the false test result. Alexander then communicated the results of Wright's false lab testing directly to Dennis Boersen. Alexander met with Boersen Farms' attorney three times, and he agreed to serve as a witness in a lawsuit Boersen Farms planned to file against LidoChem, Dean, and others.

Between September [**8] 2002 and August 2003, Stoller sent six letters to the law firm representing Boersen Farms, encouraging the attorneys to file a lawsuit. Stoller sent copies of some of these letters to Alexander. It was common knowledge in [*377] the very small industry for farm chemicals that Stoller pushed the lawsuit against LidoChem and the other defendants.

In the letters to the attorneys, Stoller claimed that Nutrefol's MSDS was falsified and that Nutrefol was shipped and sold without a proper MSDS. He described The Andersons as a company with "very deep pockets" and disclosed that Alexander had visited The Andersons' president, Rod Enry, to discuss Nutrefol. Stoller claimed that Gelder falsely represented to Boersen that Nutrefol was the same as Foli-Zyme. He asserted that Dean had a "history of changing formulations" and using "customers as an experimental laboratory." He also claimed that Stoller Enterprises had worked for months, employing "numerous lab analyses and specialized equipment," to isolate the damaging ingredient in Nutrefol, 2-PBA, which he said had been "cleverly disguised." He provided Wright's lab report and Dean's patent, which he alleged Dean obtained using research taken from Stoller [**9] Enterprises. Stoller suggested the law firm had a "very good case" and requested payment of $20,000 or ten percent of any damages recovery, whichever was greater,

Case: 14-1167 CASE PARTICIPANTS ONLY Document: 47 Page: 410 Filed: 06/20/2014

Page 7

500 Fed. Appx. 373, *377; 2012 U.S. App. LEXIS 19266, **9;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

to reward Stoller Enterprises for its discovery of the harmful ingredient in Nutrefol. He also agreed to serve as an expert witness.

At his expert deposition held in mid-February 2006, Stoller conceded that he was not a chemist, that he spent his own money conducting laboratory analysis of Nutrefol, and that he had a proprietary interest in the lawsuit. Shortly after the deposition, Stoller sent another letter to the law firm providing suggestions for how to respond to the defense expert's opinion that Roundup, not Nutrefol, harmed the soybeans. Stoller assured the attorneys that this was "a red herring" and that it would be difficult for the defense to claim that Nutrefol was not tested by a good chemist because "Wright Laboratories is recognized by the federal government."

By May 2006, Stoller became concerned that Gerst had started distributing LidoChem products. In an email dated May 11, 2006, Stoller denied Gerst the right to access research samples of Stoller Enterprises products because Gerst was "doing business with [**10] Frank Dean, who stole private information" from Stoller's company. When Gerst complained that Stoller had directed Alexander to pursue Gerst's largest accounts, Stoller sent Gerst another email on May 22 calling Dean "a dishonest person and a thief." On May 24, Stoller sent another email to Gerst, listing business associates he considered loyal to him, but accusing Gerst of doing business with "a known crook who stole from me."

In late 2006, Stoller withdrew as an expert witness for Boersen Farms. In January 2007 the Michigan trial court barred Wright from testifying as an expert because he disposed of the Nutrefol samples that Stoller gave him to test and he also claimed that his computer "crashed" so that he no longer possessed the underlying data and testing procedure that formed the basis for his opinion that Nutrefol contained 2-PBA. Boersen Farms and LidoChem ultimately settled the lawsuit.

Lidochem's evidence indicates that Stoller's numerous statements falsely maligned Nutrefol. Green Valley Agriculture sprayed Nutrefol and Foli-Zyme side-by-side on Michigan crops. The two products produced virtually no difference in crop production. LidoChem's insurer, AIG Claim Services, Inc., [**11] issued a report on independent laboratory testing of a Nutrefol sample. Although the sample contained two substances that were not listed on the MSDS, neither substance was a threat to soybeans. Additional expert

[*378] testing of Nutrefol failed to detect 2-PBA at the part-per-trillion level.

LidoChem also produced evidence that it was economically damaged by the false representations. LidoChem's contract with The Andersons provided for an initial one-year term with renewal for successive years unless written notice of termination was given. According to Pucillo, LidoChem's relationship with The Andersons ended after Stoller alleged that Nutrefol contained a toxic substance. Gelder explained that he had to work much harder to sell any LidoChem product in western Michigan, and he produced a list of fifteen Michigan customers and prospects of LidoChem "tainted" by Stoller's actions.

After 2001, Zeeland Farm Services purchased farm chemicals for their customers, including Boersen Farms, exclusively from Stoller Enterprises through Alexander. In 2007, two Michigan farmers approached Christians at Green Valley Agriculture to report that either Stoller or Alexander had informed them that Dean assisted [**12] in the development of a new LidoChem product (not Nutrefol) and that the new product would damage their crops. [3]

> 3  Although Christians' testimony on this point is hearsay, LidoChem may be able to present admissible evidence on the subject at trial.

LidoChem and Dean filed this lawsuit in 2009. Based on expert analysis of sales data for the years 2000 to 2009, LidoChem asserted marketplace damages in the range of $4.4 million to $4.8 million due to an event in 2000 through 2002. In addition, LidoChem alleged additional damages for loss of reputation and ability to compete.

## II. STANDARD OF REVIEW

[HN1] Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a) & (c)*. The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

500 Fed. Appx. 373, *378; 2012 U.S. App. LEXIS 19266, **12;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. [**13] We consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Id.* The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law. *Id. at 251-52*.

### III. ANALYSIS

LidoChem and Dean challenge the district court's determination that they failed to produce sufficient proof to present their legal claims to a jury. We conclude that there are genuine issues of material fact with respect to some of the claims against some of the defendants, as explained below.

### A. Lanham Act claim

LidoChem alleged that defendants Stoller, Alexander, Stoller Enterprises, Michael Wright, and McKenzie Wright Laboratories violated the Lanham Act. [HN2] *Section 43(a) of the Lanham Act* precludes any [*379] person from making any "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial [**14] activities. . . ." *15 U.S.C. § 1125(a)(1)(B)*. This remedial statute is broadly construed to provide protection against a variety of deceptive commercial practices, including false advertising and promotion. *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1383 (5th Cir. 1996)*.

The Supreme Court has said that [HN3] commercial speech is "expression related solely to the economic interests of the speaker and [his] audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)*. "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id. at 561-62*. Yet, the "commercial speech" covered by the Lanham Act extends beyond the classic advertising campaign into other forms of promotion used to influence consumers to purchase goods or services. *Semco, Inc. v. Amcast, Inc., 52 F.3d*

108, 112 (6th Cir. 1995); *Seven-Up Co., 86 F.3d at 1384*. Speech does not have to resemble a typical advertisement to be commercial. *Semco, Inc., 52 F.3d at 112-13* (citing *Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 68, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983))*. Thus, [HN4] to determine what conduct falls [**15] within *§ 1125(a)(1)(B)*, most courts have held that contested representations must be:

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Seven-Up Co., 86 F.3d at 1384* (quoting *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994))*; *Champion Labs., Inc. v. Parker-Hannifin Corp., 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009)*; *Int'l Techs. Consultants, Inc. v. Stewart, No. 07-13391, 2008 U.S. Dist. LEXIS 72761, 2008 WL 4378095, at *6 (E.D. Mich. Sept. 23, 2008)*. At a minimum, commercial speech must "target a class or category of purchasers or potential purchasers, not merely particular individuals." *Podiatrist Ass'n v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003)*. A disparaging statement about another's product must be published and must [**16] identify some "means through which the defendant disseminated information to a particular class of consumers." *Id.* (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.102 (4th ed. 2003), and *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc., 27 F. Supp. 2d 86, 91 (D. Mass. 1998))*.

The required level of dissemination to the relevant purchasing public "will vary according to the specifics of the industry." *Seven-Up Co., 86 F.3d at 1385-86*. The "touchstone" is whether the "contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002)*. Where the

Case: 14-1167 CaseS14-EA67TIDANTSeON4T Docu#ent1125 FilagEd06/20/20F4ed: 06/20/2014

Page 9

500 Fed. Appx. 373, *379; 2012 U.S. App. LEXIS 19266, **16;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

market is small and the potential purchasers limited in number, "even a single promotional presentation to an individual purchaser may be enough to trigger the protections" of the Lanham Act. *Seven-Up Co., 86 F.3d at 1386*; [*380] *Mobius Mgt. Sys., Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1019-21 (S.D.N.Y. 1994)*.

[HN5] To state a cause of action under *§ 1125(a)(1)(B)* in this Circuit, LidoChem must show:

> 1) the defendant has made false or misleading statements of fact concerning his own product or [**17] another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc., 185 F.3d 606, 613 (6th Cir. 1999)*. The second element allows a plaintiff to establish a Lanham Act violation "without proving actual confusion or a lost sale; that is, a communication that has a 'tendency to deceive'" is enough if all the other elements are met. *Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 689 (6th Cir. 2000)*.

[HN6] The third element, requiring proof of deception, and the fifth element, requiring proof of injury, are components of causation generally. *Am. Council of Certified Podiatric Physicians and Surgeons, 185 F.3d at 613*. "The deception element asks whether the defendant's misstatements caused the consumer to be deceived." *Id.* This element requires a showing of actual deception or, at the least, a [**18] tendency to deceive a substantial portion of the intended audience. *Id. at 616*. A plaintiff may show either that the defendants' statements were literally false or that the statements were true but misleading or confusing. *Id. at 614*. If the plaintiff proves that the statements were literally false, the plaintiff may prevail without evidence that the false statements actually misled consumers because actual deception is presumed. *Id.*; *Porous Media Corp. v. Pall Corp., 110 F.3d 1329,*

*1335-36 (8th Cir. 1997)*.

"The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff." *Am. Council of Certified Podiatric Physicians and Surgeons, 185 F.3d at 613-14*. The "literal falsity" rule may allow a plaintiff to obtain injunctive relief, but it does not assist the plaintiff in recovering "marketplace damages without other proof that such damages occurred." *Balance Dynamics Corp., 204 F.3d at 693-94*.

Applying these principles, we conclude that Michael Wright and McKenzie Wright Laboratories did not engage in commercial speech by providing Stoller with a false laboratory report because Wright was not engaged in promotion to influence consumers to purchase goods [**19] or services from McKenzie Wright Laboratories. *See Semco, Inc., 52 F.3d at 112*. Similarly, Wright did not engage in commercial speech when he participated as an expert witness in Boersen Farms' lawsuit against LidoChem and others. *See Seven-Up Co., 86 F.3d at 1384*; *Podiatrist Ass'n, 332 F.3d at 19*; *Fashion Boutique of Short Hills, Inc., 314 F.3d at 57*. Therefore, Wright and McKenzie Wright Laboratories are entitled to summary judgment on the Lanham Act claim.

Turning to the Lanham Act claim against Stoller Enterprises, we note the parties do not dispute that LidoChem and Stoller Enterprises were commercial competitors during the relevant time frame. Further, Stoller Enterprises may be held vicariously liable for the conduct of its owner, Stoller, and its employee, Alexander. *See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1277* [*381] *(10th Cir. 2000)* ([HN7] "Vicarious liability may arise either from an employment or agency relationship.") Therefore, we consider whether LidoChem produced sufficient evidence to proceed to trial on the Lanham Act claim against Stoller Enterprises.

Taking the evidence in a light most favorable to LidoChem, we conclude that a reasonable factfinder could determine that [**20] Stoller engaged in commercial speech for the purpose of influencing consumers--not just the end-use farmer, but also the farm-chemical distributor--to buy Stoller Enterprises products and that Stoller's statements were disseminated widely enough to the relevant purchasing public to constitute promotion within the relatively small western-Michigan farm-chemical industry. *See, e.g., Seven-Up Co., 86 F.3d at 1384*; *Porous Media Corp., 110 F.3d at 1333*; *Champion Labs., Inc., 616 F. Supp. 2d*

Case: 14-1167 Case: 14-1167 Document: 47 Document: 41-5 Page: 413 Page: 413 Filed: 06/20/2014 Filed: 06/20/2014

Page 10

500 Fed. Appx. 373, *381; 2012 U.S. App. LEXIS 19266, **20;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

at 694; *Int'l Techs. Consultants, Inc., 2008 U.S. Dist. LEXIS 72761, 2008 WL 4378095, at *6.* LidoChem produced ample evidence that Stoller repeatedly made false statements of fact about the toxicity of Nutrefol directly to western Michigan farmer Dennis Boersen, as well as to a farm-chemical distributor in western Michigan, Wally Gerst of Advanced Ag Services. Because Stoller's claim that Nutrefol contained a toxin was demonstrably false, actual deception is presumed and LidoChem is not required to produce proof that Stoller's false statements actually misled consumers. *See Am. Council of Certified Podiatric Physicians and Surgeons, 185 F.3d at 613; Porous Media Corp., 110 F.3d at 1335-36.* Further, Stoller disparaged LidoChem in another [**21] way by casting doubt on Dean's honesty and on the validity of his patents. *See Int'l Tech. Consultants, Inc., 554 F. Supp. 2d at 757-58* (holding letter to competitor's customer questioning ownership of certain technology was meant to convey that letter writer owned the technology and was more competent and trustworthy to handle a project than the competitor).

LidoChem produced sufficient evidence that Stoller's false statements were material, in that they influenced purchasing decisions by farmers and distributors. After Stoller first alleged in 2001 that Nutrefol contained a substance harmful to plants, LidoChem's Michigan salesman, Gerry Gelder, had difficulty selling the product to distributors. At least one Michigan distributor, Zeeland Farm Services, stopped selling LidoChem's products altogether and instead sold only Stoller Enterprises' products after 2001. Pucillo and Gelder identified a list of customers whose purchasing decisions were influenced by Stoller's false statements.

In addition, Stoller knowingly placed his false statements about LidoChem and Nutrefol into the stream of interstate commerce, and LidoChem produced expert evidence of a causal link between the challenged [**22] disparagement and more than four million dollars in damages to LidoChem. Whether the causation analysis is affected by the fact that Nutrecology pulled Nutrefol from the market in late 2001 is a factual question for the jury to decide. We conclude that LidoChem presented sufficient proof on the elements of a Lanham Act claim to warrant a jury trial. *See Am. Council of Certified Podiatric Physicians and Surgeons, 185 F.3d at 613.*

The defendants contend that many of Stoller's comments were directed to the attorney for Boersen

Farms and, as such, they were not commercial speech. We disagree. The attorney acted as the agent of Boersen Farms in dealing with Stoller, *see Uniprop, Inc. v. Morganroth, 260 Mich. App. 442, 678 N.W.2d 638, 640-41 (Mich. Ct. App. 2004),* and the evidence suggests that Stoller fully expected his statements to the attorney to reach farmer Dennis Boersen [*382] and the farm-chemical industry in western Michigan. A reasonable jury, in examining Stoller's motive for disparaging LidoChem and Nutrefol to Boersen's attorney, could believe Stoller's own words--that he intended to instigate litigation to inflict severe competitive injury on LidoChem and disrupt its business relationships. Stoller even [**23] admitted during his deposition in the Boersen Farms lawsuit that he possessed a financial interest in the success of the litigation. The district court's belief that Stoller made the false statements to the attorney simply to promote himself as a consultant and expert may be one reasonable interpretation of the evidence, but it is not the only one, and it is the jury's role to decide which reasonable factual inferences should be drawn from the evidence as a whole.

LidoChem also produced evidence that Alexander directly communicated false information about Nutrefol to Dennis Boersen and other Michigan growers. After McKenzie Wright Laboratory provided Stoller Enterprises with a false report that Nutrefol contained 2-PBA, the substance allegedly toxic to the Boersens' soybean plants, Calvin Hartzog called Alexander and told him, "we got 'em," referring to LidoChem and Dean. Stoller also explained the results of the false lab report to Alexander, who then communicated the results of Wright's lab testing directly to Dennis Boersen. Further, Alexander agreed to be a fact witness for the Boersens and met with their attorney to prepare for the lawsuit Boersen Farms filed against LidoChem, [**24] Dean and others. In addition, Alexander agreed to serve as an expert witness for the Boersens on the topic of the investigation into Nutrefol. At the time of the deposition, Boersen Farms was Alexander's largest customer and accounted for twenty-five to thirty percent of his sales of Stoller products. Alexander also admitted that he discussed the facts underlying the Boersens' lawsuit with Michigan growers to whom he sold Stoller products, including the managers of Sackett Ranch and Blue Sky. According to Alexander, the Sacketts were aware that LidoChem and Dean had allegedly added a toxic compound to Nutrefol. A reasonable jury hearing this evidence could find that Alexander communicated false

statements about Nutrefol and convinced Michigan farmers to purchase Stoller Enterprises' products instead of LidoChem's.

Finally, LidoChem presented proof that Stoller's and Alexander's statements were material, in that the statements likely influenced the business decisions of The Andersons, LidoChem's distributors, and Michigan farmers with respect to LidoChem products. The statements were made in interstate commerce and not solely to lawyers for Boersen Farms. LidoChem also produced expert [**25] evidence to draw a causal link between the challenged conduct in 2001 and damage to LidoChem.

Because there are genuine issues of material fact on LidoChem's Lanham Act claim against Stoller, Alexander, and Stoller Enterprises, we reverse the grant of summary judgment on this claim. We affirm summary judgment in favor of Wright and McKenzie Wright Laboratories on the Lanham Act claim.

The dissent criticizes our decision to reverse the grant of summary judgment in favor of Alexander, asserting that we have no authority to consider facts in the summary judgment record that counsel did not mention specifically to the district court. To the contrary, our power to consider the entire summary judgment record springs from two sources: the Federal Rules of Civil Procedure and Supreme Court case law.

First, [HN8] *Federal Rule of Civil Procedure 56(c)(3)* provides: "The court need consider [*383] only the cited materials, but it may consider other materials in the record." Thus, while the litigant must cite "particular parts of materials in the record," *Fed. R. Civ. P. 56(c)(1)(A)*, courts are not precluded from exercising the discretion granted to them in *Rule 56(c)(3)* to review other materials in the record. [**26] In accordance with the discretion granted by this rule, we reviewed the entirety of defendant Alexander's deposition, which is included in the summary judgment record.

The dissent asserts that appellate courts cannot or should not rely on *Rule 56(c)(3)* because that rule is to be applied only by district courts. *Fed. R. Civ. P. 1*. However, our cases are replete with statements that [HN9] we apply the same *Rule 56* standard that was applied by the district court. *See e.g., Alexander v. CareSource, 576 F.3d 551, 557 (6th Cir. 2009); Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008); Sutherland*

*v. Mich. Dep't of Treasury, 344 F.3d 603, 613 (6th Cir. 2003); E.I. Du Pont de Nemours & Co. v. Okuley, 344 F.3d 578, 584 (6th Cir. 2003); Hunley v. DuPont Auto., 341 F.3d 491, 495 (6th Cir. 2003); Dotson v. Wilkinson, 329 F.3d 463, 466 (6th Cir. 2003); Thacker v. City of Columbus, 328 F.3d 244, 251-52 (6th Cir. 2003); Perry v. McGinnis, 209 F.3d 597, 600 (6th Cir. 2000).*

The dissent worries, moreover, that if a plaintiff files a motion to reconsider under *Rule 59(e)*, this court could consider evidence that *Rule 59(e)* bars the district court from considering. But we have already made clear that [HN10] we review [**27] a *Rule 59(e)* motion to alter or amend the judgment *de novo*, using the same standard that was applied by the district court, just as we do in the *Rule 56* context. *See Smith v. Wal-Mart Stores, Inc., 167 F.3d 286, 289 (6th Cir. 1999).* And there is no reason to fear, as the dissent does, that if a party *produces no evidence* in response to the summary judgment motion, this court will nonetheless scour the moving party's evidence to find a genuine issue of material fact. We apply the well-settled principle that [HN11] the non-moving party may not rest on his pleadings, but must produce evidence to show that there is a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Havensure, L.L.C. v. Prudential Ins. Co., 595 F.3d 312, 315 (6th Cir. 2010).* In any event, this case does not involve a non-moving party's failure to produce evidence in opposition to a summary judgment motion. LidoChem produced Alexander's entire deposition when it filed its summary judgment response.

Further, it is beyond dispute that [HN12] our examination of a summary judgment ruling is *de novo. Branham v. Gannett Satellite Info. Network, Inc., 619 F.3d 563, 568 (6th Cir. 2010).* In [**28] conducting such review, the Supreme Court counsels us to review the summary judgment "record taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* In accordance with the Supreme Court's guidance, we have conducted "independent review" of the factual record to decide that summary judgment was properly granted, *see e.g., Coffman v. Ford Motor Co., 447 F. App'x 691, 697 (6th Cir. 2011); Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1097 (6th Cir. 1996),* or to decide that reversal of summary judgment was required. *See e.g., Toledo Elec. Joint Apprenticeship v. Patchen, 14 F. App'x 601, 603-04 (6th Cir. 2001); Ferby v. Runyon, No. 92-5662, 1993 U.S.*

Case: 14-1167 Case: 14-1167 Document: 47 Document: 47 Page: 415 Page: 415 Filed: 06/20/2014 Filed: 06/20/2014

Page 12

500 Fed. Appx. 373, *383; 2012 U.S. App. LEXIS 19266, **28;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

App. LEXIS 20705, 1993 WL 309716, at *6 (6th Cir. Aug. 13, 1993).

Finally, the rule proposed by the dissent is impractical to apply and contrary to the purposes of appellate review. It would bar this court from considering evidence-- [*384] either contradictory or supportive--found in reviewing the record on points raised and argued by the parties. While our rules and cases may not *require* us to consider that evidence, there is nothing in them that supports the notion that an appellate court must blind itself to germane evidence. Under [**29] *de novo* review, we must apply the law to the facts in the record, and the dissent's proposal would necessarily hamstring fulfillment of that duty.

The case law cited and many similar cases we have decided, along with *Rule 56(c)(3)*, supports our determination that the district court's grant of summary judgment to Alexander must be reversed based on Alexander's own deposition testimony. To the extent the dissent relies on cases from other circuits, we are not persuaded to deviate from our own established law.

## B. Tortious-interference claim

LidoChem and Dean also alleged in their complaint that all defendants tortiously interfered with plaintiffs' business interests. [HN13] To prevail on a claim of tortious interference with a business relationship under Michigan law, a plaintiff must prove: "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *BPS Clinical Labs. v. Blue Cross and Blue Shield of Michigan, 217 Mich. App. 687, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996)*. "One [**30] is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another." *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc., 83 Mich. App. 84, 268 N.W.2d 296, 299 (Mich. Ct. App. 1978)* (emphasis omitted). A plaintiff "must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's . . . business relationship." *Feldman v. Green, 138 Mich.*

*App. 360, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984)*. Tortious interference may be caused by defamatory statements. *Lakeshore Cmty. Hosp., Inc. v. Perry, 212 Mich. App. 396, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995)*.

The district court determined that the gravamen of the tortious-interference claim was false statements, but ruled that LidoChem failed to present sufficient proof to warrant a jury trial. We disagree. In light of the evidence summarized above, a jury could reasonably determine that Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories [**31] tortiously interfered in LidoChem's business relationships with Boersen Farms, Zeeland Farm Services, Gerst, and The Andersons by falsely stating that Nutrefol contained a toxic chemical. The defendants knew of LidoChem's business relationships with these entities. A reasonable jury could find intentional interference by inducing or causing a breach or termination of those business relationships, and LidoChem presented proof of damages. Whether LidoChem had a valid business relationship or a future expectancy of a business relationship with Boersen Farms or The Andersons are factual questions for the jury.

We do not see sufficient evidence in the record to warrant trial on any separate claim for tortious interference that Dean may have against the defendants. Therefore, we reverse the grant of summary judgment to the defendants on the tortious-interference claim as to LidoChem, but affirm as to Dean.

[*385] **C. Civil conspiracy**

LidoChem claims that Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories conspired to create a false lab report and then destroyed relevant evidence. [HN14] "A civil conspiracy is a combination of two or more persons, by some concerted action, to [**32] accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co., 194 Mich. App. 300, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992)*.

A jury could rationally find that Stoller, his company, Wright, and McKenzie Wright Laboratories conspired to create the false lab report that became the central evidence that Boersen Farms used to support the lawsuit against LidoChem and its associates. A jury

might also determine that Alexander was a co-conspirator because Hartzog notified Alexander of the results of the false lab report and Alexander then communicated the results directly to Dennis Boersen. Alexander also agreed to serve as a fact witness, and perhaps an expert witness, in the Boersen Farms' lawsuit against LidoChem, Dean and others. From all the evidence LidoChem produced, a jury could rationally determine that two or more persons, by concerted action, combined to accomplish the unlawful purpose of engaging in unfair competition under the Lanham Act and other violations of state tort law. We reverse the grant of summary judgment on this claim and remand it for trial.

### D. Injurious falsehood

LidoChem and Dean allege that all [**33] of the defendants are liable for injurious falsehood. [HN15] Under Michigan law, a person "who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if . . . he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and . . . he knows that the statement is false or acts in reckless disregard of its truth or falsity." *Kollenberg v. Ramirez, 127 Mich. App. 345, 339 N.W.2d 176, 179 (Mich. Ct. App. 1983)* (quotation omitted). "The communication of such an injurious statement to a third party must play a 'material and substantial part in inducing others not to deal with the plaintiff, with the result that the plaintiff suffers special damage, in the form of loss of trade or other dealings.'" *Neshewat v. Salem, 173 F.3d 357, 363 (6th Cir. 1999)* (quoting *Kollenberg*). The plaintiff must prove that the injurious statement is actually false. *Id.*

The district court ruled that LidoChem's injurious-falsehood claim failed because LidoChem did not prove causation, i.e., that the injurious statements played a material and substantial [**34] part in inducing others not to deal with LidoChem. We think this analysis overlooks the evidence that the defendants' concocted falsehood about Nutrefol did play a material and substantial part in inducing Boersen Farms, Zeeland Farm Services, and The Andersons to refrain from doing further business with LidoChem. Again, viewing the record in a light favorable to LidoChem, we determine that this claim must also be presented to a jury for resolution. Because we uncovered no evidence in the

record to show that Dean suffered any damages, we agree that summary judgment was proper as to his claim. To the extent LidoChem alleges that Stoller and Wright committed perjury during their depositions, however, its claims must fail because [HN16] witnesses are immune from causes of action based on testimony given during a legal proceeding. *See Briscoe v. LaHue, 460 U.S. 325, 331-32, 103 S. Ct. 1108, 75 [*386] L. Ed. 2d 96 (1983)*. We reverse the grant of summary judgment on the claim of injurious falsehood brought by LidoChem, but affirm on the claim brought by Dean.

### E. Defamation

The last claim before us is [HN17] defamation, the elements of which are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a [**35] third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation *per se*) or the existence of special harm caused by the publication (defamation *per quod*). *Sawabini v. Desenberg, 143 Mich. App. 373, 372 N.W.2d 559, 563 (Mich. Ct. App. 1985)*. Dean alleged that Alexander defamed him during a 2008 luncheon meeting with Gelder. During the meeting, Alexander allegedly "bashed" Dean and Gerst. Also, at that time, Gelder knew the Boersen Farms litigation had settled. Alexander allegedly told Gelder that, if he would work for Alexander, then Alexander would reveal to him what "really" happened in the Boersen Farms litigation and Gelder would be shocked. Gelder did not go to work for Alexander, so he did not learn what "really" happened in the litigation.

This evidence is insufficient to meet the first element of defamation, proof of a false and defamatory statement concerning the plaintiff. Moreover, as previously stated, Dean did not produce any evidence of his damages. We conclude that the district court properly granted summary judgment on Dean's defamation claim.

In this appeal, Dean points to Gelder's [**36] testimony that Alexander said: "Frank Dean knowingly put materials in fertilizer." Appellants' Br. at 39. Any defamation claim relating to this statement is not properly preserved for our review. In addition, to the extent Gelder did initially so testify, he subsequently retracted the statement and testified that Alexander did not make any such comment to him at the lunch meeting. Therefore, the claim lacks merit and should not proceed.

500 Fed. Appx. 373, *386; 2012 U.S. App. LEXIS 19266, **36;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

Finally, [HN18] a one-year statute of limitations applies to defamation, and any such claim accrues when the defamatory statement is made. *Mitan v. Campbell, 474 Mich. 21, 706 N.W.2d 420, 422 (Mich. 2005)*. Neither LidoChem nor Dean has pointed to any defamatory statement made by Stoller within the one-year limitations period. Therefore, summary judgment on the defamation cause of action was appropriate.

## IV. CONCLUSION

For all of the reasons stated, we AFFIRM in part, REVERSE in part, and REMAND for trial. We affirm the grant of summary judgment on all claims brought by Dean individually. We also affirm the grant of summary judgment on LidoChem's Lanham Act claim against Wright and McKenzie Wright Laboratories, as well as LidoChem's defamation claim. We reverse the grant of [**37] summary judgment on LidoChem's claim under the Lanham Act against Stoller, Alexander, and Stoller Enterprises, and we reverse the grant of summary judgment on LidoChem's claims against Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories for tortious interference, injurious falsehood, and civil conspiracy.

**DISSENT BY:** THAPAR

**DISSENT**

**THAPAR, District Judge, dissenting in part.** After reviewing the record, the briefs, and the law, a well-prepared district judge asked direct and pointed questions at a summary-judgment hearing. He wanted to know what evidence the plaintiffs had to support three of their claims against Dave Alexander. The plaintiffs came up with [*387] nothing more than rumors and speculation-not a scintilla of concrete evidence. So the district court did the only thing it could by properly granting Alexander's motion for summary judgment on those claims.

The story should end there. But in this case, the majority, acting alone, finds evidence that purportedly supports the plaintiff's arguments. When was that evidence first presented? Not in the briefs to the district court. Not in the argument before the district court. Not in response to the district court's questions. And [**38] not in this court. Never.

After finding those never-presented facts, the majority uses those facts as the sole grounds for reversing the district court's grant of summary judgment on the Lanham Act, injurious-falsehood, and tortious-interference claims against Alexander. To recall, LidoChem and Dean allege that some of their competitors in the agricultural fertilizer industry, Stoller and Alexander, made literally false statements about LidoChem's and Dean's products that caused them to lose business. LidoChem and Dean sued these defendants, asserting Lanham Act, injurious-falsehood, tortious-interference, civil conspiracy, and defamation claims. Stoller and Alexander moved for summary judgment, arguing in part that there was no admissible evidence that they made any actionable statements. To avoid summary judgment on the Lanham Act, injurious-falsehood, and tortious-interference claims against Alexander, LidoChem and Dean only pointed to the rumor-and-guesswork mill:

> o Christian's testimony that his two farmers told him that Alexander said LidoChem products would damage any crops they tried to grow. Pls. Resp. in Opp., R. 70 at 21 (citing Christian Dep., R. 70-11 at 68-69).

> o Gelder's [**39] testimony that individuals, including Pete VanWeerdhuizen, Keith Hanenberg, and Steve Leiprandt, told him that Alexander said LidoChem's products were having "quality issues" and contained "poison." *Id.* (citing Gelder Dep., R. 70-10 at 99-105).

> o Gerst's testimony that Gelder, Green Valley, and farmer Adam Mulder told him that Alexander said negative things about Dean's and LidoChem's products. *Id.* at 32 (citing Gerst Dep., R. 70-17 at 120-22, 146).

> o Alexander must have said something false about LidoChem during his meeting with Rod Enry, the President of The Andersons. Mots. Hr'g Tr., R. 75 at 9-10.

The district court correctly concluded that none of this

500 Fed. Appx. 373, *387; 2012 U.S. App. LEXIS 19266, **39;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

evidence was sufficient to defeat summary judgment. After all, Christian, Gelder, and Gerst each testified that "Farmer X [told him] about what somebody else said to Farmer X." Mots. Hr'g Tr., R. 75 at 66. That inadmissible hearsay is not competent summary judgment evidence. *See, e.g., Carter v. Univ. of Toledo, 349 F.3d 269, 274 (6th Cir. 2003)* ("If the [offered evidence] is deemed to be hearsay, then the evidence could not be considered on summary judgment."). And LidoChem and Dean did not present any evidence that Alexander made [**40] a negative statement--let alone a literally false statement--about them during the meeting with Enry. Worse yet, when the district court specifically inquired about the contents of the statements, counsel inexplicably responded that they did not depose the individuals at The Andersons because those individuals were dismissed from the case. R. 75 at 10. On appeal, all the plaintiffs can do is point to the meeting between Alexander and Enry and speculate that the timing was right for something to have been said. Appellant's Br. at [*388] 9. Pointed to these--and only these--facts, the district court properly granted summary judgment on all the claims against Alexander. What else was the district court to do?

According to the majority, roll up its judicial sleeves and scour the record for evidence to avoid granting summary judgment. The majority sifts through hundreds of pages of deposition testimony to find two false representations made by Alexander: Alexander admitted that he explained the results of the false McKenzie Wright Laboratory report directly to Dennis Boersen. *See* Alexander Dep., R. 70-18 at 119, 145. And he also admitted that he discussed the facts underlying the Boersens' lawsuit [**41] with Michigan growers, including managers of Sackett Ranch and Blue Sky. *See id.* at 174-75. Majority Op. at 15-16. This set of statements, the majority concludes, is a sufficient basis for the plaintiffs' claims against Alexander to survive summary judgment.

The majority does not dispute that these statements were neither presented to the district court nor on appeal. So where does the majority claim authority to start combing the record? They say *Federal Rule of Civil Procedure 56(c)(3)* ("The court need consider only the cited materials, but it may consider other materials in the record."). There are multiple problems with the court of appeals applying *Rule 56(c)(3)*. For starters, the rule applies to district courts, not appellate courts, *see Fed. R. Civ. P. 1* (noting rules apply to district courts), and it is

discretionary, not mandatory, *see Fed. R. Civ. P. 56(c)(3)* (stating that the district court "may" consider other materials). But the majority says that *de novo* review justifies the appellate court starting over. *De novo* review though has never meant the appellate court starts over. Rather, it means the appellate court takes the facts as presented to the court below and reviews [**42] whether summary judgment is justified without giving special deference to the decision below. *See, e.g., Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2007)* (stating on summary judgment review that Sixth Circuit looks at factual record as presented by the non-movant to district court); 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 2.14 (3d ed. 1999) ("[W]hat is meant [by de novo review] is merely appellate power, ability, and competency to come to a different conclusion *on the record as determined below.*") (emphasis added).

Maybe the majority's misunderstanding of the rules stems from the word "presented" or "record below." After all, the record below arguably includes everything, and all of that is in some sense "presented" to the district court. But "presented" is a legal term of art that means "pointed out to a court," not simply included in the record. The Federal Rules of Civil Procedure require a party seeking summary judgment to "present evidence" by pointing to specific facts that demonstrate there is no support for the non-movant's case. *See Amini v. Oberlin College, 440 F.3d 350, 357 (6th Cir. 2005)* ("A moving party can meet its [**43] burden under *Rule 56(c)* by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." (internal quotations and citations omitted)). In response, the non-movant must point to specific facts showing there is a genuine issue for trial. *See Fed. R. Civ. P. 56(c)(1)(A)*; *see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 n.17 (6th Cir. 1990)* (stating non-movant must present affirmative evidence to defeat summary judgment and collecting numerous cases saying the same). Courts do not engage in a self-directed inquiry into the facts because district judges are not "pigs, [*389] hunting for truffles." *Emerson v. Novartis Pharms. Corp., 446 F. App'x 733, 736 (6th Cir. 2011)* (quoting *United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)*). And this circuit has reaffirmed this principle time and again. *Wimbush v. Wyeth, 619 F.3d 632, 638 n.4 (6th Cir. 2010)* (stating that parties may not simply dump "a pile of paper on the district judge's desk," but rather have an obligation "to point to the evidence with specificity and

Case: 14-1167 Case: 14-1167 Document: 17 Document: 41-5 Page: 195 Page: 419 Filed: 06/20/2014 Filed: 06/20/2014

Page 16

500 Fed. Appx. 373, *389; 2012 U.S. App. LEXIS 19266, **43;
2012 FED App. 1003N (6th Cir.); 2012-2 Trade Cas. (CCH) P78,060

particularity").

Set aside doctrine for a minute and imagine a world where appellate courts could apply [**44] *Rule 56(c)(3)* when they saw fit. After the parties fail to demonstrate a disputed issue of fact and the district judge properly grants summary judgment, the court of appeals could go hunting for evidence. But if this sort of review is in the purview of the appellate court, the non-movant can simply file a two-page brief or one with no citations to the record or admissible evidence, and then when they lose, they can rely on the court of appeals to do their job. If that is the standard, why have briefs at all -- one side could say, "I move for summary judgment," and the other could say, "We contest," and then the district court judge would have to go hunting through the record. Where does it stop?

And if that is not enough, imagine what the majority's approach does to other rules. Say in this case, after the district court's ruling, the plaintiff files a motion to reconsider under *Rule 59(e)* and points the court to evidence it forgot to mention before. For a district court to consider that evidence, it must be "previously unavailable." *See GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir. 1999)* (holding that for a party to prevail on newly discovered evidence, it "must [**45] have been previously unavailable"). Yet, under the majority's reasoning, the appellate court could consider the very evidence that the district court was not allowed to consider. Or let's say the party produces no evidence in response to the movant's factual assertions, and the district court considers the fact undisputed under *Rule 56(e)(2)*, which allows a district court to consider undisputed facts as proven. Can a court of appeals say, "Well it is *de novo* review and we found facts in the record you could have used to dispute it," and reverse the district court?

Finally, and perhaps most importantly, the majority's voyage into uncharted waters is in contradiction to published circuit precedent on two levels: (1) it ignores the well-established rule that district courts need not examine every line of the record looking for reasons to deny summary judgment, and (2) it ignores the rule that this court will not consider evidence not presented to the district court.

A sampling of cites supporting (1): *Wimbush, 619 F.3d at 639 n.4* ("This evidence was not attached to her brief responding to Wyeth's merits argument, nor was it cross-referenced in that brief. Instead, Buchanan suggests that [**46] the fact that the evidence was in the record somewhere is sufficient to create a question of fact and survive summary judgment. This is simply incorrect."); *Chicago Title, 487 F.3d at 995* ("A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact." (internal quotations and citations omitted)); *In re Morris, 260 F.3d 654, 654-55 (6th Cir. 2001)* ("Poss [argues] that the court used an improper standard that did not require it to review the entire record. . . . The bankruptcy court interpreted *Street* to mean that the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. [*390] This reading accords with the burden *Celotex* places on the nonmoving party." (internal quotation omitted)); *Guarino v. Brookfield Twp. Trs., 980 F.2d 399, 404 (6th Cir. 1992)* ("Appellants' argument that the district court erred in not searching the record sua sponte is wholly without merit. The facts presented and designated by the moving party were the facts at hand to be dealt with by the trial court. Furthermore, their [**47] status as "the facts at hand" is maintained intact here on review."); *InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)* ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. *Rule 56* contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial.").

A sampling of cites supporting (2): *Chicago Title, 487 F.3d at 995* ("[T]he Sixth Circuit will not entertain on appeal factual recitations not presented to the district court when reviewing a district court's decision. In reviewing summary judgment, we look at the record in the same fashion as the district court." (internal quotations and citations omitted)); *Estate of Mills v. Trizec Props., 965 F.2d 113, 115 (6th Cir. 1992)* ("In reviewing summary judgment, we look at record in the same fashion as the district court."); *Guarino, 980 F.2d at 404* ("This Court will not entertain on appeal factual recitations not presented to the district court any more readily than it [**48] will tolerate attempts to enlarge the record itself."); *White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir. 1990)* (stating that this Court only reviews "the case presented to the district court rather than a better case fashioned after the district court's

order" (internal quotation marks and citation omitted)).

Finally, some other circuits' views: *Holland v. Sam's Club, 487 F.3d 641, 644 (8th Cir. 2007)* ("[T]he district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim, rather the nonmoving party must designate the specific genuine issues of material fact that preclude summary judgment. Even though on appeal Holland designated the specific facts supporting [the claim], Holland waived this argument by not presenting it to the district court." (internal citation and quotation omitted)); *Atlanta Gas Light Co. v. UGI Utils., Inc., 463 F.3d 1201, 1208 n.11 (11th Cir. 2006)* ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Ruffin-Thompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 610 (7th Cir. 2005)* [**49] ("The appellate stage is too late to specify portions of the record which may create an issue of material fact." (internal quotation omitted)); *Amnesty Am. v. Town of West Hartford, 288 F.3d 467, 470 (2nd Cir. 2002)* ("[Rule 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001)* (noting that "requiring the district court to search the entire record, even though the adverse party's response does not set out the specific facts or disclose where in the record the evidence for them can be found, is unfair" to the movant, to the court, and to other litigants whose cases the court could be addressing); *Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998)* ("Thus, where the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district [*391] court for failing to uncover them itself. . . . If the rule were otherwise, the workload of the district

courts would be insurmountable and summary judgment would rarely be granted."); *Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 (5th Cir. 1992)* [**50] ("Because the Skotaks failed to refer to [certain evidence] in their summary judgment response, the articles were not properly before that court in deciding whether to grant the motion; therefore, they will not be considered here. Although on summary judgment the record is reviewed de novo, this court, for obvious reasons, will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion.").

Even the cases the majority cites are contradictory to their holding. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* ("[T]he non-moving party must come forward with specific facts showing there is a *genuine issue for trial.*") (emphasis in original; quotation omitted)); *Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1087 (6th Cir. 1996)* ("The trial court no longer has the duty to search the entire record or establish that it is bereft of a genuine issue of material fact." (quotation omitted)).

In the end, LidoChem and Dean's attorneys did not present the majority's unearthed statements to the district court or in any of their appellate briefs. *See, e.g.,* Appellants' Br. at 16, 29, 36; Appellants' Reply [**51] Br. at 4, 12. It was their job to do so, and their failure should be fatal. *Magnum Towing & Recovery v. City of Toledo, 287 F. App'x 442, 449 (6th Cir. 2008)* ("It is not the district court's (or our) duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments before the court."). Thus, I respectfully dissent from the reversal of the district court on the Alexander claims.





Analysis
As of: Jun 10, 2014

**SMITH & NEPHEW, INC. AND JOHN O. HAYHURST, M.D.,
Plaintiffs-Appellants, v. ARTHREX, INC., Defendant-Appellee.**

**2012-1265**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*502 Fed. Appx. 945*; *2013 U.S. App. LEXIS 1038*

**January 16, 2013, Decided**

**NOTICE:** THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Injunction granted at *Smith & Nephew, Inc. v. Arthrex, Inc., 2013 U.S. Dist. LEXIS 131114 (D. Or., Sept. 12, 2013)*
US Supreme Court certiorari denied by *Arthrex, Inc. v. Smith & Nephew, Inc., 2013 U.S. LEXIS 8918 (U.S., Dec. 9, 2013)*

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the District of Oregon in Case No. 04-CV-0029, Judge Michael W. Mosman.
*Smith & Nephew, Inc. v. Arthrex, Inc., 2010 U.S. Dist. LEXIS 91470 (D. Or., Aug. 31, 2010)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant patent licensee

sought review of a decision from the United States District Court for the District of Oregon, which granted judgment as a matter of law that appellee competitor did not infringe the patent in suit under *35 U.S.C.S. § 271*. A jury had rendered a verdict in favor of the licensee.

**OVERVIEW:** The patent in suit was directed to a method and apparatus of anchoring cartilage within a joint. The licensee accused the competitor of infringement. After the matter was tried and appealed several times, in a third trial the jury found in favor of the licensee. However, the district court, without an opinion, granted the competitor's motion for judgment of noninfringement as a matter of law. On review, the court determined that the district court erred in construing the patent claims to require "lodging" to be sufficient to withstand all the forces of surgery. Nothing in the claim language, the prosecution history, or precedent suggested that lodging had to be sufficient to withstand all the forces of surgery. Instead, lodging, as claimed, only related to how the anchor would stay in place after being initially pressed into the bone. The jury, having been instructed on the proper construction of lodging, found in favor of the licensee and substantial evidence supported

502 Fed. Appx. 945, *; 2013 U.S. App. LEXIS 1038, **1

that determination. As to indirect infringement, the jury found for the licensee under either of two possible standards and the district court also erred in disturbing that ruling.

**OUTCOME:** The court reversed and remanded the district court's judgment and instructed that the jury verdict be reinstated.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgments*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
*Patent Law > Jurisdiction & Review > Standards of Review > Substantial Evidence*

[HN1] The United States Court of Appeals for the Federal Circuit reviews the grant or denial of a motion for judgment as a matter of law under the law of the regional circuit. The Ninth Circuit reviews a district court's denial of a motion for judgment as a matter of law de novo. Judgment as a matter of law should be granted only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result. A jury's determination of infringement is a question of fact, which is reviewed for substantial evidence. The court addresses claim construction as a matter of law, which is reviewed without formal deference on appeal, although the reviewing court gives respect to the conclusions and reasoning of the district court.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case*

[HN2] The law of the case doctrine is not applicable when an issue was neither presented nor decided in a former proceeding in the case.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*

*Intent & Knowledge*

[HN3] Liability for inducement of infringement under *35 U.S.C.S. § 271(b)* requires knowledge that the induced acts constitute patent infringement. In Global-Tech, the United States Court of Appeals for the Federal Circuit had used "deliberate indifference" as an alternative to actual knowledge, but the Supreme Court considered that "willful blindness" was a better surrogate for actual knowledge than the Federal Circuit Court's deliberate indifference test.

**COUNSEL:** JOHN M. SKENYON, Fish & Richardson, P.C., of Boston, Massachusetts, argued for plaintiffs-appellants. With him on the brief was MARK J. HERBERT.

CHARLES W. SABER, Dickstein Shapiro, LLP, of Washington, DC, argued for defendant-appellee. With him on the brief were SALVATORE P. TAMBURO, MEGAN S. WOODWORTH and S. GREGORY HERRMAN.

**JUDGES:** Before LOURIE, CLEVENGER, and WALLACH, Circuit Judges. Opinion for the court filed by Circuit Judge LOURIE. Dissenting opinion filed by Circuit Judge CLEVENGER.

**OPINION BY:** LOURIE

**OPINION**

[*946] LOURIE, *Circuit Judge.*

Smith & Nephew, Inc. ("Smith") appeals from the final judgment of the United States District Court for the District of Oregon which granted judgment as a matter of law that Arthrex, Inc. ("Arthrex") does not infringe claim 1 of *U.S. Patent 5,601,557* (the "*557 patent*"). *Smith & Nephew, Inc. et al. v. Arthrex, Inc.*, No. 3:04-cv-00029-MO (D. Minn. Dec. 16, 2011) (Dkt. No. 1034). Because the court erred in granting judgment of noninfringement as a matter of law, we *reverse* and *remand.*

BACKGROUND

Smith is a licensee of the *'557 patent*, owned by Dr. John O. Hayhurst. [**2] The patent is directed to a method and apparatus of anchoring cartilage within a joint. The patent discloses drilling a hole through the hard outer shell of bone into the less dense cancellous bone

502 Fed. Appx. 945, *946; 2013 U.S. App. LEXIS 1038, **2

followed by a surgeon inserting a small, but resilient device (an "anchor") by pressing it into the smaller drilled hole. The anchor compresses as it passes through that hole, but once in the softer cancellous bone, the resilience causes it to expand again, causing it to stay in place. Claim 1 reads:

> 1. A method for anchoring in bone a member and attached suture, comprising the steps of:
>
> forming a hole in the bone;
>
> attaching a suture to a member;
>
> lodging the member within the hole by pressing the member with attached suture into the hole; and
>
> attaching tissue to the suture so that the tissue is secured against the bone.

'557 patent col. 11, ll. 2-10. At issue in this appeal is the meaning of the term "lodging."

In 2004, Smith filed a complaint against Arthrex for patent infringement, accusing four Arthrex anchors of infringement. The jury was unable to reach a verdict after the first trial, but the second trial returned an infringement verdict favorable to Smith. On appeal, we reversed and remanded [**3] for a new trial, reversing the trial court's claim construction of "resile" in claim 2 and holding that resilience alone had to be sufficient to cause lodging of the anchor in the bone:

> [I]ntrinsic resiliency is the only disclosed means for lodging the anchor, and it [*947] therefore must be sufficient to lodge the anchor. Thus, "resile" must be construed to mean "to return to or tend to return to a prior or original position in a manner sufficient to cause the lodging of the member in the hole."

*Smith & Nephew, Inc. v. Arthrex, Inc.*, 355 F. App'x 384, 386-87 (Fed. Cir. 2009). We noted that such construction relied in part on a previous construction of "lodging" where we stated that a surgeon's tug on the anchor after insertion "is not a required step in lodging the anchor, the anchor must lodge by some other mechanism." *Id.* (citing *Smith & Nephew, Inc. v. Ethicon*, 276 F.3d 1304 (Fed.

Cir. 2001).

On remand, the parties disputed the meaning of the term "lodging." During the third trial, after the close of evidence for Smith, the district court adopted a construction of "lodging" that would add a requirement to the claim that to be lodged the anchor had to "withstand all the forces of surgery." [**4] Faced with the dilemma of either a new trial or continuing the trial with a supposedly erroneous construction, the court decided to proceed with the trial because it believed that Arthrex would win under either construction. During that trial, expert testimony was presented to the effect that the maximum force on the anchor during surgery was 12.6 to 12.7 lbs, while the average was about 6 to 7 lbs.

The jury returned a verdict for Smith of underlying direct infringement by the surgeons who use the Arthrex anchors as well as induced and contributory infringement by Arthrex along with damages totaling roughly $85 million. Arthrex moved for judgment of noninfringement as a matter of law. In its motion, Arthrex argued that under the correct construction of "lodging," which required the anchor to "withstand all the forces of surgery," no reasonable jury could find direct infringement because the accused anchors could not withstand the maximum 12.6 to 12.7 lbs of force during surgery. Arthrex also moved for judgment of no indirect infringement as a matter of law based on the testimony of its witnesses at trial.

Without an opinion, the district court granted both of Arthrex's motions for judgment [**5] of no direct infringement as a matter of law and of no indirect infringement. Smith timely appealed. We have jurisdiction under *28 U.S.C. § 1295(a)(1)*.

DISCUSSION

I.

[HN1] We review the grant or denial of a motion for judgment as a matter of law under the law of the regional circuit. *Summit Tech., Inc. v. Nidek Co., 363 F.3d 1219, 1223 (Fed. Cir. 2004)*. The Ninth Circuit reviews a district court's denial of a motion for judgment as a matter of law *de novo. In re First Alliance Mortg. Co., 471 F.3d 977, 991 (9th Cir. 2006)*. "Judgment as a matter of law should be granted only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Hangarter*

*v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004) (internal quotations omitted). The jury's determination of infringement is a question of fact, which we review for substantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309-10 (Fed. Cir. 2009). We address claim construction as a matter of law, which we review without formal deference on appeal, although we give respect to the conclusions and reasoning of the district court. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) [**6] (en banc).

A.

Smith argues that the court's grant of judgment as a matter of law of no direct infringement was based on an erroneous [*948] construction of "lodging" and should thus be vacated and the jury verdict reinstated. Smith contends that the law of the case and the mandate rule precluded the court from revising this court's prior constructions of "resiles" and "lodging." In addition, Smith argues that the post-trial construction of "lodging" requiring the anchor to "withstand[] all the forces of surgery" was contrary to the intrinsic record.

At the outset, the "law of the case" doctrine does not apply to the construction of "lodging." [HN2] That doctrine is not applicable when an issue was neither presented nor decided in a former proceeding in the case. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1220 (Fed. Cir. 2006). Similarly, the mandate does not encompass an issue that was not presented to the court. *Exxon Chem. Patents, Inc. v. The Lubrizol Corp.*, 137 F.3d 1475, 1484 (Fed. Cir. 1998). We did not construe "lodging" during the prior 2009 appeal. The issue was therefore not presented or decided, and the mandate rule and the law of the case doctrine are inapplicable.

Turning [**7] to the merits, we see no support in the intrinsic record to require the "lodging" to "withstand[] all the forces of surgery." Claim 1 of the *'557 patent* is directed only to anchoring a suture in the bone, not to the full surgical operation. *'557 patent* col. 11 ll. 2-9. The "lodging" step occurs just after "forming" the hole and "attaching" a suture, but prior to "attaching tissue." *Id.* None of the other steps of the actual surgery that occur after that attachment of tissue to the anchor are claimed.

Consistent with that understanding, the specification makes clear that it is only after tensioning, *i.e.* the surgeon's tug, that the anchor becomes irremovable for

the purposes of completing the surgery:

Whenever tension is applied to the suture, the ends of the legs dig into the bone and resist removal of the anchor member from the hole.

. . .

[T]ension in the suture (in conjunction with the intrinsic resilient force of the anchor member 80 that forces the leg edges 87 apart) tends to lodge the edges 87 of the anchor member legs beneath the cortical layer 97, rendering the anchor member substantially irremovable from the hole 100.

*'557 patent* col. 3 ll. 4-6, col. 9 ll. 50-60. However, as we [**8] previously noted in *Ethicon*, that tensioning, also known as the surgeon's tug, is not a part of the lodging limitation. *See Ethicon*, 276 F.3d at 1310. We agreed with the magistrate judge in that case that "lodging . . . does not bar the surgeon's tug and any ensuing small movement of the anchor after insertion." *Id. at 1308.* Indeed, we held that "claim 1 neither excludes nor requires the step of pulling on the suture after it is inserted." *Id. at 1310.* In other words, the surgeon's tug, while possibly necessary to complete the surgery, is not part of what is claimed.

Indeed, the term "lodging" was only added to the claim language to overcome an anticipation rejection based on *U.S. Patent 4,409,974* ("Freedland"). Freedland discloses connecting two sets of bone by using an anchoring device inserted into a hole drilled through the bone. That device was initially smaller than the diameter of the drilled hole, and it was not until the surgeon used pliers to deploy the arms of the device so that the anchor could remain in place. In overcoming that rejection, Hayhurst added "lodging" to the claims, stating:

This method [of lodging the member within the hole] is not found in the umbrella-like [**9] operation of the Freedland device. In order for the Freedland device to become lodged within a hole in a bone . . . it is necessary to apply opposing [*949] forces to the head 12 in order to swing the hinged arms 20 out of

their collapsed position and into an extended position.

J.A. 607-08. Notably, there is no mention that the claimed anchor must withstand all the forces of surgery. Instead, that statement appears to deal only with how the claimed anchor stays in place after being initially pressed into the hole in the bone.

Nothing in the claim language, the prosecution history, or our precedent suggests that lodging must be sufficient to withstand all the forces of surgery. Instead, lodging, as claimed, only relates to how the anchor stays in place after being initially pressed into the bone. Thus the court erred in construing the claims to require lodging to be sufficient to withstand all the forces of surgery.

Smith also argues that under either construction the resilience testing evidence offered at trial sufficiently shows the anchors to be lodged. We agree. In the prior appeal, we rejected Arthrex's argument that, given the correct construction of "resile," the district court should [**10] enter judgment of noninfringement:

> Arthrex argues that in light of the claim construction we have adopted, the district court should be instructed to enter judgment of noninfringement in Arthrex's favor. We disagree. Reasonable jurors could find infringement even under the revised claim construction. For example, the push-out tests submitted by [Smith] suggested that resilience itself creates 7.5 pounds of resistive force in the accused anchors. A reasonable juror could find that amount of resistive force to be sufficient to lodge the anchor in the bone.

*Arthrex, 355 F. App'x at 387.* That is exactly what happened during the third trial. Smith submitted test results concerning the resistive force due to resilience in the accused anchors. The jury, having been instructed on the proper construction of lodging and resiles, found that that amount of resistive force was sufficient to lodge the anchor in the bone. Substantial evidence supports that determination; we therefore see no reason to disturb that finding by the jury. Thus, the district court erred in granting judgment of no direct infringement of claim 1 as a matter of law.

**B.**

Smith also argues that the court erred in granting judgment [**11] as a matter of law that Arthrex does not induce infringement of or contributorily infringe the patent. Smith challenges the instruction given by the district court on induced infringement, contending that the district court erroneously incorporated the *Global-Tech* "willful blindness" standard onto the "knowledge of infringement" test. *See Global-Tech Appliances, Inc. v. SEB S.A., U.S. , 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011).* Smith argues that the court instead should have applied the "known or should have known of the infringement" standard outlined in *DSU Medical Corp. v. JMS Co., 471 F.3d 1293, 1304 (Fed. Cir. 2006)* (en banc). On the merits, Smith argues that, under either standard, the court's granting of judgment as a matter of law that Arthrex does not induce infringement or contributorily infringe was in error as substantial evidence supported the jury verdict.

[HN3] Liability for inducement of infringement under *§ 271(b)* "requires knowledge that the induced acts constitute patent infringement." *Global-Tech, 131 S.Ct. at 2068.* Our earlier precedent in *DSU Medical* articulated the inducement standard somewhat differently from *Global-Tech,* requiring that the alleged infringer's [**12] actions "knew or should have known his actions would induce actual infringement," which includes knowledge of the patent. *DSU* [*950] *Med. Corp., 471 F.3d at 1304, 1306* ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."). In *Global-Tech,* our court had used "deliberate indifference" as an alternative to actual knowledge, but the Supreme Court considered that "willful blindness" was a better surrogate for actual knowledge than this court's deliberate indifference test. *Global-Tech, 131 S.Ct. at 2068.* In any event, the district court, in an abundance of caution, instructed the jury on both formulations and specifically submitted two separate questions for the jury on inducement. The jury found for Smith under both standards. Thus, any error in the instruction or the questions submitted to the jury regarding induced infringement was harmless.

We agree with Smith, however, that the court erred in finding that no rational jury could find induced or contributory infringement. The court again granted judgment as a matter of law without an opinion, only

stating in a telephone conference that "no rational [**13] jury could find indirect infringement for the reasons stated by Arthrex." J.A. 124. Arthrex, in its post-trial briefing, had argued that it lacked the requisite knowledge of infringement based on the testimony offered by its employees at trial describing the differences between the accused products and the patent. The jury rejected that testimony.

Instead, as the jury heard, Arthrex indisputably knew of the *'557 patent* prior to any infringement. The jury heard evidence that the president and owner of Arthrex as well the chief engineer and group director for one of the accused products, the Bio-SutureTak anchors, knew of the *'557 patent*. J.A. 31900-03. The jury was also presented with evidence that, after personally learning of the *'557 patent*, the group director drafted instructions for use of the accused Bio-SutureTak anchor that paralleled the patented method steps of the *'557 patent*. J.A. 32012-17. Finally, the jury heard that Arthrex made no attempt to compare its anchors to the claims of the *'557 patent*. After weighing that evidence against Arthrex employees' testimony, the jury resolved the factual issue of knowledge against Arthrex, concluding that Arthrex had the necessary knowledge [**14] for both induced and contributory infringement. We see no reason to disturb that finding by the jury. Thus the district court erred in granting judgment as a matter of law that Arthrex does not induce infringement of the *'557 patent*.

CONCLUSION

We have considered the parties' remaining arguments and conclude that they are without merit. Because the district court erred in granting judgment of no direct infringement and in granting judgment that Arthrex did not indirectly infringe claim 1 of the *'557 patent* as a matter of law, we reverse the grants of judgment of noninfringement and remand to the court for further proceedings not inconsistent with this opinion. For the foregoing reasons, the jury verdict is reinstated and the judgment of the district court is

**REVERSED AND REMANDED.**

**DISSENT BY:** CLEVENGER

**DISSENT**

CLEVENGER, *Circuit Judge,* dissenting.

I respectfully dissent from the majority's reversal of judgment as a matter of law on the issue of indirect infringement. Because the jury's verdict on indirect infringement is not supported by substantial evidence, we should affirm.

As the majority acknowledges, the Supreme Court has made clear that to be guilty of indirect infringement, the accused infringer must [**15] either actually know of, or [*951] be willfully blind to, both the existence of the patent and the fact of infringement. *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068, 179 L. Ed. 2d 1167 (2011) ("we now hold that induced infringement under *§ 271(b)* requires knowledge that the induced acts constitute patent infringement."); *see also In re Bill of Lading Transmission & Processing Sys. Patent Litig.,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) ("[t]o survive Appellees' motion to dismiss, therefore, [the patentee's] amended complaints must contain facts plausibly showing that Appellees specifically intended their customers to infringe the . . . patent and knew that the customer's acts constituted infringement."). This is true for both induced and contributory infringement. *See Global-Tech,* 131 S.Ct. at 2067 ("[A] violator of *§ 271(c)* 'must know that the combination for which his component was especially designed was both patented and infringing.'" (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 488, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (1964))).

Here, it is undisputed that Arthrex knew of the existence of the *'557 patent*. The parties dispute whether or not Arthrex was willfully blind to the fact of infringement.

Willful [**16] blindness is a high standard; it requires both "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech,* 131 S. Ct. at 2070.

In this case, Smith & Nephew did not present substantial evidence that Arthrex subjectively believed that they infringed. Smith & Nephew introduced circumstantial evidence to the effect that Arthrex was lagging in the suture anchor market. Smith & Nephew also showed that Arthrex learned of the patent before launching SutureTak on the market. Smith & Nephew used this evidence to imply that Arthrex copied their resilient suture anchor.

502 Fed. Appx. 945, *951; 2013 U.S. App. LEXIS 1038, **16

Arthrex rebutted this evidence with testimony showing that their product designers subjectively believed they did not infringe, and in fact understood that the accused products worked in an entirely different manner. To rebut any inference of copying, Arthrex showed that they did not change the design of the SutureTak products after learning of the *'557 Patent*. The only reasonable conclusion a jury could reach based on this evidence is that Arthrex did not subjectively believe they infringed

the patent, [**17] and therefore Smith & Nephew failed to show willful blindness under the *Global-Tech* standard as a matter of law.

Because Smith & Nephew's damages award was based solely on indirect infringement, we should affirm the court below on the issue of indirect infringement. I would not reach the issue of claim construction.

Unicom Monitoring, LLC v. Cencom, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 1704300

2013 WL 1704300
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

UNICOM MONITORING, LLC, Plaintiff,
v.
CENCOM, INC., d/b/a American Digital
Monitoring, Digitaldiverter.Com and
Saveonmyalarm.Com, Defendant.

Civil Action No. 06–1166 (MLC). | April 19, 2013.

**Attorneys and Law Firms**

Arthur M. Peslak, Gertner Mandel & Peslak, LLC, Lakewood, NJ, for Plaintiff.

Andrew P. Nemiroff, Cozen O'Connor, New York, NY, Michael Bennett Fein, Cozen O'Connor, PC, Cherry Hill, NJ, for Defendant.

**Opinion**

**MEMORANDUM OPINION**

COOPER, District Judge.

**\*1** Plaintiff, Unicom Monitoring, LLC ("Unicom"), brought this action against Defendant, Cencom, Inc. ("Cencom"), alleging infringement of its patent, U.S. Patent No. 6,366,647 (" '647 Patent"), which is directed to an Alarm Report Call Re-router. (*See* dkt. entry no. 1, Compl. at ¶¶ 5, 10–11.) This matter comes before the Court on Cencom's motion for summary judgment in its favor with respect to relief, both compensatory and equitable. (*See* dkt. entry no. 117, Mot. for Summ. J.) The Court held oral argument on April 10, 2013, and carefully reviewed the parties' submissions, and will now grant the Motion.

**BACKGROUND**

The Court will only present a brief synopsis of the relevant facts for resolution of the Motion because the Court writes mainly for the parties, which are familiar with the history of this case and the patent at issue.[1]

Cencom provides wholesale monitoring services in the capacity of a third-party vendor to alarm dealers whose accounts are located in Cencom's center. (*See* dkt. entry no. 117–2, Cencom Statement of Material Facts not in Dispute at ¶ 1 ("Cencom Statement").) The '647 Patent pertains to "security systems, and more particularly to security systems that communicate with a central monitoring station via a telephone line."(*Id.* at ¶ 4.) Unicom brought this action against Cencom on March 9, 2006, alleging infringement of the '647 Patent. (*See id.* at ¶ 5.) The Court previously granted summary judgment in Unicom's favor finding infringement of Claim 1 of the '647 Patent. (*See* dkt. entry no. 50, 3–12–10 Mem. Op. at 2–3.)

The Pretrial Order sets forth the following contested facts, *inter alia,* as to what Unicom intends to prove with respect to damages:

(1) The number of sales, leases or other transfers of the DD2 from Cencom to a customer.

(2) The revenue derived by Cencom from sales, leasing, or monitoring accounts with the DD2.

(3) The profit derived by Cencom from the sales, leasing or monitoring of accounts with the DD2.

(4) Unicom is entitled to a reasonable royalty to compensate it for Cencom's infringement.

(5) Unicom is entitled to a reasonable royalty of 30% of the total revenue derived by Cencom from the sale, leasing, monitoring or other transfer of the DD2.

(Dkt. entry no. 80, 10–6–10 Pretrial Order at 3.) Unicom indicated it intends to call Matthew J. Szapucki to "testify as to Unicom's ownership of the Patent–in–Suit, its policy not to license the '647 Patent, the various public means by which Cencom markets the DD2, Unicom's test marketing of its product and resulting sales, Unicom's damages and irreparable injury."(Cencom Statement at ¶ 12.) Unicom also indicated its intent to call James Maggs to "testify as to Unicom's ownership of the Patent–in–Suit, its policy not to license the '647 Patent,

A5055

Unicom Monitoring, LLC v. Cencom, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 1704300

the various public means by which Cencom markets the DD2, Unicom's damages and irreparable injury."(Cencom Statement at ¶ 13.)

**\*2** Unicom did not identify a damages expert, nor did it submit a damages report at any point in the duration of this case. (*See id.* at ¶¶ 14–15.)Unicom did not produce licenses for the patent-insuit or for a comparable technology. (*See id.* at ¶ 16.)The only evidence in the record with respect to the reasonable royalty rate that Unicom asks the factfinder to apply comes from a short statement of attorney argument in Unicom's opposition papers and a brief calculation the Court painstakingly elicited during oral argument. (*See* Unicom Opp'n Br. at 6–7 ("Since Cencom and Unicom were in the same business, Unicom would only have licensed Cencom for a royalty rate in the vicinity of 30% of revenues collected from DD2 customers, including monitoring fees."); *see also* Tr. of 4–10–13 Hearing at 26–27.)[2]

### ANALYSIS

The parties dispute whether an expert is necessary to sustain a reasonable royalty damages award, and whether an injunction can issue where no damages have been awarded. The Court will first provide the standard applied on a motion for summary judgment, and then address the issues in that order.

### I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(a). The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."*Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The burden on the movant may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-movant's

case. *Celotex,* 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. Bor. of W. Chester, Pa.,* 891 F.2d 458, 460–61 (3d Cir.1989). A non-movant asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute[.]"Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir.2007). If the non-movant fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to judgment as a matter of law. See *Celotex,* 477 U.S. at 322.

### II. Use of an Expert to Prove a Reasonable Royalty Claim

**\*3** The statute governing the use of a reasonable royalty rate in patent damages is 35 U.S.C. § 284, which provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.... The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances."35 U.S.C. § 284. The burden is on the patentee to show damages. *Devex Corp. v. Gen. Motors Corp.,* 667 F.2d 347, 361 (3d Cir.1981).

Cencom argues that, because Unicom proffers no expert who can provide a reasonable basis for the reasonable royalty damages, Cencom is entitled to summary judgment in its favor with respect to damages, despite the Court's previous determination of Cencom's liability for infringement. (*See* dkt. entry no. 117–1, Cencom Br. in Supp. of Mot. for Summ. J. at 1–2 ("Cencom Br.").)

A5056

Cencom contends that Unicom has failed to produce admissible expert testimony to establish "an approximation of the market as it would have hypothetically developed, [which] requires sound economic and factual predicates."(*Id.* at 4.)

Cencom further argues that, where the patentee has presented little or no satisfactory evidence for the award of a reasonable royalty, the Court should award only those reasonable royalties that are supported by the evidence in the record. (*See* Cencom Br. at 4.) Cencom notes that, in the event the record does not support an award of any reasonable royalty damages, the Court of Appeals for the Federal Circuit has previously approved an award of no damages because "[t]he statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., 895 F.2d 1403, 1407 (Fed.Cir.1990)* (quoting *Devex, 667 F.2d at 363*). Without citation, Cencom argues that, "[b]ecause of the complex and serious nature of damages, the determination of damages in patent litigation almost always requires the testimony of an expert witness."(Cencom Br. at 5.) Relying heavily on a case from the Northern District of Illinois, Cencom argues that the Court should rule that Unicom cannot meet its burden of proof without either expert reports or testimony regarding what would be an appropriate reasonable royalty. (*See id.*(citing *Apple, Inc. v. Motorola Inc., 869 F.Supp.2d 901 (N.D.Ill.2012)*).)³ Cencom notes that Unicom has neither expert reports nor testimony to offer the Court, only "Cencom's sales records and the self-serving and conclusory statements of Unicom owners".(*Id.*) Cencom argues that Unicom cannot rely on any of the evidence it identified as support in the Pretrial Order as a valid method of determining reasonable royalties. (*See id.* at 5–6.)Cencom argues that an expert is necessary to explain the reasonable royalty rate based on Cencom's sales records or Unicom's policy not to license the patent, and that testimony by Unicom's owners is inadmissible because it does not come from a "disinterested source." (*Id.* at 6.)

**\*4** Unicom responds that (1) the statute requires an award of reasonable royalty damages liability for Cencom's infringement, and (2) the *Georgia–Pacific* factors require consideration of factors other than the testimony of experts, including whether the infringement is willful. (*See* Unicom Opp'n Br. at 1.) Unicom focuses on the multifactorial test established in *Georgia–Pacific Corp. v.*

*U.S. Plywood Corp., 318 F.Supp. 1116 (S.D.N.Y.1970)*, arguing that no case cited by Cencom requires a judgment against it on the damages claim if it fails to proffer an expert on the issue. (*See id.* at 5.) Unicom states, without legal or factual citation, that "[s]ince Cencom and Unicom were in the same business, Unicom would have only licensed Cencom for a royalty rate in the vicinity of 30% of revenues collected from DD2 customers, including monitoring fees."(*Id.* at 6–7.)Unicom distinguishes *Apple* on the basis that the damages report excluded therein was based on a faulty consumer survey regarding specific features of complex machines containing patented as well as unpatented components, whereas here the infringing device is a knock-off of the patented device and there is no need to apportion the profits over separate features in order to establish a reasonable royalty. (*See id.* at 7.)

Cencom replies that Unicom (1) has not met its burden of proving damages and cannot produce either case law or evidence to support its position, and (2) is not entitled to an injunction. (*See* dkt. entry no. 122, Cencom Reply Br. in Further Supp. of the Mot. at 1 ("Cencom Reply Br.").) Cencom states that "Unicom's Opposition is inherently flawed because it does not meet the minimum requirements under Fed.R.Civ.P. 56 necessary to defeat Cencom's Motion. Unicom fails to present any genuine issue of material fact for trial, either by way of an affidavit or declaration, or through reference to evidence in the record."(*See id.*)Cencom then argues that, while *entitled* to damages, Unicom has failed to *prove* the damages, thus warranting summary judgment in Cencom's favor. (*See id.* at 1–2.)Cencom notes that Unicom's only reference to how damages should be calculated is the statement regarding the "30% royalty rate", which is unsupported by either testimony in the record, or affidavits or certifications accompanying the opposition papers. (*See id.* at 2.) Further, Cencom argues that Unicom fails to show how the *Georgia–Pacific* factors are implicated, thus failing to meet Unicom's burden of raising a genuine factual dispute to defeat a motion for summary judgment. (*See id.* at 2–3.)

A patentee requesting damages carries the burden of proof that its proposed royalty would be reasonable. *See Lindemann, 895 F.2d at 1406*. In *Lindemann,* the district court held Lindemann's patent to be infringed and awarded only $10,000 as a reasonable royalty in damages, despite Lindemann's expert's opinion that "a reasonable royalty would be 75%–85% of [Defendant's] targeted gross profit, yielding a royalty rate of 20%–25% of the net selling price of the entire machine and sales of spare

2013 WL 1704300

parts, resulting in a damage award of $179,844–$224,805."*Id.* at 1404.The Court of Appeals for the Federal Circuit upheld the district court's award because:

> **\*5** [w]hen lost profits are the measure, the amount is normally provable by the facts in evidence or as a factual inference from the evidence. When a "reasonable royalty" is the measure, the amount may again be considered a factual inference from the evidence, yet there is room for exercise of a common-sense estimation of what the evidence shows would be a "reasonable" award. One challenging only the court's finding as to amount of damages awarded under the "reasonable royalty" provision of § 284, therefore, must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty. Here Lindemann, who bore the burden and yet failed to adduce evidence dictating a particular amount, left the magistrate with the widest range of choice.

*Id.* at 1406.Patent-holder Lindemann presented only one witness as the basis for its damages claim, "patent attorney Enlow", who

> gave his opinion that a reasonable royalty would be 20%–25% of the sale price of the entire machine. Lindemann implies but does not, as it cannot, argue that the magistrate was bound to accept that opinion. Indeed, the record reflects fully adequate bases for the magistrate's rejection of that opinion. As brought out on cross-examination, Enlow's opinion was based on a nonexistent or at best woefully incomplete understanding of the market and on an estimate of

anticipated profits that bore no relation to actual profits, Enlow having no knowledge of the latter.

*Id.* at 1407.The Court of Appeals for the Federal Circuit stated that, while the statute does not require a patentee to "show the fact of damage" if infringement is proven or admitted, "that does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284."*Id.* at 1407.

A distinction exists between the fact of damages and proving an amount to be awarded. Although the statute requires an award of a reasonable royalty when there is infringement because such infringement establishes the *fact* of damages, "to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."*Devex, 667 F.2d at 363*. In another case where the patent was held valid and infringed, the Court of Appeals for the Federal Circuit upheld a district court's award of no damages but a permanent injunction. *Gustafson, Inc. v. Intersystems Indus. Prods., Inc., 897 F.2d 508, 509 (Fed.Cir.1990)* (finding "no reversible error in the district court's ... awarding no damages to [plaintiff] because none were proven.").

The appropriate statutory measure of damages for patent infringement is "the difference between the patent owner's pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred."*Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed.Cir.2002)*. This measurement requires that the patentee present evidence to "reconstruct the market, a necessarily hypothetical exercise, to project economic results that did not actually occur."*Id.* The court cautioned that "to prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."*Id.* The court examined the patentee's proposed model for determining a reasonable royalty and noted several problems: (1) the model was based on the value of the entire product, while the patent only covered a limited portion of the product; (2) the patentee did not present evidence that the royalty rate was reflective of an agreement between the two companies that was reached through a hypothetical negotiation at a time before the

infringement occurred; and (3) the agreement would violate the patentee's established licensing practices. *Id.* at 1312–13.These flaws were fatal to the model; the court vacated the district court's award of damages as unsupported by the evidence in the record. *Id.* at 1305, 1313.

**\*6** Competent evidence of damages for a reasonable royalty rate does not necessarily require expert testimony, contrary to Cencom's position. (*See* Cencom Br. at 2–3, 5.) A district court's order was reversed after it excluded the plaintiff's expert's testimony for *Daubert* reasons, and then found that the plaintiff was not entitled to damages as a matter of law because it "had not carried its burden to establish damages."*Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370 (Fed.Cir.2003)* (holding that "district court erred in concluding that Dow did not carry its burden to establish damages because it failed to provide expert testimony on the damages issue"). The Court of Appeals clarified that "section 284 is clear that expert testimony is not necessary to the award of damages, but rather *may* be received as an aid."*Id.* at 1382.Quoting *Lindemann,* the court cautioned the district court that its obligation to award damages for infringement under section 284 did not obviate a patentee's burden to present evidence demonstrating the amount to be awarded. *Id.* If the plaintiff proved infringement of its patent, "the district court should consider the so-called *Georgia–Pacific* factors in detail, and award such reasonable royalties as the record evidence will support."*Id.*

Cencom relies heavily on *Apple,* which it claims stands for the principle that a patent holder cannot request reasonable royalty damages without the testimony of an expert to support that claim. (*See* Cencom Br. at 2–3, 5.) In response, Unicom distinguishes the case, and argues that the case does not require judgment against it on the damages claim as a matter of law because the patentee did not provide an expert report. (*See* Unicom Opp'n Br. at 7.) As a decision from the Northern District for the District of Illinois, the decision is not binding on this Court, but the Court finds it to be persuasive authority in light of its thorough analysis and extensive discussion.

The *Apple* case, which was decided by Circuit Judge Posner, sitting by designation, provided no decision on infringement because the lack of proof of damages required dismissal of the case. *Apple,* 869 F.Supp.2d 901. After a *Daubert* hearing in which the court excluded three experts, the court determined that the record evidence would not permit a reasonable royalty award. *Id.* at 905.The court noted that a witness testifying with respect

to reasonable royalty damages should have some knowledge about the relevant market's economic or factual predicates for fleshing out the hypothetical negotiation: "[a] competent damages witness would be one who was involved in the procurement of chips, or who advised as a consultant on the choice of chips; there is no suggestion that [the proposed expert] has such experience."*Id.* at 905–06;*see also Riles,* 298 F.3d at 1311 ("this analysis necessarily involves some approximation of the market as it would have hypothetically developed absent infringement. This analysis, in turn, requires sound economic and factual predicates."). In *Apple,* the proffered damages witness could not determine the portion of the price that should be attributed to the patented part. 869 F.Supp.2d at 905–06. The court noted that for "a plaintiff to withstand summary judgment[, he] must present enough evidence to make a prima facie case—that is, enough evidence to justify a trier of fact in finding in favor of the plaintiff if the defendant presents no contrary evidence."*Id.* at 906.The evidence presented by the damages witness must eliminate guesswork or speculation in the damages award. *Id.* at 907.The court noted that providing such evidence may require presenting one fact witness for a computer scientist's description of the chips and another witness who was "involved more in a financial part of the company or the selling part, the marketing or the procurement [part]."*Id.*

**\*7** The court also addressed Apple's argument that "any act of infringement, even if it gives rise to no measurable damages, is an injury entitling it to a judgment."*Id.* at 908.After a review of tort, contract, and patent law issues, the court determined that nominal damages are not available if there is an absence of any evidence from which a court may derive a reasonable royalty.*Id.* at 910 (quoting *Lindemann,* 895 F.2d at 1407; *Devex,* 667 F.2d at 363).

Cencom proffered a recent case from the District of Delaware that excluded the testimony of a co-inventor of a patent, whom the patentee proffered for testimony about: (1) the benefits of the patent-in-suit; (2)the legal assignments of the patent-in-suit; (3) the witness's prior negotiations with the defendant; (4) the witness's conduct in a hypothetical negotiation; and (5) the witness's knowledge of prior negotiations with the defendant with respect to other patents. *AVM Techs., LLC v. Intel Corp., No. 10–610, 2013 WL 656745, at \*15–16 (D.Del. Feb.21, 2013).* Following objections by defendant to numbers 3 and 4, the court reviewed *Lindemann* and *Devex* and stated that "[although] reasonable royalty damages must be awarded if infringement is found, ... [this] does not

mean that the rules of evidence do not apply to proposed testimony."*Id.* at \*18.The court concluded that the witness was being offered for improper expert testimony because he would discuss calculations about how to reach a reasonable royalty. *See id.* at \*18–19 ("These calculations are the province of expert analysis.") (citing *Veritas Operating Corp. v. Microsoft Corp.,* No. 06–0703, 2008 WL 657936, at \*33 (W.D.Wash. Jan.17, 2007) (lay witness may not offer an opinion on ultimate patent damages, "including determining a reasonable royalty")). Further, the witness was also proffered for improper expert testimony because he would delve into hypothetical situations, outside of his personal knowledge. *See id.* at \*19 ("[ The witness' s] testimony as to what would have happened in a hypothetical negotiation would not be based on his personal knowledge and, therefore, is not admissible.").

The court determined that, although the witness would be permitted to testify as to those facts within his personal knowledge, the expert and hypothetical testimony called for in numbers 3 and 4 were inadmissible. *Id.* at \*7. The court initially reserved its decision on the pending summary judgment motion when it issued its opinion excluding this expert, but later granted summary judgment for the defendant when plaintiff had no evidence with which to prove its reasonable royalty damages theory. *AVM Techs., LLC v. Intel Corp.,* No. 10–610, dkt. entry no. 294, at \*3 (D.Del. Mar. 29, 2013).

The Court has reviewed the dearth of evidence in the record on which Unicom intends to present its reasonable royalty theory of damages to the factfinder. Without providing either factual or legal authority or economic or factual predicates, Unicom has demanded a royalty rate of "30% of the total revenue derived by Cencom from the sale, leasing, monitoring, or other transfer of the DD2."(10–6–10 Pretrial Order at 3.) In the seven years over which this litigation has unfolded, Unicom never established a reasonable royalty calculation, nor named a specific amount that it demanded in damages, until the Pretrial Management Conference with the Court, held a mere two weeks before trial was set to commence. (*See* Tr. of 4–10–13 Hearing at 26–27.) As identified in the Pretrial Order, Unicom did not name any expert witness, and indeed only intends to present two fact witnesses, Matthew Szapucki and James Maggs. (*See* 10–6–10 Pretrial Order at 3.) At oral argument, counsel for Unicom indicated that these witnesses would provide somewhat broader testimony, as would be necessary to support a reasonable royalty calculation: "My clients are going to talk about a hypothetical negotiation. They're going to

talk about, you know, what happened in this case and what their policies and plans were in 2004 when the infringement began."(Tr. of 4–10–13 Hearing at 16; *see* Cencom Statement at ¶ 13 (noting that Unicom intends to call James Maggs to "testify as to Unicom's ownership of the Patent–in–Suit, its policy not to license the '647 Patent").)

**\*8** The Court finds that Unicom has not established that a genuine issue of material fact exists that requires a factual determination. Unicom does not have an expert to guide a factfinder through a hypothetical negotiation process to reach a reasonable royalty rate as a damages award. Rather, the evidence Unicom intends to present regarding the hypothetical negotiation is contrary to the basic premise of those negotiations. *See Riles,* 298 F.3d at 1312 ("A 'reasonable royalty' contemplates a hypothetical negotiation between the patentee and the infringer *at a time before the infringement began."*(emphasis added)); *see also Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed.Cir.1983) (stating that a "reasonable royalty may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty *resulting from arm's length negotiations between a willing licensor and a willing licensee"* (emphasis added)). Unicom does not intend to present evidence that is competent to establish a reasonable royalty as it must be calculated: the witnesses will be testifying to the wrong time period; Unicom's policy of not licensing the patent is at odds with the presumed voluntary negotiation; Unicom does not have an expert to delve into hypotheticals; Unicom does not have an analogous practice of licensing that can be uniformly applied; and Unicom has no rationale to support its suggested reasonable royalty calculation.

Although there are many *Georgia–Pacific* factors which the Court can consider, the failure to present competent evidence regarding how the factfinder should perform the reasonable royalty calculation is fatal to Unicom's claim for reasonable royalty damages. A factfinder cannot be asked to speculate from numbers unsupported by law and divorced from expert guidance, but rather the factfinder needs either clear guidance from an expert about how to apply complex calculations or simple factual proofs about what this patentee has previously accepted in factually analogous licensing situations. *See Lindemann,* 895 F.2d at 1407;*see also Devex,* 667 F.2d at 361 (holding that, although plaintiff failed to adduce proof to support its proposed reasonable royalty rate, the facts demonstrated that the plaintiff had previously made an industry-wide offer of license for a fixed amount of .75% and that offer was sufficient evidence to support a royalty rate for

Unicom Monitoring, LLC v. Cencom, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 1704300

.75%).

The Court therefore holds that, without competent proof upon which to make a reasonable damages claim, Unicom cannot meet its burden of proving the amount of damages, even if it is entitled to an award of damages. Accordingly, the Court grants summary judgment in favor of Cencom with respect to monetary damages.

### III. Equitable Relief without Damages Proof

Cencom argues that Unicom is not entitled to a permanent injunction because Unicom has not demonstrated that damages are an inadequate remedy. (*See* Cencom Br. at 7.) Cencom argues that Unicom cannot claim "damages are inadequate as a remedy" when the inadequacy of the damages results from Unicom's failure to demonstrate what damages were appropriate through the use of an expert. (*See id.* at 7–8.)

**\*9** Unicom responds that Cencom failed to address the factors considered for issuing a permanent injunction, as established by *eBay Inc. v. MercExchange LLC,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). (*See* Unicom Opp'n Br. at 8.) Unicom argues that the irreparable injury of violated patented rights establishes a right to an injunction for several reasons: (a) Cencom is Unicom's direct competition, creating a "competitive injury" not easily quantified or thus compensable; (b) Unicom built its business around the patented product and the loss of exclusivity "delayed" the start-up of that business; (c) the balance of hardships and equities favors an injunction because Cencom stole Unicom's inventive efforts; (d) any effect on Cencom's business should be discounted, even if Cencom stops infringing; and (e) public interest favors protection of patents, which here would best be served through the injunction. (*See id.* at 8–9.)

Cencom simply replies that Unicom is not entitled to an injunction because it cannot prove damages. (*See* Cencom Reply Br. at 5 (citing *Apple,* 895 F.Supp.2d at 923 (holding that neither party is entitled to an injunction because neither has shown that damages would not be an adequate remedy)).) Cencom further argues that the Court does not need to reach the *eBay* factors where this essential element has not been met. (*See id.*)

The grant of injunctive relief is not automatic, or even a presumptive result of a finding of liability, even in a patent case. *See eBay,* 547 U.S. at 391–92. The standard

for deciding whether to grant such relief in patent cases follows the normal equity standard. *Id.* at 394.

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court ....

*Id.* at 391 (internal citations omitted).

The plaintiff-patentee must demonstrate that the alternative of monetary relief would be inadequate in order to receive a grant of an injunction, with few exceptions, none of which are implicated here. *See Apple,* 869 F.Supp.2d at 915. As the court in *Apple* recognized, where the inadequacy of damages stems from one party's failure to present proof establishing the amount of damages to be awarded, this does not satisfy the second prong of the *eBay* inquiry. *See id.* at 915–17. As stated by the court, the issue in *Apple* was similarly "not that damages cannot be calculated, but that on the eve of trial, with the record closed, it became apparent that the parties had failed to make a responsible calculation." *Id.* at 916. The court further differentiated between the failure of proof and when damages would truly be an inadequate remedy:

> **\*10** In fact neither party is entitled to an injunction. Neither has shown that damages would not be an adequate remedy. True, neither has presented sufficient evidence of damages to withstand summary judgment—but that is not because

damages are impossible to calculate with reasonable certainty and are therefore an inadequate remedy; it's because the parties have failed to present enough evidence to create a triable issue. They had an adequate legal remedy but failed to make a prima facie case of how much money, by way of such remedy, they are entitled to. That was a simple failure of proof.

*Id.* at 915.

Other considerations implicated in determining whether monetary damages would be adequate also involve the other elements of the *eBay* test. *See Robert Bosch LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142 (Fed.Cir.2011). In *Robert Bosch,* the court considered other factors in assessing the adequacy of monetary damages:

There is no reason to believe that Pylon will stop infringing, or that the irreparable harms resulting from its infringement will otherwise cease, absent an injunction. *Cf. Reebok Int'l, Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed.Cir.1994) (recognizing that "future infringement ... may have market effects never fully compensable in money"). More importantly, the questionable financial condition of both Pylon and its parent company reinforces the inadequacy of a remedy at law. A district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate. While competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so.

*Id.* at 1155–56. The severity of the irreparable harm is closely intertwined with the adequacy of monetary damages, as is the likelihood of receiving the monetary damages. *Id.*

There is no likelihood of irreparable harm demonstrated from the facts on the record. To the contrary, as indicated by counsel for both parties during oral argument, Cencom ceased using the infringing product as of 2010. (*See, e.g.,* Tr. of 4–10–13 Hearing at 27.) Moreover, the question of whether Unicom is "likely" to be paid the monetary damages assessed is irrelevant because the Court has determined that Unicom failed to prove the amount of

damages that it was entitled to, and thus no damages are owed. (*See supra* at section II.) The factors of the test as a whole favor denying the injunction, as the record indicates that Cencom is no longer infringing the product, Unicom is not currently producing the product, and Cencom does not owe monetary damages it would be unlikely to produce as adequate compensation. Accordingly, Unicom's request for injunctive relief is denied and Cencom's motion for summary judgment in its favor with respect to equitable relief is granted.

## CONCLUSION

**\*11** Based upon the reasons stated, the Court will grant the Motion for summary judgment in favor of Cencom and against Unicom on Unicom's claims for damages and for a permanent injunction. We anticipate that an eventual final judgment embodying these rulings will be with prejudice as to all events occurring in the past and through the time of entry of final judgment. *See Apple,* 869 F.Supp.2d at 924 ("It would be ridiculous to dismiss a suit for failure to prove damages and allow the plaintiff to refile the suit so that he could have a second chance to prove damages. This case is therefore dismissed with prejudice"); *Jet, Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 1365–66 (Fed.Cir.2000) (providing the four-factor test for issue preclusion, "which serves to bar the revisiting of 'issues' that have been already fully litigated").

The Court will not enter a final judgment at this time, as this is not the final adjudication of all claims in the case. *See* Fed.R.Civ.P. 54(b).[4] Cencom's counterclaim for a judgment of invalidity currently remains viable. (*See* 10–6–10 Pretrial Order at 4.) As represented by counsel at a status conference with the Court on April 18, 2013, Cencom also has an Offer of Judgment outstanding, and Cencom seeks an award of counsel fees under 35 U.S.C. § 285 (concerning extraordinary cases). (*See* 10–6–10 Pretrial Order at 4.)[5] Unicom has withdrawn its claims for willful infringement and extraordinary case relief. (*See* dkt. entry no. 132, 4–15–13 Letter.) However, based upon the favorable ruling Unicom obtained on the issue of Cencom's infringement of the '647 Patent, it appears that Unicom may yet seek an award of taxed costs under 35 U.S.C. § 284. *See* 28 U.S.C. § 1920.

The Court will enter an appropriate Order on the Motion.

### Footnotes

[1] Unicom neither disputes the facts as presented in Cencom's Statement of Material Facts not in Dispute, nor provides a counter-statement of facts in dispute: "Cencom's motion is merely legal argument based upon an alleged statement of material facts. *Unicom admits those facts for the purpose of this motion* but submits that the facts are immaterial to the Court's determination of the legal issues involved."(*See* dkt. entry no. 120, Unicom Br. in Opp'n at 1 ("Unicom Opp'n Br.") (emphasis added).) Accordingly, all facts discussed herein will be drawn from the statement presented by Cencom along with the Motion. *See also* L.Civ.R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion"); *Smith v. Addy,* 343 Fed.Appx. 806, 808 (3d Cir.2009). We thus, after ensuring that Cencom's statement accurately summarizes the record, provide citation to that statement.

[2] This transcript is currently available in Chambers. The following exchange represents the relevant portion:
  THE COURT: Mr. Peslak, from counsel table will you please tell me what damages you're seeking through your witness—through your evidence and who on your side is going to articulate that magic number?
  MR. PESLAK: We're going to ask for 30 percent of [Cencom's] sales numbers, which is their Exhibit 32.
  THE COURT: Tell me what that is?
  MR. PESLAK: It is one—it is a little short of $130,000.
  THE COURT: What is it?
  MR. PESLAK: The number?
  THE COURT: Counsel, if you were to diagram that sentence, you would understand that I can't understand you.
  MR. PESLAK: I'm sorry. [Cencom's] total of revenue for selling the product and monitoring it is approximately 128 or $129,000.
  THE COURT: Over how long of a period?
  MR. PESLAK: Over the period during this lawsuit when they sold the product. From 2004 to I believe it's 2010.
  THE COURT: [Cencom is] not using the product anymore?
  MR. PESLAK: They claim not to be using the product anymore.
  THE COURT: So that's, what, $128,000—
  MR. PESLAK: Yes.
  THE COURT:—of total revenue?
  MR. PESLAK: Yes.
  THE COURT: So you want 30 percent of that?
  MR. PESLAK: Yes.
  THE COURT: Do the math for me.
  MR. NEMIROFF: It is approximately $36,000, 37,000.
 (Tr. of 4–10–13 Hearing at 26–27.)

[3] An appeal from this decision to the Court of Appeals for the Federal Circuit is pending. *See Apple Inc. v. Motorola, Inc.,* Nos. 12–1548, 12–1549, dkt. entry no 1, Appeal Docketed (Fed.Cir. July 30, 2012).

[4] Federal Rule of Civil Procedure 54(b) provides:
  When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.
  Fed.R.Civ.P. 54(b).

[5] Although the Offer of Judgment was not placed on the docket, the offer was communicated to the Magistrate Judge as of January 26, 2011.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Unicom Monitoring, LLC v. Cencom, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 1704300

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.



**MATTHEW MCGUIRE, Plaintiff-Appellant, v. MICHIGAN DEPARTMENT OF COMMUNITY HEALTH, et al., Defendants, GARY SHEETS; ROOSEVELT ABRAHAM; MICHAEL BORIE; MATTHEW HASSENGER; MARK COOPER; CYNTHIA KELLY, Defendants-Appellees.**

**No. 12-1378**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**13a0469n.06; *526 Fed. Appx. 494*; *2013 U.S. App. LEXIS 9560*; *2013 FED App. 0469N (6th Cir.)***

**May 9, 2013, Filed**

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [**1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.
*McGuire v. State Dep't of Cmty. Mental Health, 2012 U.S. Dist. LEXIS 38811 ( E.D. Mich., Mar. 22, 2012)*

**COUNSEL:** For MATTHEW MCGUIRE, Plaintiff - Appellant: Alyson Oliver, Law Office, Rochester, MI.

For GARY SHEETS, ROOSEVELT ABRAHAM, MICHAEL BORIE, MARK COOPER, PRICE PULLINS, CYNTHIA KELLY, Defendant - Appellees: Mark E. Donnelly, Office of the Michigan Attorney General, Lansing, MI; Nicole Amber Grimm, Assistant Attorney General, Office of the Michigan Attorney General, Lansing, MI.

For MATTHEW HASSENGER, Defendant - Appellee: Mark E. Donnelly, Office of the Michigan Attorney General, Lansing, MI.

**JUDGES:** Before: KEITH, MARTIN, and COLE, Circuit Judges.

**OPINION**

[*495] **PER CURIAM.** Plaintiff-Appellant Matthew McGuire appeals from a district court order granting partial summary judgment and dismissing his *Fourteenth Amendment* claim for alleged excessive force pursuant to a *§ 1983* theory of liability. McGuire suffers from mental illness, including, *inter alia*, shizoaffective disorder, psychotic disorder, and impulse control disorder. He was housed at the Mount Pleasant Center ("Center"), pursuant to a court order, from October 2006 until the Center closed in October 2009. The Center has a well-documented and shameful history of abusing patients. [**2] During McGuire's time at the Center, he suffered numerous serious injuries on multiple occasions, including but not limited to several rib fractures on both sides of his body, bruising on his face, redness in his eye, and a loose tooth in his mouth that eventually had to be extracted.

The parties do not dispute the injuries; they only

Case: 14-1167 Case: 14-1167 Document: 47 Document: 43-1 Page: 439 Filed: 06/20/2014 Filed: 06/20/2014

Page 2

526 Fed. Appx. 494, *495; 2013 U.S. App. LEXIS 9560, **2;
2013 FED App. 0469N (6th Cir.)

dispute the causation, specifically the reasonableness of the force used by the staff at the Center. McGuire argues that the injuries were caused by Defendants' excessive force against him. Defendants argue that McGuire had episodes that required his restraint and that the injuries were caused by Defendants' good faith physical management techniques. The district court dismissed McGuire's claims at the summary judgment phase. The district court's decision was largely based on its exclusion of a letter from a forensic pathologist, Dr. Spitz, who was also listed as one of McGuire's experts to testify at trial. The district court determined that without the letter from Dr. Spitz, there was no genuine issue of material fact to present at trial. McGuire now appeals the district court's determination to exclude the letter from Dr. Spitz and the district court's [**3] judgment against him. [*496] Because the district court improperly excluded Dr. Spitz's letter, and because a genuine issue of fact exists as to the force used against McGuire, we reverse the district court's judgment as to McGuire's excessive force claim.

We review a district court's grant of a motion for summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of the non-moving party. *Ireland v. Tunis, 113 F.3d 1435, 1440 (6th Cir. 1997)*. Summary judgment is proper if, after viewing the evidence that way, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Fed. R. Civ. P. 56(a)*. The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*.

Much of the appeal hinges upon the district court's decision to exclude and strike a letter that was submitted by Plaintiff's expert--a letter that supports McGuire's allegations of severe abuse by the Center's staff. Dr. Spitz had investigated McGuire's injuries and concluded that McGuire's [**4] injuries were caused by blunt and excessive force. He reviewed McGuire's complaints and his injuries and found that the types of injuries he suffered were consistent with his complaints and that the "injuries require brutal and excess force." He further stated that it was "alarming . . . how many times, in the relatively short period of time that . . . McGuire resided [at the Center], he was traumatized." The letter was unsworn and was submitted in response to Defendants'

motion for summary judgment.

In cases like the instant one, where the nonmoving party bears the burden of proof at trial on a dispositive issue, the party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. While "[t]he proffered evidence need not be in admissible *form*, . . . its *content* must be admissible. *Bailey v. Floyd Cnty. Bd. of Educ., 106 F.3d 135, 145 (6th Cir. 1997)* (emphasis in original) (citing *Celotex Corp., 477 U.S. at 324*) ("For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided [**5] substituted oral testimony would be admissible and create a genuine issue of material fact.").

While Dr. Spitz's letter was not in an admissible form as attached to McGuire's response to Defendants' summary judgment motion, the district court improperly focused only on the form of Dr. Spitz's letter and failed to consider whether the content was admissible. *Alexander v. Caresource, 576 F.3d 551, 558 (6th Cir. 2009)* ("[T]he party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue of material fact exists, and that a trial is necessary." (emphasis in original)). Here there is no indication that the contents of the letter would not be able to be presented in an admissible form at trial, as Dr. Spitz was disclosed as one of McGuire's expert witnesses. [1] Because the information in Dr. Spitz's letter is capable [*497] of being presented in admissible form at trial, the district court erred in excluding the letter. [2] *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990)* ("The averments of Spagnola's affidavit are capable of proof through [**6] admissible evidence and we will consider them [for purposes of summary judgment.]"); *see also DeBiasi v. Charter Cnty of Wayne, 537 F. Supp. 2d 903, 911-12 (E.D. Mich. 2008)* (considering the contents of a diary that was presented in an inadmissible form at the summary judgment stage because the contents could be presented in an admissible form at trial).

1  The district court never made any evidentiary ruling as to Dr. Spitz's suitability to serve as an expert witness.

2  It should be noted that McGuire attempted to

Case: 14-1167 Case: 14-1167 Document: 17 Document: 44-5 Page: 440 Filed: 06/20/2014 Filed: 06/20/2014

Page 3

526 Fed. Appx. 494, *497; 2013 U.S. App. LEXIS 9560, **6;
2013 FED App. 0469N (6th Cir.)

provide the letter in an admissible form at summary judgment by providing a sworn letter from Dr. Spitz on August 12, 2011--one day after Defendants filed their reply brief. Nevertheless, the district court struck the document and waited more than seven months--until March 22, 2012--to rule on the motion for summary judgment. The district court characterized the perceived problem as one of attorney neglect. However, a "plaintiff should not be punished for his attorney's mistake absent a clear record of delay, wilful contempt or contumacious conduct." *Stephens v. State of Michigan, 865 F.2d 1269, 1269 (6th Cir. 1988)* (unpublished table opinion) (citing *In re: Salem Mortg. Co., 791 F.2d 456, 459-60 (6th Cir. 1986)).*

The [**7] district court determined that without Dr. Spitz's letter, there was no genuine issue of material fact to be considered by a jury. We disagree. "[A]t the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994).* The district court determined that McGuire's testimony--which was contradictory at times--was not

credible and did not carry enough weight for his case to proceed past summary judgment. The district court improperly made credibility determinations and weighed the evidence. McGuire alleges that the abuse was imposed over time and that the staff repeatedly abused him. Defendants do not dispute the injuries, the seriousness of the injuries, or the fact that force was used on a frequent basis. Defendants simply assert that it was a necessary part of the job to restrain McGuire forcibly and that the force was imposed in good faith. Defendants have not presented conclusive evidence that the force was reasonable or that the severe injuries [**8] sustained were a result of good faith restraint techniques. The reasonableness of the force is an issue for a jury to determine. We recognize some of the inconsistencies in McGuire's testimony, but those inconsistencies are not fatal to McGuire's entire claim and are for the jury to weigh.

Because the district court erred in excluding the letter and failed to rule on the admissibility of the content and because there is a genuine issue of material fact as to McGuire's excessive force claim, we **REVERSE** the district court's grant of summary judgment to Defendants as to the excessive force claim and **REMAND** for further proceedings consistent with this opinion. We do not disturb the district court's judgment in any other respect.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 20, 2014, I electronically filed the foregoing Non-Confidential Joint Appendix with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered users:

Barry E. Bretschneider
Michael E. Anderson
Bridget S. Merritt
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W.
Washington Square
Washington, DC 20036

Kevin W. Kirsch
Baker & Hostetler LLP
Suite 3200
312 Walnut Street
Cincinnati, OH 45202-3957

*Counsel for Appellee*

*Counsel for Appellee*

/s/ James L. Kwak
James L. Kwak
STANDLEY LAW GROUP LLP
6300 Riverside Dr.
Dublin, OH 43017
(614) 792-5555

*Counsel for Appellant*